1          IN THE DISTRICT COURT OF JOHNSON COUNTY, KANSAS

2                    CRIMINAL COURT DEPARTMENT

3     STATE OF KANSAS,

4            Plaintiff,          Case No. 12CR1074

5     vs.                        Division No. 1

6     RHEUBEN JOHNSON III,

7            Defendant.

8                    TRANSCRIPT OF PROCEEDINGS

9                     PRELIMINARY HEARING

10           BE IT REMEMBERED that on the 22nd day of

11    August, 2012, the above-entitled matter comes on for

12    hearing before the HONORABLE PETER V. RUDDICK, Judge of

13    Court No. 1 of the Tenth Judicial District, State of

14    Kansas, at Olathe, Kansas.

15

16    APPEARANCES:

17        State of Kansas:

18        **MS. HEATHER JONES**
          **MR. KEITH HENDERSON**
19        Assistant District Attorneys
          Johnson County Courthouse
20        Olathe, KS 66061

21

22        For the Defendant:

23        **MR. JOSEPH L. DIOSZEGHY**
          130 N. Cherry, Ste. 103
24        Olathe, KS 66061

25

**Abby J. Ryan, RPR, CSR**

Clerk of the District Court
Johnson County Kansas
9/5/2012 14:01:33 MM

1                          I N D E X

2    **RONALD NODWELL**

3    Direct Examination by Ms. Jones            Page 4

4    Cross-Examination by Mr. Dioszeghy          Page 20

5    **LONNIE STITES**

6    Direct Examination by Ms. Jones            Page 47

7    Cross-Examination by Mr. Dioszeghy          Page 65

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Abby J. Ryan, RPR, CSR**

*Clerk of the District Court*
*Johnson County Kansas*
*9/5/2012 14:01:33 MM*

1                 P R O C E E D I N G S

2                 THE COURT:  Next I have 12CR1074, State of

3     Kansas vs. Rheuben Johnson III.

4                 MS. JONES:  May it please the Court, the

5     State appears by Heather Jones and Keith Henderson.

6                 MR. DIOSZEGHY:  May it please the Court,

7     Mr. Johnson appears in person by and through Joseph L.

8     Dioszeghy, his attorney.  Judge, can Mr. Johnson join me

9     at counsel table and be unhandcuffed so he can take notes

10    during the preliminary hearing?

11                THE COURT:  Yes.

12                MR. DIOSZEGHY:  Thank you, Judge.

13                THE COURT:  We are set for preliminary

14    examination today.  Are there any preliminary motions or

15    matters to take up?

16                MS. JONES:  Judge, if I may approach, I

17    have provided counsel a copy, but I would ask the Court

18    leave to file an amended complaint.

19                THE COURT:  All right.  Mr. Dioszeghy, you

20    have seen the amended complaint; correct?

21                MR. DIOSZEGHY:  That is correct, Your

22    Honor.

23                THE COURT:  So we are proceeding on that

24    today.

25                MR. DIOSZEGHY:  Your Honor, I do have an

**Abby J. Ryan, RPR, CSR**

Clerk of the District Court
Johnson County Kansas
9/5/2012 14:01:33 MM

1    objection to the filing of the amended complaint at this

2    late date.  In all candor, however, I have had full

3    discovery of the file.

4              THE COURT:  Fair enough.  State is

5    entitled to file an amended complaint without order of

6    the Court really before arraignment, but it sounds like

7    we're ready to go forward on both counts.  Anything else

8    preliminary?

9              MS. JONES:  Not by the State.

10              MR. DIOSZEGHY:  None by the defense, Your

11    Honor.

12              THE COURT:  Ms. Jones, you may call your

13    first witness.

14              MS. JONES:  State would call Ronald

15    Nodwell.

16                        **RONALD NODWELL**,

17    called as a witness, having been first duly sworn to tell

18    the truth, the whole truth, and nothing but the truth,

19    was examined and testified as follows:

20                      DIRECT EXAMINATION

21    BY MS. JONES:

22    Q.    Please state your name.

23    A.    Ronald Eric Nodwell.

24    Q.    Mr. Nodwell, will you please spell your last

25          name?

**Abby J. Ryan, RPR, CSR**

1    A.    N-o-d-w-e-l-l.

2    Q.    Mr. Nodwell, do you know an individual by the name

3          of Rheuben Johnson?

4    A.    Yes, I do.

5    Q.    And do you see him in the courtroom today?

6    A.    Yes.

7    Q.    Would you please point to him and identify him for

8          the record.

9    A.    He is right over there.  (Witness indicating.)

10   Q.    Generally what is he wearing?

11   A.    Jail uniform.

12         MS. JONES:  Okay.  Your Honor, I would ask

13   the record reflect that the witness has indicated the

14   defendant.

15         THE COURT:  Very well.

16         MS. JONES:  Thank you.

17   BY MS. JONES:

18   Q.    Mr. Nodwell, when did you first meet the

19         defendant?

20   A.    It was April 14th or 15th.

21   Q.    Okay.  So of this year?

22   A.    Yes, ma'am.

23   Q.    2012?

24   A.    Yes, ma'am.

25   Q.    How was it that you met him?

**Abby J. Ryan, RPR, CSR**

```
 1    A.    I was looking for extra work at the time, and a
 2          buddy of mine told me he knew somebody who had an
 3          extermination company and was looking for help.
 4          He talked to Rheuben.  Rheuben said yes, give him
 5          his number and had me call him.  I called him day
 6          or so later.  He agreed to meet with me so we
 7          could talk.
 8    Q.    Okay.
 9    A.    But it was through a friend.
10    Q.    Through a friend.  Okay.  You said that you were
11          looking for some extra work?
12    A.    Yes, ma'am.
13    Q.    Did you in fact meet with the defendant?
14    A.    Yes.
15    Q.    Where did you meet with him?
16    A.    Mr. Goodcents sandwich shop on Ridgeview Road and
17          K-10.
18    Q.    Is that here in Olathe?
19    A.    Yes, ma'am.
20    Q.    In Johnson County, Kansas?
21    A.    Yes, ma'am.
22    Q.    Do you remember approximately when it was that you
23          met with the defendant?
24    A.    It was probably around the 15th of April.
25    Q.    Okay.  So it was back in April?
```

**Abby J. Ryan, RPR, CSR**

*Clerk of the District Court*
*Johnson County Kansas*
*9/5/2012 14:01:33 MM*

```
 1   A.   Yes, ma'am.

 2   Q.   Did you drive yourself to the Mr. Goodcents?

 3   A.   Yes, ma'am.

 4   Q.   And when you got there, was the defendant there?

 5   A.   No, I had to wait approximately 15 minutes for him

 6        to get there.

 7   Q.   Okay.  And when the defendant -- when the

 8        defendant arrived at the Mr. Goodcents in Olathe,

 9        did you have a conversation with him?

10   A.   Yes, I did.  He bought me a sandwich.

11   Q.   He bought you a sandwich.  While you were meeting,

12        was it lunch?

13   A.   It was basically dinner.  It was kind of late.

14   Q.   While you were eating at Mr. Goodcents, tell the

15        Court about the conversation that you and the

16        defendant had.

17   A.   You know, he introduced hisself.  Said he, you

18        know, here, let me at least buy you something to

19        eat.  He bought me a sandwich.  He said we will

20        talk.  And as we sat down and started to eat, I

21        grabbed the sandwich.  You know, he was telling me

22        -- he proceeded to tell me how the root of all his

23        problems was his ex-wife, how she has been

24        molesting his son and trying to take all of his

25        money and just making him miserable, and that his
```

**Abby J. Ryan, RPR, CSR**

Clerk of the District Court
Johnson County Kansas
9/5/2012 14:01:33 MM

1          life would be a whole lot better without her.  It

2          would be 20 grand if she was gone.

3    Q.    Did he use the term "if she was gone," or what

4          specific term --

5    A.    That is what he said.

6    Q.    What did you take that to mean?

7    A.    You know, I mean, I knew exactly what he meant.

8          Talking about killing her.

9              MR. DIOSZEGHY:  Object.  That is

10   nonresponsive to the question.

11             THE COURT:  Sustained.  You can ask the

12   question again.

13   BY MS. JONES:

14   Q.    What did you believe that the defendant meant by

15         that statement?

16   A.    Wanted to put an end to her.

17   Q.    An end to her what?

18   A.    Her life.

19   Q.    Her life.  And what was it about the conversation

20         that gave you that impression?

21   A.    At first, you know, I thought it was just a joke.

22         You know, I looked around for cameras like it was

23         some kind of joke, but I knew it wasn't a joke

24         when he said, "Here, jump in my car."  He drove

25         me -- showed me where she lived, what kind of car

**Abby J. Ryan, RPR, CSR**

1           she drove, told me where his son went to daycare,

2           where she worked, where she stopped at McDonald's

3           to get her coffee in the morning before work.

4   Q.   Okay.

5   A.   When the babysitter picked him up, when she picked

6           him up.

7   Q.   So did he -- did the defendant tell you how it was

8           he wanted his ex-wife gone?

9   A.   Yes, he mentioned three different ways.

10   Q.   Tell me about those ways.

11   A.   The first one he said, you know, I -- she was

12           driving to work in the morning and I could just

13           pull alongside her and shoot her in the head while

14           she was driving.

15   Q.   So he told you that you could shoot her in the

16           head?

17   A.   Yes, that was his suggestion.

18   Q.   That was first one, and then you said there was

19           three?

20   A.   You could burn the apartment down.  One of the --

21           one of the nights when his son wasn't there, burn

22           it down.  And then, you know, he told me that I

23           could tie her up and overdose her on her own

24           narcotic medications.

25   Q.   Okay.  And when he was giving you these different

**Abby J. Ryan, RPR, CSR**

```
1              scenarios, were you still at Mr. Goodcents or was
2              this when you were driving around?
3    A.        In his Suburban.
4    Q.        And how long -- how long would you estimate that
5              you were at Mr. Goodcents before you got in his
6              Suburban and drove around?
7    A.        Forty-five minutes to an hour.
8    Q.        Okay.  So before getting in the car to drive
9              around, he told you that he wanted his wife or his
10             ex-wife gone; is that right?
11   A.        Yes.
12   Q.        Did you discuss --
13   A.        He said it as calmly as putting out the trash.
14   Q.        I am sorry?
15   A.        He said it just as calmly as if he were putting
16             out the trash.
17   Q.        So his demeanor was he was calm?
18   A.        Yes.
19   Q.        At Mr. Goodcents did you discuss the financial
20             side of this?
21   A.        Yes, we did.
22   Q.        Okay.  Tell me about that conversation.
23   A.        He said it would be worth 20 grand and that he
24             could give me 5,000 up front.  He didn't have all
25             of the money, but he had access to it and could
```

**Abby J. Ryan, RPR, CSR**

```
 1              give it to me in increments.  He proceeded to tell
 2              me just, you know, look into it, let him know what
 3              I thought and he would bring me five grand.
 4     Q.       Okay.  And so then you said after you guys had
 5              discussed things at Mr. Goodcents for 45 minutes
 6              or an hour, you got in his Suburban; is that
 7              right?
 8     A.       Yes.
 9     Q.       Where did you go, sir?
10     A.       I don't know the name of the apartments, but it is
11              off 75th Street by Wal-Mart.  There is a gated
12              community, apartments over there.  I don't know
13              the name of them.
14     Q.       Is it here in Johnson County?
15     A.       Yes.
16     Q.       Okay.  When you got to this or near this apartment
17              complex, what, if anything, did the defendant
18              say?
19     A.       He pointed out exactly which apartment she lived
20              in, showed me she had drove a black Durango.  He
21              pointed everything out.
22     Q.       Okay.
23     A.       I mean, he even let me know that you can't just
24              get in there because it is a gated community.
25     Q.       What did he say about that?
```

**Abby J. Ryan, RPR, CSR**

```
1   A.   He said I would have to wait and catch her in the
2        car on the way to work.
3   Q.   Did he talk to you about her general schedule?
4   A.   Yes.  He told me what, you know, the first thing
5        she did in the morning was go to McDonald's on
6        75th Street and stop and get her coffee before she
7        went to the hospital.
8   Q.   Did he tell you where she worked?
9   A.   Yes.
10  Q.   Where did she work?
11  A.   Shawnee Mission Medical Center.
12  Q.   Did he tell you about his son?
13  A.   Yes.
14  Q.   What did he tell you?
15  A.   He told me several things.  He said that --
16  Q.   Did he tell you specifically when his son would or
17       would not be with his ex-wife?
18  A.   Yes, he told me about the days his ex-wife dropped
19       him off at the sitter or daycare, when the
20       baby-sitter picked him up on what days, and the
21       days that I wouldn't have to worry about the boy
22       being there.
23  Q.   Did you have a discussion with the defendant about
24       any precautions that were going to be taken?
25  A.   Not directly, but I kind of -- when he mentioned
```

**Abby J. Ryan, RPR, CSR**

1          this to me and started talking about it, you know,

2          he told me that he had been going through a

3          custody battle over his son for about two years.

4          And, you know, here he is asking me to make his

5          wife disappear.  I kind of looked at him and said,

6          "Well, that don't make no sense because if you

7          have been having a custody battle, you are the

8          first person they are going to look at if

9          something happens."  Then he got real cautious and

10         started, you know -- instead of talking about

11         getting rid of his wife, he started talking about

12         hey, you know, I need to talk to you about that

13         job.  That roof needs repair and I had can't be

14         walking around on this glass.

15             He stopped calling me from his number and

16         started calling me on private numbers.

17    Q.   Okay.  So after this day where you met at

18         Mr. Goodcents and then he drove you around, you

19         had further phone conversations with the

20         defendant?

21    A.   Oh, yeah.

22    Q.   Did you call him or did the defendant call you?

23    A.   No, he called me every time.

24    Q.   When you -- I assume after he drove you all these

25         places, did he drive you back to Mr. Goodcents

**Abby J. Ryan, RPR, CSR**

```
 1              that day?
 2    A.        Yes, he did.
 3    Q.        You guys parted ways?
 4    A.        Yes.
 5    Q.        Did you contact him after that?
 6    A.        No.
 7    Q.        Why not?
 8    A.        Because I -- that is not something I want to be a
 9              part of.
10    Q.        What do you mean by that?
11    A.        You know, I am not a saint.  You know, I mean, I
12              was a problem child.  I spent 25 years in prison
13              myself.
14    Q.        Let's talk about that for just a minute.  You
15              spent time in prison?
16    A.        Yes, I did.
17    Q.        For what?
18    A.        Theft.
19    Q.        You have theft convictions on your record?
20    A.        Yes, I do.
21    Q.        Okay.  And when did you get out of prison?
22    A.        January 24th, 2011.
23    Q.        Okay.  And are you still on parole?
24    A.        Until February.
25    Q.        Of 2013?
```

**Abby J. Ryan, RPR, CSR**

1    A.    I'm sorry.  January of next year, yes, ma'am.

2    Q.    2013.  So you meet with a parole officer

3          regularly?

4    A.    Yes, ma'am.

5    Q.    So you have been through the system?

6    A.    Yes, I have.

7    Q.    Like you said, you are not a saint.  So why

8          weren't you interested in the defendant's offer?

9    A.    Because if I have 25 years in prison for stealing,

10         what do you think they're going to give me for

11         murder?  Forever and a day.  That isn't something

12         I am willing to do.  I remember what the 25 years

13         felt like.

14   Q.    Okay.  So you weren't -- you didn't have any

15         intention of calling him?

16   A.    No.

17   Q.    But he called you?

18   A.    Regularly.

19   Q.    Okay.  Regularly.  What do you mean by

20         regularly?

21   A.    You know, when I left Mr. Goodcents, I told him

22         yes, I will look into it.  I will give you a call,

23         let you know what I think.  I never called him.

24         About a week, maybe a week and a couple days went

25         by.  He called me.  "Hey Ron, did you ever get a

**Abby J. Ryan, RPR, CSR**

Clerk of the District Court
Johnson County Kansas
9/5/2012 14:01:33 MM

     1          chance to, you know, think about that work?  You

     2          know, I really need to get that taken care of."

     3          No, I haven't had a chance yet, but, you know, I

     4          will get back to you.

     5                And from then he called me -- at first it

     6          was a couple times a week.  And then it started --

     7          the calls started progressing to where there was

     8          three, four a day.  This went on for a month.  And

     9          finally, you know, I realized myself, you know,

    10          hey, if he is going to be that persistent, he is

    11          going to get her, whether it is with me or

    12          somebody else.  I went to the Olathe Police

    13          Department.

    14     Q.   Okay.  So you decided to contact law

    15          enforcement?

    16     A.   Yes, I knew he was serious.

    17     Q.   Okay.  And did that concern you?

    18     A.   Yes.

    19     Q.   Okay.

    20     A.   I mean, yes, it concerned me.  You know, here you

    21          got a little boy that is getting ready to grow up

    22          without a mother.

    23                MR. DIOSZEGHY:  Judge, object to him

    24     injecting his conclusions and opinion.  There is no

    25     question for the witness.

**Abby J. Ryan, RPR, CSR**

*Clerk of the District Court*
*Johnson County Kansas*
*9/5/2012 14:01:33 MM*

```
 1                    THE COURT:  Sustained.
 2      BY MS. JONES:
 3      Q.      Mr. Nodwell, so on your own you went to the Olathe
 4              Police Department; is that right?
 5      A.      Yes, ma'am.
 6      Q.      Did you do that under any coercion?
 7      A.      No.
 8      Q.      Did you do that under any order from anyone?
 9      A.      No.
10      Q.      Did you receive anything as a result of doing
11              that?
12      A.      No.
13      Q.      So you decide to contact the Olathe Police; is
14              that right?
15      A.      Yes, ma'am.
16      Q.      And what happened next?
17      A.      The lady at dispatch put me in touch with
18              Detective Sweeney.  I kind of, you know, told him
19              what was going on.  I was at work at the time.
20              But he said, you know, I'd really like to get you
21              down here so that we can talk today, you know, see
22              what is going on here.  So I made arrangements to
23              meet him at 4:30 after I got off work.  I went to
24              the police department.  I met him.  I stayed there
25              until about 7:30.
```

**Abby J. Ryan, RPR, CSR**

```
 1    Q.    Do you recall what day that was that you initially

 2          contacted the Olathe Police Department?

 3    A.    The 18th of May.

 4    Q.    Okay.  And so after you got off work, you went to

 5          the Olathe Police Department; is that right?

 6    A.    Yes, ma'am.

 7    Q.    Who did you speak with?

 8    A.    Detective Sweeney, and he brought in Detective

 9          Campbell.

10    Q.    Did you tell them -- did you tell Detective

11          Campbell specifically -- generally everything you

12          have talked about today?

13    A.    Yes, ma'am.

14    Q.    Okay.  So once you told Detective Campbell

15          everything, what happened next?

16    A.    They asked me if I would be willing to -- if I

17          would be willing to work with them to get him.

18    Q.    Were you willing to do that?

19    A.    Yes.

20    Q.    Okay.

21    A.    They asked me if I would set up a meeting with him

22          and asked me to see if he would be open to meeting

23          somebody else.

24    Q.    Okay.  And what happened -- did you in fact have a

25          conversation with the defendant regarding that?
```

**Abby J. Ryan, RPR, CSR**

*Clerk of the District Court*
*Johnson County Kansas*
*9/5/2012 14:01:33 MM*

```
 1    A.    Yes, I did.  It was recorded.

 2    Q.    Tell me about that conversation.

 3    A.    I called him and told him, "Hey, you know, I have

 4          got a buddy of mine I would really like you to

 5          meet.  He has got more time to do the work you are

 6          wanting.  You should meet him."  He said, "Well,

 7          okay."  So we agreed to meet three or four days

 8          later when he got off of work.

 9    Q.    Okay, so on or about May 21st?

10    A.    Yes, ma'am.

11    Q.    Okay.  Where did you meet?

12    A.    Waterworks Park.

13    Q.    Is that here in Olathe?

14    A.    Yes, it is on Sheridan.

15    Q.    Okay.  And it was you and the undercover officer;

16          is that right?

17    A.    Yes, ma'am.

18    Q.    And was the defendant there?  Did he meet with

19          you?

20    A.    Yes, he did.

21    Q.    And do you recall what vehicle he arrived in?

22    A.    Yes, black Suburban.

23    Q.    Was it the same vehicle that you had driven with

24          him in?

25    A.    Yes, ma'am.
```

**Abby J. Ryan, RPR, CSR**

Clerk of the District Court
Johnson County Kansas
9/5/2012 14:01:33 MM

1    Q.    Okay.  And how did this introduction work out?

2    A.    He got out of the Suburban.  You know, we walked

3          over by the horseshoe pits and I said, you know,

4          hello.  He said hello.  I said, "This is my buddy

5          Lonnie.  We went to school together.  You know, he

6          has got more time to look into the work that you

7          are wanting done.  I don't have time.  I work too

8          much and am running my own business."  Told him I

9          had to get back to work, but they should talk.  I

10         told him, you know, "I have told Lonnie, you know,

11         some of the stuff, but you have more details than

12         I do."  With that I shook both of them's hands and

13         I left.

14   Q.    Okay.  Was that the end of your involvement?

15   A.    Yes, it was.

16             MS. JONES:  I have no further questions.

17             THE COURT:  Mr. Dioszeghy, cross?

18             MR. DIOSZEGHY:  Yes.

19                  CROSS-EXAMINATION

20   BY MR. DIOSZEGHY:

21   Q.    All right.  Mr. Nodwell; is that right?

22   A.    Yep.

23   Q.    You spent 25 years in prison; correct?

24   A.    Yep.

25   Q.    How many theft convictions do you have to earn you

**Abby J. Ryan, RPR, CSR**

1          25 years in prison?

2    A.    Probably 22.

3    Q.    Twenty-two convictions for dishonesty?

4    A.    No, it is not for dishonesty.  I didn't go to

5          prison for lying.  I admitted what I did.

6    Q.    You think stealing is honest?

7    A.    No, it isn't honest, but at 12 years old --

8    Q.    Just a second, Mr. Nodwell.  Tell me where your 22

9          convictions -- where else do you have convictions?

10         I know some of them are in Missouri.  I don't

11         know --

12   A.    They are all in Missouri.

13   Q.    Twenty-two separate convictions from the time you

14         were how old?

15   A.    I was a teenager, man.  I wasn't even 16 years old

16         yet.

17   Q.    When you started your life of stealing; correct?

18   A.    Yes, I did.

19   Q.    What kinds of things did you steal?

20   A.    Cars, combines.  It didn't matter.

21   Q.    Where did you spend time in prison?

22   A.    Pick one in Missouri.  I have been in all of them.

23   Q.    Escaped from one of them?

24   A.    I escaped from two of them.

25   Q.    So back in April of 2012, you are out on parole;

**Abby J. Ryan, RPR, CSR**

Clerk of the District Court
Johnson County Kansas
9/5/2012 14:01:33 MM

```
 1              correct?

 2      A.      Yep.

 3      Q.      And you're being monitored here in Kansas on a

 4              Missouri parole; right?

 5      A.      Yep.

 6      Q.      And were you working at the time?

 7      A.      Yes.

 8      Q.      Where were you working?

 9      A.      I have my own construction company.

10      Q.      You mean you had employees and you had --

11      A.      Yes.

12      Q.      A business location and all of that?

13      A.      Yes.

14      Q.      What was the name of that company?

15      A.      Nodwell Construction.

16      Q.      Where is it located?

17      A.      Out of my house.

18      Q.      And how many employees did you have?

19      A.      Six.

20      Q.      And did you have equipment?

21      A.      Yes.

22      Q.      You had some big trucks?

23      A.      I rent bobcats and everything else, yes.

24      Q.      So you had equipment that would be suitable for

25              cleaning up, let's say, a big pile of junk?
```

**Abby J. Ryan, RPR, CSR**

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | And this buddy of yours who introduced you or gave |
| 3 | | you Mr. Johnson's phone number -- who was that? |
| 4 | A. | Bill Moore. |
| 5 | Q. | Bill Moore? |
| 6 | A. | Yes. |
| 7 | Q. | Who is Bill Moore to you? |
| 8 | A. | A friend. |
| 9 | Q. | Just a friend.  What kind of business is he in? |
| 10 | A. | He sells cars. |
| 11 | Q. | How did he know Mr. Johnson, if you know? |
| 12 | A. | I don't know.  I don't know how they met.  I |
| 13 | | couldn't tell you. |
| 14 | Q. | But you had put the word out that you needed some |
| 15 | | extra construction work? |
| 16 | A. | No, I said that I was looking for something else |
| 17 | | to do in my spare time to make extra money because |
| 18 | | construction wasn't picking up yet. |
| 19 | Q. | Okay.  And I never got your answer.  How many |
| 20 | | employees did you have? |
| 21 | A. | Six. |
| 22 | Q. | And were you incorporated? |
| 23 | A. | No. |
| 24 | Q. | How long had you been in business for yourself? |
| 25 | A. | Three months. |

**Abby J. Ryan, RPR, CSR**

| | | |
|---|---|---|
| 1 | Q. | You got out of prison in January? |
| 2 | A. | Uh-huh. |
| 3 | Q. | Of this year; right? |
| 4 | A. | No, 2011. |
| 5 | Q. | Of 2011. You had been self-employed for about |
| 6 | | three months? |
| 7 | A. | Yep. |
| 8 | Q. | What did you do between January of '11 and January |
| 9 | | or February of '12? |
| 10 | A. | I'm certified in the State of Kansas for asbestos, |
| 11 | | radiation and lead. |
| 12 | Q. | Removal, you mean, of those items? |
| 13 | A. | Yes. |
| 14 | Q. | Were you working for some company? |
| 15 | A. | Yes, Birdco. |
| 16 | Q. | Okay. Sir, if I understand your testimony, |
| 17 | | Mr. Billy Moore gives you Rheuben Johnson's phone |
| 18 | | number? |
| 19 | A. | Yes. |
| 20 | Q. | You call Rheuben Johnson; right? |
| 21 | A. | Yes. |
| 22 | Q. | And you -- what do you say to Mr. Johnson when |
| 23 | | this first phone call -- what do you say to him? |
| 24 | A. | I was told that he was looking for some extra |
| 25 | | work. You know, somebody to help out with his |

**Abby J. Ryan, RPR, CSR**

*Clerk of the District Court*
*Johnson County Kansas*
*9/5/2012 14:01:33 MM*

```
 1              business.  I told him that I was interested.  He
 2              asked if we could -- if there was a sandwich shop
 3              somewhere around where we could meet and discuss
 4              it.
 5      Q.      What kind of business, to your knowledge, did
 6              Mr. Johnson have?
 7      A.      Extermination business.
 8      Q.      And was Mr. Johnson during this conversation --
 9              did he say to you that that is the kind of work he
10              was looking for?
11      A.      No.
12      Q.      What kind of work did he tell you he needed done
13              during this initial phone conversation?
14      A.      He didn't.
15      Q.      What kind of work did you offer to do for him?
16      A.      I told him I would drive a truck, whatever he
17              needed done.
18      Q.      So you talked about -- well, you must have talked
19              some about what kind of work had to be done if you
20              were suggesting driving a truck?
21      A.      He runs an extermination company.
22      Q.      So you were going to drive one of his trucks, one
23              of his extermination trucks?
24      A.      Yes.  For extra money, yes, I would.  I would pick
25              up dog poo if I had to.
```

**Abby J. Ryan, RPR, CSR**

```
 1    Q.    You probably would.  Mr. Nodwell, when you

 2          arranged to meet Mr. Johnson, you arranged the

 3          meeting at a Mr. Goodcents; correct?

 4    A.    Yes, that was the closest sandwich shop.

 5    Q.    And your recollection is that this was on April

 6          the 15th of 2012?

 7    A.    Thereabouts, yes.

 8    Q.    And it was a Mr. Goodcents at Ridgeview and K-10

 9          out here in Olathe; right?

10    A.    Uh-huh.

11    Q.    Now, how did Mr. Johnson know who you were?  Did

12          you describe yourself to him?

13    A.    I just told him what I was driving.

14    Q.    Told him what you were driving?

15    A.    He told me what he was driving.

16    Q.    You met in the parking lot to start with?

17    A.    Yep.

18    Q.    And then you go inside and he buys you a sandwich;

19          right?

20    A.    Yes, he did.

21    Q.    Now, does he ever ask you any questions about who

22          you are or what kind of work you do or anything

23          like that?

24    A.    Yes, he did.

25    Q.    What did you tell him?
```

**Abby J. Ryan, RPR, CSR**

Clerk of the District Court
Johnson County Kansas
9/5/2012 14:01:33 MM

```
 1    A.    I told him I did construction.

 2    Q.    Okay.  And that was the first part of the

 3          conversation, right, that in fact he wanted to

 4          understand what kind of work that you did, and

 5          what -- did he ask what kind of equipment you

 6          had?

 7    A.    No.

 8    Q.    Just construction?

 9    A.    Just asked me what I did.

10    Q.    Did he ask anything about your background or where

11          you lived or anything?

12    A.    No.

13    Q.    Anything about you?

14    A.    No.

15    Q.    So are you telling us that all Mr. Johnson knew

16          about you during this first conversation is I am

17          assuming your name.  You told him your name;

18          right?

19    A.    Yes, I did.

20    Q.    That you worked construction?

21    A.    Yep.

22    Q.    Period.  That is all he knew about you?

23    A.    Yes.

24    Q.    Never met him before?

25    A.    Nope.
```

**Abby J. Ryan, RPR, CSR**

*Clerk of the District Court*
*Johnson County Kansas*
*9/5/2012 14:01:33 MM*

```
 1    Q.    And you're telling us that to a complete stranger,
 2          he starts making these suggestions to you about
 3          killing his wife?
 4    A.    Yes, he did.
 5    Q.    Just out of the blue?
 6    A.    He did, yes.  Well, he isn't going to get a nun
 7          from the Catholic church to do it now, is he?
 8    Q.    He didn't know anything about your prison record,
 9          did he?
10    A.    Apparently he did.  For all I know Bill could have
11          told him.
12    Q.    But you don't know that, do you?
13    A.    No, I don't.
14    Q.    I mean, all you've got is a bunch of tattoos.
15          That doesn't mean anything; right?  That doesn't
16          mean you have been in prison.  You didn't tell him
17          that, did you?
18    A.    I didn't tell him anything.
19    Q.    Okay.
20    A.    You don't ask, I don't tell.
21    Q.    Uh-huh.  So then tell me something.  Isn't it a
22          fact what Mr. Johnson talked to you about
23          initially was hauling off a bunch of old vans and
24          a bunch of trash that had built up out at a farm
25          that he owned?
```

**Abby J. Ryan, RPR, CSR**

```
 1    A.    No.

 2    Q.    Did he ever --

 3    A.    He never said a word about vans or trash.  The

 4          only thing he talked about was his wife.

 5    Q.    Did he ever talk to you about you possibly

 6          investigating her?

 7    A.    No.

 8    Q.    You are telling us he never mentioned to you that

 9          he felt that he needed to have her possibly

10          checked out because she is into a goth culture,

11          into drugs, things of that nature?

12    A.    No.  The only thing he told me was that she was

13          molesting his son and that she was a pill addict.

14    Q.    And you're denying that he ever said to you that

15          possibly you could infiltrate that group that she

16          was with and that is what he wanted you to do?

17    A.    No.

18    Q.    Never said anything like that?

19    A.    No.

20    Q.    According to you your testimony today is that he

21          just launches into telling you that she is the

22          root of all of his problems, correct, and that she

23          molested his son and took all of his money, and

24          that he would pay you $20,000.  Did he ever

25          specifically tell you that he wanted her killed?
```

**Abby J. Ryan, RPR, CSR**

```
 1    A.    He told me three ways hisself to do it.

 2    Q.    And sir --

 3    A.    You tell me.

 4    Q.    Sir, I am interested in that because I want to ask

 5          you this.  Now, tell the truth here.  When you

 6          went to the police a month later, did you tell the

 7          police that he told you three different specific

 8          methods by which he suggested that you kill his

 9          ex-wife?

10    A.    I am not sure I did.

11    Q.    You are not, are you?

12    A.    I am assuming.

13    Q.    Let me ask you something.  You are on tape?

14    A.    I don't care.

15    Q.    Telling the police what you told him; right?

16    A.    Yes, I am.

17    Q.    Did you listen to that tape?

18    A.    No, I didn't, but I knew it was being recorded.

19    Q.    Are you testifying under oath here today that you

20          told them number one, that Rheuben Johnson

21          suggested to you that you drive up next to his

22          ex-wife and shoot her in the head.  Did you tell

23          the police that?

24    A.    I think I did.

25    Q.    Are you stating it under oath that you did?
```

**Abby J. Ryan, RPR, CSR**

|    |    |    |
|----|----|----|
| 1  | A. | I said I think I did. |
| 2  | Q. | Well, May the 18th wasn't that long ago.  Would |
| 3  |    | you not remember something like that?  Isn't that |
| 4  |    | significant? |
| 5  | A. | Man, there was so much going on, I couldn't tell |
| 6  |    | you half the stuff. |
| 7  | Q. | What do you mean?  What do you mean so much going |
| 8  |    | on?  You are sitting in a room with Detective |
| 9  |    | Campbell.  I assume it is quiet in there, and you |
| 10 |    | are telling him, quote, the truth; right?  What |
| 11 |    | was going on that you couldn't remember whether or |
| 12 |    | not you told him that Rheuben Johnson suggested -- |
| 13 | A. | I run a business, have a family and everything |
| 14 |    | else.  You know what I mean?  Rheuben Johnson |
| 15 |    | isn't king of my world. |
| 16 | Q. | I understand that.  So -- |
| 17 | A. | Okay? |
| 18 | Q. | Let me ask you this.  Did you tell the police very |
| 19 |    | specifically that he suggested to you that you |
| 20 |    | maybe could burn down her apartment with her in it |
| 21 |    | but to be sure that the son wasn't there.  Did you |
| 22 |    | tell the police that? |
| 23 | A. | I think so. |
| 24 | Q. | Once again you think so.  Do you remember telling |
| 25 |    | them or not? |

**Abby J. Ryan, RPR, CSR**

```
 1    A.    I am not sure, man.

 2    Q.    Why would you forget such a significant thing?

 3    A.    I didn't forget anything.  I'm just telling you I

 4          am not sure.

 5    Q.    When did you first decide that he told you these

 6          things -- just today or sometime weeks ago?

 7    A.    No, the day he said it.  It isn't a figment of my

 8          imagination.  He is sitting over there, isn't he?

 9    Q.    Yes, he is.

10    A.    Well, apparently somebody's information is correct

11          because he is over there.

12    Q.    Just a second.  Just a second.  Sir, did you tell

13          the police during your interview with them that

14          Mr. Johnson suggested to you that you could

15          possibly tie his ex-wife up and basically force

16          feed her her own prescription medication to kill

17          her?

18    A.    Yes.

19    Q.    You told them that?

20    A.    I believe so.

21    Q.    You do remember that; right?

22    A.    Yes.

23    Q.    Did you tell the police that he offered you

24          $20,000 -- 5,000 up front and the remainder in

25          increments?
```

**Abby J. Ryan, RPR, CSR**

```
1    A.    I don't believe so.

2    Q.    Why not?

3    A.    Well, because that conversation didn't happen

4          until after we made the recordings.

5    Q.    What are you talking about?  You had one meeting

6          with Mr. Johnson at the Goodcents.  You had some

7          phone calls you say from him.  You then had a

8          conversation with the police on the 18th of May --

9    A.    Uh-huh.

10   Q.    -- wherein they tape what you had to say.  What

11         are you talking about that the money was talked

12         about after the recordings?  What recording?

13   A.    Well, they recorded the tapes, man.

14   Q.    Yes.

15   A.    Have you listened to them?

16   Q.    I sure did.  Sir, are you telling me that

17         Mr. Johnson talked to you again after May 18th

18         after you went to the police?

19   A.    No, I am telling you he talked to me again when I

20         made the phone call from my own home and he

21         returned the call.  I wasn't at the police

22         station.  There were phone calls that took place

23         after that as well.

24   Q.    Fine.  Did he or did he not, according to you,

25         offer you the $20,000 --
```

**Abby J. Ryan, RPR, CSR**

```
 1    A.    Yes.

 2    Q.    Just listen to my question, please.  Did he offer

 3          that to you at the Mr. Goodcents, or did he offer

 4          it to you during a phone call later?

 5    A.    It was mentioned twice.

 6    Q.    When was the first time he mentioned it?

 7    A.    We can run this circle all day if you want.  At

 8          Mr. Goodcents.

 9    Q.    And then again the second time -- when was that?

10    A.    The 17th of May when he called me on Sunday night.

11    Q.    The day before you decided to report this?

12    A.    No, not the day before.  I reported it on Friday.

13          He called me on Sunday.  We met with the

14          undercover on Monday and they locked him up on

15          Tuesday.

16    Q.    Mr. Nodwell, are you under the influence of any

17          drugs or alcohol now?

18    A.    No, I'm not.

19    Q.    Have you had any problems with your memory in the

20          past?

21    A.    No.

22    Q.    Have you ever had a problem with drug addiction?

23    A.    No.

24    Q.    What you just told me that he told you -- this

25          thing about the 20,000 on the 17th of May --
```

**Abby J. Ryan, RPR, CSR**

1     A.     He said it again.

2     Q.     Wasn't that the day before you went to the police?

3            You went to the police on the 18th of May, sir.

4     A.     I am talking about the day before I met with an

5            undercover and him at the park, he called me to

6            say yes, he would meet me.  He mentioned it again.

7            It was after the recordings.  When they

8            tape-recorded me calling him to set up a meeting,

9            he didn't answer his phones.  So the detective

10           gave me his personal phone number and said if he

11           called back, let him know.

12    Q.     So he offered you this money after you were

13           working with the police?

14    A.     Yes.

15    Q.     Yes?

16    A.     It was mentioned again, yes.

17    Q.     But you never ever told the police about the

18           $20,000, did you?

19    A.     I don't --

20    Q.     Never once did you mention that, did you?

21    A.     I don't remember if I did or not.  Man, there is

22           three hours of tape, man.  I can't tell you if

23           that was mentioned in there.

24    Q.     Well, you sure had no trouble remembering these

25           things today.  Mr. Nodwell, would it surprise you

**Abby J. Ryan, RPR, CSR**

```
 1              to learn that this is the first time that any of

 2              these three supposed methods of dispensing with

 3              his ex-wife has ever been mentioned?  Would that

 4              surprise you that in none of the reports does it

 5              indicate that you ever said anything even close to

 6              what you are saying here today?

 7      A.      Does it surprise me?  No, because the detective I

 8              met with was Sweeney.  There was no report filed

 9              from him at all.  We met before Campbell ever

10              came, so no it --

11      Q.      But Detective Campbell recorded everything you

12              said.  What about that?

13      A.      What about it?

14      Q.      It is not on that tape either?

15      A.      It don't matter.

16      Q.      They specifically ask you --

17      A.      People forget things, man.  People, you know, when

18              they have so much going on and you have so many

19              things to tell you, they have a lot going on,

20              man.

21      Q.      Do you do this often?

22      A.      I'm not perfect.

23      Q.      You go --

24      A.      Yes, I go to court every day and just make stuff

25              up on people.
```

**Abby J. Ryan, RPR, CSR**

Clerk of the District Court
Johnson County Kansas
9/5/2012 14:01:33 MM

```
 1              THE COURT:  Hang on here.  This has to be
 2    a civil exchange, and she has to be able to get all of it
 3    down.  So you ask the questions, and they don't need to
 4    be argumentative.  You answer his questions, and we don't
 5    need anything except the answer to his question.
 6    BY MR. DIOSZEGHY:
 7    Q.    Sir, the police very specifically asked you
 8          whether or not Mr. Johnson ever suggested or told
 9          you how he wanted this job done?
10    A.    I don't recall that.  It may very well have, but I
11          don't know.
12    Q.    And are you telling us that when you introduced
13          the undercover police officer to Mr. Johnson, you
14          used his correct first name of Lonnie?
15    A.    No, I didn't.
16    Q.    You testified to that.  You said --
17    A.    I know what I said, man.
18    Q.    It was wrong, wasn't it?
19    A.    I don't remember the name that I called him at the
20          time.
21    Q.    So today you just used Lonnie and --
22    A.    Because that is what I know him as.
23    Q.    Now, Mr. Johnson took you for a ride when you met
24          at the Goodcents?
25    A.    Yes, sir.
```

**Abby J. Ryan, RPR, CSR**

1   Q.   And tell us where exactly he took you.

2   A.   He got on K-10 and took K-10 all the way up to 35,

3        drove down 35 to 75th Street, got off and went by

4        the apartment that his ex-wife lived at.

5   Q.   Did he drive east or west on 75th Street?

6   A.   I don't care which way he drove.  He drove on 75th

7        Street.

8   Q.   Sir, whether you care or not, my question is do

9        you remember?

10  A.   I don't know which way.  I don't care.  I don't

11       know which way it is, north, south, east, west.

12       Man, it was 75th Street.

13  Q.   Okay.

14  A.   If you are coming from Olathe, it only goes one

15       way -- north.

16  Q.   75th Street only goes one way?

17  A.   No, 35 North.

18  Q.   Okay.  What apartment complex did he supposedly

19       point out to you?

20  A.   The one where his ex-wife lived.

21  Q.   But what was the name of it?

22  A.   I told you earlier I didn't know the name of it.

23       It is a gated community.  Got a black wrought iron

24       fence all the way around it.

25  Q.   What is it that he wanted you to do with this

**Abby J. Ryan, RPR, CSR**

| | | |
|---|---|---|
| 1 | | information? |
| 2 | A. | He wanted me to follow his ex-wife. |
| 3 | Q. | Follow her around. Did he also try to show you |
| 4 | | the vehicle that she drove? |
| 5 | A. | He didn't try. He did. |
| 6 | Q. | He did show you it. You say it was a black |
| 7 | | Durango? |
| 8 | A. | Maybe it was a caliber. I don't know. It was a |
| 9 | | black Dodge. I know that. He showed it to me. |
| 10 | Q. | Where else did he take you? |
| 11 | A. | That was it, man. |
| 12 | Q. | That was it? |
| 13 | A. | Yes. Then he drove back to Mr. Goodcents to my |
| 14 | | truck. |
| 15 | Q. | He told you where she worked; is that right? |
| 16 | A. | Uh-huh. Told me where she stops to get coffee in |
| 17 | | the morning. |
| 18 | Q. | Where was that? |
| 19 | A. | McDonald's on 75th Street. Right across the |
| 20 | | street and a little way down from where she |
| 21 | | worked. |
| 22 | Q. | Did he tell you what she looked like? |
| 23 | A. | Yes. |
| 24 | Q. | What did she look like? |
| 25 | A. | Told me she had black hair, man. He described her |

**Abby J. Ryan, RPR, CSR**

```
 1              to me.  Have I ever seen her?  No.  Could I point
 2              her out if I seen her now?  No.
 3       Q.     Did you have any kind of I-Pad or I-Phone with you
 4              during this trip?
 5       A.     No.
 6       Q.     You were not surfing the web during the trip?
 7       A.     I don't have that kind of phone.  I had a phone,
 8              yes, but not an I-Pad or I-Phone.  I had a Samsung
 9              Galaxy phone.
10       Q.     Okay.  So it would not be accurate that
11              Mr. Johnson actually told you while you're
12              searching the web that you can use Google Earth to
13              focus in on his farm to in fact see all the
14              junk?
15       A.     No.  What he told me about the phone was that I
16              could get on the dating site called Okay Cupid. He
17              didn't say nothing about Google.
18       Q.     Because there was talk about you possibly dating
19              his ex-wife; right?
20       A.     No.  I am married.  Why would I date his ex-wife?
21              That don't make no sense.
22       Q.     You talked about all of the women that you had,
23              didn't you, sir?
24       A.     No, I didn't.
25       Q.     You didn't brag about all of them?
```

**Abby J. Ryan, RPR, CSR**

```
 1    A.    I am happily married, pal.

 2    Q.    Why would he -- why would Mr. Johnson suggest to

 3          you --

 4    A.    Because he was telling me about how he was on this

 5          site.

 6    Q.    He is telling you, a complete stranger, all about

 7          his personal life?

 8    A.    Don't ask me, man.  I guess he is special.

 9    Q.    Uh-huh.  Okay.  Now, you indicated that he called

10          you almost daily and sometimes three times a day

11          after this meeting; correct?

12    A.    Yeah.

13    Q.    What --

14    A.    At first it was, you know -- it was maybe twice a

15          week.  Then it just progressed.

16    Q.    What phone number did you have?

17    A.    I had three different phone numbers.

18    Q.    Which phone was he calling?

19    A.    All three.

20    Q.    You gave him three different phone numbers to

21          call?

22    A.    No, he called me from three different phone

23          numbers.

24    Q.    Okay.  Which phone of yours did he call?

25    A.    The only one I have.
```

**Abby J. Ryan, RPR, CSR**

| | | |
|---|---|---|
| 1 | Q. | Which is what?  What is your phone number that he |
| 2 | | called? |
| 3 | A. | 913-742-00047 (sic). |
| 4 | Q. | 913-742-0047; is that right? |
| 5 | A. | Yes. |
| 6 | Q. | Is that -- that is a cell phone; right? |
| 7 | A. | No, it is a pay phone. |
| 8 | Q. | Well, yes.  We do pay for cell phones.  And these |
| 9 | | calls from Mr. Johnson from three separate phones |
| 10 | | came between April the 15th of 2012 into the |
| 11 | | mid-May time frame even after you're working with |
| 12 | | the police. |
| 13 | A. | Yes. |
| 14 | Q. | Okay.  Did he leave any messages on your cell |
| 15 | | phone? |
| 16 | A. | Yes, he left several messages. |
| 17 | Q. | And do you have any of those messages saved? |
| 18 | A. | No, I don't. |
| 19 | Q. | Did you have any of those messages saved to give |
| 20 | | to the police? |
| 21 | A. | I tried, but my phone -- I was having problems |
| 22 | | with my phone.  We didn't discuss that.  I talked |
| 23 | | about that with Sweeney and Campbell.  I had the |
| 24 | | messages and then my phone -- I don't know what |
| 25 | | happened.  I lost all my contacts and everything |

**Abby J. Ryan, RPR, CSR**

*Clerk of the District Court*
*Johnson County Kansas*
*9/5/2012 14:01:33 MM*

1          in it.

2    Q.    You still have this phone?

3    A.    No, I have got a new phone.

4    Q.    When did you get rid of this phone?

5    A.    When?

6    Q.    Yes.

7    A.    When it stopped working.

8    Q.    When was that?

9    A.    I don't know.  Month and a half ago.

10    Q.    Who did you get the phone through?

11    A.    T-Mobile.

12    Q.    Is that who your phone service was through?

13    A.    Yes.

14    Q.    It was in your name?

15    A.    Yes.

16    Q.    Or a company name?

17    A.    My name.

18    Q.    So Mr. Nodwell, these phone records should still

19          be available, then, should they not, showing these

20          calls?

21    A.    I am sure they are.

22    Q.    You are sure that they are?

23    A.    Yes.

24    Q.    Okay.

25    A.    I mean, you can go back, what, six months and get

**Abby J. Ryan, RPR, CSR**

1           records of it.

2   Q.      Okay.

3   A.      Go ahead.  You have my permission.

4   Q.      All right, sir.  Thank you.

5   A.      You're welcome.

6   Q.      Bear with me just one second.  Did Mr. Johnson

7           call you about two days before you went to the

8           police to tell you that he would actually give you

9           gas money so that you could follow her around?

10  A.      Yes, he did, and I didn't do that either.

11  Q.      I understand.  So is it your testimony, sir, that

12          it was only after you made some comment to the

13          effect that well, if something happens to your ex,

14          you're going to be the first one they're going to

15          look at because of this custody dispute -- it was

16          only after that that Mr. Johnson started talking

17          about you doing some actual construction work?

18  A.      That is when he started talking about it in job

19          descriptions.

20  Q.      And he started asking you -- talked to you about

21          doing some roofing work; right?

22  A.      Every time he talked to me, it was something

23          different.  Roofing, glass.  It was never the same

24          thing.  It was always something different.

25  Q.      He wanted you to remove some junk, haul some stuff

**Abby J. Ryan, RPR, CSR**

```
 1        off?
 2   A.   No matter how many times you say that, there was
 3        no junk.
 4   Q.   Well, didn't he want you to clear an out area
 5        where he had some glass so that his son wouldn't
 6        -- couldn't -- wouldn't cut his foot?
 7   A.   There was no glass.
 8   Q.   I didn't ask you --
 9   A.   He mentioned glass, but there was no glass.  He
10        was talking about his ex-wife.
11   Q.   That is what you say.
12   A.   No, that is what I know.
13   Q.   Mr. Nodwell, you told the prosecutor here that
14        you're getting nothing out of this testimony;
15        right?
16   A.   I'm not getting anything out of this testimony.
17   Q.   Tell me -- why did you wait a month to go to the
18        police?  Why did you wait?
19   A.   Because at first I didn't think he was serious,
20        but anybody that is going to ring my phone that
21        many times asking if I am going to do it or not is
22        serious.  Rather than have his kid grow up with
23        without his mother, I did what I had to do.
24   Q.   Here is a guy that tells you, according to you a
25        perfect stranger, that you should pull up next to
```

**Abby J. Ryan, RPR, CSR**

*Clerk of the District Court*
*Johnson County Kansas*
*9/5/2012 14:01:33 MM*

```
1              his ex-wife and blow her head off or burn her
2              inside of her apartment, and you don't think you
3              should tell the police that?  As a matter of fact,
4              you never told the police that, did you?
5    A.        I don't know.  I don't remember.  But it isn't
6              that it didn't happen, because it did.  When he
7              told me about it, her apartment had already caught
8              fire and they were living in a motel.  That is
9              what brought it up.
10   Q.        When he told you about this, he had already had a
11             fire?
12   A.        Uh-huh.
13   Q.        How do you know that?
14   A.        Because he told me.  I didn't just pluck it out of
15             the air.
16   Q.        Why didn't you tell the police all of that?
17   A.        That is what I just told you.  I have got so much
18             stuff in my head that happened at the time, you
19             can't get it all out, man.  There may be things
20             that weren't said.
21   Q.        Tying her down and forcing prescription
22             medications into her -- that was never said
23             either, was it, to the police?
24   A.        I don't remember.
25                  MR. DIOSZEGHY:  Thank you, sir.  I don't
```

**Abby J. Ryan, RPR, CSR**

Clerk of the District Court
Johnson County Kansas
9/5/2012 14:01:33 MM

1    have any other questions of this witness.

2                    THE COURT:  Ms. Jones, redirect?

3                    MS. JONES:  No redirect.

4                    THE COURT:  All right.  Thank you,

5    Mr. Nodwell.  That is all.

6                    MS. JONES:  State would call Lonnie

7    Stites.

8                        **LONNIE STITES**,

9    called as a witness, having been first duly sworn to tell

10   the truth, the whole truth, and nothing but the truth,

11   was examined and testified as follows:

12                    DIRECT EXAMINATION

13   BY MS. JONES:

14   Q.      Please state your name.

15   A.      Lonnie Stites.

16   Q.      What is your occupation?

17   A.      Detective sergeant for the City of Olathe Police

18           Department.

19   Q.      How long have you been in law enforcement?

20   A.      Twenty-seven years.

21   Q.      What is your current assignment, sir?

22   A.      I am supervisor in narcotics.

23   Q.      Detective Stites, do you know Rheuben Johnson III?

24   A.      Yes.

25   Q.      Do you see him in the courtroom today?

**Abby J. Ryan, RPR, CSR**

```
 1    A.    Yes.

 2    Q.    Would you point to him and identify him for the

 3          record.

 4    A.    Seated at defense table with gray and white

 5          stripes.

 6    Q.    Thank you.  How is it that you met the

 7          defendant?

 8    A.    I was introduced to him by Mr. Nodwell.

 9    Q.    And is that Ronald Nodwell?

10    A.    Yes.

11    Q.    Okay.  And what was the purpose of meeting the

12          defendant?

13    A.    I was asked by another detective in our agency to

14          be introduced to Mr. Johnson by Mr. Nodwell as

15          they were working a murder for hire.

16    Q.    When was it that you first met the defendant?

17    A.    On Monday, May 21st.

18    Q.    Of this year, 2012?

19    A.    Yes.

20    Q.    Okay.  Where was it that you first met the

21          defendant?

22    A.    At the Olathe Police Department.

23    Q.    You met the defendant at the Olathe Police

24          Department?

25    A.    No, I'm sorry.  The defendant was at Waterworks
```

**Abby J. Ryan, RPR, CSR**

1           Park.

2    Q.     Where is Waterworks Park located?

3    A.     Sheridan and Curtis in Olathe.

4    Q.     Johnson County, Kansas?

5    A.     Yes.

6    Q.     Thank you.  Tell me about what first happened in

7           this meeting.  Who arranged the meeting?

8    A.     The meeting with Mr. Johnson?

9    Q.     Yes, sir.

10   A.     That was arranged by Mr. Nodwell.

11   Q.     Okay.  And you went along with Mr. Nodwell; is

12          that correct?  Or did Mr. Nodwell go along with

13          you?

14   A.     We actually drove separately.

15   Q.     So you arrive at Waterworks Park.  Is the

16          defendant there already?

17   A.     No.

18   Q.     Okay.  At some point the defendant shows up to the

19          same park?

20   A.     Yes.

21   Q.     Okay.  What was he driving?

22   A.     A black Chevy Suburban, I believe.

23   Q.     And did you stay in your car?  Did you get out of

24          your car?

25   A.     No, we were out of our car.

**Abby J. Ryan, RPR, CSR**

1    Q.    Where did you go?

2    A.    Just to the north there is a small parking lot

3          there at the park just on the north side of it.

4          There is a bench by something -- I believe a

5          horseshoe throwing area.

6    Q.    How was it that you were introduced to the

7          defendant?

8    A.    Mr. Nodwell, the reporting party, had come in and

9          introduced me to the defendant when he arrived.

10   Q.    So did the defendant walk up to you guys or did

11         you guys walk up to him?

12   A.    I believe he walked up to us up there, and

13         Mr. Nodwell -- they had a brief conversation and

14         he introduced me I think as this is the buddy that

15         I told you about or this is the buddy I wanted you

16         to meet, something to that effect.

17   Q.    What was the defendant's initial reaction to

18         you?

19   A.    Nothing out of the ordinary.  I mean, he spoke

20         with Mr. Nodwell briefly, and then for some

21         reason he started to show us a video on his -- I

22         believe it was an I-Pad.

23   Q.    The defendant had an I-Pad?

24   A.    Yes.

25   Q.    Okay.  So when you first saw this video or when

**Abby J. Ryan, RPR, CSR**

```
 1                   the defendant played this video for you, how long

 2                   have you been in contact with him at that point?

 3        A.         I don't know, maybe 30 seconds to a minute.

 4        Q.         So within the first minute he starts showing you a

 5                   video on his I-Pad.  Tell the Court about that

 6                   video.

 7        A.         It was a video on his -- he said it was his son.

 8                   He was in a -- appeared to be in a carseat in a

 9                   vehicle.  He was -- the son was screaming.  The

10                   child in the video was screaming and crying and

11                   saying he didn't want to go there or didn't want

12                   to leave.  I don't remember his exact words.

13        Q.         Okay.  Did the defendant tell you why he was

14                   showing you this video of his son crying?

15        A.         No.

16        Q.         Okay.  What did he say about it?

17        A.         He just -- I believe he said this is a video or I

18                   wanted to show you this video of my son or

19                   something like that.  I wasn't -- I don't believe

20                   he said why.

21        Q.         Okay.  What happened next?

22        A.         Mr. Nodwell -- like I said, he -- they had a brief

23                   conversation.  He introduced me like he said,

24                   something to the effect of, "This is the buddy I

25                   told you about" or "This is the buddy I wanted you
```

**Abby J. Ryan, RPR, CSR**

```
 1              to meet."  And then he left.
 2    Q.        Okay.  Did the defendant when he showed you the
 3              video of his son, did he tell you -- did he give
 4              you the context of that -- when that was taped or
 5              where they were going or anything of that nature,
 6              if you recall?
 7    A.        I don't know if he said when.  I believe he said
 8              it was -- he may have done it when he was taking
 9              his son back to his wife or ex-wife.
10    Q.        Okay.  So after a brief period of time,
11              Mr. Nodwell leaves the two of you --
12    A.        Yes.
13    Q.        -- there alone at the park; is that right?
14    A.        Yes.
15    Q.        Did you have a discussion, then, with the
16              defendant?
17    A.        Yes, we were there for an extended -- I think
18              about 35, 40 minutes.
19    Q.        Sorry.  How long did you say?
20    A.        Thirty-five or 40 minutes, I believe.
21    Q.        Okay.  What was discussed?  Tell me about how the
22              discussion first starts.
23    A.        I can't remember who started it.  Basically he,
24              Mr. Johnson, wanted to know if Mr. Nodwell had
25              explained the situation to me.  What he wanted.
```

**Abby J. Ryan, RPR, CSR**

```
1    Q.    What was your response to that?  So the defendant
2          asks you, "Did Nodwell tell you what I want?"  You
3          say what?
4    A.    Yes.
5    Q.    Okay.
6    A.    To an extent.  I said I needed some more
7          information.
8    Q.    All right.  So what happens next?
9    A.    There was discussion back and forth over -- he
10         said we can refer to it -- I believe he said, "We
11         can refer to it as moving vans or remodeling or
12         cleaning up some stuff, however we want to refer
13         to it."
14   Q.    Okay.  How did you take this terminology that the
15         defendant was using?
16              MR. DIOSZEGHY:  Objection, kind of a
17   subjective conclusion on his part.  It has nothing to do
18   with the intent of the defendant.  Sounds to me like he
19   was talking about moving some junk around.
20              MS. JONES:  I think that is
21   Mr. Dioszeghy's subjective --
22              THE COURT:  Well, subject to
23   cross-examination, I am going to allow this.
24              MR. DIOSZEGHY:  Judge, it isn't cross.  It
25   is direct.
```

**Abby J. Ryan, RPR, CSR**

*Clerk of the District Court*
*Johnson County Kansas*
*9/5/2012 14:01:33 MM*

```
 1                    THE COURT:  I said, "Subject to

 2      cross-examination, I'm going to allow this."

 3                    MR. DIOSZEGHY:  Sorry.  Sorry.

 4      BY MS. JONES:

 5      Q.    How did you take this terminology?  What did you

 6            take it to mean?

 7      A.    My impression was he was being evasive about what

 8            he actually wanted.  It wasn't clear.  The context

 9            didn't seem to fit the conversations.

10      Q.    What did you -- what do you base that on?

11      A.    In that he was referring -- like I said, he would

12            refer to cleaning up vans, or there were a couple

13            of comments during this as to cleaning up glass or

14            doing other jobs.  But then I would say -- I would

15            ask, "Well, what exactly do you want done?"  And

16            the comments would be, "Well, I don't feel we need

17            -- I don't want to discuss this in detail" or, "We

18            don't need to get into details about this."

19      Q.    Okay.  This was after the defendant had asked you

20            if Mr. Nodwell had filled you in on what he

21            wanted; is that correct?

22      A.    Yes.

23      Q.    So he talked about moving vans.  He talked about

24            cleaning up glass.  Is that what you said?

25      A.    Yes.
```

**Abby J. Ryan, RPR, CSR**

Clerk of the District Court
Johnson County Kansas
9/5/2012 14:01:33 MM

```
 1    Q.      Okay.  Did you know in your mind what the
 2            defendant was talking about?
 3                    MR. DIOSZEGHY:  Objection.  That is --
 4    here again that is just speculation.
 5                    THE COURT:  Sustained.
 6    BY MS. JONES:
 7    Q.      Detective Stites, did the conversation continue
 8            about these projects?
 9    A.      Yes.
10    Q.      Okay.  Tell me about that.
11    A.      They would continue.  I asked him where it was
12            located.  That was another part of the
13            conversation that didn't fit in that when I was
14            asking where it was located, he would start
15            describing where he met his wife to hand off his
16            son.
17    Q.      Tell me about that.
18    A.      I asked him where to find it or where to find the
19            problem he needed taken care of.  He said well --
20            he gave me a date or day.  I believe it was on a
21            Wednesday night.  I don't recall right now.  That
22            is where they exchange their son or went through
23            counseling at a place called The Layne Project in
24            Olathe.
25    Q.      So he gave you information regarding that?
```

**Abby J. Ryan, RPR, CSR**

*Clerk of the District Court*
*Johnson County Kansas*
*9/5/2012 14:01:33 MM*

```
 1    A.    Yes.  When I would ask the location of what he
 2          wanted done, the location he would give me would
 3          be where his wife was at.
 4    Q.    Okay.  Did you discuss how he wanted his project,
 5          as we will call it, completed?
 6    A.    I asked how he wanted it done.  He said he didn't
 7          want to get into detail about that, but he had
 8          already told Mr. -- excuse me -- I believe given
 9          Mr. Nodwell his ideas on that.
10    Q.    Okay.  So he referred you back to Mr. Nodwell?
11    A.    Yes.
12    Q.    Okay.  Did you discuss financial arrangements with
13          respect to the defendant's project?
14    A.    Yes.
15    Q.    Tell me about that.
16    A.    I asked him how much he wanted to pay.  He said, I
17          believe, 5 to 10,000, and I said, "Well, 10,000
18          sounds right."
19    Q.    Did you talk about how that money was going to be
20          delivered to you or in what increments?
21    A.    Yes, I told him I wanted half up front and half
22          when the job was done.  It was back and forth on
23          that some in that he didn't -- not much discussion
24          on that.  Finally he said, "Well, how about three
25          up front?"
```

**Abby J. Ryan, RPR, CSR**

Clerk of the District Court
Johnson County Kansas
9/5/2012 14:01:33 MM

```
 1    Q.    So 3,000 up front and 7,000 --

 2    A.    Yes, when the job was complete.

 3    Q.    So at that point did you believe that for $10,000

 4          you would be moving vans?

 5    A.    No.

 6                MR. DIOSZEGHY:  Judge, I object.  It

 7    doesn't matter what he believed.  It is the intent of the

 8    defendant -- what the defendant said that is important.

 9                THE COURT:  Well, I mean, I agree.  I

10    don't think the witness can speculate as to what he meant

11    by a particular statement of the defendant, but on the

12    other hand, we need some context here.  I am going to

13    allow the question.

14    BY MS. JONES:

15    Q.    So after you discussed money, what happens next?

16    A.    We discussed the money and then he kind of sighed

17          at one point.  We were sitting there during the

18          conversation, and I had asked him something about

19          if it was the amount that was bothering him.  He

20          said that -- made a comment that he had a guy that

21          was going to take care of the problem but he had

22          given him his money and he had taken off and had

23          never heard from him again.

24                Conversation continued after that and he

25          talked briefly about how to get it done, get the
```

**Abby J. Ryan, RPR, CSR**

1          rest of the money afterwards when the project was

2          done.  Asked me if I had hauled off stuff before,

3          and I just responded by saying I had taken care of

4          the problems before.  I told him that I would need

5          -- that we would set up a meeting for the next

6          day.  He would need to bring me the 3,000 in cash

7          and a picture of the problem and a map of where it

8          was.

9     Q.   Okay.  With respect to a picture, did you talk

10         about different types of photos and who was going

11         to be in those photos and so forth?

12    A.   Yes.  I told him I needed a picture of the problem

13         and that started a discussion.  He was hesitant

14         about that.  He said he didn't want to print off

15         any photos on his home computer that could be

16         traced to it, so he would look and see if he had

17         any family photos around the house.

18    Q.   Okay.  With respect to a map, did you specifically

19         say what type of map or did you discuss that?

20    A.   A map to where the problem was.

21    Q.   Did the defendant indicate to you that he could

22         provide you those three things that you needed --

23         the money up front, the pictures and the map?

24    A.   Yes.

25    Q.   Did you have a discussion about how to dispose of

**Abby J. Ryan, RPR, CSR**

```
 1          any of those things?
 2   A.     Yes.  After the discussion over the maps and a
 3          comment about his ex-wife had just broken up with
 4          a boyfriend, he made the comment that, "Well, you
 5          understand Missouri is a better place to get rid
 6          of the things than Kansas is."
 7   Q.     Anything else in particular with that first
 8          initial meeting?
 9   A.     No.  Several -- like I said several of the
10          comments were evasive.  He didn't want to get into
11          detail.
12               MR. DIOSZEGHY:  Objection.  The witness is
13   commenting upon the nature of the testimony as opposed to
14   the actual testimony.  Not testimony, but the statements.
15   He is characterizing Mr. Johnson's statements as opposed
16   to just relaying them as a fact witness.
17               THE COURT:  Well, he should testify about
18   what he said.
19               THE WITNESS:  Mr. Johnson said -- the
20   project would change from vans to be cleaned up to glass
21   to be cleaned up to making sure things were hauled off or
22   cleaned up.  There were several comments made that he did
23   not want to get into detail.  He didn't want to go into
24   details about anything.  There were comments that he was
25   concerned about him getting in trouble or both of us
```

Abby J. Ryan, RPR, CSR

Clerk of the District Court
Johnson County Kansas
9/5/2012 14:01:33 MM

1    getting in trouble and that if the photos were found,

2    that he would or I would get in trouble if the photos

3    were found.

4    BY MS. JONES:

5    Q.    Mixed in with the discussion about these various

6          projects, did the defendant give you or make

7          comments about his wife?

8    A.    Yes.

9    Q.    Did he make comments about the amount that he was

10         going to pay you?

11   A.    Yes.

12   Q.    Did he make comments about his wife's relationship

13         with other men?

14   A.    Yes.

15   Q.    At the end of this initial meeting with the

16         defendant, you left the park?

17   A.    Yes.

18   Q.    Separate from the defendant?

19   A.    Yes.

20   Q.    And was there any discussion about future phone

21         calls or future meetings between the two of you?

22   A.    I told him that I would call him at noon the next

23         day to see if he had the items that I asked for --

24         the cash, the photo and the map.

25   Q.    Did you have phone conversations with the

**Abby J. Ryan, RPR, CSR**

1               defendant?

2      A.       Yes, the next day.

3      Q.       Okay.  Tell me about that.

4      A.       I called -- we called at noon.  I believe the

5               initial call was possibly to a cell phone.  It was

6               a bad connection.  I had to call back to a

7               different number that he gave.  And we discussed

8               meeting again because he had the items I needed.

9      Q.       Did you -- what did you take that to mean?

10     A.       That he had the cash, the photo and the map.

11     Q.       Okay.  Were there further phone calls, or was the

12              next thing the in-person meeting?

13     A.       No, I think there were further phone calls.  We

14              agreed to meet at four o'clock at the same place

15              we met the day before, at Waterworks Park.  I

16              arrived at that location, waited.  I believe it

17              was four o'clock or shortly after I received a

18              call from Mr. Johnson who said that he was in

19              Lee's Summit.  He was in Missouri and wouldn't be

20              able to make it to the meeting at Waterworks Park.

21     Q.       Okay.  Did you arrange a meeting later at a

22              different location?

23     A.       Yes, I called him.  We eventually arranged to meet

24              at a Wal-Mart at 135th and State Line in Missouri.

25     Q.       Okay.  So you drive over to Missouri; is that

**Abby J. Ryan, RPR, CSR**

1           right?

2     A.    Yes.

3     Q.    You meet the defendant there?

4     A.    Yes, I meet him at a Wal-Mart parking lot.  He was

5           already there.

6     Q.    Okay.  Was he driving that same vehicle?

7     A.    Yes, black Suburban.

8     Q.    Okay.  And when you made contact with the

9           defendant, what does he give you?  What, if

10          anything, does he give you?

11    A.    Initially he gave me a photo that showed him, a

12          child and a woman.  I point to the woman in the

13          picture and said, "Is that the van you need to

14          disappear?"  He said, "Yes."  He handed me what

15          appeared to be a torn off portion of an envelope

16          with hand-drawn maps on it.  He said one of the

17          maps was of his ex-wife's apartment where that

18          was.  One of the maps was of where the Layne

19          Center was at Santa Fe and Chester in Olathe.

20    Q.    That is where they exchange custody; correct?

21    A.    Yes, that was my understanding.

22    Q.    Okay.  Go ahead.

23    A.    He gave me these items.  Then a short while later

24          he gave me $3,000 in cash.

25    Q.    At that point did you have a discussion about when

**Abby J. Ryan, RPR, CSR**

1          this would take place and whether his son would be

2          present?

3   A.     Yes, we had a brief discussion in the initial

4          meeting about when.  He told me he was going to be

5          out of town for -- I think it was Wednesday night

6          through Monday.  Then during this one at the end

7          of the conversation he made several other

8          references to investigating or following his wife

9          during this meeting.  At the end of it I finally

10          said -- I told him if he wanted the kid around

11          when it happened, and he said no.  And then I

12          said, "Well, you didn't tell me the kid was part

13          of the deal.  I don't do kids," and that is when

14          he became -- appeared to become a little shaken

15          and said, "No, no kid.  No bystanders.  It is bad

16          enough to do this for anybody, even her."

17   Q.     Okay.  Did you discuss the payment of the balance

18          of the 7,000 or the balance of the 10,000 or

19          7,000?

20   A.     Yes, $7,000.

21   Q.     Because he had given you 3,000?

22   A.     He gave me 3,000 cash.  Said he wanted to pay me

23          the rest of the money when it was done, but he

24          didn't know how he was going to do it because

25          there would probably be a lot of attention on him.

**Abby J. Ryan, RPR, CSR**

Clerk of the District Court
Johnson County Kansas
9/5/2012 14:01:33 MM

```
 1              Then he said -- came to the point he said, "Well,

 2              it isn't unusual for me to leave stuff in my

 3              vehicle.  I can leave my vehicle parked with the

 4              money in the vehicle for you."

 5     Q.       Did you have a discussion regarding phone

 6              records?

 7     A.       Yes.  When we went to finish, I told him to delete

 8              my number from his phone because I didn't want a

 9              record of it.  He made some comment about yes, you

10              know, they come up on phones when stuff like this

11              happens.

12     Q.       And did the defendant say anything to you

13              regarding your safety or your care?

14     A.       Yes.  As I went to leave, he said, "Be careful."

15              MS. JONES:  Thank you.  No further

16     questions.

17              THE COURT:  Cross?  I'm sorry.  Let's take

18     a ten-minute break.

19                  (THEREUPON, a recess was taken in the

20                  proceedings, after which the following

21                  proceedings continued in open court, the

22                  parties appearing as before:)

23                       CROSS-EXAMINATION

24     BY MR. DIOSZEGHY:

25     Q.       Sergeant Stites, if you will bear with me, I have
```

**Abby J. Ryan, RPR, CSR**

1          got quite a few questions.

2     A.   I can imagine.

3     Q.   Do you have all of your reports there in front of

4          you, and possibly the better question would be do

5          you have any transcripts of the taped

6          conversations that you had with Mr. Johnson?

7     A.   No, I don't have any transcripts.

8     Q.   Okay.  But you have listened to those tapes?

9     A.   Yes.

10    Q.   Did you listen to them just prior to today or

11         sometime in the --

12    A.   In the last couple of days.

13    Q.   The last couple of days.  So you feel like you

14         have got a pretty good --

15    A.   There were two and a half hours of them.

16    Q.   Right.  Right.  The first thing that I would like

17         to ask you is what exactly did Mr. Nodwell tell

18         you or the police department in general that

19         Mr. Johnson had actually said to him that he,

20         Johnson, wanted to have done?

21    A.   My conversation with Mr. Nodwell prior to was

22         actually very short, a minute or two, I believe.

23         Basically I went in, introduced myself and just

24         told him I would be the one going with him to meet

25         him and that I wanted him to just introduce me and

**Abby J. Ryan, RPR, CSR**

```
 1              leave.  And other than that, that brief
 2              conversation was it.  Mr. Nodwell told me at that
 3              time I was going to be mad at him because he made
 4              Mr. Johnson start talking in code.
 5                     But other than that, the only thing I know
 6              is what I was advised by the other detectives.
 7     Q.       So Mr. Nodwell is the one that suggested or said
 8              to you that he, Nodwell, made Johnson talk in
 9              code?  It was his impression?
10     A.       He said -- his quote was, "You are not going to
11              like me very much because I made your job harder."
12              Because I think his phrase was I told him to stop
13              being so blunt about what he was saying.
14     Q.       Okay.  So the information that you had regarding
15              what Mr. Nodwell had reported mainly came from
16              talking to either Detective Sweeney or Detective
17              Campbell; correct?
18     A.       Correct.
19     Q.       Did you in fact talk to Detective Campbell back
20              here prior to meeting with Mr. Johnson?
21     A.       Yes.
22     Q.       Did Detective Campbell tell you what
23              Mr. Nodwell had said?
24     A.       In general terms.  There went any quotes, but he
25              said that Mr. Nodwell had come to report that
```

**Abby J. Ryan, RPR, CSR**

```
 1              Mr. Johnson was trying to hire him to kill
 2              Mr. Johnson's ex-wife.
 3       Q.     Okay.  Now, to your knowledge did Mr. Nodwell ever
 4              actually say that Mr. Johnson had said, "I want
 5              you to kill my ex-wife?"
 6       A.     Not in the conversation I had with him.  He didn't
 7              state that to me.
 8       Q.     And let me ask you this.  To your knowledge did
 9              Mr. Nodwell ever report to the police that
10              Mr. Johnson suggested to Nodwell that one way of
11              killing her would be to drive up next to her in
12              her car and basically shoot her in the head?  Did
13              Nodwell ever say to the police that that is what
14              Johnson told him?
15       A.     Not to me.
16       Q.     Did Mr. Nodwell ever tell the police that
17              Mr. Johnson suggested to Nodwell that another
18              thing he might think about doing is burning down
19              her apartment with her in it as long as his son
20              was not present and killing her in that manner?
21              Did Nodwell ever tell the police that Johnson had
22              said that?
23       A.     Not to me.
24       Q.     Did Nodwell ever to your knowledge tell the police
25              that Johnson suggested that a third alternative
```

**Abby J. Ryan, RPR, CSR**

*Clerk of the District Court*
*Johnson County Kansas*
*9/5/2012 14:01:33 MM*

```
1            would be to tie his ex-wife up and then basically
2            force her prescription medications down her throat
3            and poison her with those?  Did he ever say
4            that Johnson had told him that?  Did Nodwell ever
5            say that to the police?
6    A.      Not to me, but that was one that was mentioned
7            when I was briefed from one of them.  I asked how
8            it was expected to be done.  They said one of the
9            things that had been mentioned was an overdose.
10   Q.      I understand.  But did he ever say that Johnson
11           suggested tying her up and basically forcefully
12           overdosing her?
13   A.      Not to me.
14   Q.      And not to anyone else to your knowledge;
15           correct?
16   A.      That I don't know.  The only thing I was told is
17           that when I asked during one of our conversations
18           how he had wanted it done, one of the things that
19           was brought up by Mr. Nodwell was a mention of an
20           overdose.
21   Q.      Isn't it a fact what Mr. Nodwell said was, "Well,
22           she takes prescription medications and she might
23           overdose."  Isn't that the exact wording?
24   A.      That I don't know.
25   Q.      Okay.  Well, when you first met Mr. Johnson at the
```

**Abby J. Ryan, RPR, CSR**

Waterworks Park, isn't it correct that one of the first things that Mr. Johnson said was, "So I've got these clean-up projects" -- and this is to Ron -- "so are you thinking maybe you are the man to maybe help haul things off." He talked about big trucks and vans, and then Ron said, "No, I am too busy. I have got other things to do, but here is your guy." Isn't that kind of the way it went down?
A. Yes.
Q. And when Mr. Johnson says that, Ron, Mr. Nodwell, has filled you in on what I want done, you kind of say yes, he has; right?
A. Correct.
Q. And let me back up a second. Did Mr. Nodwell ever say to you that Mr. Johnson wanted some things hauled off, glass cleaned up and remodeling and roofing and all of that kind of stuff?
A. No.
Q. So when you hear Johnson saying, "Well, Ron has filled you in on what I want done," you're thinking about the ex-wife situation; right?
A. Correct.
Q. But Mr. Johnson himself never says that, does he?

*Clerk of the District Court*
*Johnson County Kansas*
*9/5/2012 14:01:33 MM*

1    A.    During one part of our conversation there when I

2              asked what, I mean, do you want done, he said,

3              "Well, Mr. Nodwell" -- or Ron or however we would

4              refer to him -- "has filled you in."  I said, "I

5              understand you have a problem with your ex-wife,"

6              and he said, "Yes.  It would be nice if I didn't

7              have to deal with that problem again."  So in

8              context he referred to his ex-wife as the problem

9              to me.  That is what I took it as.

10    Q.    So that is what you assumed that he was -- he

11            meant by that; correct?

12    A.    Yes.  I didn't see how that related to vans.

13    Q.    Okay.  But isn't it a fact that Mr. Johnson during

14            that meeting at Waterworks talked extensively

15            about wanting his home cleaned up, stuff hauled

16            off, talked about some of this junk was overgrown

17            with thorn trees and all of that.  He says all of

18            that, doesn't he?

19    A.    Yes, there were -- I don't remember the thorn

20            trees, but there was discussion about -- it varied

21            from vans to remodeling, hauling off glass to

22            hauling off junk.  There were varied

23            descriptions.

24    Q.    Did he not make reference to the fact that his son

25            liked to run barefooted in this area and this is

Abby J. Ryan, RPR, CSR

Clerk of the District Court
Johnson County Kansas
9/5/2012 14:01:33 MM

```
1              why he wanted the glass out?

2      A.      That I don't recall.

3      Q.      Don't remember.

4      A.      He made a comment about not wanting to get cut by

5              glass, but I don't remember it in context with his

6              son.

7      Q.      Sergeant, you often or two or three times during

8              your conversation with Mr. Johnson say to him,

9              "Okay, cut the code crap;" right?

10     A.      Yes.  On the second meeting, yes, sir.

11     Q.      But -- well, then we shouldn't jump ahead maybe,

12             but when you say those things to him, that kind of

13             stuff to him, does he then switch to saying,

14             "Well, okay.  You are right.  I really want you to

15             go and kill my ex-wife."  He never says that, does

16             he?

17     A.      No, he doesn't say that.  He says -- he

18             acknowledges what I am saying.

19     Q.      He just says, "Okay;" right.  Then within a second

20             he is talking again about other things like

21             investigating her; right?

22     A.      Yes.

23     Q.      And when he said he had hired another guy to do

24             this kind of thing and got screwed, did he mention

25             to you that happened to be Orion Investigations
```

**Abby J. Ryan, RPR, CSR**

```
 1              that he hired that screwed him?

 2     A.       He just said it was a guy he knew.

 3     Q.       But he told you it was in the context of an

 4              investigation; correct?

 5     A.       No, he -- that was during the first meeting.  That

 6              was when we were discussing the amount of money.

 7              He was still talking about vans and cleaning up

 8              the house then.

 9     Q.       Okay.  Well, during that first meeting you say to

10              him that Ron told you that -- talking to

11              Mr. Johnson -- that you had a problem with your

12              ex-wife.

13     A.       Yes, sir.

14     Q.       He says that is a problem.  It would be nice if I

15              didn't have that problem.  Nice if I didn't ever

16              have to deal with her again?

17     A.       Yes, sir.

18     Q.       Right.  You then say, "So you want the problem

19              permanently gone," and he says, "Well, that is not

20              of course the reason we're chatting here today."

21              He says specifically that is not the reason you

22              are chatting here today, doesn't he?

23     A.       That is what he said.

24     Q.       He says, "I want the van hauled off."  You just

25              mentioned that.  That is about his wife because in
```

**Abby J. Ryan, RPR, CSR**

```
 1              the perfect world, if I didn't have to deal with

 2              that, that would be nice, too?

 3      A.      That is what he said.

 4      Q.      Right.  Now, you introduced yourself as Matt;

 5              correct?

 6      A.      I believe so.  I don't remember -- I'm not even

 7              sure.  I don't think I gave him a first name.

 8      Q.      You never gave him a real name; right?

 9      A.      No, I don't think I ever gave him a name period.

10      Q.      When you talked about three things -- money,

11              pictures, and a map -- in your mind you are

12              talking about money to kill the ex-wife; right?

13      A.      Yes.

14      Q.      And you're telling him you need a picture of her

15              so you know who you're going to have to kill;

16              right?

17      A.      I told him I needed a picture of his problem.

18      Q.      Okay.  And what was this map supposed to be of?

19      A.      Where to find the problem, where to find the

20              project he needed me to do.

21      Q.      So in your mind this is where the wife would be,

22              ex-wife?

23      A.      That would be my understanding from what I was

24              told of the case, yes.

25      Q.      But he never says that -- this is in your mind,
```

**Abby J. Ryan, RPR, CSR**

*Clerk of the District Court*
*Johnson County Kansas*
*9/5/2012 14:01:33 MM*

1         but he never says that, does he?

2  A.    Actually -- well, the locations he described were

3         where his wife was.  When I asked for maps, I

4         asked him where to find it.  He said, "Well, one

5         place would be the Layne Project here in Olathe on

6         Chester off Santa Fe."  I later told him I needed

7         a map of that -- of where that problem would be,

8         where I could find the problem.

9  Q.    Okay.  And does he not talk to you, though, about

10        you basically following her around?

11  A.    In the second meeting.

12  Q.    Okay.  Not in the first meeting?

13  A.    No, sir.

14  Q.    Okay.  And when he was talking about hauling off

15        cars and stuff, didn't he say to you that it is

16        better to haul them to Missouri because they don't

17        ask a lot of questions about titles and things

18        like that when you're going to scrap old vehicles?

19        He said that, didn't he?

20  A.    He told me at the end of the first one it was

21        better to dispose of these things in Missouri than

22        it was in Kansas because there weren't as many

23        questions asked.

24  Q.    But what he really says is of course, you know,

25        the best place to haul these cars and stuff off is

**Abby J. Ryan, RPR, CSR**

Clerk of the District Court
Johnson County Kansas
9/5/2012 14:01:33 MM

```
 1              over to Missouri.  Scraps stuff a lot.  Probably
 2              here in Kansas they would ask a lot more
 3              questions.  He specifically refers to the cars and
 4              stuff, doesn't he?
 5    A.        If that is what you have written down, I believe
 6              that.  I don't have a transcript of it, sir.
 7    Q.        The tape speaks; right?
 8    A.        Yes.
 9    Q.        Okay.  So after that meeting, you talk about
10              meeting again?
11    A.        Yes.
12    Q.        And your initial arrangement is to meet at four
13              o'clock the next day once again at the Waterworks
14              Park here in Olathe; right?
15    A.        Yes, after the phone call.
16    Q.        And four o'clock rolls around and he doesn't show
17              up; right?
18    A.        Correct.
19    Q.        Now, do you call him?
20    A.        No, he called me.
21    Q.        And tells you he is in Lee's Summit?
22    A.        I believe that is where it was, yes.
23    Q.        And tells you that he is not going to be able to
24              make it to the Waterworks Park and that he really
25              wants you to meet him on I-435 and State Line over
```

**Abby J. Ryan, RPR, CSR**

Clerk of the District Court
Johnson County Kansas
9/5/2012 14:01:33 MM

| | | |
|---|---|---|
| 1 | | on the Missouri side; right? |
| 2 | A. | That is in a later phone call, yes. |
| 3 | Q. | Later phone call? |
| 4 | A. | Yes. |
| 5 | Q. | Okay.  And is it true that he -- you tell him |
| 6 | | well, I can't do that; correct?  Can't go to |
| 7 | | Missouri.  I have got problems over there.  You |
| 8 | | know, maybe somebody is looking for me or |
| 9 | | something like that? |
| 10 | A. | Correct. |
| 11 | Q. | Because you don't want to go to Missouri |
| 12 | | obviously? |
| 13 | A. | Correct. |
| 14 | Q. | It is out of your jurisdiction; right? |
| 15 | A. | Well, it isn't where I work, so I prefer to keep |
| 16 | | things in Kansas. |
| 17 | Q. | And as a matter of fact, the two of you kind of go |
| 18 | | back and forth on this to the point that you tell |
| 19 | | him you can't go to Missouri and he finally says, |
| 20 | | "Well, fine" and he hangs up on you; right? |
| 21 | A. | I hung up on him. |
| 22 | Q. | You say you hung up on him? |
| 23 | A. | Yes, sir. |
| 24 | Q. | That was the end of it.  There was not any deal at |
| 25 | | that point to meet with you.  There was never any |

**Abby J. Ryan, RPR, CSR**

1            deal to meet again; right?

2   A.      He said the only place he would do it was in

3           Missouri.

4   Q.      But you said no.  You hang up on him.  Done deal

5           at this point?

6   A.      Correct.

7   Q.      You then a half-hour later call him back;

8           correct?

9   A.      Yes.

10  Q.      And you are the one that tells him, "I really need

11          the money to go out of town.  Okay, I will go to

12          Missouri."

13  A.      Yes.

14  Q.      So you are the one that initiates the actual call

15          and you are the one that gets him to go to

16          Missouri to meet you; right?  It isn't the other

17          way around?

18  A.      No, I wouldn't agree with that.  I initiated the

19          call.  It was his idea to meet in Missouri.

20  Q.      Well, okay.  But Sergeant Stites, had you never

21          called him back, you can't sit here and tell us

22          today whether or not you would have ever talked to

23          this guy again, can you?  Because you hung up on

24          him.

25  A.      Correct.

**Abby J. Ryan, RPR, CSR**

*Clerk of the District Court*
*Johnson County Kansas*
*9/5/2012 14:01:33 MM*

```
 1    Q.    That could have been and would have been the end

 2          of this whole transaction; correct?

 3    A.    Could have been.

 4    Q.    But by telling him that you need the money, you

 5          need that 3,000 really bad because you are going

 6          out of town, you basically are talking him into

 7          coming to Missouri to meet you; right?

 8    A.    No, I wouldn't characterize it as that.  I told

 9          him I needed the money and stuff to get out of --

10          I didn't have to talk him into anything.

11    Q.    You are telling him that you are in need of money

12          and you need him to meet you and so therefore --

13          to give you the money and therefore, you will make

14          an exception and zip over to Missouri for a short

15          period of time; right?

16    A.    That is correct.

17    Q.    Okay.  Now, prior to the meeting in Missouri and

18          during one of your phone calls, did Mr. Johnson

19          ever start saying to you things like, "My first

20          concern is to be here for my son."

21    A.    Yes.

22    Q.    Did he also say, "I will not say, do or insinuate

23          anything which would be wrongdoing?"

24    A.    Correct.

25    Q.    "Everything can be recorded anywhere I might be,
```

**Abby J. Ryan, RPR, CSR**

```
 1              so I am careful to only say good about my ex."

 2    A.        Correct.

 3    Q.        He said that to you; right?

 4    A.        Yes.

 5    Q.        In fact it is true.  He did not -- he never to you

 6              said anything about harming you -- harming his

 7              ex-wife, killing her, doing anything to her at

 8              all, did he?

 9    A.        His only statements were implied on that.

10    Q.        They were all just, quote, implied?

11    A.        I am sorry.

12    Q.        Did you say his statements were just implied on

13              that subject?

14    A.        That was my impression, yes.

15    Q.        Okay.

16    A.        That statement that -- no kid or bystander and it

17              was bad enough that it happened to her.

18    Q.        Now, when he hands you the $3,000, what did he

19              tell you to do?

20    A.        As far as?

21    Q.        Just what did he say?  "Okay, here is 3,000

22              bucks?"

23    A.        I believe when he handed it to me he said, "I

24              think here is what else you are looking for."

25    Q.        That is it; right?  Never told you what to do;
```

**Abby J. Ryan, RPR, CSR**

Clerk of the District Court
Johnson County Kansas
9/5/2012 14:01:33 MM

```
 1              right?

 2     A.       Correct.

 3     Q.       When he handed you the picture, it was a picture

 4              of a woman and of him?

 5     A.       And a child, yes.

 6     Q.       And a child not of --

 7     A.       All three of them were in the photo.

 8     Q.       Pardon me?

 9     A.       All three of them were in the photo.

10     Q.       What did he say he wanted you to do with that

11              picture?

12     A.       He showed me the picture.  I pointed to the woman

13              in the front and said, "That is the van you need

14              to disappear," and he said, "Yes."

15     Q.       That is not the woman but the van; correct?

16     A.       Correct.

17     Q.       Not the woman but the van; correct?

18     A.       Correct.

19     Q.       Nothing about the woman disappearing now.  We're

20              talking about her van.

21     A.       Yes, but there was no van in the picture.

22     Q.       Well, when -- what kind of a map did he hand

23              you?

24     A.       It appeared to be hand-drawn like on a torn part

25              of an envelope.
```

**Abby J. Ryan, RPR, CSR**

```
 1     Q.    Like torn off of an envelope?

 2     A.    Yes.

 3     Q.    What was the map of?  I mean --

 4     A.    One side he pointed out -- it was only, I don't

 5           know how to describe it -- 3 or 4 inches square,

 6           torn edges, appeared to be a street map and had

 7           buildings drawn on it, two or three buildings.  He

 8           was pointing out which building his ex-wife lived

 9           in and where her vehicle was normally parked or

10           where it was parked that day when he went by and

11           checked.  Then the other one he said was of where

12           the Layne Center was where they exchange the child

13           and what time.  There were a couple of times

14           written on there that I think were times they

15           either had therapy or exchanged the child.

16     Q.    Did he ever suggest to you any kind of method by

17           which you were to, quote, make her disappear?

18     A.    No, sir.

19     Q.    Did he ever suggest to you when this was supposed

20           to happen?

21     A.    The only comment he made to that effect was in our

22           first conversation at the park.  I had asked him

23           when he needed -- I can't remember the exact

24           quote.  When it was he needed stuff cleaned up or

25           when he needed this stuff done.  He just made the
```

**Abby J. Ryan, RPR, CSR**

*Clerk of the District Court*
*Johnson County Kansas*
*9/5/2012 14:01:33 MM*

```
 1              comment, "Well, as soon as possible would be

 2              nice."

 3    Q.        Okay.  So basically, Detective Stites, you are

 4              in -- your entire conversation with Mr. Johnson

 5              regarding whether he wanted his wife injured or

 6              killed is a matter of innuendo or interpretation;

 7              correct?  There is nothing ever direct?

 8    A.        Correct.

 9                   MR. DIOSZEGHY:  Thank you.  No further

10    questions.

11                   THE COURT:  Redirect?

12                   MS. JONES:  No redirect, Judge.

13                   THE COURT:  All right.  Thank you,

14    Sergeant.  Any further evidence?

15                   MS. JONES:  Judge, no further evidence,

16    but prior to resting for preliminary hearing purposes, I

17    would ask to orally amend my amended complaint and under

18    Count II to broaden the dates based off the evidence

19    presented today to reflect between the first day of

20    April, 2012 and the 22nd day of May, 2012.  So changing

21    the first date from May 1st to April 1st on Count II.

22                   MR. DIOSZEGHY:  Judge, my understanding is

23    that Mr. Nodwell said he first met with Mr. Johnson on

24    the 15th of April.

25                   MS. JONES:  He said around the 14th or
```

**Abby J. Ryan, RPR, CSR**

1     15th, I believe, is what he said.

2                    THE COURT:  It looks like I probably have

3     the original amended complaint.  Do you want to further

4     amend Count II by interlineation?  I would think based on

5     the evidence that has been presented here, you wouldn't

6     need to go all the way back to April 1st.

7                    MS. JONES:  That is fine.  I can narrow

8     it.

9                    MR. DIOSZEGHY:  So what date did we decide

10    on?

11                   MS. JONES:  I think it should be thorough

12    and safe that -- he didn't say what day of the week

13    specifically.  April 14th was a Saturday.  I am okay with

14    going with the 10th forward.  Do you have an issue with

15    that, Mr. DIOSZEGHY?

16                   MR. DIOSZEGHY:  April the 10th?

17                   MS. JONES:  April 10th to May 22nd.

18                   MR. DIOSZEGHY:  I object to it.  There is

19    no evidence of that.

20                   THE COURT:  The evidence was from

21    Mr. Nodwell, for what it was worth, the 14th or 15th or

22    around there, so I think the 10th is a reasonable

23    amendment, and you know, just to be completely clear,

24    we're still talking about the same events and just that

25    they might have started a little earlier.  So I will

**Abby J. Ryan, RPR, CSR**

*Clerk of the District Court*
*Johnson County Kansas*
*9/5/2012 14:01:33 MM*

1     allow that amendment.

2                 Mr. Dioszeghy, do you want to present

3     evidence?

4                 MR. DIOSZEGHY:  We'll not present evidence

5     today, Your Honor.  We do have argument.

6                 THE COURT:  All right.  Go ahead.

7                 MR. DIOSZEGHY:  Your Honor, I would move

8     to dismiss the amended complaint in its entirety.  With

9     respect to Count I, there is no question that the officer

10    testified unequivocally that never once was he encouraged

11    or requested by Mr. Johnson to kill a human being.  Never

12    once.  And everything that that count is based upon is

13    based simply on innuendo, assumption, and perhaps

14    speculation.  And Judge, that hardly can rise to the

15    level of even probable cause.

16                With respect to Count II, Judge, I

17    understand the law about credibility of witnesses at a

18    preliminary hearing, but when it becomes so blatantly

19    obvious that a witness has zero credibility, which in our

20    view Mr. Nodwell has zero credibility, that probable

21    cause cannot be established upon testimony as blatantly

22    fabricated as that presented by Mr. Nodwell.  And I ask

23    that you dismiss both of these counts, Your Honor, as

24    lacking evidence to rise to the level of even probable

25    cause.

                    **Abby J. Ryan, RPR, CSR**

*Clerk of the District Court*
*Johnson County Kansas*
*9/5/2012 14:01:33 MM*

```
 1                    THE COURT:  Well, the motion to dismiss is
 2      denied.  I understand the issue with Sergeant Stites'
 3      testimony, but there is plenty to corroborate the idea
 4      that all of these conversations had to do with
 5      Mr. Johnson's ex-wife.  As to Count II, Mr. Nodwell was
 6      singularly unimpressive as the State's witness.  Still
 7      they're entitled to the best light of the evidence, and
 8      again different witnesses corroborate one another's
 9      testimony.  So the motion to dismiss is denied.
10                    Defendant is bound over on these two
11      counts.  I find probable cause on each of them on or
12      about the dates alleged.  Mr. Dioszeghy, for purposes of
13      arraignment here, does he acknowledge both those charges?
14                    MR. DIOSZEGHY:  We do.  We'll waive the
15      reading, enter pleas of not guilty on both counts.
16                    THE COURT:  How do you want to next set
17      this case for hearing, then?
18                    MR. DIOSZEGHY:  Judge, I would like to set
19      the next case for motions.  Excuse me -- the next hearing
20      for motions, and I would like to have that set out 30 to
21      45 days.  Sometime after you're fishing somewhere.
22                    THE COURT:  All right.  Fair enough.  How
23      much time do you think we need -- an hour or two?
24                    MR. DIOSZEGHY:  Two hours.
25                    THE COURT:  All right.
```

**Abby J. Ryan, RPR, CSR**

Clerk of the District Court
Johnson County Kansas
9/5/2012 14:01:33 MM

1          ADMINISTRATIVE ASSISTANT:  October 10th at

2     1:30.

3          MR. DIOSZEGHY:  Let me see here.

4     October the 10th at 1:30.  That's fine.  I am available.

5          MS. JONES:  Judge, is the -- can we do two

6     o'clock or can we go --

7          ADMINISTRATIVE ASSISTANT:  Sure.

8     October 10th at two in Court 13.

9          MR. DIOSZEGHY:  Okay.

10          THE COURT:  All right.  Anything else here

11     today?

12          MR. DIOSZEGHY:  Yes, Judge, I would like

13     to be heard on the issue of bond one more time.

14          THE COURT:  Yes, go ahead.

15          MR. DIOSZEGHY:  Judge, you have now heard

16     the evidence.  I can tell you that you heard -- you have

17     just about heard everything there is today.  And our

18     argument is what it was before -- that this in our view

19     is a weak case.  It is not a quote, slam dunk.  It is not

20     a case which requires a $350,000 bond.  Mr. Johnson's

21     bond, Judge, is disproportionately high.

22          I say that because we just did a brief

23     overview of a couple of cases here in Johnson County.

24     12CR184 is an attempted second-degree murder wherein a

25     gun was actually fired at the intended victim, and the

**Abby J. Ryan, RPR, CSR**

*Clerk of the District Court*
*Johnson County Kansas*
*9/5/2012 14:01:33 MM*

1    bond in that case was $15,000 cash or surety.  In 12DV903

2    here in Johnson County, this level -- that is a Level 1

3    attempted first-degree murder where again a gun was fired

4    at the intended victim, and the bond in that case is

5    $150,000.  The other case, the 12CR184, is a Level 3, the

6    same as this.

7              Judge, if a Level 3 in one court in this

8    county of attempted second-degree murder has a $15,000

9    bond, why doesn't Rheuben Johnson have a $15,000 bond?  I

10   mean, all that the State proved today is a bunch of talk.

11   There is never any weapon displayed.  There was never any

12   kind of credible threat to the safety of his ex-wife.

13   Judge, I don't know if you may or may not recall, the

14   State has always argued, "Well, he has got all these

15   substantial assets and he could follow through and

16   possibly harm her if he bonds out."  You know, like I

17   told you before, his assets are gone.  His business is

18   gone.  He doesn't have substantial assets, and if that

19   were the case, that he was so intent on having her done

20   away with, he probably could somehow mastermind it even

21   from the jail.

22             So Judge, I would ask that you set bond at

23   $15,000 cash or surety.  If you want to put some kind of

24   a monitoring device or bond supervision or something on

25   him, I am sure that beats jail.  He has got a giant child

**Abby J. Ryan, RPR, CSR**

Clerk of the District Court
Johnson County Kansas
9/5/2012 14:01:33 MM

1      support order that continues to mount.  His family is

2      struggling to pay that.  He needs to get out.  He needs

3      to work.  Judge, this bond as I said is

4      disproportionately high.  It started out, I think, at

5      about a million dollars, and with this Level 3 case with

6      these facts, it is not worth that kind of a bond.  Thank

7      you.

8                      THE COURT:  State's position?

9                      MS. JONES:  Judge, the State would be

10     opposed.  The bond was initially $1 million.  It was

11     lowered to half a million dollars and then reduced again

12     to $350,000 is where I believe it currently stands.  When

13     it was reduced down to $350,000, that was prior to the

14     preliminary hearing in this case.  The only thing that

15     has changed since then are actually circumstances in the

16     State's favor, and that is the defendant has been bound

17     over for trial and the Court has heard some of the

18     evidence that the State intends to put on at trial in

19     this case.

20                      The fact of the matter is that this

21     defendant was extremely calculated and was not only

22     calculated but then became what I would term as desperate

23     to get this job done and went to great lengths to do it.

24     And based off of his actions, his statements, the

25     evidence that has been presented to this point, and the

**Abby J. Ryan, RPR, CSR**

Clerk of the District Court
Johnson County Kansas
9/5/2012 14:01:33 MM

1    serious nature of these charges, the State feels that a

2    $350,000 bond is appropriate.

3                    MR. DIOSZEGHY:  Judge, if he was so

4    desperate, he would have been calling Lonnie Stites back

5    when Stites hung up on him according to him.  But that is

6    not -- those aren't the facts.

7                    THE COURT:  What kind of prior criminal

8    history have we got here?

9                    MR. DIOSZEGHY:  Zero.

10                   MS. JONES:  I don't believe he has one.

11                   THE COURT:  Well, I know he -- there is a

12   bunch of cases on there.

13                   MR. DIOSZEGHY:  Nothing.  They're all

14   civil.

15                   MS. JONES:  There has been quite a dispute

16   and a very, very contested divorce and custody between

17   these individuals.

18                   MR. DIOSZEGHY:  Well, his question was

19   what kind of criminal history and there isn't any.  And

20   quite frankly, the custody and the parenting time had

21   just about been worked out to everyone's satisfaction

22   when all of this innuendo came about.

23                   THE COURT:  All right.  Well, you know, I

24   bound him over.  These are serious charges, but they are

25   Level 3's.  I am going to reduce the amount here

**Abby J. Ryan, RPR, CSR**

*Clerk of the District Court*
*Johnson County Kansas*
*9/5/2012 14:01:33 MM*

1     somewhat.  Certainly not $15,000, and I am not moved by

2     what some other judge did on some other person or what I

3     said on some other case.  If we wanted a bond schedule,

4     we would just do that and quit setting bonds.  Anyway,

5     the motion to modify here is sustained.  I am going to

6     reduce it to $100,000 cash or surety.  All of the same

7     conditions.

8               MR. DIOSZEGHY:  Thank you, Judge.

9               THE COURT:  Those include House Arrest,

10    GPS monitoring, no contact, and there are some others in

11    there.  Anything else today?

12             MR. DIOSZEGHY:  Nothing, Your Honor.

13    Thank you.

14             THE COURT:  All right.  Thank you.

15             (THEREUPON, the proceedings were

16             adjourned.)

17

18

19

20

21

22

23

24

25

**Abby J. Ryan, RPR, CSR**

*Clerk of the District Court*
*Johnson County Kansas*
*9/5/2012 14:01:33 MM*

1          C E R T I F I C A T E

2    STATE OF KANSAS )

3    JOHNSON COUNTY  )   ss

4        I, Abby J. Ryan, a Certified Shorthand Reporter and

5    the regularly appointed, qualified, and acting Official

6    Court Reporter of Court Division 1 of the Tenth Judicial

7    District of the State of Kansas, do hereby certify that

8    as such Official Court Reporter, I was present at and

9    reported in machine shorthand, the above and foregoing

10   proceedings.

11       I further certify that a transcript of my shorthand

12   notes was typed and that the foregoing transcript is a

13   true and correct copy of my notes in said proceedings to

14   the best of my ability.

15       SIGNED, OFFICIALLY SEALED, AND FILED WITH THE CLERK

16   OF THE DISTRICT COURT OF JOHNSON COUNTY, KANSAS, this

17   5th _ day of September , 2012.

18

19

20               _____

21             Abby J. Ryan, RPR, CSR
                  OFFICIAL COURT REPORTER

22             COURT DIVISION 1

23

24

25

Abby J. Ryan, RPR, CSR