1    IN THE DISTRICT COURT OF JOHNSON COUNTY, KANSAS
                 CRIMINAL DEPARTMENT
2

3

4   STATE OF KANSAS,

5          Plaintiff,

6   vs.                        Case No.  12CR1074
                               Appellate No.: 110837A
7
    RHEUBEN CLIFFORD JOHNSON, III,
8
           Defendant.
9

10
                TRANSCRIPT OF JURY TRIAL PROCEEDINGS
11                    (Day 1, Volume I)

12       PROCEEDINGS HAD before the HONORABLE BRENDA CAMERON,

13  Judge of Court 13 of the Tenth Judicial District of the State

14  of Kansas at Olathe, Kansas, and a jury of twelve, July 29th,

15  30th, and 31st, 2013.

16  **APPEARANCES**:

17       The Plaintiff appeared by Mr. Keith Henderson and Mr.

18  Will Hurst, Assistant District Attorneys, Office of the

19  District Attorney, Johnson County Courthouse, 100 N. Kansas

20  Avenue, Olathe, Kansas.

21       The Defendant appeared in person and by Mr. Scott Toth,

22  Attorney at Law, 105 East Park Street, Olathe, Kansas.

23

24

25            REPORTED BY GLORIA J. O'MALLEY, CSR, CCR


                              1
                       OFFICIAL TRANSCRIPT

**INDEX**

**JURY SELECTION**

    Voir Dire by the Court. . . . . . . . . . 6
    Voir Dire by the State. . . . . . . . . 7
    Voir Dire by the Defense. . . . . . . . 53

ADMONITION OF THE JURY. . . . . . . . . . . 71

OPENING STATEMENT BY THE STATE. . . . . . . 77
OPENING STATEMENT BY THE DEFENSE. . . . . . 82


**STATE'S CASE IN CHIEF**

**WITNESSES:**

**RONALD NODWELL**

    Direct Examination by Mr. Henderson. . .90
    Cross-Examination by Mr. Toth. . . . . 106
    Redirect Examination by Mr. Henderson. 118

**TIM SWEANY**

    Direct Examination by Mr. Henderson. . .119
    Cross-Examination by Mr. Toth. . . . . .127

**LONNIE STITES**

    Direct Examination by Mr. Henderson. . .131
    Cross-Examination by Mr. Toth. . . . . .149
    Redirect Examination by Mr. Henderson. .164


**EXHIBIT INDEX**

| EXHIBIT: | | OFFERED | ADMITTED |
| --- | --- | --- | --- |
| State's 1 | Map | 97 | 97 |
| State's 2 | Audio CD | 136 | 137 |
| State's 3 | Audio CD | 139 | 140 |
| State's 4 | Audio CD | 141 | 142 |
| State's 5 | Audio CD | 144 | 144 |
| State's 6 | Photograph | 146 | 146 |
| State's 7 | Map | 146 | 146 |
| State's 8 | Currency | 146 | 146 |

```
          * * * * * * P R O C E E D I N G S * * * * * *
```

1

2                    THE COURT:  The State of Kansas versus

3    Rheuben Clifford Johnson, III.  Case number 12CR1074.

4                    MR. HENDERSON:  May it please the Court,

5    Your Honor, the State appears by Assistant District Attorneys

6    Keith Henderson and Will Hurst.

7                    MR. TOTH:  Good morning, Your Honor, if it

8    please the Court, Rheuben Johnson appears in person along with

9    his attorney Scott Toth and Debra Johnson.

10                    THE COURT:  Thank you.  Would all person's

11   summoned  to serve as jurors raise your right hands to take an

12   oath or affirmation to truly answer the questions concerning

13   your qualifications to serve as jurors.

14                    (Whereupon, the jury venire was sworn.)

15                    THE COURT:  Good morning, ladies and

16   gentlemen, I am Brenda Cameron.  I sincerely appreciate your

17   attendance to serve as jurors for this court.

18       I believe your orientation covered generally your duties

19   and what to expect.  However, I will further instruct you as

20   to procedures in the particular matter now pending.

21       First, I would like to introduce the Court personnel.

22       The Court's official court reporter is Ms. Gloria

23   O'Malley.  She will record verbatim statements and evidence

24   presented in this Court.  She will also administer oaths and

25   act as clerk of the court.

1     Ms. Elizabeth Nelson, whom you've already met, is the
2   Court's official bailiff and my administrative assistant She
3   is the official liaison between the jury panel and the Court.
4   Upon completion of the evidence, the jury panel will be placed
5   in her charge.  She will assist you in any way possible.
6   Should you have any personal matters that arise during the
7   pendency of this case, please do not hesitate to contact her
8   for assistance.
9     Would the bailiff please draw the names of the
10  prospective jurors.  When your name is called, please be
11  seated in the places indicated by Ms. Nelson.
12                    (Whereupon, the following names were called
13  forward:  Jill Dean, Richard Pingel, Stephanie Zaldivar, Joan
14  Lipp, Lori Jones, David Terry, Sandra Walterscheid, Evangelos
15  Habib, Stephanie Monsivaiz, Kimberlie Hensley, Gregory Case,
16  Wanda Allen, Lisa Matuska, Daniel Masilionis, Carey Clauder,
17  Derek Cox, David Breckenridge, Gregory Tompkins, Becky
18  Centlivre, Ryan Ralston, Stephanie Wann, Sharon Padavic,
19  Melinda Whiting, Robert Stinson, Michael Rose, Lana McDonald,
20  Patricia Evans, Sydney Symes, Paul Kokoruda, Carrie Munyan,
21  Stacey Saladin.)
22                    THE COURT:  The matter pending before this
23  Court is a criminal case in which State of Kansas is
24  represented by Keith Henderson and Will Hurst.
25     The defendant is Rheuben Clifford Johnson, III, and he is

**4**
**OFFICIAL TRANSCRIPT**

1    represented by Scott Toth.  The defendant is charged with the
2    following:  Count I, that between the 1st day of May, 2012 and
3    the 22nd day of May, 2012, in the City of Olathe, County of
4    Johnson, State of Kansas, Rheuben Clifford Johnson, III, did
5    then and there unlawfully, feloniously and willfully encourage
6    or request another person, to wit:  Lonnie Stites to commit a
7    felony crime, to wit:  Murder in the first degree as defined
8    by K.S.A. 21-5402, which is intentionally and with
9    premeditation killing a human being.

10       Count II:  That between the 10th day of April, 2012 and
11   the 22nd day of May, 2012, in the City of Olathe, County of
12   Johnson, State of Kansas, Rheuben Clifford Johnson, III did
13   then and there unlawfully, feloniously and willfully encourage
14   or request another person, to wit:  Ronald Nodwell to commit a
15   felony crime, to wit:  Murder in the first degree as defined
16   by K.S.A. 21-5402, which is intentionally and with
17   premeditation killing a human being, a severity level 3 person
18   felony.

19       Count III:  That between the 1st day of March, 2012 and
20   the 31st day of March, 2012, in the City of Olathe, County of
21   Johnson, State of Johnson, State of Kansas, Rheuben Clifford
22   Johnson, III, did then and there unlawfully, feloniously and
23   willfully encourage or request another person, to wit:
24   Richard Porterfield to commit a felony crime, to wit:  Murder
25   in the first degree as defined by K.S.A. 21-5402, which is

intentionally and with premeditation killing a human being, a
severity level 3 person felony.  He pleads not guilty.

At this time we will proceed with voir dire examination.
The procedure is designed to obtain a fair and impartial jury
and not to pry into your personal affairs.  The Court or
attorneys will ask you questions to discover if you have any
knowledge about the case or preconceived opinions which you
cannot lay aside or experience in your personal or family
lives that might cause us to identify with either party.

At this time I will commence with voir dire examination
by asking the jury panel as a whole general questions.
I ask that you hold your hand up if your answer is yes.  The
Court or attorneys might inquire further.  Please raise your
right hand if your answer is yes so the court reporter can
take it down.

First of all, has anyone moved outside Johnson County.
Do any of you know anything about this case either through
your own personal knowledge or by discussing it with anyone
else or reading or hearing about it in the news media.

The defendant is Rheuben Clifford Johnson, III.  Are any
of you related by blood or marriage to the defendant or know
him from any business or social relationship?

Do any of you have any physical defects such as hearing,
sight or otherwise which would render you incapable of
performing your duties as a juror in the case?

1     Do any of you have any bias or prejudice either for or

2 against the defendant or the State?

3     At this time, the counsel for the respective parties will

4 ask questions on voir dire.  We will commence with the

5 attorney for the State after which the attorney for the

6 defendant may inquire.  Mr. Henderson.

7                    MR. HENDERSON:  Thank you, Judge.

8                 **VOIR DIRE EXAMINATION**

9 **BY MR. HENDERSON:**

10     Good morning.  My name is Keith Henderson along with Mr.

11 Hurst.  We will present this case to you on behalf of the

12 State of Kansas over the course of this trial.

13     Do any of you recognize me?  I don't think I see any

14 faces that are familiar to me.  How about my co-counsel, Mr.

15 Hurst, do any of you know him?  I figure we'd get that out of

16 the way.

17     Before we go too much farther, I want to cover some of

18 the basics.  First of all, can everyone hear me all right?  I

19 sometimes have occasion to talk a little too fast, and

20 sometimes I let my voice drop, and I stutter and mumble from

21 time to time.  At any point in time you have difficulty

22 hearing me, I ask that you shoot your hand up in the air or

23 speak up or slow down or repeat whatever I said to make sure

24 you hear what's going on.  Can everyone do that for me?

25     More important, through the course of trial as you're

```
 1   going to be hearing from various witnesses from the witness
 2   stand, obviously it's going to be critically important to hear
 3   what they have to say.  At some point in time if you have
 4   difficulty hearing witnesses or can't quite make out what they
 5   are saying, do the same thing, shoot your hand up in the air
 6   and we'll make whatever accommodations we need to.
 7   Do any of you have any hearing difficulties that I might need
 8   to be aware of or might need to accommodate?
 9        Well, let's sort of dive right into it.  What are we
10   doing right now?  We're participating in the process of jury
11   selection.  It's a French phrase I was told in law school,
12   voir dire, and I was told it means to speak the truth or
13   something like that.  Do any of you happen to speak French?  I
14   see Mr. Habib, were you raising your hand?  A little bit?  Do
15   you, sir?
16                    VENIREPERSON HABIB:  I took a little in
17   school.
18                    MR. HENDERSON:  Do you know what that
19   means, sir?
20                    MR. HABIB:  I think it means to see and
21   say.
22                    MR. HENDERSON:  I've asked every jury
23   section panel, and you're the first.  I'll take your word.
24   We're seeing and saying, and hopefully trying to get the
25   truth.
```

So throughout the jury process, I'm going to be asking you a series of questions. Sometimes we ask the panel as a whole, and sometimes I pick on individual folks and try to get a sense of what you think. I'm trying to find out a little bit about you.

Over the course of this process, we've got a lot of people here right now. But a jury only has twelve people plus an alternate or maybe two. From the 31 people we have seated, we've got to get down to 12. So over half of you are going to be leaving us.

Now, don't take it personally if you're excused. It's simple math. Better than half of you have to go. To do that I need to know a little bit about you to help me make intelligent decisions of who is going to remain on the jury. All I know is information that was contained in a questionnaire that you filled out. Some of you filled that out quite some time ago. Some look like they were filled out last August.

Before we do too much further, if you can think about back to when you filled out the questionnaire, is there anything about your personal lives that have changed? Got a new job? Got married? Divorced? Anything like that major going on that you think you ought to update among your questionnaires? Okay. I'm not seeing any hands. That's okay.

1    From those questionnaires is what I've done, tried to
2    reduce each of your lives to a Post-it note.  I don't know
3    that I have been particularly successful on that, but that
4    shows you what little information we have to go on.
5         So when I'm asking you questions, it's because I don't
6    know a whole lot about you.  I need to find out a little bit.
7    I'm not going to pry into your personal lives, although I may
8    ask questions that are hard.  If at some point in time I ask
9    you something you're not comfortable as a group, let us know,
10   and we can approach the bench and talk about it privately
11   because it's hard to talk about in front of a group of people.
12   It's kind of nerve-racking thing, and I understand that.  So
13   let's dive into it.
14        I told you that when we're done with this process, we're
15   going to have a jury of twelve people plus an alternate or
16   two.  So how do we do that?
17        Well, we get there by asking questions to find out who
18   should be on the jury and who should not.  Let me just start
19   by asking everyone as a whole, what sort of qualities,
20   characteristics, qualifications do you folks think a person
21   ought to have to be a good juror?
22   Anyone feeling particularly brave?  If not, I'm going to pick
23   on somebody.  All right.  Let me pick the first victim.
24        Ms. Hensley, if I can please.  Oh, were you hoping I'd
25   avoid you?  You're right in the middle so I didn't have

1  anywhere else to go.  Ms. Hensley, I'll be nice since you're

2  first.

3      What sort of things do you think a person needs to be a

4  good juror?

5                  VENIREPERSON HENSLEY:  Keep open-minded.

6                  MR. HENDERSON:  Why is that important?

7                  VENIREPERSON HENSLEY:  Because you have to

8  hear both sides of the story.

9                  MR. HENDERSON:  You've got to hear all the

10  evidence, listening to everything that's going on and keep an

11  open mind throughout the case.  Does that sound about fair?

12  Okay.

13      Let me go down and pick on Mr. Cox.  What can you add to

14  the list, sir?  What else do you need to be a good juror?

15                  VENIREPERSON COX:  She said open-minded.

16                  MR. HENDERSON:  That speaks for you too?

17                  VENIREPERSON COX:  Absolutely.

18                  MR. HENDERSON:  What about you, Mr.

19  Stinson, what do you think, sir?

20                  VENIREPERSON STINSON:  The person would

21  have to be honest, honest with themselves and honest with the

22  Court.

23                  MR. HENDERSON:  With themselves and --

24                  VENIREPERSON STINSON:  With the Court.

25                  MR. HENDERSON:  With the Court.

```
 1        Okay.  Why is that important to you do you think, sir?
 2                    VENIREPERSON STINSON:  Well, in America you
 3   need to have a fair shake of things.
 4                    MR. HENDERSON:  Okay.
 5                    VENIREPERSON STINSON:  You've got to look
 6   at yourself to see if you're going to give the person that
 7   fair shake.
 8                    MR. HENDERSON:  I think I understand what
 9   you're saying.  Ms. Wann?
10                    VENIREPERSON WANN:  I was going to say
11   open-minded.
12                    MR. HENDERSON:  Somebody give me something.
13   Mr. Terry, your hand?
14                    VENIREPERSON TERRY:  Moral compass.
15                    MR. HENDERSON:  Why is that important?
16                    VENIREPERSON TERRY:  Somebody that doesn't
17   have a moral compass, they don't care either way about things.
18   They don't have a standard.
19                    MR. HENDERSON:  Okay.  That's fair enough.
20   Ms. Dean, what do you think, ma'am?
21                    VENIREPERSON DEAN:  An open mind, that's
22   important.
23                    MR. HENDERSON:  Would you agree with me
24   that all of us have various life experiences to bring with us?
25                    VENIREPERSON DEAN:  Yes.
```

**12**
**OFFICIAL TRANSCRIPT**

```
 1                    MR. HENDERSON:  To take with us that we do?
 2                    VENIREPERSON DEAN:  Yes.
 3                    MR. HENDERSON:  Do you think having those
 4   sorts of experiences, the sort of shape the way we look at
 5   things give us wisdom, if we're lucky?
 6                    VENIREPERSON DEAN:  It can.
 7                    MR. HENDERSON:  Is it important to use that
 8   experience in a jury to draw upon your own life to make sense
 9   of what happens in the case?
10                    VENIREPERSON DEAN:  Not really.
11                    MR. HENDERSON:  Why do you say that?
12                    VENIREPERSON DEAN:  You have to keep an
13   open mind in this case.
14                    MR. HENDERSON:  What about common sense,
15   Ms. Dean?
16                    VENIREPERSON DEAN:  Common sense I'm big
17   on.
18                    MR. HENDERSON:  I think we probably all
19   are.  Why do you think we need common sense to be a juror?
20                    VENIREPERSON DEAN:  To be fair.
21                    MR. HENDERSON:  To be fair?
22                    VENIREPERSON DEAN:  Uh-huh.
23                    MR. HENDERSON:  Okay.  Well, we've got a
24   pretty good list.  We have, we've got being open minded,
25   honesty, moral compass, talk about life experience, talk about
```

having common sense.  Does everyone have those particular
qualities?  Is there anyone here that doesn't think they are
open-minded or think they are not honest or lack moral
compass?  Anybody here that doesn't have life experiences or
doesn't have any common sense?  I didn't think so.

Why am I wasting time asking you folks questions?  Why
didn't we take the first 12 jurors that came in and sit you
down and get started with the case?  That would have been a
lot faster.

Well, it would have been faster, but not have been the
best way to do a trial in a criminal case.

The Judge in her orientation talked a little bit about
biases and prejudices, and I don't want to have a particularly
negative orientation there, but we all have certain biases and
prejudices that we form based on the experiences in our lives.
And those are things that help make us who we are, and that's
not necessarily a bad thing, but it can potentially cause
problems in a criminal case.

Mr. Tompkins, can I pick on you for a second?  Mr.
Tompkins, will you agree that if a family member of yours, a
loved one, was somehow involved in this case either as a
witness or either the defendant or something like that, you'd
be a little biased to sit in this case; right?

VENIREPERSON TOMPKINS:  Yes.

MR. HENDERSON:  This wouldn't be the right

1  case for you, would it?

2            VENIREPERSON TOMPKINS:  If you had any

3  knowledge of it?

4            MR. HENDERSON:  Right.  If you had

5  knowledge, or if you had a family member involved.

6            VENIREPERSON TOMPKINS:  True.

7            MR. HENDERSON:  Maybe there's a trial down

8  the hallway that you'd be good for, but in this particular

9  case you would be biased and prejudiced, and wouldn't be fair

10 for you to sit as a juror?

11            VENIREPERSON TOMPKINS:  Right.

12            MR. HENDERSON:  It doesn't say anything

13 about you.  It just says that's the wrong case for you.

14 That's what I'm trying to get at when I'm asking my questions.

15 I'm not trying to delve in to make a judgment about your

16 personal lives.  I'm trying to find out if there's something

17 about your background that makes this the wrong case for you

18 to sit on this jury when you might be a particularly good

19 juror on a trial going down the hallway.  So that's the sort

20 of thing I'm looking for when I'm asking my questions.

21       So if you can keep that in mind, that will help me out a

22 lot.  So speaking of folks being involved in the case, what

23 I'd like to do now is read a list of witnesses for the State.

24 I may or may not call all of these individuals, but these are

25 potential witnesses in the case.

1    If any of you recognize any of these names, I'd ask that
2 you shoot your hand up in the air, and we'll talk about it.
3 Okay.

4    The first one is Sergeant Tim Sweany.  Sergeant Lonnie
5 Stites.  And both of those witnesses are with the Olathe
6 Police Department.  Detective James McMillian, Detective Matt
7 Campbell are both with the Olathe PD as well.  Lieutenant
8 Shawn Tompkins with the Sheriff's Office.  Ronald Nodwell,
9 Andy Johnson, Richard Porterfield, and Don Wait.  Do those
10 names sounds familiar to any of you?  Great, that makes it
11 easy then.

12    What I'd like to do is a little bit, not too much, is
13 talk about some basic information about the charges.

14    You heard the Judge read the charges in this case, and at
15 this point in time that's all they are.  They are charges.
16 They are allegations.  No evidence has been presented to you
17 to support them.  It's on a complaint.  It's really nothing
18 more than a piece of paper.  It just sort of gets processed,
19 kicked off and doesn't mean anything or have any evidentiary
20 value to you, but that's letting you know the type of case
21 we're going to be talking about.

22    The defendant, Mr. Johnson, is charged with three crimes,
23 and he is presumed innocent in those three crimes.  It's the
24 same crime, it's soliciting an individual to commit murder in
25 the first degree.  No one died, but essentially the crime

involved commenting to somebody to actually commit that crime.
So that gives you a little bit of that information of what
we're talking about.  Before I go too much into that, I want
to ask questions of the group.

First of all, have any of you ever been a victim of a
crime against your person.  And by that I mean a battery or a
robbery, a burglary when you were home, something like that?
I see some hands.

I'm going to start in front and work my way back.  Is it
Ms. Saladin?

VENIREPERSON SALADIN:  Uh-huh.

MR. HENDERSON:  Can you tell me about your
situation?  If it's something you don't want to talk about --

VENIREPERSON SALADIN:  It was a car theft.

MR. HENDERSON:  Theft?

VENIREPERSON SALADIN:  A theft out of my
car.

MR. HENDERSON:  Out of your car?

VENIREPERSON SALADIN:  Yes.

MR. HENDERSON:  Did you happen to be around
when that was going on?

VENIREPERSON SALADIN:  Yes, I watched it.

MR. HENDERSON:  Okay.  How long ago was
that?

VENIREPERSON SALADIN:  It was 22 years,

1   maybe.

2                    MR. HENDERSON:  That's quite some time ago.

3                    VENIREPERSON SALADIN:  Yes.

4                    MR. HENDERSON:  Is that something that you

5   think would affect your ability to be a fair and impartial

6   juror in this case?

7                    VENIREPERSON SALADIN:  No.

8                    MR. HENDERSON:  We're trying to find 12

9   people who can be fair and impartial, and that's the sort of

10  thing I have to ask about.  Any other hands from Ms. Saladin's

11  row?

12      Let's move back to the next row of chairs, any hands?  Is

13  that Mr. Rose?

14                   VENIREPERSON ROSE:  Yes.

15                   MR. HENDERSON:  Can you tell me about your

16  situation, sir?

17                   VENIREPERSON ROSE:  Yeah.  Back in 1998 I

18  had a vehicle stolen outside my place of business.

19                   MR. HENDERSON:  So that was quite some time

20  ago for you?

21                   VENIREPERSON ROSE:  Right.

22                   MR. HENDERSON:  Is there anything about

23  that situation that makes you question your ability to be a

24  fair juror in this case?

25                   VENIREPERSON ROSE:  No.

```
 1                    MR. HENDERSON:  Thank you.  Other hands in
 2   Mr. Rose's row.  Miss, is it Wann -- no, it's Evans.  Ms.
 3   Evans, my chart is a little out of skew.
 4                    VENIREPERSON EVANS:  That's okay.
 5                    MR. HENDERSON:  Can you tell us a little
 6   Bit about your situation.
 7                    VENIREPERSON EVANS:  A couple of years ago
 8   I had a couple of kids break into my house and take my purse
 9   and slap me around.
10                    MR. HENDERSON:  Did you happen to be around
11   at that time?
12                    VENIREPERSON EVANS:  Yes.
13                    MR. HENDERSON:  The same question I've been
14   asking the other folks, are there any concerns for about being
15   a fair juror in this case?
16                    VENIREPERSON EVANS:  No, no.
17                    MR. HENDERSON:  Other hands in that row?
18   All right.  Let's move back another row, the middle row of
19   chairs, Ms. Wann?
20                    VENIREPERSON WANN:  It was domestic
21   violence.
22                    MR. HENDERSON:  How long ago was that?
23                    VENIREPERSON WANN:  About 25 years.
24                    MR. HENDERSON:  Sorry?
25                    VENIREPERSON WANN:  About 25 years.
```

```
 1                    MR. HENDERSON:  It was 25 years ago?
 2                    VENIREPERSON WANN:  Yes.
 3                    MR. HENDERSON:  The same question for you
 4    that I've been asking everyone else.  Do you have any concerns
 5    about being a fair and impartial juror in this case?
 6                    VENIREPERSON WANN:  No, no.
 7                    MR. HENDERSON:  Thank you.  Let's move into
 8    the first row in the jury box.  Any hands there?  And then the
 9    final row of chairs.  Has anyone there had a crime against
10    their person?  Did I miss anyone's hand?
11        Have any of you ever testified in court before?  Okay.  I
12    see a few hands.
13        Those of you who have, have any of you ever testified in
14    a criminal case?  Mr. Stinson, you have?
15                    VENIREPERSON STINSON:  Yes.
16                    MR. HENDERSON:  I don't want to get too
17    much into that.  Can you tell me in what capacity?
18                    VENIREPERSON STINSON:  I was a criminal
19    investigator and was employed with insurance.
20                    MR. HENDERSON:  How long was that?
21                    VENIREPERSON STINSON:  I was an
22    investigator in it.
23                    MR. HENDERSON:  How long was that?
24                    VENIREPERSON STINSON:  For 28 years, I
25    guess.
```

```
 1                    MR. HENDERSON:  How did you feel while you
 2     were testifying?
 3                    VENIREPERSON STINSON:  Well, I was working
 4     for the prosecution.
 5                    MR. HENDERSON:  The experience itself, were
 6     you excited?  Were you nervous?  Apprehensive?
 7                    VENIREPERSON STINSON:  Well, looking back
 8     on it, I think so.  I was younger.  It was the first time on
 9     something of that magnitude.  The cases I worked for were
10     mostly insurance fraud investigator, first experience.
11                    MR. HENDERSON:  That wasn't the first time
12     you testified?
13                    VENIREPERSON STINSON:  Oh, no.
14                    MR. HENDERSON:  You're kind of an old pro
15     at this?
16                    VENIREPERSON STINSON:  But it was my first
17     biggy.
18                    MR. HENDERSON:  Your first biggy.  Okay.
19                    VENIREPERSON STINSON:  I've been in
20     insurance fraud cases.
21                    MR. HENDERSON:  Oh, yeah?  And I bet that
22     was a big case?
23                    VENIREPERSON STINSON:  It went up to the
24     Supreme Court.
25                    MR. HENDERSON:  How about other times you
```

```
 1    testified?

 2                    VENIREPERSON STINSON:  Other times they

 3    were criminal cases and people in the slammer.

 4                    MR. HENDERSON:  Any nervousness when doing

 5    that?

 6                    VENIREPERSON STINSON:  No.

 7                    MR. HENDERSON:  Answering questions from a

 8    bunch of lawyers, guys like me picking on you?

 9                    VENIREPERSON STINSON:  No.  We get used to

10    it.

11                    MR. HENDERSON:  Let me find someone a

12    little less professional.  The rest of you perhaps, other than

13    Mr. Stinson, can I see that, I'm going to pick on Ms. Clauder,

14    how did you feel?

15                    VENIREPERSON CLAUDER:  I was nervous.

16                    MR. HENDERSON:  Why?

17                    VENIREPERSON CLAUDER:  I was a witness, and

18    lawyers had to turn it around and were attacking me, I guess,

19    if that helps.

20                    MR. HENDERSON:  How does a person act --

21    how do you act when you're nervous?  Do you think if you were

22    nervous, is there any way I could tell just from looking at

23    you?

24                    VENIREPERSON CLAUDER:  My voice is shaky.

25                    MR. HENDERSON:  Your voice shakes.  If I
```

1   was really good, making you perspire a little bit.  I might

2   notice that.  My eyesight is not that good though.

3       Okay.  Let's move on to something else.  How many or you

4   have been a juror in a case before?  Can I see a show of hands

5   there?  I'm going to mix it up and move starting from the back

6   and moving forward.

7       Ms. Lipp, can you tell me about your prior service.

8                   VENIREPERSON LIPP:  About 15 years ago, I

9   served on a medical malpractice case.

10                  MR. HENDERSON:  So that was a civil case;

11  correct?

12                  VENIREPERSON LIPP:  Yes.

13                  MR. HENDERSON:  You said that was 15 years

14  ago?

15                  VENIREPERSON LIPP:  Correct.

16                  MR. HENDERSON:  Was that here in Johnson

17  County?

18                  VENIREPERSON LIPP:  It was.

19                  MR. HENDERSON:  Without telling me what

20  your verdict was, I don't want to know how it turned out, did

21  your jury reach a verdict?

22                  VENIREPERSON LIPP:  Yes.

23                  MR. HENDERSON:  Were you satisfied with

24  that verdict?

25                  VENIREPERSON LIPP:  Yes.

1                      MR. HENDERSON:  Are you happy with it even

2      today?

3                      VENIREPERSON LIPP:  I'm comfortable with it

4      today.

5                      MR. HENDERSON:  Anything about your prior

6      service as a juror that makes you not want to do your civic

7      duty for us one more time?

8                      VENIREPERSON LIPP:  There is nothing about

9      that experience that would change my mind.

10                     MR. HENDERSON:  Okay.  I think I saw

11     another hand in your row.  Ms. Dean?

12                     VENIREPERSON DEAN:  Yes.

13                     MR. HENDERSON:  Same questions for you,

14     ma'am.  Were you on a criminal or civil?

15                     VENIREPERSON DEAN:  Civil, five years ago.

16                     MR. HENDERSON:  Five years ago.  And what

17     type of case was it generally?

18                     VENIREPERSON DEAN:  Actually, I can't even

19     remember because it was like, you know, I'm glad to be here.

20                     MR. HENDERSON:  Fair enough.  Other hands

21     in that back row?  Let's move forward, the next row, has

22     anyone done this before then?  How about the middle row right

23     in front of the jury box and move forward one more row.  I

24     think I saw somebody down in the front, Mr. Symes?

25                     VENIREPERSON SYMES:  Yes.

```
 1                    MR. HENDERSON:  That's correct.  I've been
 2  known to mispronounce your names.  Mr. Symes, a criminal or
 3  civil case?
 4                    VENIREPERSON SYMES:  Criminal.
 5                    MR. HENDERSON:  How long ago was that?
 6                    VENIREPERSON SYMES:  About 35 years ago.
 7  It was a DUI case.
 8                    MR. HENDERSON:  Without telling me what the
 9  verdict was, did you reach one?
10                    VENIREPERSON SYMES:  Yes.
11                    MR. HENDERSON:  Would you be willing to do
12  your civic duty one more time?
13                    VENIREPERSON SYMES:  Yes.
14                    MR. HENDERSON:  Ms. Munyan, did I see your
15  hand?
16                    VENIREPERSON MUNYAN:  Yes.
17                    MR. HENDERSON:  Criminal or civil?
18                    VENIREPERSON MUNYAN:  Civil.
19                    MR. HENDERSON:  How long ago?
20                    VENIREPERSON MUNYAN:  It was 15, 20 years.
21                    MR. HENDERSON:  And, generally speaking,
22  what type of case was it?
23                    VENIREPERSON MUNYAN:  Aggravated assault.
24                    MR. HENDERSON:  And did your jury reach a
25  verdict?
```

```
 1                    VENIREPERSON MUNYAN:  Yes.
 2                    MR. HENDERSON:  Did I miss anybody's hand?
 3     Mr. Masilionis?
 4                    VENIREPERSON MASILIONIS:  Yes.
 5                    MR. HENDERSON:  Mr. Masilionis, can you
 6     tell us?
 7                    VENIREPERSON MASILIONIS:  Not on a jury,
 8     but I've testified as a witness.
 9                    MR. HENDERSON:  Okay.  So you've testified
10     as a witness before, but haven't been on a jury; okay.  I've
11     got that down.  Anyone else with prior jury service that I
12     missed?  Those of you who have been on a jury before, were any
13     of you the presiding juror, foreperson.  And, Mr. Stinson, you
14     were -- Mr. Symes, I'm sorry.  How did you get that job?  Just
15     the first one to go to the bathroom?
16                    VENIREPERSON SYMES:  I'm not sure.
17                    MR. HENDERSON:  They elected you while you
18     were out of the room?
19                    VENIREPERSON SYMES:  I had a tie on that
20     day.
21                    MR. HENDERSON:  That's probably what did
22     it.
23          Let's talk about credibility a little bit.  In trials
24     you're going to be on a jury and part of what you're going to
25     have to do is figure out what and who you believe and what and
```

1    who you don't believe.  So you're going to be judging folks'

2    credibility.  That's just part of the job description of being

3    a juror.  Ms. Matuska?

4                   VENIREPERSON MATUSKA:  Yes.

5                   MR. HENDERSON:  How do you feel about that

6    sorting through who is shooting you straight and who is not?

7                   VENIREPERSON MATUSKA:  I think after all

8    the details, you know, one has the option to come to the wrong

9    conclusion.

10                   MR. HENDERSON:  I'm sorry, I didn't hear

11   you.

12                   VENIREPERSON MATUSKA:  You would have the

13   option of coming to their own conclusion based only on the

14   details.

15                   MR. HENDERSON:  Listen to what people are

16   saying?

17                   VENIREPERSON MATUSKA:  Right.

18                   MR. HENDERSON:  Think about it and make

19   conclusions as far as whether they are shooting you straight

20   or whether they are not?

21                   VENIREPERSON MATUSKA:  Yes.

22                   MR. HENDERSON:  Is that something you're

23   comfortable with doing?

24                   VENIREPERSON MATUSKA:  Yes.

25                   MR. HENDERSON:  Sorting through the

1  evidence and trying to figure out what's the truth, what's not
2  the truth?
3  VENIREPERSON MATUSKA:  Yes.
4  MR. HENDERSON:  Is that something you have
5  experienced doing in your everyday life?
6  VENIREPERSON MATUSKA:  Yes.
7  MR. HENDERSON:  Let me turn to Ms. Allen,
8  if I can for a minute.  Ma'am, how do you tell, how do you
9  decide if someone is telling you the truth or not?
10  VENIREPERSON ALLEN:  A lot of life
11  experience.
12  MR. HENDERSON:  Okay.
13  VENIREPERSON ALLEN:  And it helps to know a
14  little background on a person.
15  MR. HENDERSON:  What about, let me pick on
16  Ms. Centlivre.  What about a stranger?  You're not going to
17  know these people.  They are going to be strangers to you.
18  How do you decide if a stranger is telling you the truth or
19  not, ma'am?
20  VENIREPERSON CENTLIVRE:  I think you just
21  listen to them, but also listen to all the other evidence and
22  just weigh all of that.
23  MR. HENDERSON:  See if what they are
24  telling you makes sense together with everything as a whole?
25  VENIREPERSON CENTLIVRE:  Yes.

**28**
**OFFICIAL TRANSCRIPT**

MR. HENDERSON:  Is it harder to judge the
credibility of a stranger than it is someone you know and are
familiar with?

                    VENIREPERSON CENTLIVRE:  Sure.

                    MR. HENDERSON:  I notice you've got two
kids.  They are grown now?

                    VENIREPERSON CENTLIVRE:  Uh-huh.

                    MR. HENDERSON:  And I assume your children,
when they were younger, were perfect angels?  They never got
in trouble and never told a little white lie?

                    VENIREPERSON CENTLIVRE:  I wouldn't go that
far.

                    MR. HENDERSON:  They are pretty close in
age?

                    VENIREPERSON CENTLIVRE:  Right.

                    MR. HENDERSON:  I'm sure they never did one
of these and one blamed the other; right?

                    VENIREPERSON CENTLIVRE:  Right.

                    MR. HENDERSON:  Let's say that did happen
and your kids weren't perfect angels.  There's a story I
sometimes tell, and I think I'm going to tell it now.  I don't
know if you're a baker in the family.  Let's say you baked a
batch of chocolate chip cookies, and your kids are little and
you've left the room, and when you come back, the proverbial
cookie jar is open and empty, and you know you left cookies in

1    there when you left and you said, "Don't eat them now.  You
    2    can have them later.  I don't want you to spoil your dinner."
    3    Let's say you decided to investigate our particular cookie
    4    caper and find out what happened to them.  What's your first
    5    step, Ms. Centlivre?

    6                    VENIREPERSON CENTLIVRE:  Well, I'd probably
    7    ask them.

    8                    MR. HENDERSON:  Okay.  Let's say they each
    9    blame the other.  You would just throw your hands up in the
   10    air and let it go; right?  Probably not, because you wouldn't
   11    have peace in the home if you did that.  So you look into it
   12    further.  What's your next step, ma'am?

   13                    VENIREPERSON CENTLIVRE:  Well, I probably
   14    would look at their mouths to see who had crumbs.

   15                    MR. HENDERSON:  Right, right, right.  And
   16    let's say you notice crumbs on maybe your oldest kid, and
   17    let's say maybe you sit down to dinner and your younger child
   18    eats the whole meal and the older kid barely touches their
   19    plate, and maybe complains about maybe having a belly ache.
   20    What do you think?  Do you sort of got some information to
   21    judge their credibility at this point in time?

   22                    VENIREPERSON CENTLIVRE:  Absolutely.

   23                    MR. HENDERSON:  You're going to be asked,
   24    folks, to decide credibility in the case.  It's something
   25    you're going to have to wrestle with.  Is there anyone here

1   that isn't comfortable with doing that?  Is there anyone here

2   that doesn't feel that they have had enough experience in

3   their lives, either through work or through family, figuring

4   out who is telling you the truth and what the truth is?  Okay.

5   I'm not seeing any hands.

6      There are some specific issues about a couple of

7   witnesses in this case that I want to talk about.

8      You are going to hear evidence that two of the witnesses

9   for the State have criminal records.  They have prior

10   convictions for things like theft, burglary.  Quite a few

11   convictions, to be quite honest, and they are going to be

12   here.  You are going to hear information that two of those

13   witnesses have been in prison before.  So let's talk about

14   that a little bit.

15      Let me pick on Mr. Kokoruda.  Am I saying your name

16   right?

17               VENIREPERSON KOKORUDA:  Yes.

18               MR. HENDERSON:  Mr. Kokoruda, when I said

19   that, what was your reaction as you were listening to me?

20               VENIREPERSON KOKORUDA:  You would have kind

21   of a bias towards them.

22               MR. HENDERSON:  What do you mean by that?

23               VENIREPERSON KOKORUDA:  Well, they have

24   committed crimes before.  So what would make them not now?

25               MR. HENDERSON:  Fair enough.  Do other

**31**
**OFFICIAL TRANSCRIPT**

```
 1   folks have reactions to that?  What was your reaction when he
 2   said that?  Ms. Jones, what was your reaction when I said
 3   that?
 4                    VENIREPERSON JONES:  That if he was looking
 5   for someone to commit a crime, that he would pick someone that
 6   had committed a crime before?
 7                    MR. HENDERSON:  Okay.  Okay.  Mr.
 8   Breckenridge, what was your reaction, sir?  What were you
 9   thinking when I said that?
10                    VENIREPERSON BRECKENRIDGE:  I think I need
11   more information.
12                    MR. HENDERSON:  That's fair.  That's fair.
13   What I'm asking is, do any of you have any immediate sort of
14   visceral reactions to that that make you biased, sort of
15   biased or prejudiced to maybe you think I should know about
16   that.  Mr. Breckenridge, while I've got you, the fact that a
17   person has been convicted of a crime before, does that
18   automatically, automatically mean that the person is incapable
19   of telling you the truth?
20                    VENIREPERSON BRECKENRIDGE:  No.
21                    MR. HENDERSON:  What do you think about
22   that, Mr. Ralston?  A person that has been convicted of a
23   crime before, does that automatically mean?
24                    VENIREPERSON RALSTON:  Oh, no.
25                    MR. HENDERSON:  What if you hear evidence
```

1     that one of those witnesses is getting a benefit from the

2     State, is getting some help on a criminal case that he has

3     pending.  What's your reaction to that?

4                  VENIREPERSON RALSTON:  I would have to know

5     the facts before I could make a judgment.  Again, you have to

6     be open minded to what you hear, you have to hear all the

7     facts.

8                  MR. HENDERSON:  Ms. Wann, I see you nodding

9     your head.  I take it you agree?

10                 VENIREPERSON WANN:  Yes.

11                 MR. HENDERSON:  The fact that a person has

12     gotten a benefit from the State, does that mean he is

13     incapable of telling the truth?

14                 VENIREPERSON WANN:  No.

15                 MR. HENDERSON:  If you are presented

16     evidence that two witnesses have been -- let me pick on, oh,

17     let's see, Ms. Padavic.  Am I saying your name right?

18                 VENIREPERSON PADAVIC:  Yes.

19                 MR. HENDERSON:  Ms. Padavic, if you are

20     presented evidence that two witnesses have criminal records

21     and one is testifying under a plea agreement, what we call it,

22     are you willing to be open minded in listening to their

23     testimony?

24                 VENIREPERSON PADAVIC:  Absolutely.

25                 MR. HENDERSON:  Evaluate just like everyone

1    else?  Can you do that?

        2              VENIREPERSON PADAVIC:  Yes, I can.

        3              MR. HENDERSON:  I'm not asking you to

        4    ignore what the facts are.  Put all the facts into

        5    credibility?  Can you go into things with an open mind?

        6              VENIREPERSON PADAVIC:  Every situation is

        7    different.

        8              MR. HENDERSON:  Is there anyone that

        9    doesn't thinks they can go into that situation with an open

       10    mind?  Mr. Terry, I see your hand, sir?

       11              VENIREPERSON TERRY:  That put a red flag up

       12    for me.

       13              MR. HENDERSON:  That puts a red flag up?

       14              VENIREPERSON TERRY:  Yes.

       15              MR. HENDERSON:  Is that read flag such a

       16    red flag that you think those folks are incapable of telling

       17    the truth?

       18              VENIREPERSON TERRY:  No, I would seriously

       19    question their credibility.

       20              MR. HENDERSON:  That's fair.  You folks can

       21    use whatever you want to in assessing a person's credibility.

       22    But do you feel at this point in time you can be fair and

       23    impartial, sir?

       24              VENIREPERSON TERRY:  I don't know enough

       25    about the case to say that's true.

THE COURT:  Mr. Henderson, I had a juror
indicate that he needs to use the restroom.  So it's 10:32,
and let's take a very quick recess.  I told you where the
restrooms are.  Come back to your exact seat.  I'll give you
ten minutes.  It's 10:30 by my computer here.  I think this is
working.  As I told you before, it gets at little wacky on the
wall clock.  Look at your phones, don't get on your phones.
Don't try to look up the case or anything at all about this
matter.  Don't discuss it among yourselves.  You don't know
much yet, but as you all said, you need to keep open minds.  I
don't want you to look up anything or talk to anybody about
this case.  Let's take 10 minutes.  Be back in place at 10:42.
          (Whereupon, a recess was taken at 10:32
a.m., and proceedings resumed at 10:43 a.m.)
          THE COURT:  We are back on the record in
the State of Kansas versus Rheuben Clifford Johnson.  Parties
appear as before, including the defendant with his attorney.
The jury is in place.  We are in the middle of voir dire.  We
took a recess for a bathroom break.  We are ready for further
voir dire for the State.
          MR. HENDERSON:  Thank you, Judge.  Before I
go too much further, usually I cover this at the start, but I
forgot to today.
     I want to talk about the schedule a little bit.  I think
our best estimate is that this trial will take about three

days, and so we're hoping to be done Wednesday at some point
in time.  Now, that is an estimate.  In my experience, our
estimates, sometimes they are wrong and sometimes they are
really wrong, but that's our best guesstimate based on what we
think our evidence will take.

     One thing we cannot estimate is the length of your
deliberations.  Once the case is submitted to the jury, you
can deliberate for however long you feel you need to come to a
verdict.

     So with that being the schedule, do any of you have any
particularly compelling personal hardships, family vacation, a
particularly important medical procedure going on in the next
three days that would make it an extraordinary hardship to
serve on the jury?  Any hands?

               MR. HENDERSON:  Hang on, you're Ms. Wann?

               VENIREPERSON WANN:  Uh-huh.

               MR. HENDERSON:  Can you tell us?

               VENIREPERSON WANN:  We're leaving on a
family vacation Friday.

               MR. HENDERSON:  So if we wrap up Wednesday,
you'll be fine?

               VENIREPERSON WANN:  Yes.

               MR. HENDERSON:  Ms. Jones, I saw your hand.

               VENIREPERSON JONES:  I have bursitis in
both of my hips.  It's painful to sit for long periods of

```
 1    time.  Is that something that --
 2                  MR. HENDERSON:  I don't want to excuse
 3    someone if we can make an accommodation.  If we took more
 4    frequent stretch breaks like that, is there anything we can
 5    do?
 6                  VENIREPERSON JONES:  I'm supposed to start
 7    physical therapy this week.  I'm not sure what would make it
 8    better.
 9                  MR. HENDERSON:  Are you having any trouble
10    this morning?
11                  VENIREPERSON JONES:  Well, you know, we've
12    been here for a little bit.
13                  MR. HENDERSON:  Okay.  We may discuss that
14    further later, but I'll certainly take note of that.  Anyone
15    else, Mr. Tompkins?
16                  VENIREPERSON TOMPKINS:  Yes.
17                  MR. HENDERSON:  Tell us about your
18    situation.
19                  VENIREPERSON TOMPKINS:  I work on straight
20    commission.
21                  MR. HENDERSON:  Okay.
22                  VENIREPERSON TOMPKINS:  Every day I'm not
23    working, I'm not making money.
24                  MR. HENDERSON:  So as you sit here, you're
25    not getting paid?
```

**37**
**OFFICIAL TRANSCRIPT**

```
 1                    VENIREPERSON TOMPKINS:  Right.
 2                    MR. HENDERSON:  Is that something that's
 3      going to be weighing on your mind and distracting you from the
 4      case?
 5                    VENIREPERSON TOMPKINS:  Yes.
 6                    MR. HENDERSON:  And, again, I don't want to
 7      pry, is that something that's going to cause you, not getting
 8      paid for the next three days, some financial hardships?
 9                    VENIREPERSON TOMPKINS:  Possibly.
10                    MR. HENDERSON:  That being the case, I
11      guess I'll ask you straight out, do you want to serve, or do
12      you think you're going to be too focused on other things to
13      really give this your full attention?
14                    VENIREPERSON TOMPKINS:  Being three days, I
15      just -- I don't understand the facts -- I'd prefer not to.  I
16      do want to do my civic duty, but I want to let you know that's
17      a potential problem.
18                    MR. HENDERSON:  You know your situation
19      better than I do.  If I just ask you straight out, do you want
20      to be excused?
21                    VENIREPERSON TOMPKINS:  Yes.
22                    MR. HENDERSON: Judge, that being the case,
23      I would ask Mr. Tompkins to be excused for cause.
24                    THE COURT:  Mr. Toth?
25                    MR. TOTH:  I have no objection, Judge.
```

```
 1                    THE COURT:  I will ask Mr. Tompkins to have
 2       a seat in the gallery, and Ms. Nelson will call another name.
 3                    (Whereupon, Samantha Serum was called
 4       forward.)
 5                    THE COURT:  This is how it works.  You all
 6       pay attention back there.  Is there anything that I asked to
 7       which you would have raised your hand?
 8                    VENIREPERSON SERUM:  No.
 9                    THE COURT:  Thank you.  Mr. Henderson.
10                    MR. HENDERSON:  Thank you, Your Honor.  Ms.
11       Serum, welcome to the hot seat.
12                    VENIREPERSON SERUM:  Thank you.
13                    MR. HENDERSON:  I assume you were listening
14       to the questions I was asking you as well?
15                    VENIREPERSON SERUM:  Yes.
16                    MR. HENDERSON:  Did you know any of the
17       witnesses whose names I read?
18                    VENIREPERSON SERUM:  No.
19                    MR. HENDERSON:  Did you have any particular
20       reactions to the questions I asked before?
21                    VENIREPERSON SERUM:  No.
22                    MR. HENDERSON:  Have you ever been a victim
23       of any crime against your person?
24                    VENIREPERSON SERUM:  Yes.
25                    MR. HENDERSON:  Can you tell me about that,
```

1  please?

2               VENIREPERSON SERUM:  About three years ago,

3  my townhouse got broken into.

4               MR. HENDERSON:  Did you happen to be home

5  when that happened?

6               VENIREPERSON SERUM:  Yes.

7               MR. HENDERSON:  Anything about that

8  situation that makes you unable to be a fair and impartial

9  juror in this case?

10              VENIREPERSON SERUM:  No.

11              MR. HENDERSON:  Have you been a juror

12  before?

13              VENIREPERSON SERUM:  No.

14              MR. HENDERSON:  I was talking with the

15  panel as a whole about the schedule, and I don't want to give

16  the impression that I'm handing out "get out of jury duty free

17  cards," but do any of you have concerns about the schedule?

18  Ms. Munyan?

19              VENIREPERSON MUNYAN:  That's correct.

20              MR. HENDERSON:  Can you tell us about your

21  concerns.

22              VENIREPERSON MUNYAN:  I have a follow-up

23  appointment with a doctor on Thursday morning.  So if it got

24  delayed, the follow-up procedure, I could call and reschedule

25  it today, but I don't know.

**40**
**OFFICIAL TRANSCRIPT**

1          MR. HENDERSON:  That sounds to me the sort
2    of thing we can maybe work around.  I'm reasonably confident
3    we'll be done Wednesday.  If we stretch into Thursday, we can
4    make some accommodation.  Would that work for you?
5          VENIREPERSON MUNYAN:  Yes.
6          MR. HENDERSON:  Thank you, ma'am.  Anyone
7    else that I missed?  I want to talk a little bit about some
8    principles in the law that you're going to be dealing with
9    over the course of this case.
10         The first one I think I alluded to it earlier.  It's
11   called "the presumption of innocence."  Under our legal
12   system, folks who are accused of crimes are presumed to be
13   innocent, and they retain that presumption of innocence
14   throughout the case unless the State proves it otherwise.
15         So at this point in time Mr. Johnson has been charged
16   with crimes, but he is presumed innocent of those crimes.
17   That's how or constitutional system works.  Is everyone
18   comfortable with that?
19         Mr. Case, I'm going to pick on you a little bit.  The
20   presumption of innocence, that something you're comfortable
21   with; is that correct?
22         VENIREPERSON CASE:  Yes.
23         MR. HENDERSON:  When the Judge later on at
24   the end of the case the Judge is going to present the jury
25   with a packet of what we call Instructions.  They will be

instructions to tell you folks what the law is on this case. One of those instructions will deal with the presumption of innocence, and I take it, Mr. Case, you're going to be able to follow and going to follow that particular instruction; is that correct?

VENIREPERSON CASE: Yes, sir.

MR. HENDERSON: Anyone think otherwise? Is there anyone that isn't capable of looking at Mr. Johnson now and presuming him to be innocent? Because if you can't do that, then I don't want you on the jury because you can't follow the law. Okay. Anybody's hand? Great, I'll move on.

I said that Mr. Johnson is presumed to be innocent unless the State proves otherwise.

So the next concept I want to talk about is what's called the burden of proof, and that is on me and Mr. Hurst. That is on the State. The State has the burden of proof in this case. The defendant does not have a burden. He does not have to present any evidence. He can, if he wants to. He does not have to testify. He can, if he wants to. If he chooses not to testify, you can't hold that fact against him. You can't consider that in your deliberations. It's just he didn't testify, you move on. Okay. And that's because the burden of proof in a criminal case is always on the State. Is everyone comfortable with that?

Ms. Saladin, I'm going to pick on you once again. I told

1   you that Mr. Johnson is presumed innocent and the burden of
2   proof is on the State; right?
3                   VENIREPERSON SALADIN:  Uh-huh.
4                   MR. HENDERSON:  I'll give you a little pop
5   quiz.  If the Judge shut me down right now and said:  Ladies
6   and gentlemen, go back to the jury room, talk it over and come
7   back with a verdict.  Knowing Mr. Johnson is presumed innocent
8   and the burden of proof, the burden is on me and I haven't
9   proven anything thus far, what would your verdict be?
10                  VENIREPERSON SALADIN:  Not guilty.
11                  MR. HENDERSON:  Is everyone in agreement?
12  Because he's presumed innocent and the State hasn't done
13  anything, is everyone comfortable with that?  Great.
14       The next thing I want to talk about is what we have to
15  prove.  What is our burden?  Well, like I said, at the end of
16  the case you will get a packet of instructions that will tell
17  you what the law is going to be.  Some of those instructions
18  will deal with what we call the elements of the crimes.
19       Elements are basically a checklist of those things that
20  we are required to prove to you before we can find a defendant
21  guilty of a crime and we have to prove each and every one of
22  those elements to you.  We've got to prove them beyond a
23  reasonable doubt, and we'll talk about that in a minute, but
24  that's what we have to prove, those elements.
25       Now, I can't really talk about the elements of these

1  particular crimes because that's not my job, and we are not at

2  that point of the case yet.

3      But to talk about elements a little bit, and let me pick

4  on Mr. Pingel, if I can, sir. Let's say that somebody passed

5  a law that made it illegal to eat grape jelly sandwiches on

6  Thursday mornings. Okay. A pretty silly law, would you

7  agree? Would you say yes?

8              VENIREPERSON PINGEL: I would say it is.

9              MR. HENDERSON: Okay.

10             VENIREPERSON PINGEL: The burden of proof.

11             MR. HENDERSON: But let's say somebody

12  passed it, and let's say the case we got here today is we're

13  trying our grape jelly sandwich case. What would the elements

14  of that crime have to be? What would I have to prove to you

15  to prove our sandwich person is guilty, to see if we can

16  figure it out? I'd say it's got to be a grape jelly sandwich,

17  right, sir?

18             VENIREPERSON PINGEL: Right. It's got to

19  be a sandwich, yes.

20             MR. HENDERSON: I've got to get your

21  answers for the court reporter.

22             VENIREPERSON PINGEL: Yes.

23             MR. HENDERSON: So it's got to be a

24  sandwich, number one: It's got to have grape jelly on it, and

25  got to have someone eating the thing; right?

**44**
**OFFICIAL TRANSCRIPT**

```
 1                    VENIREPERSON PINGEL:  Uh-huh.

 2                    MR. HENDERSON:  It's got to be a Thursday

 3  and got to be in the morning.  So five elements; is that

 4  right, Mr, Pingel?

 5                    VENIREPERSON PINGEL:  You betcha, yeah.

 6                    MR. HENDERSON:  We've covered them all, if

 7  I can tell?

 8                    VENIREPERSON PINGEL:  As far as it seems.

 9                    MR. HENDERSON:  Ms. Monsivaiz, close

10  enough?

11                    VENIREPERSON MONSIVAIZ:  Close enough.

12                    MR. HENDERSON:  Five elements:  The

13  sandwich, grape jelly, got a guy eating it on a Thursday, and

14  it's in the morning?

15                    VENIREPERSON MONSIVAIZ:  Yes.

16                    MR. HENDERSON:  Those are five things I've

17  got to prove to you to find a person guilty of this crime?

18                    VENIREPERSON MONSIVAIZ:  Yes.

19                    MR. HENDERSON:  What if I prove to you that

20  we've got a gentleman who is eating a sandwich, and, by gosh,

21  he's got grape jelly on a Thursday, and it's 12:01 p.m.  Have

22  I proven my case to you, ma'am?

23                    VENIREPERSON MONSIVAIZ:  No.

24                    MR. HENDERSON:  No, why not?

25                    VENIREPERSON MONSIVAIZ:  He did not eat it
```

```
 1   in the morning.
 2                   THE COURT:  It's 12:01.
 3                   VENIREPERSON MONSIVAIZ:  Not by the
 4   elements.
 5                   MR. HENDERSON:  And if it's not by the
 6   elements and you don't win by close enough in a criminal case,
 7   I have to prove each and every one in the case.  All right.
 8   Is everyone comfortable with that?  All right.
 9       Ms. Walterscheid, we have got a sandwich, grape jelly, a
10   guy eating it, it's Thursday, and it's in the morning.  Those
11   are the five elements required to prove to you; correct?
12                   VENIREPERSON WALTERSCHEID:  Correct.
13                   MR. HENDERSON:  Do I have to prove to you,
14   Ms. Walterscheid, whether our particular fellow made his
15   sandwich with white or wheat bread?
16                   VENIREPERSON WALTERSCHEID:  No.
17                   MR. HENDERSON:  Why not?
18                   VENIREPERSON WALTERSCHEID:  Because a
19   sandwich is a sandwich.
20                   MR. HENDERSON:  A sandwich is a sandwich.
21   I've just got to prove that it's not a bagel?
22                   VENIREPERSON WALTERSCHEID:  Right.
23                   MR. HENDERSON:  The elements didn't say
24   anything about white or wheat bread?
25                   VENIREPERSON WALTERSCHEID:  No.
```

```
 1                    MR. HENDERSON:  Ms. Matuska?

 2                    VENIREPERSON MATUSKA:  Matuska, yes.

 3                    MR. HENDERSON:  I'll try to get that right

 4     next time.  Do I have to prove whether our sandwich either had

 5     chicken or tomato soup with his sandwich?

 6                    VENIREPERSON MATUSKA:  No.

 7                    MR. HENDERSON:  Not one of the elements?

 8                    VENIREPERSON MATUSKA:  No.

 9                    MR. HENDERSON:  Maybe it's a fact of the

10     case, and maybe it's important, but can you find someone

11     guilty of that crime without knowing what kind of soup they

12     had with that?

13                    VENIREPERSON MATUSKA:  Yes.

14                    MR. HENDERSON:  Yeah.  Because I have to

15     show you that it's a sandwich, has grape jelly on a Thursday

16     in the morning.  I'm not required to prove to you what kind of

17     soup it was; right?

18                    VENIREPERSON MATUSKA:  Right.

19                    MR. HENDERSON:  Does that make sense to

20     everyone as far as what the elements are and what has to be

21     proven?  What's required to be proven?  Okay.  I mentioned the

22     term "beyond a reasonable doubt" a little while ago.  You know

23     it's obviously something that comes up in criminal cases.  Who

24     all has heard that term before, "beyond a reasonable doubt"?

25     Pretty much everybody.
```

I cannot tell you what it means.  I cannot provide you
with a definition.  If I were to start to tell you what I
think beyond a reasonable doubt means, the Judge would shut me
down.  She would tell me:  Mr. Henderson, it's not your job.
It's for the jury to determine what is beyond a reasonable
doubt, and I think that's a hard thing to ask you folks to
figure out what such an open-ended concept means and not give
you guidance and not give you a definition.
So I think it's something the jury sometimes struggles with.
       I can't talk to you about what proof beyond a reasonable
doubt means, but I can talk to you a little bit about what it
doesn't mean, and maybe that will help.
       Those of you who have been on civil juries before, can
you raise your hands for me one more time.  Those of you who
have, the burden of proof in a civil case is different than in
a criminal case.  It's usually by a preponderance of the
evidence.  Does that sound familiar to any of you?  I know for
a lot of you it was a long time ago.
       Mr. Habib, I've seen you shake your head.  Were you
saying that does sound familiar or not?
                    VENIREPERSON HABIB:  Okay.
                    MR. HENDERSON:  What that means, the
preponderance of the evidence, it means more likely than not.
If you're going to put a number on it, it means whatever side
has 51 percent of the evidence beats the side with 49 percent

1  of the evidence, so that's a civil burden.  There are other

2  burdens under civil law.  There's a higher one called clear

3  and convincing evidence which means higher still than

4  preponderance of the evidence.  So those are civil burdens,

5  and that's not proof beyond a reasonable doubt.  Proof beyond

6  a reasonable doubt is the criminal burden, and it's the

7  highest burden that we have under our legal system.  It is the

8  highest standard of proof that's required to be proved in the

9  case, proof beyond a reasonable doubt.  That's the standard in

10  this case, and I want to make sure that each and every one of

11  you are willing to hold the State to that standard, if

12  selected as a juror.  Is everyone willing to do that?  Okay.

13      Ms. McDonald, what about you?  Are you willing to hold

14  the State to that standard?

15                    VENIREPERSON MCDONALD:  Yes.

16                    MR. HENDERSON:  You're not going to let me

17  and Mr. Hurst skate on a lower standard?

18                    VENIREPERSON MCDONALD:  No.

19                    MR. HENDERSON:  Well, you're not going to

20  say:  Well, they got close enough, I'm going let them skate?

21                    VENIREPERSON MCDONALD:  No.

22                    MR. HENDERSON:  Is anyone going to let me

23  or Mr. Hurst skate by?  I'm not seeing any hands.  Let's see,

24  we talked about some lower burdens of proof.  Let's do the

25  flip side of that coin.

1         Ms. Wann, is there a difference between proof beyond a
         2    reasonable doubt and proof beyond all doubt?
         3                        VENIREPERSON WANN:  Yes.
         4                        MR. HENDERSON:  What is that difference?
         5                        VENIREPERSON WANN:  Well, I guess if you're
         6    caught in the act, that's someone catches you doing it, then
         7    you know that they did it.  That's how I see it.
         8                        MR. HENDERSON:  Let's talk maybe a little
         9    more generally.
        10                        VENIREPERSON WANN:  Okay.
        11                        MR. HENDERSON:  Proof beyond a reasonable
        12    doubt requires me to prove something to where you don't have
        13    any reasonable doubt left.  Is that fair?
        14                        VENIREPERSON WANN:  Yes.
        15                        MR. HENDERSON:  Proof beyond a reasonable
        16    doubt would require me to prove something where you have zero,
        17    no doubt.
        18                        MR. TOTH:  Judge, I object.  I object to
        19    the line of questioning.  Mr. Henderson is injecting his own
        20    opinions as to that.
        21                        THE COURT:  I think the question was
        22    permissible, but I think you've covered that line of
        23    questioning.  Proof beyond a reasonable doubt, the Court has
        24    to instruct you in the law, and I will do that.  I think
        25    what's been done has been permissible, but I would say move

1    on.

2                    MR. HENDERSON:  Kind of the last thing I
3    want to talk about then is sometimes when I'm done with a
4    case, I talk with the jurors.  During the course of the case,
5    the attorneys, the people, the folks involved, we are not
6    going to speak with you.  In fact, we will probably actively
7    avoid you.

8         The reason we're doing that is because we're not rude
9    people or we want to be unfriendly.  It just wouldn't look
10   right if, Mr. Habib, if you and I were off in the corner
11   having a private conversation.  Maybe we're talking about the
12   Royals, but it wouldn't pass the smell test.  It wouldn't look
13   right.  So I'm not even going to talk to you except to say
14   "thank you," "excuse me," or "please," or something like that.
15   If you have a question for me, don't ask me, ask one of the
16   Court's staff, approach Ms. Nelson with the question because I
17   get very uncomfortable when jurors try to speak with me.
18   I will actively avoid you.  We try to avoid the appearance of
19   impropriety, so we're not going to go there.

20        After the case is done, we can speak to each other, to
21   one another if you want to.  It's entirely voluntary, entirely
22   up to you.

23        Sometimes when I have spoken with jurors after a case is
24   done, they have talked to me about some issues that they have
25   had, and some jurors have told me, you know, Mr. Henderson, I

felt the State proved its case beyond a reasonable doubt.  I
felt that each and every element required to be proven was
satisfied, but for some reason, I had difficulty voting
guilty, and that was because I felt like I was sitting in
judgment of another person.  I think that's a fair concern.  I
think it can be hard if you feel like you're judging another
person and that can be difficult.  We might think that that's
not our place, that that's someone else's place or some other
being's place to judge.  For whatever reason, be it religious,
philosophical or moral, I think that's fair, and I don't know
if any of you will have that particular concern if you're
selected as a juror.

But if you do think this way, you won't be asked to judge
a person.  You're going to receive some instructions.  You're
going to be receiving a verdict form where the jury indicates,
you know, what their verdict is.  It's not going to say "sign
here if you think the defendant is a good person," "sign here
if you think he's a bad person."  "Sign here if you think the
witnesses are good people," "sign here if you think they are
bad people."  You won't be asked to judge anyone.  You will be
asked to judge the facts of the case and apply those facts as
you find them to the law provided to you by the Judge.

So maybe if you find yourself having that particular
difficulty, think of it that way and maybe that will help.

Okay.  I am just about done, folks.  This is my last

1   chance to speak with you.  Like I said, from here on out I
2   will do my best to actively avoid you.
3       Do any of you have anything that you think I should know?
4   Any questions that I should have asked you?  Any information
5   that I should have gotten to but I just didn't ask the right
6   question for some reason?  Okay.  I'm not seeing any hands.
7   Thank you for your time and attention.  Judge, I pass the
8   panel for cause.
9                    THE COURT:  Mr. Toth, Ms. Johnson, do you
10  wish to inquire?
11                   MR. TOTH:  Yes, Judge.
12                **VOIR DIRE EXAMINATION**
13  BY MR. TOTH:
14      Good morning everyone.  You know, I really like the way
15  that Mr. Henderson phrased that last line of questioning about
16  standing in judgment of another person because he's absolutely
17  correct.  Your goal, and your role is really to determine
18  whether or not the State has met all of the elements that they
19  are required to show you.  And they have done so to the extent
20  they have met their burden of proof.
21      As I've already guessed, there's going to be witnesses
22  that are presented in this case, some of which bring some
23  baggage to this courtroom, some of which do not.
24      As jurors you have to assess the credibility of the
25  witnesses without making a determination or a judgment as to

whether or not they are a good person or a bad person.  And
that concept applies to not only the witnesses, but it applies
to the defendant in this case, Mr. Johnson.

What my role here today right now is to make sure that
I'm satisfied that there are 12 of you that are seated right
there that can be fair to him, that can look through the
issues of whether or not you might think he exercises bad
judgment or issues regarding character, things of that sort.
I have to make sure that I'm satisfied that there are 12
people that can properly and effectively look to whether or
not the State has proved their case beyond a reasonable doubt.
Twelve people that can be fair, and, you know, this is an
inexact science.  It really is, and lawyers have different
styles when they are going through jury selection, and I
really like Mr. Henderson's style.  He does a good job of
bringing out issues.

My style is a little different.  I tend not to focus in
on asking one particular juror questions, although I've been
known to do that.  I tend to try to ask the panel as a whole.
Because, quite frankly, most of the issues have already been
addressed by Mr. Henderson and my co-counsel Debbie and I have
been making notes.

There's just a few other questions that are tailored more
towards what we're looking for that I'm going to address with
you this morning.

So let me get started here and try to get you out by
lunch time.  I tend not to take a whole long time in doing
jury selection.  And, again, my name is Scott Toth, my last
name is spelled, T-O-T-H.

        I am a criminal defense practitioner whose office is here
in Olathe.  I have an office right across the street from the
courthouse.  I am in a three-man partnership with two other
lawyers.  Their names are Tyler Garretson and Christian Webb.
I have been practicing criminal defense for the last seven
years and emphasize trial work.  I'm one of these guys that I
don't do anything other than defense work.  I don't sue
people, divorce people, things like that because I feel like
this is what I'm comfortable doing.  It's what I think I'm
good at, and the reason that I believe that is because prior
to becoming a criminal defense attorney, I was a prosecutor.
I was a prosecutor for 18 years here in the Johnson County
District Attorney's Office.

        I was hired in 1988 by former U.S. Congressman Dennis
Moore.  I worked for Paul Morrison and went into private
practice in 2006.  So when you come from that background where
you've been prosecuting murders, rapes, robberies, things like
that for so long that it makes it a good fit to go into the
line of work I do now because I think it shows some balance,
and I like doing what I do.  I like trying cases.

        I've tried a lot of cases.  I've tried about 125 jury

trials.  That's a lot of jury trials.  So I have got things I can bring to the table with my client and hopefully evaluating who can be fair and who cannot be fair.

My co-counsel, actually, she's a Missouri attorney. We've become pretty good friends over the course of the last year or so.  She's getting admitted into the State of Kansas, and although she practices primarily juvenile law and helps kids with disabilities and things like that, get into school systems and deal with IEPs and things like that, she's trying to broaden her practice a little bit.

I've asked her to co-counsel, and she's going to be taking notes and assisting me with this defense.

My client is an individual named Rheuben Johnson. Rheuben lives out in rural Johnson County where he's lived for quite a period of time.

He is now single.  He is divorced from his ex-wife, Annie, who is the person that he's accused today of hiring people to go out and do harm to her.  He, of course, denies that, and that's why we're here.

Rheuben owns a number of businesses in Johnson County.  I want to make sure that nobody has had any contact with him before; or, if you have, that your contact has not affected your ability to be fair or impartial to him.

Primarily the latest business venture that he had was kind of an exterminator business, but really more of an

emphasis on bees, beekeeping, bee extermination, things of those sorts. So if somebody has a hive up in their attic and would call Rheuben, and he has his company called ABee's, and he could come out and extract them, and he's been doing this for quite a while.

Also, he's involved in small pest removal. It doesn't have to be bees, but more snakes, and I call it varmints, and I watched too much Duck Dynasty with my son. But those kind of things, critters, things like that can be invasive in the house. Rheuben and his workers will go out and extract them and safely remove them.

He's also been in the landscaping business for quite a period of time. He owned a business called Apex Lawn and Landscape. He also did some snow removal when it wasn't landscaping season, and he also owned, or at least owned at one point, a company called Aquatic Gardens of Kansas City, where he would take exotic plants that are usually harvested towards the Gulf Coast area and bring them up here and sell them and grow them and sell them out to the general public.

With that being said, that's my client Rheuben Johnson. Does anybody know Rheuben or has anybody had any contact with him before? Great, I see no hands. What about me or Deborah Johnson, has anybody had any contact with us? Because I don't recognize anybody on the panel. Very good. Okay.

Well then, let me talk about, you know, as far as the

witnesses go, Mr. Henderson indicated the State's witnesses he anticipated on calling.

For us, you know, we may be calling witnesses. We may not be calling witnesses. Again, as Mr. Henderson said, we are in no obligation to do that. If we do, I think one of the witnesses would be a woman named Kat Klosterman. It's K-A-T, which obviously is short for Katherine. I may be mistaken. I'll have her correct that if she testifies. She is Mr. Johnson's long-time girlfriend. She is very close to him and has a lot of knowledge about the situation and dynamics involved.

Mr. Johnson may or may not take the stand. He's certainly not required to, and I'm going to address that in a little bit.

The complaint was read to you, and, as you know, it's a three-count complaint, three identical charges. Essentially under all three charges Mr. Johnson is accused of essentially asking, hiring, encouraging somebody to kill his ex-wife. Okay.

And what you're going to hear as far as three people, one of them is a police officer, one of them is somebody that Mr. Johnson met over at the jail, and one of them is an individual that was doing some -- potentially doing some work for Mr. Johnson out on his farm over in Gardner. That's who those individuals are.

I couldn't help but notice when the court read the
charges to you that some of you were like:  Whoa, this isn't
anybody stealing some candy bars here.  This is a significant
thing.  And some of you naturally had a tendency to look over
at our desk and maybe look at Mr. Johnson, maybe look at me or
my co-counsel, and that happens.  And, you know, there's
nothing that can be done about that because in a certain
respect when you have a charge like this, it's, you know, most
people don't go through something like this before,
allegations of somebody doing something like this.  And it can
be spooky and scary and things of that sort.  But I have to
make sure that you understand that this is an allegation only.
All the State at this point has done is prepared a legal
document that sets out what these charges are.  And that's a
judgment call that was made by some prosecutor who believes
that there's enough evidence there.
         As jurors you have to determine whether or not that is
true.  Now, Mr. Johnson has a constitutional right to have a
trial, a constitutional right to have 12 fair people determine
whether or not the State has met their burden.
         My question to the panel as a whole is this:  Does
anybody on this panel believe that because he is charged with
this offense that that necessarily means he's guilty?  If so,
would you please raise your hand.  Okay.  Great, I think I've
emphasized my point that we all understand that it is an

1    allegation only.

2         A couple of other things along those lines.  Being

3    involved in this process, the criminal trial is really unique,

4    and it's really unique in my world, the Judge's world, the

5    prosecutor's world.  The reason I say that is only about five

6    percent of all criminal cases go to trial.  They usually get

7    resolved one way, shape or form, whatever.

8         So when you actually have a case that goes to a jury

9    trial, that's the exception rather than the rule.  But he has

10    a right to have a trial, and he's chosen to have a trial.

11        Is there anybody that's on the panel that believes that

12    because Mr. Johnson is exercising his constitutional right to

13    go to trial that that means he is more or less guilty than

14    anybody else who does not?  If so, please raise your hand.  I

15    see no response.

16        Mr. Henderson addressed with you the two main legal

17    principles involved in a case like this.  That is the

18    presumption of innocence and then the burden of proof, which

19    is proof beyond a reasonable doubt.  I think everybody here

20    has now agreed if you had to take a vote right now, because

21    you don't have any evidence in front of you, you would have to

22    find the defendant not guilty.  Again, is there anybody else

23    out there that disagrees with that?  Because, if so, I need to

24    know that.

25        All right, I see no response.  There's a reason why we

have this presumption of innocence, obviously. And it's been
this way for hundreds and hundreds of years. All criminal
cases are dealt with the same standard: Proof beyond a
reasonable doubt, and the defendant is presumed innocent. And
that presumption of innocence is probably as important as the
burden of proof.

That means that my client has no burden. He does not
have to present any evidence whatsoever, although we may
present evidence in this case. And as jurors, you cannot make
any inference against him if he doesn't present any evidence
because it's irrelevant. All right.

Has anybody on the panel ever -- well, you probably have.
This is going to be a stupid way to ask.

Has anyone heard the Fifth Amendment before? The Fifth
Amendment of the Constitution says that a person cannot be
compelled to incriminate themselves. And yet the logical
extension of that is that a person cannot be compelled to give
information either to the police or to the Court or to testify
in a trial. And that's one of the longstanding principles
that we have. And that is the State who has the burden. It's
not the defendant who has the burden.

Now, again, as I told you, you know, we don't precisely
know whether my client is going testify or not, but can
anybody on the panel think of a reason why a person who
maintains they are innocent would not want to testify in a

1    case?  Can anybody think of a reason?  Ms. Evans.

2                    VENIREPERSON EVANS:  They don't want to

3    implicate themselves.

4                    MR. TOTH:  Okay.  Well, that's probably the

5    most easiest reason, and that was Ms. Wann -- sorry, Ms.

6    Evans.

7                    MR. TOTH:  Can anyone else think of a

8    reason?  Yes, Ms. Monsi --

9                    VENIREPERSON MONSIVAIZ:  Monsivaiz.

10                   MR. TOTH:  Exactly.  Thank you.  What other

11   reason can you think of?

12                   VENIREPERSON MONSIVAIZ?  Just too nervous

13   under pressure.

14                   MR. TOTH:  Right.  That's a good reason.

15   You know, has anybody ever had to give a public presentation

16   to a bunch of strangers before?  I mean, maybe some of you

17   have and some of you haven't, but unless you are really

18   trained and skilled and you really enjoy doing things that

19   like that, it could be really scary, and it can be intimating

20   and sometimes you don't come across the way that you could or

21   should.  I mean, it happens to all of us.  I mean, we've all

22   been in a position where we're uncomfortable and addressed

23   people before.  Maybe it's as simple as something like that,

24   but is there anybody on the panel that believes that a

25   criminal defendant should have to take the stand to defend

themselves?  If so please raise your hand.  All right.

Is there anybody on the panel that would hold it against Mr. Johnson if he decides not take the witness stand?  If so, please raise your hand.  All right.  I appreciate that.  I'm not going to beat you over the head with that concept.  I think we all understand.

Reasonable doubt, again, I thought Mr. Henderson did a good job of explaining reasonable doubt to the extent that you should understand that it is high.  It is the highest burden that we have in our system.

Now, we can't define it for you, and that's why at one point you heard me stand up and object.  And out of respect for Mr. Henderson, when I make an objection, folks, it's not because I'm trying to play games or anything like that.  I only try to do that if there's a valid, legal reason to interrupt somebody.  Because nobody likes to be interrupted, and I get that.  I've been doing this too long.  But objections will happen from time to time.  He's going to object to something I do, and I'm going object to something he does.  I can tell you that Mr. Henderson and I are friends. Mr. Hurst and I are friends, but that's away.  In the courtroom we have our roles, and my role is certainly to represent my client, and I'm going to do so zealously.  But the point I was trying to make about that is that reasonable doubt is what you think it is.  It's based on common sense.

It's based on everyday experiences.  I think you now understand that it's the highest burden that we have in the land.

Mr. Henderson indicated to you that when you sue somebody for money, and let's say you get in a car wreck and you're trying to get money from the other side because they were negligent.  Would the law that the Judge will instruct the jury there is if you believe one side has proven their case beyond a preponderance of the evidence, then you have to vote for that side.  And basically what that means is if you believe one side is 51 percent and the other side is 49 percent, you've got to vote in favor of the 51 percent.

When the State comes in to take a child out of a family unit, in this state anyway, the burden of proof is the state has to prove that the child's life, health, safety is endangered based on clear and convincing evidence.  That's a higher standard of proof based on the preponderance of the evidence.  That's higher; that's more.  You have to prove more than 51 percent, but yet it's still not as high as the standard of proof beyond a reasonable doubt.

Okay.  Is there anybody on the panel that doesn't understand that at this point?  If so, would you please raise your hand.  Okay.  I see no response.

Is there anybody on the panel that thinks that's just a bunch of BS?  It shouldn't be that way.  It shouldn't be that

hard for the State to have to convict somebody of that crime.
The burden of proof should be less than that.  It should be
either clear and convincing or preponderance or whatever.  Is
there anybody on the panel that believes that?  If so, please
raise your hand.  Okay, I see no response.

     Is there anyone on the panel that knows of somebody
that's been unjustly accused of a crime before?  Mr. Terry?

                    VENIREPERSON TERRY:  My brother right now
is being accused.

                    MR. TOTH:  Your brother?

                    VENIREPERSON TERRY:  Yes.

                    MR. TOTH:  And I take it that's a pending
case that's going on somewhere?

                    VENIREPERSON TERRY:  Yes.

                    MR. TOTH:  Is it from around here?

                    VENIREPERSON TERRY:  It's on the Missouri
side.

                    MR. TOTH:  Okay.  I take it because you
were quick enough to answer, quick enough to raise your hand,
that you know that that can happen from time to time; right?
The system is not completely foolproof, is it, Mr. Terry?

                    VENIREPERSON TERRY:  No.

                    MR. TOTH:  The fact that you're aware that
your brother may be unjustly accused of something like right
now, does it make it where it would affect your ability to be

```
 1   fair and impartial in this case?

 2                    VENIREPERSON TERRY:  Maybe, because my

 3   brother is being accused for defending himself, and just the

 4   whole way the way things went down, I mean it seems too

 5   obvious for me why it has gotten as far as it has.

 6                    MR. TOTH:  Do you think that the

 7   authorities in that case, whether prosecutor or police, jumped

 8   the gun or misanalyzed the evidence?

 9                    VENIREPERSON TERRY:  Yes, I do.

10                    MR. TOTH:  Okay.  So you believe that that

11   can happen sometimes?

12                    VENIREPERSON TERRY:  Yes, I do.

13                    MR. TOTH:  Things are subject to different

14   interpretations sometimes?

15                    VENIREPERSON TERRY:  Yes.

16                    MR. TOTH:  Well, let me ask you this:  If

17   you were given alternative interpretations either by way of

18   evidence or inferences on this particular case, would you

19   carefully weigh both sides of this before making a decision?

20                    VENIREPERSON TERRY:  Yes.

21                    MR. TOTH:  All right.  Is there anybody

22   else on the panel that knows somebody that's been unjustly

23   accused of a crime before?  Okay.  Mr. Masilionis?

24                    VENIREPERSON MASILIONIS:  Yes.

25                    MR. TOTH:  And is that something that's
```

1    ongoing right now?

 2                    VENIREPERSON MASILIONIS:  No.

 3                    MR. TOTH:  Did everything work out okay in

 4    the end?

 5                    VENIREPERSON MASILIONIS:  Yes.

 6                    MR. TOTH:  You as well then are aware at

 7    times the authorities come to rush to jump or misanalyze

 8    evidence?

 9                    VENIREPERSON MASILIONIS:  Yes.

10                    MR. TOTH:  And do you mean, do you feel

11    that's what happened in the particular case you're referring

12    to?

13                    VENIREPERSON MASILIONIS:  Yes, that's

14    right.

15                    MR. TOTH:  Do you think that that is

16    something that would affect your ability to be fair and

17    impartial in this case?

18                    VENIREPERSON MASILIONIS:  No.

19                    MR. TOTH:  Do you promise to listen to all

20    the evidence before making a determination?

21                    VENIREPERSON MASILIONIS:  Yes.

22                    MR. TOTH:  Very good.  Is there anybody

23    else on the panel?  Okay.

24         You know, I told you a little bit that my client -- well,

25    the alleged victim in this case is his ex-wife.  They had

recently got divorced.  They have a small boy together, who is also named Rheuben.  They call him little Rheuben.  I think he was five at the time this was going on, something along those lines.

Anyway, a divorce is going on, and they were working through the court system to try to get issues regarding the child custody taken care of.  It happens.

Has anybody on the panel gone through a divorce before?  Okay.  We've probably got half of our panel.  I'm not going to ask anybody individually about that because it's very, very common.  Does anybody think that just because somebody is going through a divorce that that necessarily means that automatically they would want to kill their spouse or ex-spouse?  Think about that.  Is there anybody that thinks just because somebody gets divorced that they end up hating each other so much that one of them is going to try to kill the other person.  Does anybody believe that?  Okay.  I see no response.

Is there anybody on the panel that doesn't understand that sometimes people can go through a divorce and it can even be contentious at times, but that's just the way it is, and that doesn't necessarily mean that the one side necessarily wants to cause physical harm to the other side?  Is there anybody that disagrees with that?  If so, raise your hand.  I see no response.

Again, this is all, what I said, this case is going to be
guided by common sense, personal experience.  It's difficult
for me to phrase questions like that because I have to get out
there and use extreme examples.  But if you can utilize common
sense and wait until the evidence is in and agree to be fair
to Mr. Johnson, then you are a good juror in my mind.

        Now, again, I'm sure probably all of you could do that,
but because the way this works with the deselection, we have
to cut you down to 12.  So if you want to be on this panel and
you're not, I apologize.  If you didn't want to be on the
panel and you are, conversely, I apologize.  I know you're all
fine people, and I think you can all do a fair job.

        Is there anybody on the panel who ever had to wear one of
these really goofy, bulky contraptions on their foot before?
I see a number of people.

        I broke my foot about a month ago.  So in case you're
wondering, but that's what it is.  So, anyway, you've all been
extremely gracious, and I appreciate your honesty with me.  I
know you can be fair jurors, and that's why I'd like to go
ahead and recommend to the Court to pass the panel for cause.
Thank you, Your Honor.

                    THE COURT:  We will now begin the process
to where we pare you down to 13, and the State will have the
first strike.

```
 1                    (Whereupon, the following jurors were
 2     struck from the panel:  David Terry, Stephanie Zaldivar, Wanda
 3     Allen, Richard Pingel, Michael Rose, David Masilionis, Jill
 4     Dean, Ryan Ralston, Samantha Serum, Lana McDonald, Evangelos
 5     Habib, Lori Jones, Melinda Whiting, Stephanie Monsivaiz,
 6     Sharon Padavic, Robert Stinson, Lisa Matuska, Patricia Evans.)
 7                    THE COURT:  If I read your name, I'm going
 8     to ask that you please stand:  Ms. Lipp, Ms. Walterscheid, Ms.
 9     Ms. Hensley, Mr. Case, Ms. Clauder, Mr. Cox, Mr. Breckenridge,
10     Ms. Centlivre, Ms. Wann, Mr. Symes, Mr. Kokoruda, Ms. Munyan,
11     Ms. Saladin.
12          Those of you who are standing will be our jurors in this
13     case.  Those of you who are seated will not.  So those of you
14     who are standing, stay where you are, and those seated will be
15     excused.  Those of you who are in the gallery and seated are
16     not serving, you will not be needed in another courtroom.
17     We've confirmed that.  I thank you very much for your service
18     and time.  You can meet with Ms. Nelson in the hall to collect
19     your vouchers.  Thank you very much for your service.
20          Ms. Lipp, scoot all the way down to the seat on the left
21     followed by Ms. Walterscheid.  Ms. Hensley, you're going to
22     follow in the third seat in the back followed by Mr. Case.
23     After Mr. Case, Ms. Clauder will go next, followed by Mr. Cox
24     and Mr. Breckenridge.  In the next row, Ms. Centlivre, then
25     Ms. Wann and Mr. Symes will go next.  Mr. Kokoruda will
```

1    follow, and then Ms. Munyan and Ms. Saladin.

2          So there are 13 of you.  As I told you during my

3    orientation, one of you is the alternate.  We don't know until

4    the close of the entire evidence and we'll pull one out of the

5    hat.  So right now you are all on and serving, and the others

6    have been released.  Would the clerk please swear these jurors

7    to try the issues of this case.

8                          (Whereupon, the jury panel was sworn.)

9                THE COURT:  Before we break for lunch, I

10   have some preliminary instructions that I have to give you.

11   When we're done with that, right behind this door is the jury

12   room, and that's where you'll meet when you come back from

13   lunch.  That's where you'll gather after breaks, that's where

14   you will go.  There are restrooms in there.  Ms. Nelson will

15   give you buttons that identify you as jurors so no one will

16   talk to you.  So you have to wear that button around.  Again,

17   you'll go back there and meet with her.

18         These are the preliminary instructions that I need to

19   give you.  When we come back after lunch, we'll come back and

20   hear opening statements.  The State will open.  The defense

21   may or may not.  They can reserve if they wish, but these are

22   the instructions I will give you now:

23         Now that you have been chosen as jurors for this trial,

24   you are required to decide this case based solely on the

25   evidence and the exhibits that you see and hear in this

1  courtroom.

2      At the end of the case, I will instruct you in the law
3  that you must apply.  You will be asked to use that law
4  together with the evidence you have heard to reach a verdict.
5  In order for your verdict to be fair, you must not be exposed
6  to any other information about the case, the law or any other
7  issues involved in the case.  This is very important, and so I
8  want to give you some very detailed explanations about what
9  you should and should not do when you are jurors.

10      First, you must not try to get information from any
11  source other than what you see and hear in the courtroom.
12  This means you may not speak to anyone, including your family
13  and friends about the case.  You may not use any printed or
14  electronic source to get information about the case or any of
15  the issues involved.

16      These sources include the Internet, reference books,
17  dictionaries, newspapers, magazines, television, radio,
18  computers, blackberries, iPhones, smartphones or any other
19  electronic device.  You must not do any other personal
20  investigation about the issues, including visiting any of the
21  places involved or using Internet map or Google Earth to
22  examine the scene.

23      Second, you must not communicate with anyone about the
24  case and you must not allow anyone to communicate with you.
25  In particular, you may not talk about the case using your cell

1    phones, e-mails, text messages, tweets, blogs, chat rooms,

2    comments or other postings on Facebook, MySpace, LinkedIn or

3    any other social website.  You must not communicate with

4    anyone else in this fashion, including your family members,

5    your employer and people involved in the trial.  You may

6    notify your family and your employer that you have been seated

7    as a juror in the case.

8        If you are asked or approached by anyone in any way about

9    your jury service or anything about the case, you must respond

10   that you have been ordered not to discuss it and then report

11   that contact to the Court as soon as possible.

12        The Court recognizes that those rules and restrictions

13   may affect activities you would consider to be normal and

14   harmless.  However, the law requires these restrictions to

15   ensure that the parties' jury have a fair trial based only on

16   the evidence.

17        If one or more of you were to try to get information from

18   an outside source, that information might not be accurate.  It

19   might be incomplete.  For some other reason it might not be

20   applicable to the case.  The parties would not have a chance

21   to explain it or contradict that information because they

22   would not know about it.  That is why it's so important that

23   you base your verdict only on the evidence and information you

24   receive in this courtroom.  These restrictions must remain in

25   effect throughout the trial.

Once the trial is over, you may resume your normal
activities.  At that point, you will be free to read or
research anything you wish.  You will be able to speak or
choose not to speak about the trial with anyone you wish.  You
may write, text, post or tweet about the case if you choose to
do so.  The only limitation is that you must wait until after
your verdict when you have been discharged from your jury
service.

        It is 11:53.  We are going to take a recess for lunch,
and you will go back first and you will meet with Ms. Nelson,
as I said, to get your jury buttons on and further
instructions, and we will reconvene at 1:15.  So be back in
place ready to come back out by 1:15.  Please stand for the
jury.

                    (Whereupon, the jury left the courtroom at
11:53 a.m., and proceedings resumed at 1:15 p.m.)

                    THE COURT:  We are on the record in the
State of Kansas versus Rheuben Clifford Johnson, III,
12CR1074.  The parties appear as before, including Mr.
Johnson with his attorney.  We are outside the presence of the
jury.  They are here and waiting, but there was a matter that
we need to take up outside the presence of the jury; is that
correct?

                    MR. HENDERSON:  Yes, Your Honor.  I believe
counsel wants to take up the issue of the transcripts that

1    were prepared with the audiotapes with reference on this case.

2               THE COURT:  That came up in the pretrial on

3    Friday, and I understand you both worked on the transcript and

4    both going to work on that together to see if you can come up

5    with something that was accurate, and you wanted to take that

6    up again?

7               MR. HENDERSON:  Yes, Judge.  The transcript

8    was prepared both by officers with the Olathe PD and by

9    members of the District Attorney's Office.

10     My understanding is that we are having accuracy issues

11    with the transcript, but counsel does still object to its use.

12              THE COURT:  Is that correct, Mr. Toth?

13              MR. TOTH:  That is correct, Your Honor.  We

14    still object to the use of the transcript.  I believe that the

15    transcript draws unnecessary emphasis on the transcript itself

16    rather than spoken words, so we would object to the use of the

17    transcript.

18     I would indicate to you that after having reviewed it and

19    discussed it and have no objection to the accurateness of the

20    transcript.  So I just ask that the Court note that I guess

21    our continuing objection probably I'd still like to object at

22    the time that it's offered, unless the Court would consider

23    this continuing objection, but we do object to its use.

24              THE COURT:  I understand the objection, and

25    I will consider it a continuing objection, so you don't have

1    to object again.  It will be noted for the record that Mr.

2    Toth does object.  I am going to allow it given that there's

3    no issues regarding its accuracy.  It's hard to hear in this

4    courtroom.  I've had jurors comment after a jury trial that

5    they felt that the audio and videotapes are hard to hear, and

6    it's hard to hear people in person talk.  It is a

7    discretionary call, and in my opinion it is often necessary,

8    especially in this courtroom.  So I'm going to allow the

9    transcript.

10                   MR. HENDERSON:  Judge, along with that, I

11   am going to propose an instruction dealing that I model off of

12   the *Kraus* case that I provided the Court and counsel.

13       My suggestion is that we read that to the jury prior to

14   that being played and include it along with the other

15   instructions in the case.

16                        THE COURT:  Any comment on that, Mr. Toth?

17                        MR. TOTH:  No, Your Honor.

18                        THE COURT:  Will that be one of the first

19   pieces of evidence we have?

20                        MR. HENDERSON:  It will be witness number

21   three.

22                        THE COURT:  I left that instruction on the

23   desk.  Ms. Nelson can get it, unless you have a copy.

24                        MR. TOTH:  I have it, Judge.

25                        THE COURT:  Thank you.

1        Just alert me.  I will need that.  I will read that into
2    the record.
3                    MR. HENDERSON:  Thank you.
4                    THE COURT:  Anything else?
5                    MR. HENDERSON:  Not from the State.
6                    MR. TOTH:  No.
7                    THE COURT:  I will note too for the record
8    I talked to counsel about this prior to the jury coming in and
9    selecting our jury.  There was one juror who had indicated
10   that he could not read and understand the English language,
11   and I did excuse him, Mr. Ping.  There was no objection or
12   comment on that; is that correct, counsel?
13                    MR. HENDERSON:  Yes.
14                    MR. TOTH:  Yes.
15                    THE COURT:  Very good.  We'll bring in the
16   jury.
17                    (Whereupon, the jury entered the courtroom
18   at 1:20 p.m.)
19                    THE COURT:  We are back on the record in
20   State of Kansas versus Rheuben Clifford Johnson, III.  The
21   parties appear as before with defendant and his counsel.
22        The jury is in place after having been selected this
23   morning.  We then took a recess for your lunch, and now we're
24   ready for opening statements.  The State may go first.
25                    MR. HENDERSON:  Thank you, Judge.

Murder for hire.  That is exactly what this case is about.  In the Spring of 2012 the defendant had a problem, and that problem was his ex-wife Annie Johnson.

At that time the two of them were engaged in a heated divorce, and at the center of that divorce was a dispute over the custody of their young son.

During that spring of last year, the defendant began to feel as if he was losing that custody battle.  That's a problem, and to the defendant the only solution to that problem was to hire someone to kill Annie Johnson.

Now, during this trial you are going to hear from not one, not two, but three different individuals that the defendant solicited to kill his ex-wife.

The first one you're going to hear from is Ronald Nodwell.  Mr. Nodwell is a convicted felon.  He spent time in prison.  He's exactly the kind of guy that the defendant thought was capable of committing this crime.  So in April of 2012, the defendant gets Mr. Nodwell to meet him up at Goodcents at K-10 and Ridgeview.  Mr. Nodwell thinks he's there to discuss some construction he's doing, and when they are there eating sandwiches, the defendant flat out asks Mr. Nodwell if he'd be willing to kill his ex-wife for $20,000.

He looks around and says, "Is this a joke?  Is this guy joking?"  But the defendant was not.  In fact, after they finished their meal, the defendant took Mr. Nodwell and showed

him where Annie Johnson lived.  This is her apartment.  That's
her car.  This is where she works.  This is the McDonald's
that she gets coffee at every morning before she goes to work.
They even had a discussion, and by that the defendant tells
Mr. Nodwell of ways he can complete the task, a gun, pills, or
just burn down her apartment.

Now, to Mr. Nodwell, he'll tell you again, to him this
didn't seem real.  It didn't seem like it could possibly be
serious.  But as the days followed it became very clear to Mr.
Nodwell that the defendant was deadly serious.

So at this point, Mr. Nodwell contacts the Olathe Police
Department.  He says, "Hey, this guy is trying to hire me to
kill his wife."

So on May 21st, 2012, the Olathe Police Department sets
up a meeting.  At this meeting, Mr. Nodwell gets to introduce
the defendant to a friend of Mr. Nodwell's, a friend that
would have the time and the ability to complete this terrible
task.

Now, the defendant didn't know it, but this friend of Mr.
Nodwell's was Sergeant Lonnie Stites with over 25 years of law
enforcement experience.

At this meeting that takes place May 21st, Sergeant
Stites is wearing a wire.  He's got audio on him.  You're
going to hear that conversation.  You're going to hear the
defendant say "We can refer to it as moving vans or remodeling

or cleaning up stuff, however we want to refer to it."

You're going to hear throughout the defendant's conversations with Mr. Stites that he tries to stick to this code, this secrecy, but he slips up a few times. Countless times he refers to her or she.

When Sergeant Stites would ask about where this problem is located, the defendant would talk about places that Annie Johnson could be found and at what time.

You'll hear the defendant when he's talking in this code say that when these vans are moved, he didn't want any glass to be left behind so that people could be cut later. They even discuss a price, $10,000, $3,000 up front, and the rest when the job is done.

That May 21st conversation ends with the defendant, or rather Sergeant Stites agree to call the defendant the next day. And Sergeant Stites is going to testify, and he's going to tell you, in fact, that he did call.

You all are going to have an opportunity to hear that conversation and follow-up phone conversations that took place. Conversations in which the defendant is careful with his words. He's concerned that they are being recorded. You'll hear that on the audio, but he makes it very clear what he wants and what he's talking about.

The defendant again discusses in length, and you're going to hear it, where Annie Johnson can be found and at what time.

He discusses how money isn't the issue, but he's concerned about providing Sergeant Stites with a picture of Annie.

The defendant also demands that this transaction, this exchange of information and the cash be exchanged across State Line. He won't meet in Kansas. It has to be across State Line.

So on May 21st the two of them agree to meet off Wal-Mart at 135th and State Line. Again, Sergeant Stites has a wire on, and you're going to have an opportunity to hear that conversation. You're going to hear the defendant provide Sergeant Stites with a map. You all can see the map saying this is where you can find Annie Johnson.

You're going to see, or rather hear, the defendant provide Sergeant Stites with $3,000 cash. And you're also going to hear that the defendant provided Sergeant Stites with a photograph of Annie Johnson.

When holding that photograph, you're going to hear on the audio Sergeant Stites go, "Is this the vehicle that you want to disappear?" And the defendant says "Yes."

There is no doubt in Sergeant Stites' mind that he has just been hired to kill Annie Johnson.

So the defendant leaves the scene. He's arrested as soon as he comes across State Line, and you think that's the end of it. But the defendant is not done. The problem still remains.

Well, while in the jail, actually just across the street
here, the defendant seeks out another inmate to see if he
would be willing to kill Annie Johnson.  You will hear from a
third person asked by the defendant to kill Annie Johnson.

          Richard Porterfield, an inmate at the Johnson County
Jail, just like Mr. Nodwell has a criminal history.  He has
committed crimes before.  The defendant hopes he's willing to
commit crimes in the future.  And when they are talking in
jail and getting to know one another, the defendant asks Mr.
Porterfield if he's interested in getting rid of someone.  And
when Mr. Porterfield asks who, the defendant says, "My
ex-wife."

          That's a brief summary of why we're here today.  During
this trial, you will hear the defendant is angry about his
divorce and the child custody situation.  And you will hear
about his terrible solution to have his ex-wife Annie Johnson
killed.  And at the end of the trial, the State, we're going
to come back and ask you to hold the defendant accountable for
his actions by finding him guilty by soliciting Ronald
Nodwell, Sergeant Lonnie Stites and Richard Porterfield to
kill Annie Johnson.  Thank you.

                    THE COURT:  Mr. Toth, do you wish to
present an open statement?

                    MR. TOTH:  Yes, Your Honor.

                    THE COURT:  Go ahead.

MR. TOTH:  Rheuben Johnson is naive.  He is
gullible.  Rheuben Johnson tends to be bullied and pushed
around, and Rheuben Johnson is a very, very bad businessman,
but he's not a purported killer.  He's just not.  And the
State will not be able to prove that he is.

    Now, what you will hear is, especially when you listen to
these tapes, and you probably will have a difficult time
trying to get a read on Mr. Johnson and Detective Stites and
things like that, and what you're going to see is that
although Rheuben Johnson may act or sound a little different
or a little odd, the reality is he's a loving father whose
only crime is trying to be overly protective of his young son.

    The State is going to try to convey this case based only
on testimony from Mr. Nodwell, taped conversations between Mr.
Johnson and Detectives Stites, but what you will discover is
that these testimony and tapes do not prove anything at all.

    You will hear very clearly is that there was a perfectly
reasonable explanation about what was taking place between Mr.
Johnson and these individuals.

    Mr. Johnson needs help for two things:

    Number one, to clean up a bunch of junk, abandoned cars,
things like that that he had on his property in Gardner.

    Number two, he needed someone to do private investigation
work to follow his ex-wife because he had concerns about her
private life and how it might impact her young son, little

1    Rheuben.  That's it.  That's all you have for this case.

2        Now, the State's allegations are correct in this sense

3    that Annie Johnson and Rheuben had gone through a divorce.

4    The same type of process that millions of people go through

5    each and every year.

6        They had some disputes about things like custody and

7    parenting time and things of that sort, which are common.

8    At times, both sides were very frustrated.  The process can be

9    slow.  The process can be tedious, but for the most part the

10   issues were progressing along very nicely.

11       Rheuben was in line to have his custody time with his son

12   increased on or about the time that these allegations

13   surfaced.  All sides were doing counseling.  The attorneys and

14   court staff were working towards a suitable, workable,

15   permanent resolution.  So there's no desperate attempt to try

16   to take care of the problem because things were working

17   themselves out in a suitable fashion.

18       Now, again, Mr. Johnson, there were two issues that

19   needed to be resolved.  The first had to do with a large piece

20   of property that he owns in southern Johnson County.

21       You're going to hear this from Mr. Johnson's girlfriend

22   and anybody in his family can back this up.  He's one of those

23   guys that collects stuff, things like old cars, machinery,

24   things like that.  And over the years he's accumulated gobs

25   and gobs of junk.

And the thing about it is that when you collect old cars, you can't just remove them and dump them in a salvage yard because cars have titles on them. So if a car has a title, you have to go through a rigorous process to try to get the title back to the State before you can salvage it. But he keeps collecting this stuff because that's just the kind of guy he is. So he's got about 16 old cars sitting on his property, and they become a concern as it relates to how the property looked, safety issues for his son, there is broken glass. There is broken glass all over that property, and things really needed to be cleaned up, especially if they were moving towards a resolution on all of the divorce issues.

So he was in the process of finding someone to clean this up and get rid of it. And this is not the kind of work where you can open up the Yellow Pages and find somebody to do it.

But because of who he is and what he has done in the past, he readily can come across individuals that are always looking for work.

As I told you in jury selection, at times he was running a landscaping operation, snow removal. He was doing the growing of the plants that he was harvesting from Gulf Coast, things like that and the beekeeping and extermination business.

Well, people that do this kind of work usually tend to find people that are willing to work for cash and not work for

a whole lot of money and sometimes have dubious histories, including criminal histories.  So one of those individuals happened to be Ron Nodwell.

Mr. Johnson met with him and asked what he was looking for, but he did not ask Mr. Nodwell to kill his ex-wife.  He did discuss concerns about junk removal.  He did discuss concerns with doing private investigation work.

Two years earlier, Rheuben Johnson had hired a private investigating company called Orion to do an investigation on his ex-wife -- or I guess it was his wife at that time.  He paid them $3,000 to see what they could come up with because he had some concerns about her, which you are going to hear through their own records is that the company did very, very little.  They really didn't do anything at all, and quite frankly, Mr. Johnson got ripped off for the money that he gave them.

But here we are two years later, and he still has concerns about things and he wants to know what she was doing in her daily life.  So that's why he came in contact with Mr. Nodwell.  It's as simple as that.

You know, as I told you, Mr. Johnson, it's easy for him to find people like that to do work for him.  And as such, that's how it is that he's able to get in contact with Mr. Nodwell.  So the State is not going to be able to prove anything beyond that.

Now, they did have conversations, as I indicated to you, about what specifically needed to be done, and it is true at some point that Mr. Nodwell went to the police for reasons we still are not clear on.

That's when Mr. Johnson gets hooked up with Detective Stites. And there are a series of phone calls and a series of meetings. And you are going to hear the conversations that take place. And what you're not going to hear, however, you are simply not going to hear is that at any point in time is Mr. Johnson telling Detective Stites: I want you to kill my ex-wife.

You're not going to hear it, although that's the job of this detective. At least that's what he thought his job was to try get Mr. Johnson to admit that, but he was never able to do it. Because Mr. Johnson was asking him about the same types of things that he was talking to Mr. Nodwell about.

There's going to be another very, very important conversation which means very little to you right now, and it's not going to mean a lot until the end of this case. And it happened on May 22nd right before Mr. Johnson and Detective Stites meet up on State Line over in Missouri. And this is a phone call that takes place. And in this particular phone call Detective Stites is asking Mr. Johnson essentially "So you still want to go through with the project?" And they have some discussions about money, and they have discussions about

if they were going to get together, where they were going to get together at. And Mr. Johnson says "Well, I will meet you over in Missouri." And Detective Stites says, "no, I'm not coming over to Missouri. They want me over in Missouri." He was giving the appearance that the authorities are trying to arrest him if he goes over there. And Mr. Johnson says "Hey, I've rethought this thing, and I don't think I want to go through with any projects. And Detective Stites then says "Okay. Well, I'm going out of town next week," and hangs up on him. That will become important later in the case because the Judge is going to instruct you as to the law and how the law applies to -- legally what is termed as what's called a solicitation. But we'll talk more about that when we get to the close of the case when all this is over with.

So anyway Detective Stites reinitiates contact and says, "Okay. I'll come meet you in Missouri." They go over to Missouri. Mr. Johnson gives Stites the $3,000 to do the projects, and he's arrested where he's been held in jail the last year.

So a month ago this guy Porterfield pops up, and he goes to his lawyer and he says he wants to give the cops some information and the information he has is about Rheuben Johnson.

Now, what's going to become abundantly clear to you is the only reason Mr. Porterfield is doing this is because he

1   wants to work a deal for himself.  He was in jail facing
2   significant prison time because of his criminal history
3   because of his burglaries.  Because he had so much criminal
4   history, he's staring at a long prison sentence unless some
5   miracle occurs.  That miracle came in the form of Rheuben
6   Johnson.
7        Mr. Porterfield is going to testify to you that he no
8   longer has to go to prison, and the only reason he does not
9   have to go to prison is because he made an agreement with the
10  State of Kansas that if he were to come into court and testify
11  against Rheuben Johnson, that he gets to stay out and be a
12  free man.
13       We are going to be arguing to you he has absolutely no
14  credibility whatsoever.  We are going to argue that Mr.
15  Nodwell has absolutely no credibility whatsoever as he has
16  spent the majority of his life in prison.
17       Don't prejudge this case because you promised before we
18  broke for lunch that you wouldn't do that.  You promised that
19  you were going to listen to all the evidence.  And I can tell
20  you over my years and years of experience in trying cases that
21  trials have this certain ebb and flow to them where you might
22  think at some point one side is doing a better job than the
23  other side job.  I'm telling you what you're going to see is
24  this.  So you can't prejudge it while it's taking place.  You
25  have to wait until the close of all of the evidence.  And when

**89**
**OFFICIAL TRANSCRIPT**

```
 1   you get to the close of evidence, then you can discuss among

 2   yourselves whether the State has met the highest burden of

 3   proof that our laws allows.  And I'm confident that when we

 4   get to that point, you're going to find that the State has

 5   utterly failed in meeting their burden of proof and find that

 6   the defendant, Rheuben Johnson, is not guilty.

 7                    THE COURT:  The State may call its first

 8   witness.

 9                         RONALD NODWELL,

10   having been duly sworn to tell the truth, the whole truth and

11   nothing but the truth, testified as follows:

12                        DIRECT EXAMINATION

13   BY MR. HENDERSON:

14        Q.    Sir, could you state your name for the record,

15   please?

16        A.    Ronald D. Nodwell.

17        Q.    And, Mr. Nodwell, how old are you?

18        A.    I'm 40.

19        Q.    Mr. Nodwell, do you know an individual by the name

20   of Rheuben Johnson?

21        A.    Yes, sir, I do.

22        Q.    Is Mr. Johnson in the courtroom today?

23        A.    Yes, sir.  He's sitting right there.

24        Q.    Tell me what color shirt he is wearing?

25        A.    White.
```

```
 1      Q.     In a black suit?

 2      A.     Yes.

 3             MR. HENDERSON:  For the record, the witness

 4   has identified the defendant.

 5      Q.     (By Mr. Henderson) How is it, Mr. Nodwell, that

 6   you came to meet Mr. Johnson?

 7      A.     A mutual friend introduced me to him.  He had an

 8   extermination business and was looking for help, and I was

 9   looking for a job.

10      Q.     You correct me if I'm wrong, but you had recently

11   gotten out of prison; correct?

12      A.     Yes.

13      Q.     You needed some work?

14      A.     Yes.

15      Q.     You spoke with a mutual friend about that?

16      A.     Yes.

17      Q.     He put you in touch with Mr. Johnson?

18      A.     Yes.

19      Q.     When was this?

20      A.     My friend told me about it probably on April 14th.

21   I believe it was April the 15th when I talked to Mr. Johnson.

22      Q.     Was that of last year?

23      A.     Yes, sir.

24      Q.     2012?

25      A.     Yes, sir.
```

```
 1      Q.     When you first talked to Mr. Johnson, was that in
 2   person, on the phone?
 3      A.     We spoke over the phone.
 4      Q.     At some point in time, did you meet in person?
 5      A.     Later that day.
 6      Q.     Where did that meeting take place?
 7      A.     Mr. Goodcents on Ridgeview and K-10.
 8      Q.     Is that location here in Johnson County, Kansas?
 9      A.     Yes.
10      Q.     How did you get to Mr. Goodcents on that
11   particular day?
12      A.     I drove.
13      Q.     You drove your car?
14      A.     Yes, sir.
15      Q.     Did anybody else go with you?
16      A.     No.
17      Q.     What happened once you arrived?
18      A.     I waited for Mr. Johnson to show up.
19      Q.     Where did you wait?
20      A.     In the parking lot.
21      Q.     About how long did you wait?
22      A.     Fifteen minutes, I think.
23      Q.     Did Mr. Johnson eventually show up?
24      A.     Yes.
25      Q.     Did he drive himself there?
```

```
 1      A.      Yes, he did.  He was in a black Suburban.

 2      Q.      Was there anybody else with him?

 3      A.      No.

 4      Q.      What happened next?

 5      A.      He offered to buy me something to eat since I

 6 waited on him.  We went into the sandwich shop.  He orders a

 7 sandwich and bought me a sandwich, and he stopped to talk.

 8      Q.      At the start of the conversation, what do you all

 9 talk about?

10      A.      At first he was talking about a job doing what he

11 does, and then the conversation shifted to his ex-wife.

12      Q.      Who shifted the conversation to the ex-wife?

13      A.      He did.

14      Q.      Mr. Johnson did?

15      A.      Yes.

16      Q.      What did Mr. Johnson say about his ex-wife?

17      A.      That she was the root of all his problems, how she

18 was taking his son, his money, his business, she was into

19 weird things like goth and vampires and addicted to pain

20 pills.

21      Q.      Okay.  What, if anything, did the defendant say

22 he'd like done about this root of all his problems?

23      A.      He made it aware to me, he said it would be worth

24 money if she would disappear.

25      Q.      Is that the word he used "disappear"?
```

A.    I don't believe that that was the exact term.  It
was "If she was gone."

         Q.    "If she was gone"?

         A.    Yeah.

         Q.    How did you take that?

         A.    That he wanted to kill her.

                      MR. TOTH:  Objection.  Calls for
speculation.

                      THE COURT:  He has answered it.  Overruled.

         Q.    (By Mr. Henderson) What was your initial reaction
to that request from the defendant?

         A.    I thought I was -- I started looking around for
cameras.  I thought it was a joke.

         Q.    You were expecting to see someone jump out like
you were on Candid Camera?

         A.    Yeah, I did.

         Q.    I take it that that didn't happen?

         A.    No.

         Q.    What happened next?

         A.    He talked more, and it kind of -- the whole
conversation just shifted towards her.

         Q.    Did you and the defendant talk about the money
while at Goodcents?

         A.    Yes.

         Q.    Who brought up money?

1    A.    He did.

2    Q.    What did -- I mean he -- I mean the defendant say

3  about money?

4    A.    That he would pay me to make her go away.

5    Q.    Did he specify an amount?

6    A.    Yes, he did.

7    Q.    What was that?

8    A.    He offered me $20,000.  He proceeded to tell me

9  that he couldn't pay me all of it up front because she had

10 taken a lot of his money up front and had taken it already,

11 but he could pay me in payments.

12   Q.    At some point, did you and the defendant leave Mr.

13 Goodcents?

14   A.    Yes, sir, we did.

15   Q.    Approximately, how long were you there?

16   A.    Probably, 45 minutes.

17   Q.    So you left Mr. Goodcents.  Did you two leave

18 together or separately?

19   A.    I started to leave, and he asked me to jump in his

20 truck, and he drove me to where she lived to show me where she

21 lived.

22   Q.    Tell me where he took you?

23   A.    He took me -- I'm pretty sure -- I'm not sure if

24 it's Shawnee Mission or Overland Park, but right off of the

25 Frontage Road and 75th Street.

```
 1        Q.    And what sort of an area did he take you to?

 2        A.    It was an apartment complex, a gated community.

 3        Q.    You said it was a gated community?

 4        A.    Yeah.

 5        Q.    Did Mr. Johnson tell you anything about how you

 6   get into that gated community?

 7        A.    He said that I couldn't without a code.

 8        Q.    He said there a code?

 9        A.    Yes.

10        Q.    Did he identify who lived at that gated community?

11        A.    Yeah, his ex-wife.  He showed me that she drove a

12   black SUV.  I think it was a Durango.  It was a Dodge SUV.

13        Q.    A black Dodge SUV?

14        A.    Yes.

15        Q.    Did the defendant drive you anywhere other than

16   his wife's apartment?

17        A.    Yes.

18        Q.    Where?

19        A.    McDonald's where she stopped to get coffee before

20   work.

21        Q.    Did he tell you where she worked?

22        A.    Yes.  Shawnee Mission Medical Center.

23                   MR. HENDERSON:  May I approach the witness,

24   Judge?

25                   THE COURT:  Yes.
```

Q.     (By Mr. Henderson) Mr. Nodwell, I'm going to show
you what's been marked for identification as State's No. 1.

         A.     Yes.

         Q.     Does this appear to be a map, an overhead map, of
the area you drove that the defendant drove you on that
particular day?

         A.     Yes, it is.

         Q.     Does it appear to be an accurate map of the places
you went to?

         A.     Yes, there's her apartment.  There's McDonald's,
and there's the hospital.

         Q.     Are those places labeled accurately?

         A.     Yes, they are.

         Q.     Do the streets appear to be labeled accurately?

         A.     Yes, they are.

                     MR. HENDERSON:  Your Honor, I move for the
admission of State's 1.

                     MR. TOTH:  No objection.

                     THE COURT:  State's 1 is admitted.

                     (Whereupon, State's Exhibit No. 1 was
admitted into evidence.)

                     MR. HENDERSON:  May I publish, Judge?

                     THE COURT:  You may.

         Q.     (By Mr. Henderson) Mr. Nodwell, if you wouldn't
mind hopping down for a second for me, whatever works best for

1    you.  Can you show us the route Road to the apartment.  After
2    we left the apartment, we went back down the frontage street
3    to McDonald's, and he showed me where she worked at the
4    hospital.

5         Q.    That would be Shawnee Mission Hospital?

6         A.    Yes, it is.

7         Q.    Go ahead and take your seat, sir.

8    Did the defendant ever mention his son while you were
9    talking to him?

10        A.    Yes, he did.

11        Q.    Did he ever mention if he had any custody issues?

12        A.    Yes, he did.

13        Q.    What did he tell you about that?

14        A.    That she was trying to take his son, and that she
15   was an unfit mother.

16        Q.    Did he indicate whether the son was ever taken to
17   a daycare or anything like that?

18        A.    Yes, he did.  He told me what days he was on
19   daycare.

20        Q.    What day was that?

21        A.    I believe he said Monday, Wednesday and Friday.
22   It's been a while.

23        Q.    While you were in the car with the defendant, was
24   there ever any conversation about how you were to make the
25   ex-wife disappear?

```
 1      A.    Yeah, there was.

 2      Q.    How did that come up?

 3      A.    He just started talking how it would be best if

 4  she just disappeared again, and he proceeded to tell me that,

 5  you know, she's addicted to pain pills, and that I could

 6  overdose her on her pain pills and it looked like an accident.

 7      Q.    Did he suggest any other ways?

 8      A.    Yeah, burn the place down.

 9      Q.    Burn the place down, referring to what?

10      A.    Her apartment.

11      Q.    What about a third way?

12      A.    Yeah.  He said I could catch her after getting

13  coffee and drive up beside her and shoot her in the head on

14  the way to work.

15      Q.    How long do you think you guys were driving

16  around?

17      A.    Probably 30, 45 minutes.

18      Q.    What's your reaction to all this?  What's going

19  through your head?

20      A.    He's nuts.

21            MR. TOTH:  Objection.  Relevance.

22            THE COURT:  Overruled.

23      Q.    (By Mr. Henderson) After you were done talking

24  about this, Mr. Johnson drives you back to Goodcents?

25      A.    Yes, he did.
```

```
 1        Q.      What happens then?

 2        A.      We parted ways.  He asked me to look into it, and

 3   I told him I would.

 4        Q.      Did you have any intention of looking into it?

 5        A.      No.

 6        Q.      Did you have any intention of going through with

 7   this?

 8        A.      No.

 9        Q.      I take it you go home at some point?

10        A.      Yes, I did.

11        Q.      After that, did you speak with the defendant

12   again?

13        A.      Yes.

14        Q.      Your next contact with him, is that face to face

15   or a phone call?

16        A.      A phone call.

17        Q.      Tell me about how the phone call took place?

18        A.      I called him back to ask about employment, and he

19   asked about his wife.

20        Q.      Was it just the one call afterwards between you

21   and Mr. Johnson, or multiple?

22        A.      No, there were several.  There were several

23   different numbers.

24        Q.      Several different numbers?

25        A.      Yes.
```

```
 1        Q.     What do you mean?

 2        A.     He had different phone numbers.

 3        Q.     How do you know he had different numbers?

 4        A.     Because every time he would call me, he had a

 5   different phone number.

 6        Q.     Did he give you some of those different numbers?

 7        A.     Yes.

 8        Q.     At some point in time, did you decide to report

 9   this to law enforcement?

10        A.     Yes, I did.  After about a month, I realized, you

11   know, why the conversation it kept coming up, kept coming up.

12   I knew it was serious.  Whether it's me or someone else, he's

13   going to do this.

14        Q.     So you went to the Olathe Police Department?

15        A.     Yes, sir, I did.

16        Q.     Before you went to the Olathe Police Department,

17   did you have a conversation with the defendant where his words

18   started to become a little more cautious?  Do you know what

19   I'm talking about?

20        A.     Yes.

21        Q.     Tell me about that conversation?

22        A.     While we were at Mr. Goodcents talking about

23   making his ex-wife disappear, you know, he had already told me

24   about the custody battle that had been going on for a couple

25   of years with his son, and I told him, I mean, I'm an ex-con,
```

```
 1    I said, "Well, you're stupid because if you do, the first
 2    person they are going to look at is you because of custody."
 3    Every time he talked to me after that, he made it sound like
 4    he was talking about a construction job or cleaning up glass.
 5    He made it sound like it was something other than what it was.
 6         Q.    Let's talk about you going to the Olathe Police
 7    Department then.
 8         How did you put yourself in touch with law enforcement?
 9         A.    I called them.
10         Q.    What happened?
11         A.    I went that same day later that afternoon when I
12    got off after work to talk to them.
13         Q.    You talked to police officers there?
14         A.    Several.
15         Q.    Were you interviewed by Detective Matt Campbell?
16         A.    Yes, I was.
17         Q.    Did you tell him what had happened?
18         A.    Yes, I did.
19         Q.    What, if anything, did law enforcement ask you to
20    do as a result of this?
21         A.    They asked me to make some phone calls while I
22    recorded it.
23         Q.    Who were you supposed to call?
24         A.    Rheuben Johnson.
25         Q.    What was the purpose of you calling Rheuben
```

1    Johnson to record it?

2         A.    To talk about his wife.

3         Q.    Did you try to call Mr. Johnson on that day when

4    you first went to the Olathe PD?

5         A.    Several times, and he didn't answer the phone.

6         Q.    Did you leave a message?

7         A.    Yes, I did.

8         Q.    All right.  So did you then go home?

9         A.    Yes, I did.

10        Q.    Let's clarify.  You reported to the Olathe PD, was

11   that on May 18th, 2012?  Does that sound about right?

12        A.    Yes, sir, it was.

13        Q.    So does that sound like Friday to you?

14        A.    It was Friday.

15        Q.    It was Friday?

16        A.    Yes, sir.

17        Q.    So over the weekend, over that weekend, did you

18   have any phone contact with the defendant?

19        A.    Yes.

20        Q.    Tell me how that happened, who called who?

21        A.    I believe he called me.  He returned my phone

22   call, I believe, on Sunday.  We made arrangements to meet on

23   Monday.  I let him know that I didn't have time to look into

24   his situation and do all that because I worked, but I had a

25   friend that was willing to, and asked him if he'd be

```
 1   interested in meeting him.

 2        Q.    Now, who did you know this friend to be?

 3        A.    An Olathe police officer.

 4        Q.    I assume you didn't tell Mr. Johnson that?

 5        A.    No, I didn't.

 6        Q.    So let's talk about Monday then.  You went back to

 7   the police department on Monday?

 8        A.    Yes, sir.

 9        Q.    What happened?

10        A.    They put an undercover officer with me and had us

11   ride out to the meeting.

12        Q.    Do you happen to remember where you all met at?

13        A.    Yeah, Waterworks Park in Olathe.

14        Q.    What happened once you got there?

15        A.    I was supposed to introduce them and remove myself

16   from the situation as soon as possible.

17        Q.    Did you do that as best you could?

18        A.    Yes, I did.

19        Q.    Did you leave the area?

20        A.    Yes, I did.

21        Q.    Since that time, have you had any further contact

22   with the defendant, Mr. Johnson?

23        A.    No.

24        Q.    Now, we've alluded to it throughout the course of

25   your testimony.  You've got a record?
```

```
 1        A.      Yes, sir.

 2        Q.      You've been to prison?

 3        A.      Yes, I have.

 4        Q.      How much time have you spent in prison, Mr.

 5   Nodwell?

 6        A.      Twenty-five years.

 7        Q.      That's a long time.

 8        A.      Yes, it is.

 9        Q.      What all have you been convicted of?

10        A.      Theft.

11        Q.      Any murders?

12        A.      No.

13        Q.      Anything like that?

14        A.      No.

15        Q.      Stealing, that's it?

16        A.      That's it.

17        Q.      When did you get out of prison that led up to all

18   of this?

19        A.      I got out of prison January 24th, 2011.

20        Q.      Now, have you gotten in sort of a deal from the

21   State in exchange for your testimony?

22        A.      No.

23        Q.      Have I given you anything?

24        A.      No.

25        Q.      Has Mr. Hurst given you anything?
```

```
 1        A.    No.

 2        Q.    Has anybody in my office fixed a parking ticket?

 3        A.    No.

 4        Q.    Anything like that?

 5        A.    No.  I did it for one little reason.  One reason

 6  only, that little boy.

 7        Q.    Did you know the defendant prior to all this going

 8  down?

 9        A.    I never met him before in my life.

10        Q.    Ever met his ex-wife?

11        A.    No.

12              MR. HENDERSON:  May I have a moment?

13              THE COURT:  Yes.

14              MR. HENDERSON:  Thank you, Mr. Nodwell.  No

15  further questions.

16              THE COURT:  Cross-examination?

17              MR. TOTH:  Thank you.

18                    CROSS-EXAMINATION

19  BY MR. TOTH:

20        Q.    Mr. Nodwell, when you met Mr. Johnson, you had

21  fairly recently been released from prison; is that correct?

22        A.    About over a year.

23        Q.    About over a year?

24        A.    Yeah.

25        Q.    You had indicated, Mr. Henderson brought this up,
```

1    that you had been in prison for about 25 years of your life?
    2         A.    Yes, sir.
    3         Q.    And I've noticed -- I have the benefit of a
    4    preliminary hearing transcript that seems to indicate that you
    5    have testified before once in this case; is that correct?
    6         A.    Yes, sir.
    7         Q.    And I'm assuming that you told -- you swore to
    8    tell the truth and told the truth at that prior testimony?
    9         A.    Yeah.
   10         Q.    If you would have indicated at that prior hearing
   11    that you had 22 convictions for theft, would that be accurate?
   12         A.    Sure.
   13         Q.    Okay.  How old are you?
   14         A.    I'm 40.
   15         Q.    You are 40.  So you've been in the system for all
   16    but 15 years of your life pretty much?
   17         A.    Right, pretty much.
   18         Q.    All right.  And you, because you were recently
   19    released from prison, you were looking for work?
   20         A.    Yes.
   21         Q.    And what kind of work were you looking for?
   22         A.    I'll do anything in construction.  I do anything
   23    in construction.
   24         Q.    Okay.  And you had gotten Mr. Johnson's name from
   25    another individual; is that correct?

```
 1        A.      Yes, sir.

 2        Q.      What's that other individual's name?

 3        A.      Jim Moore.

 4        Q.      Could it be Billy Moore?

 5        A.      Billy Moore.

 6        Q.      How did you know Billy Moore?

 7        A.      I go to church with him.

 8        Q.      Were you going to church with him back then?

 9        A.      Yes, I was.

10        Q.      How is it that he turns you on to Mr. Johnson?

11        A.      He knew I had back surgery.  I blew my back out

12   doing concrete, and I needed a job.

13        Q.      So you had talked to him about the fact that you

14   needed a job?  What did he say?

15        A.      He had an extermination company and needed help.

16   He talked about hiring Billy at one time.

17        Q.      So he tried to hire Billy at one time to do some

18   work around his property?  Is that your understanding?

19        A.      No.

20        Q.      To do extermination work?

21        A.      Yeah, his business.

22        Q.      Okay.  Okay.  So when you're talking to Billy

23   about that, Billy says, "This guy tried to hire me for doing

24   work."

25        I'm assuming Mr. Moore couldn't do work and that's why he
```

```
 1   suggested you?

 2        A.    No.  Mr. Moore had a car -- worked at a car lot

 3   selling cars so he told me about it.

 4        Q.    I see.  And you hadn't met Mr. Johnson before

 5   that?

 6        A.    No.

 7        Q.    So you set up -- who gave you Mr. Johnson's phone

 8   number?  Billy Moore?

 9        A.    Billy called him.  He said to give him my phone

10   number.

11        Q.    So the first time you would have met Mr. Johnson

12   would have been back on April 15th, 2012?

13        A.    Yes.

14        Q.    That's at Mr. Goodcents?

15        A.    Yes.

16        Q.    And it's at this particular meeting that you

17   indicated that you waited for about 15 minutes until he showed

18   up?

19        A.    Yes.

20        Q.    And then you go inside and you guys have a

21   sandwich?

22        A.    Yes.

23        Q.    And you started talking about some work to be

24   done?

25        A.    Yes.
```

```
 1        Q.    And the conversation turns to his ex-wife?
 2        A.    Yes.
 3        Q.    And would you agree with me that it appears Mr.
 4   Johnson is a pretty talkative guy?
 5        A.    Yeah.
 6        Q.    You mean, you've never met this guy before, and
 7   he's telling you about his child support woes and all this
 8   kind of stuff; right?
 9        A.    Yeah.
10        Q.    And so he's indicating to you that he's going
11   through a divorce, and he's got some issues with his ex-wife?
12        A.    Yes.
13        Q.    And isn't it true he also told you at some point
14   that he wants to see if you'd be interested in following her
15   to track her?
16        A.    Yeah.  After he said he wanted her gone.
17        Q.    Well, I think you said he wanted her to disappear?
18        A.    Yeah.
19        Q.    That's the words you used, he wanted her to
20   disappear?
21        A.    I'm not a magician, but, yes, that's what he said.
22        Q.    Okay.  I would assume then by you saying that it
23   would all be better for him that she would disappear, he did
24   not say to you, specifically say to you, "I want you to kill
25   my ex-wife"?
```

```
 1        A.      No.

 2        Q.      So you're reading something into this; right?

 3        A.      No.  He wanted me to give her a $20,000 taxi ride.

 4        Q.      Did he say he wanted you to give her a $20,000

 5  taxi ride?

 6        A.      No.

 7        Q.      So you would be -- that would be speculation on

 8  your part that he wants you to give her a $20,000 taxi ride?

 9  I mean the truth?

10        A.      I know the truth.

11        Q.      I also want to say this, Mr. Nodwell, I'm not

12  trying to put words in your mouth and trick you.

13        A.      You can't.

14        Q.      I'm just asking you specific words he said.  He

15  asked you if she'd disappear?

16        A.      That's right.

17        Q.      He never tells you that he wanted you to kill her?

18        A.      He told me three ways to kill her.  That's not

19  speculation.

20        Q.      He told you three ways to kill her?

21        A.      Yeah.

22        Q.      He told you to have her overdose on pills?

23        A.      That's one.

24        Q.      He told you that you could do a drive-by shooting

25  after she leaves McDonald's or whatever?
```

```
 1        A.     Right.
 2        Q.     And he told you that you could burn down her
 3   apartment?
 4        A.     Yes.
 5        Q.     And we know that at some point after this initial
 6   meeting, and after some phone calls you had with Mr. Johnson,
 7   you decided to go to the Olathe Police Department because as
 8   you say, you've had enough; right?
 9        A.     Yeah.
10        Q.     So you waited 33 days, and then you go in and you
11   see Detective Campbell?
12        A.     Yes.
13        Q.     Have you had an opportunity to review the
14   statement that you gave to Detective Campbell?
15        A.     Yes.
16        Q.     Would it be accurate that in the interview with
17   Detective Campbell, Detective Campbell asked you, "Did he say
18   he wants it done?"  And you say, "He said it would be nice if
19   she overdosed on her pills because everyone knows she has
20   trouble with being on pills."  Would you agree with me?
21        A.     Yes.
22        Q.     Would you agree with Detective Campbell that you
23   never told Detective Campbell that Mr. Johnson suggested to
24   you that you should do a drive-by?
25        A.     Yeah.
```

1     Q.    And would you also agree with me, sir, that on May

2  18th, 2012, you never told Detective Campbell that Mr. Johnson

3  suggested to you that you could burn down her apartment?

4     A.    Yeah.

5     Q.    But here we are now a year and a half later, and

6  you have a specific recollection that that's what he told you

7  at Mr. Goodcents?

8     A.    Yeah.

9     Q.    And you remember more clearly now than you did 33

10  days after the actual conversation?

11     A.    There was so much going on, I didn't remember

12  anything.  It was going on over a month.

13     Q.    I would think that if it bothered you so much, if

14  you felt you needed to go to the police, wouldn't it make

15  sense that you remember specific ways that Mr. Johnson asked

16  you to kill his wife?

17     A.    It's hard for me to remember a lot of things

18  because my wife has cancer, and I have to remember that too.

19  There's more to my life than Mr. Johnson.

20     Q.    So should we discount what you're testifying today

21  because you have difficulty remembering things just because

22  your wife has cancer?

23     A.    No.

24     Q.    Would you agree with me that at the preliminary

25  hearing when you were asked about money, you testified under

1    oath, like you did today, that Mr. Johnson said it would be

2    $20,000 for you to do this job?

3         A.    Yes.

4         Q.    Would you at least agree with me that on May 18th,

5    when you spoke with Detective Campbell, Detective Campbell

6    asked you, "Did you throw out a figure?"  And you answered

7    "No, I didn't throw out a figure.  But if I did, he'd take it

8    because he was serious."  Do you remember specifically saying

9    that?

10        A.    Yeah.

11        Q.    So when given the opportunity by Detective

12   Campbell to discuss the exact amount that you were supposed to

13   get paid 33 days after the conversation, you did not tell

14   Detective Campbell that it was a $20,000 job?

15        A.    At the time, I didn't remember it.

16        Q.    Okay.  Fair enough.  Now, he had indicated to you

17   Mr. Johnson either at that original meeting or in later phone

18   conversations that he had some concerns about his ex-wife's

19   behavior?

20        A.    Yes.

21        Q.    He indicated to you that he was concerned because

22   she was into goth and into vampires and takes pills?

23        A.    Yes.

24        Q.    And would you agree with me that he also indicated

25   to you that he had concerns about how her behavior might

1    relate to her ability to be a good parent for her son?

2        A.     Sure he did.

3        Q.     Okay.  Very good.  The phone calls that you had

4    with Mr. Johnson, did you ever save any of those phone calls?

5        A.     I did.  They tried to get them.

6        Q.     They tried to get them, the DA's Office?

7        A.     Yes.

8        Q.     All right.  Do you know if they have them?

9        A.     I don't know.  I know they had a copy of my phone

10   records, but I don't know if they were able to get them.

11       Q.     All right.  All right.  But as far as you know,

12   you didn't like go take your phone in and say when you went to

13   the police in May:  These are messages I got from Rheuben

14   Johnson?

15       A.     I tried to, yes.

16       Q.     You tried to?

17       A.     Yes.

18       Q.     Okay.  Well, we'll wait and see about that.

19           Now, you also indicated that at some point after these

20   series of conversations that you had a conversation with Mr.

21   Johnson where you said basically:  This is a stupid idea

22   because they are going to focus in on you, and at that point,

23   according to your own testimony, from then on he referred to

24   it as a project that relates to construction?

25       A.     Yes.

1     Q.     Well, you're making an assumption, are you not,

2  that when you say he referred to it as a construction project,

3  you're making an assumption that it wasn't a construction

4  project?

5     A.     It wasn't.

6     Q.     You're making an assumption when you make that

7  statement; correct?

8     A.     He didn't do that until after I said they were

9  going to focus on him.  How is that an assumption?

10    Q.     You're assuming that?

11    A.     No.

12    Q.     You don't have to make certain logical inferences?

13    A.     No.

14    Q.     Do you know if he had a construction project?

15    A.     No.

16    Q.     Did you ever go over to his property in Gardner

17 and look at all the junk?

18    A.     No.  Because I didn't want to be around that dude.

19    Q.     You never did.  I'm not asking you why, just if

20 you ever did?

21    A.     No.

22    Q.     You never did?

23    A.     No.

24    Q.     Would it surprise you to know that he has a large

25 construction project to be done over there?

```
 1      A.      No.

 2      Q.      It would not surprise you?

 3      A.      No.

 4      Q.      If you were so sure that Mr. Johnson wanted you to

 5  kill his wife, then why did you wait 33 days before you went

 6  to the police?

 7      A.      Because I thought he'd leave me alone.

 8      Q.      But you just told me that -- you just told us all

 9  that the reason you went to the police was because you did it

10  for the little boy?

11      A.      Yeah, I did.

12      Q.      Okay.

13      A.      Anybody who calls and keeps calling and keeps

14  calling is obviously serious, and if it's not me, it's going

15  to be somebody else, which is why he's sitting right there.

16      Q.      Well, there's a lot of reasons why he's sitting

17  right there?

18      A.      Yeah, I know.

19      Q.      But you obviously didn't take him seriously the

20  first time that you met?

21      A.      No, I didn't.

22      Q.      So if you didn't take him seriously, then you

23  didn't believe he was attempting to hire you to kill his wife;

24  correct?

25      A.      Then why are we here?
```

1        Q.      I'm just asking you.

        2        A.      I'm telling you.

        3        Q.      If you would have believed it, you would have gone

        4   to the police that day?

        5        A.      No, no.  I didn't know that dude from Adam, but

        6   after a month of phone calls and getting to know him, I knew.

        7        Q.      You didn't believe him on April 15th that he

        8   wanted you kill his wife?

        9        A.      No.

       10                MR. TOTH:  Thank you.  That's all, Your

       11   Honor.

       12                THE COURT:  Any redirect?

       13                MR. HENDERSON:  Yes, Judge.

       14                     **REDIRECT EXAMINATION**

       15   **BY MR. HENDERSON:**

       16        Q.      Mr. Nodwell, I think Mr. Toth established that you

       17   testified previously at a preliminary hearing; is that

       18   correct?

       19        A.      Yes, sir.

       20        Q.      At that preliminary hearing, did you tell the

       21   Court about three ways that Mr. Johnson suggested his wife

       22   disappear?

       23        A.      Yes.

       24        Q.      All three ways?

       25        A.      Yes, sir.

```
 1        Q.      The fire?

 2        A.      Yes.

 3        Q.      The drive-by?

 4        A.      Yes.

 5        Q.      And the pills?

 6        A.      Yes.

 7                        MR. HENDERSON:  Nothing further.

 8                        THE COURT:  Any recross, Mr. Toth?

 9                        MR. TOTH:  No, thank you.

10                        THE COURT:   Thank you for your testimony.

11   You may step down.

12        The State's next witness, please.

13                              TIM SWEANY,

14   having been duly sworn to tell the truth, the whole truth and

15   nothing but the truth, testified as follows:

16                         DIRECT EXAMINATION

17   BY MR. HENDERSON:

18        Q.      Sir, can you state your name for the record,

19   please.

20        A.      Tim Sweany.

21        Q.      And what do you do for a living?

22        A.      I'm a sergeant with the Olathe, Kansas Police

23   Department in the Investigations Division in persons crimes.

24        Q.      And, Sergeant, what does a sergeant with the

25   Olathe Police Department investigate in the crimes that you
```

1   do?

2        A.    Basically, we have six desks in a crime scene

3   investigation that work underneath me, and I just simply

4   review on unassigned cases and ongoing investigations and

5   supervision investigations.

6        Q.    At this point in time, you work in a supervise

7   role?

8        A.    No.  I've worked since 1995.  I've been with

9   Olathe, I was a patrol officer, trainer at the Academy, a

10  detective in investigations.  Then I got promoted to sergeant

11  in 2005.  So I've been a supervisor since 2005, and a

12  supervisor in investigations since 2009.

13       Q.    So you've worked the gamut then?

14       A.    Yes.

15       Q.    Now, you're primarily a supervisor?

16       A.    Yes.

17       Q.    Okay.  Sergeant Sweany, I want to take you back to

18  May 18th, 2012.  Were you working that particular day?

19       A.    Yes.

20       Q.    During your shift that day, did you receive

21  information that a person named Ronald Nodwell wanted to talk

22  with officers?

23       A.    Yes, I received a notification from Ronald Nodwell

24  that requested information to speak to a detective.

25       Q.    What information were you given as far as why he

1    wanted to talk to a detective?

2        A.    I contacted Mr. Nodwell, and he told me that he

3    needed to speak with a detective because somebody had tried to

4    hire him to kill their ex-wife.

5        Q.    Where was Mr. Nodwell when you first spoke to him?

6        A.    He was at work, based on our phone conversation.

7    I had asked him if he could come into the station for a formal

8    interview, and he informed me that he was at work and wouldn't

9    be able to respond until about 5:30 that evening.

10        Q.    When he got off work?

11        A.    Yes.

12        Q.    Did Mr. Nodwell, in fact, come into the police

13    department that evening?

14        A.    Yes, sir, he came in shortly before 5:30.

15        Q.    What happened?

16        A.    In the interim I contacted Detective Matt Campbell

17    and informed Detective Campbell that Ron would be coming in

18    and preliminary information that was provided to me by Ron,

19    and somebody approached him and attempted to hire him to kill

20    his ex-wife, and he became increasingly concerned with him

21    over that investigation because of persistence, and that was

22    why he contacted the police.  So I informed Detective Campbell

23    that Mr. Nodwell would be coming in for a formal interview

24    around 5:30.

25        Q.    Did you ask Detective Campbell to perform that

1 interview?

2     A.    Yes, I did.

3     Q.    Did Detective Campbell, in fact, interview Mr.

4 Nodwell?

5     A.    Mr. Nodwell showed up, Detective Campbell talked

6 to Mr. Nodwell and was able to determine the identity of the

7 person who attempted to hire him as Rheuben Johnson. So

8 Detective Campbell had arranged for a phone contact between

9 Mr. Nodwell and Mr. Johnson.

10     Q.    What was the purpose to have phone contact?

11     A.    Mr. Nodwell, basically we wanted to get him out of

12 the equation, and we had asked Mr. Nodwell if he would

13 introduce an undercover police officer to Mr. Johnson to

14 fulfill the solicitation.

15     Q.    What was the point of getting an undercover police

16 officer involved?

17     A.    We wanted to get the civilian out of the equation,

18 Mr. Nodwell, and we were concerned, obviously, about the

19 safety of the person that he was trying to have killed. So we

20 introduced an undercover officer so that we could set up a

21 wire tap on the officer, and the officer would have an idea of

22 what was criminal and what wasn't.

23     Q.    So Mr. Nodwell tries make a phone call to Mr.

24 Johnson on the 18th?

25     A.    Correct.

1    Q.    Do you know if he got a hold of him or not?

2    A.    He did not.  He left a message for Mr. Johnson,

3    and on the following day, Saturday.  I provided Mr. Nodwell

4    with my personal contact information, and then the following

5    day, Saturday, I believe it was around six in the evening, I

6    got a phone call from Mr. Nodwell stating that he may have had

7    contact with Mr. Johnson, and Mr. Johnson had agreed to meet

8    Mr. Nodwell and be introduced to our undercover officer.

9    Q.    Was a meeting arranged?

10   A.    Yes, it was.  Well, actually we met again on

11   Monday with Mr. Nodwell to make the final arrangements for the

12   meeting.

13   Q.    That would be Monday, May 21st of 2012?

14   A.    Correct.

15   Q.    Mr. Nodwell came into the station?

16   A.    Yeah.  He came in again, and the phone

17   conversations again were recorded.

18   Q.    That's a phone conversation between Mr. Nodwell

19   and Mr. Johnson?  Is that how that went down?

20   A.    Correct.

21   Q.    Was a location picked for this particular meeting?

22   A.    Yes, it was.  Originally we were going to meet at

23   Oregon Trail Park.  Prior to the meeting myself and other

24   officers responded to the area to see what the area looked

25   like where we could set up surveillance.  They had a bunch of

little league games going on, so the place was very populated. For safety reasons and surveillance reasons we moved the location to Waterworks Parks at 600 Curtis.

Q. Waterworks Park, is that in Olathe, Johnson County, Kansas?

A. Yes, it is.

Q. Did the meeting take place?

A. Yes, it did.

Q. Did Mr. Nodwell introduce the defendant, Mr. Johnson, to the undercover officer?

A. Yes, he did.

Q. Now, was there a second meeting at some point in time?

A. Yes, during the original meeting Sergeant Stites, the undercover officer, had come to an agreement with Mr. Johnson on what it would cost to carry out his request, and Sergeant Stites had also requested some additional information, some maps and some pictures and an agreement was made. Mr. Johnson agreed to pay Sergeant Stites, I believe, $3,000 as a down payment, and said that he would pay him the rest after the task was completed.

Q. What was the date of the scheduled second meeting?

A. The following day, Tuesday.

Q. Did that meeting, in fact, happen?

A. I don't believe that there was an actual date set.

They had agreed Sergeant Stites said that he would call Mr.
Johnson about noon the following day and they would make
arrangements when to meet.  That phone call took place and the
meeting date was set, Tuesday evening around four o'clock.

Q.     Now, meeting number two, where was it initially
supposed to take place?

A.     The same location, 500 South Curtis, Waterworks
Park.

Q.     Waterworks Park?

A.     Yeah.

Q.     Did the meeting, in fact, happen at the Waterworks
Park?

A.     No.  We set up surveillance and waited.  Somewhere
between four and 4:30 Mr. Johnson called Sergeant Stites back
and said that he was over in Missouri and unable to make that
meeting.

Q.     You guys go back to the station and kind regroup a
little bit?

A.     Yes.

Q.     What happens next?

A.     Sergeant Stites then recontacted Mr. Johnson on
the phone?

A.     Mr. Johnson basically said that he would not meet
with Sergeant Stites in Kansas, that he had to meet in
Missouri.

```
 1        Q.     What happened next?

 2        A.     There were some discussions whether or not that

 3   would be an acceptable solution based on the fact that we're

 4   Kansas law enforcement.  So Sergeant Stites said that he would

 5   call Mr. Johnson back and discussed it and decided that

 6   somebody's life was at stake and could not risk going into

 7   Missouri, and Mr. Stites -- Sergeant Stites called Mr. Johnson

 8   and made an arrangement to meet at the Wal-Mart at 135th and

 9   State Line.

10        Q.     Did that meeting over at Wal-Mart on the Missouri

11   side take place?

12        A.     Yes, it did.

13        Q.     Did Mr. Johnson show up?

14        A.     Yes.

15        Q.     Was Sergeant Stites there?

16        A.     Yes.

17        Q.     At that meeting what happened?

18        A.     We had several detectives in the area at the time

19   of the meeting, and we had a wire set up.  We had a record of

20   what was being said and done.  And at the conclusion of the

21   meeting we set up a rolling surveillance on Mr. Johnson and

22   once he stepped back over into the State of Kansas, we

23   contacted the local jurisdiction in Leawood.  They effected a

24   traffic stop on I-35, and he was placed under arrest.

25                    MR. HENDERSON:  May I have a moment?
```

```
 1                         THE COURT:  Yes.

 2                         MR. HENDERSON:  No further questions,

 3    Judge.  Thank you.

 4                         THE COURT:  Cross-examination?

 5                         MR. TOTH:  Thank you.

 6                         CROSS-EXAMINATION

 7    BY MR. TOTH:

 8         Q.     Officer Sweany, what is your title these days?

 9         A      I'm sergeant.

10         Q      You're a sergeant?

11         A.     Yes.

12         Q.     Sergeant Sweany, were you the kind of lead person

13    in charge of this whole investigation then?

14         A.     I was the supervisor overseeing the investigation.

15         Q.     Okay.  And so you would have been involved then on

16    conversations between Detective Stites and other detectives as

17    far as how to react to each particular phone call and each

18    particular contact that occurred between Detectives Stites and

19    Mr. Johnson; right?

20         A.     Probably, yes.  I can't say that I was privy to

21    all of them, but, yes, I oversaw all of them.

22         Q.     Let me narrow my scope here a little bit.  You

23    would have been privy to discussions within the department

24    about what to do when Mr. Johnson refused to come over to the

25    State of Kansas?
```

1      A.      Correct, yes.

         2      Q.      And would you agree with me that this presents a

         3   very unusual, difficult scenario for your department in that,

         4   number one, it's outside of your jurisdiction; correct?

         5      A.      Correct.

         6      Q.      And, secondly, you were aware that Mr. Johnson had

         7   essentially withdrawn from any sort of agreement with

         8   Detective Stites at the time that he said that he didn't want

         9   to meet in Missouri?

        10      A.      He said that he didn't want to meet in Kansas.

        11      Q.      Yeah, right?

        12      A.      I wasn't aware that withdrawing from the

        13   agreement, simply altering the location.

        14      Q.      Okay.  Were you aware when Mr. Johnson requested

        15   that Detective Stites go to the State of Missouri, that

        16   Detective Stites said that he wouldn't do that, and Mr.

        17   Johnson said, "Well, I've got to rethink all of this.  I'm not

        18   sure if I want to go through with it."  And Detective Stites

        19   says, "Well, I'm going out of town," and hangs up with him?

        20      A.      I don't know the details of the conversation.  I

        21   know that they couldn't agree.  Sergeant Stites did not agree

        22   immediately with going over to Missouri, and then I was

        23   approached, and said -- and I was informed that Mr. Johnson

        24   wanted to handle all the transactions in Missouri, and

        25   Sergeant Stites said that we needed to discuss it further

before we went over into Missouri.

Q.     Right.  Are you aware that it was Detective Stites that reinitiated contact with Mr. Johnson after that phone call?

A.     Yes.

Q.     And would you agree with me that your department would have had the ability to have Kansas City, Missouri Police be there and take Mr. Johnson into custody if something were to have taken place in Missouri?

A.     If a crime would have been committed in Missouri that was an arrestable offense, they could have arrested him, yes.

Q.     All right.  But what you guys decided to do was wait and let him drive back into Kansas.  And then he was arrested by the Leawood Police Department?

A.     Yes.

                    MR. TOTH:  That's all, Your Honor.  Thank you.

                    THE COURT:  Any redirect?

                    MR. HENDERSON:  No, Your Honor.

                    THE COURT:  Thank you for your testimony. You may step down.  State's next witness.

                    MR. HENDERSON:  Judge, could we take a brief recess to set up the equipment?

                    THE COURT:  Yes.  This is probably a good

```
 1    time for a recess.  It's 2:23.  Let's take 15 minutes.

 2          I will remind you of the Court's prior admonition.  Do

 3    not discuss the case.  Don't look at anything or discuss with

 4    anybody.  We'll take 15 minutes.  Please stand for the jury.

 5                          (Whereupon, the jury left the courtroom at

 6    2:23 and proceedings resumed at 2:45 p.m.)

 7                          THE COURT:  We are back on the record in

 8    the State of Kansas versus Rheuben Clifford Johnson, III,

 9    12CR1074.  All parties appear as before, including the

10    defendant with his counsel.  The jury is in place after an

11    afternoon recess.  We are now ready for further presentation

12    of evidence by the State, and I have been informed by the

13    lawyers that there will be a transcript.  It will be presented

14    during this testimony, and I need to give you an instruction

15    regarding that:

16          You will be presented with audio recording of

17    conversations between various witnesses in this case,

18    including the defendant.  The voice on the recording and what

19    those voices say are the evidence in the case.  A transcript

20    will be presented along with the audio recordings.  The

21    transcript has been prepared to aid you in showing what was

22    said although the transcript is not evidence.  It is for you

23    to determine what was said or not said on the recording.

24    If you find the transcript is inaccurate, you should disregard

25    the transcript.
```

```
 1          The State may call its next witness.

 2                       MR. HENDERSON:  Thank you, the State calls

 3     Lonnie Stites.

 4                            LONNIE STITES,

 5     having been duly sworn to tell the truth, the whole truth and

 6     nothing but the truth, testified as follows:

 7                          DIRECT EXAMINATION

 8     BY MR. HENDERSON:

 9          Q.     Sir, state your name for the record, please.

10          A.     Lonnie Stites.

11          Q.     And what is it that you do for a living?

12          A.     I'm a detective sergeant for the Olathe Police

13     Department.

14          Q.     And what is it that a detective sergeant does?

15          A.     I'm currently a supervisor for the narcotics unit.

16          Q.     How long have you worked with the narcotics unit?

17          A.     Four years total.

18          Q.     How long have you been a police officer?

19          A.     Twenty-seven years.

20          Q.     Twenty-seven?

21          A.     Yes, sir.

22          Q.     In your capacity both as a police officer and

23     specifically as a member of the narcotics unit, have you ever

24     had an opportunity to work in an undercover capacity?

25          A.     Yes, sir.
```

```
 1       Q.    I'm sure we all know what I mean, but from your
 2  professional position, what this does undercover work mean to
 3  you?
 4       A.    Appearing to be the criminal to complete a drug
 5  transaction.
 6       Q.    You've had occasion to buy illegal drugs while
 7  undercover?
 8       A.    Yes.
 9       Q.    How frequently do you do that?
10       A.    Sorry?
11       Q.    How frequently do you do that?
12       A.    Not as frequently.  When I was first in the drug
13  unit, I did it a number of times.
14       Q.    When you were working in undercover drugs, do you
15  wear a suit and tie?
16       A.    Not normally.
17       Q.    What "normal" what do you mean?
18       A.    Whatever is appropriate to the occasion, jeans,
19  work coat, work shirt, T-shirt, whatever fits the occasion.
20       Q.    Do you dress down a little bit?
21       A.    Yes.
22       Q.    As opposed to cleaning up, you might dirty up for
23  your work?
24       A.    Correct.
25       Q.    Sergeant Stites, I want to take you back to May
```

```
 1   18th of 2012.  At some point were you asked to participate in
 2   an undercover capacity in relation to this case?
 3        A.    Yes, I was.
 4        Q.    How were you selected to fulfill this particular
 5   role?
 6        A.    Detective Sergeant Sweany and I discussed it, and
 7   due to the inexperience in the unit that I had at that time,
 8   he said he would prefer if I did it.
 9        Q.    You agreed to do that?
10        A.    Yes.
11        Q.    At some point in time did you have a meeting with
12   the suspect in relation to this case?
13        A.    Yes.
14        Q.    Who was that individual?
15        A.    Rheuben Johnson.
16        Q.    Is Mr. Johnson in the courtroom today?
17        A.    Yes.
18        Q.    Would you identify him and tell me what he's
19   wearing, please?
20        A.    He's at the defense table, a black shirt, white
21   tie -- excuse me, black suit, white shirt.
22              MR. HENDERSON:  Let the record reflect that
23   the witness identified the defendant.
24        Q.    (By Mr. Henderson) Where did that meeting take
25   place?
```

1       A.      The first meeting occurred at Waterworks Park in

 2   Olathe.

 3       Q.      Was that on May 21st, 2012?

 4       A.      Yes.

 5       Q.      How did you get to that particular location?

 6       A.      How did I get there, I drove.

 7       Q.      When you got there, did you hook up with Mr. Ron

 8   Nodwell?

 9       A.      Yes, Mr. Nodwell drove separately.

10       Q.      Had you given Mr. Nodwell any instructions as far

11   as how he was to introduce you to the defendant?

12       A.      Just that he was to introduce me and then leave as

13   soon as possible.

14       Q.      What, if anything, did you tell him about

15   identifying you by name?

16       A.      I told him not to.

17       Q.      You told him not to give Mr. Johnson your name?

18       A.      Correct.

19       Q.      Your conversation with Mr. Johnson there at the

20   Waterworks Park, can you describe the general area where it

21   took place?

22       A.      It took place, there is a small parking lot in the

23   park.  It took place on the north side of that parking lot.

24   There is, I believe, there is a horseshoe pit, there's a bench

25   in that area.

1      Q.     Are you guys in a car, outside, where are you?

2      A.     No.  We were standing outside around the bench.  I

3 believe at one point Mr. Johnson was seated on the bench and I

4 was standing.

5      Q.     Were any efforts made to get an audio recording of

6 your conversation with Mr. Johnson?

7      A.     Yes.

8      Q.     Tell us about that, please.

9      A.     I was wearing a transmitter and a recorder during

10 the conversation.

11      Q.     And have you worn such devices before?

12      A.     Yes.

13      Q.     Have you utilized them to record undercover

14 conversations before?

15      A.     Yes.

16      Q.     To your knowledge, and in your experience, do

17 those devices tend to record accurately?

18      A.     Yes.

19      Q.     Have you had an opportunity to review the

20 recording in this particular case; is that correct?

21      A.     Yes.

22      Q.     Did it appear to be an accurate recording in this

23 case?

24      A.     Yes, it did.

25                     MR. HENDERSON:  May I approach the witness,

1   Judge?

2                       THE COURT:  Yes.

3       Q.    (By Mr. Henderson) Sergeant, I'm going to hand you

4   what's been marked for identification as State's No. 2.

5       A.    Does that appear to be an audio recording of your

6   meeting with Mr. Johnson at the Waterworks Park on May 21st?

7       A.    Yes, it does.

8                       MR. HENDERSON:  Your Honor, I move for the

9   admission of State's No. 2.

10                      THE COURT:  Any objection?

11                      MR. TOTH:  Can I ask one question, Your

12  Honor?

13                      THE COURT:  Yes.

14                  **VOIR DIRE EXAMINATION**

15  **BY MR. TOTH:**

16      Q.    Sergeant Stites, when did you review that

17  recording, this new one?

18      A.    This one?

19      Q.    Yeah.

20      A.    About one o'clock.

21      Q.    Okay.  And it's accurate?

22      A.    Yes, sir.

23                      MR. TOTH:  For previous reasons, I would

24  object, Your Honor, and that's all I have to say in that

25  matter.

```
 1                    THE COURT:  Okay.  That will be noted and
 2    overruled.  Exhibit 2 is admitted.
 3                    (Whereupon, State's Exhibit No. 2 was
 4    admitted into evidence.)
 5                    MR. HENDERSON:  May I publish, Judge?
 6                    THE COURT:  Yes.
 7                    (Whereupon, the audio recording was
 8    published to the jury.)
 9         Q.    (By Mr. Henderson) Briefly, Sergeant Stites,
10    what's going on at this time?
11         A.    He showed me a video on an iPad.
12         Q.    Who showed you a video?
13         A.    Mr. Johnson.
14         Q.    So we're hearing part of a video?
15         A.    Yeah, audio from the video from an iPad.
16                    (Whereupon, the audio recording was
17    published to the jury.)
18         Q.    (By Mr. Henderson) Sergeant Stites, what is going
19    on at this point?
20         A.    I'm trying to enter a phone number into the cell
21    phone.
22         Q.    You're trying to figure the phone out?
23         A.    Yeah.  I had a phone.  I was not used to it, and I
24    was trying to figure the phone out.
25         Q.    Fair enough.  So Sergeant Stites, in the course of
```

```
 1    that meeting, you asked Mr. Johnson to provide a photograph of
 2    what?
 3         A.    Of his problem.
 4         Q.    You referred to it as "his problem"?
 5         A.    Yes.
 6         Q.    Did you ever ask for a photograph of her?
 7         A.    No.
 8         Q.    Of she?
 9         A.    No.
10         Q.    Did you refer to that problem that you wanted a
11    photograph of using any sort of female pronoun, adverb,
12    adjective or anything like that?
13         A.    No.
14         Q.    At the conclusion of your first meeting with Mr.
15    Johnson, you went back to the station?
16         A.    Yes, sir.
17         Q.    Move forward a day to the 22nd.  You had phone
18    contact with Mr. Johnson on that particular day?
19         A.    Correct.
20         Q.    Were those phone contacts recorded as well?
21         A.    Yes.
22         Q.    Tell us about the technology as far as how that
23    happened.
24         A.    Detective Campbell handled taping those.
25    There's -- I'm a little lax at explaining technology.  There's
```

1    a microphone that attaches to the cell phone or whatever phone
         2    we're using, and then the recording device is attached to it.
         3         Q.    Did you have a phone conversation on May 22nd with
         4    the defendant to set up a second meeting at the Waterworks
         5    Park?
         6         A.    Yes, sir.
         7         Q.    Who called whom?
         8         A.    I called Mr. Johnson.
         9                   MR. HENDERSON:  May I approach the witness,
        10    Judge?
        11                   THE COURT:  Yes.
        12         Q.    (By Mr. Henderson) Sergeant Stites, I'm handing
        13    you what's been marked as State's Exhibit No. 3.  Does that
        14    appear to be a recording of the phone calls we were just
        15    talking about?
        16         A.    Correct.
        17         Q.    Is it an accurate recording?
        18         A.    Yes.
        19                   MR. HENDERSON:  Your Honor, I move for the
        20    admission of State's Exhibit No. 3.
        21                   MR. TOTH:  No objection.
        22                   THE COURT:  Exhibit 3 is admitted.
        23                   MR. HENDERSON:  May I publish, Judge?
        24                   THE COURT:  Yes.
        25                   (Whereupon, the audio recording was

1    published to the jury.)

2        Q.    (By Mr. Henderson) So that's the end of that

3    particular phone call, Sergeant?

4        A.    Yes, sir.

5        Q.    During the conversation we just listened to, there

6    was discussion about some private investigator detective work;

7    is that correct?

8        A.    Yes.

9        Q.    Was there any talk about you being a PI or

10   detective during the meeting on the previous day on May 21st?

11       A.    No.

12       Q.    This is the first time that had come up?

13       A.    Yes.

14       Q.    So you arranged this meeting at the Waterworks

15   Park?

16       A.    Correct.

17       Q.    You go out there on the 22nd?

18       A.    Yes.

19       Q.    What happens?

20       A.    Mr. Johnson doesn't show up.

21       Q.    What do you do?

22       A.    He called a little after the meeting time, I

23   believe four to 4:15, in that timeframe he called.

24       Q.    Okay.

25       A.    And he said that he was in Missouri and wasn't

1    going to be able to make it to the meeting.

 2         Q.    What happens next?

 3         A.    I told him that I was busy and I had to look at my

 4    schedule and reschedule and I would call back.  He said that

 5    was fine.

 6         Q.    What happened after that?

 7         A.    We left and went back to the station and called

 8    him back and told him I freed up time at 5:30, if he still

 9    wanted to meet.

10         Q.    Was that phone call recorded as well?

11         A.    Yes.

12                   MR. HENDERSON:  May I approach?

13                   THE COURT:  Yes.

14         Q.    (By Mr. Henderson) Sergeant Stites, State's

15    Exhibit No. 4, is that the recording of your phone call with

16    Mr. Johnson that we talked about?

17         A.    Yes, it is.

18         Q.    Is it an accurate recording?

19         A.    Yes, it is.

20                   MR. HENDERSON:  Your Honor, I move for the

21    admission of State's Exhibit No. 4.

22                   THE COURT:  Any objection?

23                   MR. TOTH:  No, Your Honor.

24                   THE COURT:  State's Exhibit 4 is admitted.

25                   (Whereupon, State's Exhibit No. 4 was

**141**
**OFFICIAL TRANSCRIPT**

1     admitted into evidence.)

2                          MR. HENDERSON:  May I publish, your Honor?

3                          THE COURT:  You may.

4          Q.     (By Mr. Henderson) Sergeant, you hung up kind of

5     abruptly there at the end.

6          A.     Uh-huh.

7          Q.     Why?

8          A.     I was tired of playing games.

9          Q.     Did you have some concerns about meeting Mr.

10    Johnson over in Missouri?

11         A.     Yes.  I wanted to get with the other

12    investigators.

13         Q.     The detective sergeant running the case made sure

14    that was fine with him prior to making that arrangement?

15         A.     Yes.

16         Q.     You went over to meet over in Missouri; correct?

17         A.     Yes.

18         Q.     You called Mr. Johnson back and set up the

19    meeting?

20         A.     Yes.

21         Q.     Where was the meeting to take place, at Wal-Mart,

22    135th and State Line?

23         A.     Yes.

24         Q.     Did you go over to that location?

25         A.     Yes, I did.

1      Q.     Did you meet the defendant there?

2      A.     Yes, I did.

3      Q.     Tell us about the meeting, the setup of the --

4   where was the meeting physically located?

5      A.     The Wal-Mart parking lot on the northeast corner

6   of 135th and State Line on the Missouri side.  It's a typical

7   Wal-Mart.  There are two or three businesses in the front.

8   Two or three businesses with it.  I told him that I'd meet

9   him.  I'd be in the area closest to State Line Road in the

10  parking lot, which is typically out of the way of cars and

11  easy to try to meet with somebody in the parking lot.

12     Q.     So when you met with Mr. Johnson, were you outside

13  or in the vehicle?

14     A.     No, I stayed in my vehicle.

15     Q.     Where was he?

16     A.     He drove up from his vehicle and came up to my

17  driver's side door.

18     Q.     Was this meeting with Mr. Johnson similarly

19  recorded?

20     A.     Yes, sir.

21             MR. HENDERSON:  May I approach, Judge?

22             THE COURT:  Yes.

23     Q.     (By Mr. Henderson) At this time, Sergeant Stites,

24  State's 6, same question:  Is that a recording of the meeting

25  we were talking about?

```
1        A.    Yes, sir.

2        Q.    An accurate one?

3        A.    Yes, sir.

4              MR. HENDERSON:  Your Honor, I move for the

5   admission of Exhibit 5.

6              THE COURT:  Any objection?

7              MR. TOTH:  Same objection.

8              THE COURT:  Exhibit 5 is admitted.

9              (Whereupon, State's Exhibit No. 5 was

10  admitted into evidence.)

11       Q.    (By Mr. henderson)  Sergeant Stites, at one point

12  during the tape, you were asked by the defendant what else you

13  need.  Do you remember that part?

14       A.    Yes.

15       Q.    And said "that"?

16       A.    Yes.

17       Q.    What were you referring to when you said that?

18       A.    He had a wad of cash that he pulled out of his

19  pocket.

20              MR. HENDERSON:  May I approach, Judge?

21              THE COURT:  Yes.

22       Q.    (By Mr. Henderson) I'm handling you what has been

23  marked as State's Exhibit 8.  Do you recognize that?

24       A.    Yes.

25       Q.    What is it?
```

1          A.     That's the cash that he handed me.

          2          Q.     How was the cash arranged when Mr. Johnson handed

          3    it to you?

          4          A.     It was in thousand dollar stashes, three stacks of

          5    hundred bills.

          6          Q.     He said something about not needing ones, just

          7    hundreds?

          8          A.     Yes.  It was rolled over in a wad in his pocket.

          9    There were two or three ones in the middle of it.  I told him

         10    I didn't need those.

         11          Q.     Did you also receive a hand-drawn map from the

         12    defendant?

         13          A.     Yes.

         14          Q.     Double side?

         15          A.     Yes.

         16                    MR. HENDERSON:  May I approach the witness,

         17    Judge.

         18                    THE COURT:  Yes.

         19          Q.     (By Mr. Henderson) Sergeant Stites, State's No. 7,

         20    is that the map we were just talking about?

         21          A.     Yes, sir.

         22                    MR. HENDERSON:  I move for the admission of

         23    State's Exhibit 7, Judge.

         24                    THE COURT:  Any objection?

         25                    MR. TOTH:  No objection.

```
 1                    THE COURT:  Exhibit 7 is admitted.

 2                    MR. HENDERSON:  Judge, I forgot to ask to

 3       admit 8, so I'll ask.

 4                    THE COURT:  Any objection to 8?  That's the

 5       cash.

 6                    MR. TOTH:  Oh, the cash, no objection.

 7                    THE COURT:  State's Exhibit 8 is admitted.

 8                    (Whereupon, State's Exhibit No. 8 was

 9       admitted into evidence.)

10                    MR. HENDERSON:  Again, finally, Sergeant,

11       did you receive a photograph from the defendant?

12            A.    Yes.

13            Q.    (By Mr. Henderson) Sergeant, I'm handing you what

14       has been marked as State's No. 6.  Do you know what that is?

15            A.    Yes.  That's a photograph that he handed me.

16                    MR. HENDERSON:  Your Honor, I move for the

17       admission of State's exhibit 6.

18                    THE COURT:  Any objection?

19                    MR. TOTH:  No objection.

20                    THE COURT:  Exhibit 6 is admitted.

21                    (Whereupon, State's Exhibit No. 6 was

22       admitted into evidence.)

23            Q.    (By Mr. Henderson)  Sergeant, at one point during

24       your conversation with the defendant you said this is the

25       vehicle you want to disappear; is that correct?
```

```
 1       A.     Yeah.  This is the vehicle, or "Is this the van
 2  you want to disappear."
 3       Q.     Was there anything in your hands?
 4       A.     Yes.
 5       Q.     What was that, the picture?
 6       A.     Yes.
 7       Q.     What were you pointing to when you said that?
 8       A.     Yeah.
 9       Q.     Where were you pointing?
10       A.     I was pointing at the female in the picture.
11       Q.     Sergeant Stites, we heard toward the tail end of
12  the video you were asking for ex-wife's name; is that correct?
13       A.     Yes.
14       Q.     Did you ever get her last name?
15       A.     No.
16       Q.     Did Mr. Johnson ever tell you her maiden name?
17       A.     No.
18       Q.     Where she went to high school?
19       A.     No.
20       Q.     Who her parents are?
21       A.     No.
22       Q.     Who her parents are?
23       A.     No.
24       Q.     Who she supposedly hangs around with that are bad
25  influences in this?
```

1          A.     Other than the reference to the drug addicts,

2     goths and vampires.

3          Q.     Did you get any names of goths and vampires and

4     drug addicts that she was supposedly hanging around with?

5          A.     No.

6          Q.     What's Mr. Johnson address?

7          A.     I don't know.  The only thing I had was a

8     description.

9          Q.     You don't know Mr. Johnson's address?

10         A.     No.

11         Q.     How were you supposed to haul vans off the

12    property if you never had his address?

13         A.     I don't know.

14         Q.     Did you ever give Mr. Johnson your name?

15         A.     No, sir.

16         Q.     Did he ever ask for your name?

17         A.     No, sir.

18                     MR. HENDERSON:  Nothing further.

19                     THE COURT:  Cross-examination?

20                     MR. TOTH:  Thank you.

21                     **CROSS-EXAMINATION**

22    BY MR. TOTH:

23         Q.     Okay.  Sergeant Stites, let's go ahead and start

24    with on May 21st which is the first day that you were

25    introduced to Mr. Johnson.

```
 1        A.      Okay.

 2        Q.      You had received information from Mr. Nodwell that

 3   made you believe that Mr. Johnson wanted to kill his ex-wife;

 4   correct?

 5        A.      Yes.  My information actually came through the

 6   other detectives, but my contact with Mr. Nodwell was very

 7   brief.

 8        Q.      So you didn't actually have a conversation with

 9   Mr. Nodwell.  He didn't tell you exactly everything?

10        A.      No, sir.

11        Q.      You got it from the other detective?

12        A.      Yes, sir.

13        Q.      Probably Detective Campbell?

14        A.      Yes.  Detective Campbell and Sergeant Sweany

15   briefed me.

16        Q.      Okay.  Would you agree with me that primarily with

17   what you're intending on doing is to try to get Mr. Johnson

18   make admissions to you or make it very, very clear with his

19   intent to have his wife ex-wife killed?

20        A.      To make sure what he was wanting, yes.

21        Q.      And you've, obviously, had experience doing

22   undercover work before?

23        A.      Yes, sir.

24        Q.      And I know this isn't the same as doing an illegal

25   drug transaction, but it's the same type of work?
```

1    A.    Yes, the same concept.

2    Q.    You think somebody is doing something illegal, and

3 you're going to try to do something to be able to memorialize

4 that or take it and be able to prove it?

5    A.    Yeah, figure out what's happened.

6    Q.    Okay.  Very good.  Now, when you went to

7 Waterworks Park when you first were introduced to Mr. Johnson,

8 Mr. Johnson refers to a project where he wants some junk

9 hauled off, basically; right?

10    A.    Yeah.  He said he would refer to it as several

11 different things, project, vans hauled off, remodeling of the

12 house.  He had referred to it in several different ways.

13    Q.    And, I believe, he also indicated to you, did he

14 not, that as far as custody issues are going, things like

15 that, things were going really, really good.  His life was in

16 pretty good shape.  So it was a good time to get these other

17 projects done?

18    A.    Yeah.  He made several references to custody

19 issues.

20    Q.    Okay.  When you asked him how much money it would

21 take to do this project, he told you $10,000?

22    A.    I believe his wording was five to $10,000.

23    Q.    Five to $10,000.

24    A.    I believe he gave a range.

25    Q.    Okay.  And were you aware that Mr. Nodwell had

indicated at some point, or maybe he hadn't indicated at some

        point, that Mr. Johnson was requiring $20,000 to do whatever

        project?

        A.      No.

        Q.      Would you agree with me that during this

conversation Mr. Johnson never specifically said to you:   I

want you to kill my wife?

        A.      No, he never specifically said that.

        Q.      And he never indicated to you that he wanted his

wife to disappear?

        A.      Not directly, no.

        Q.      Okay.  Right.  Not directly?

        A.      Yeah.  There was no direct statement to that.

        Q.      Quite frankly, you're having to make certain

assumptions and inferences about what you think he's talking

about when he's trying to address things to you; correct?

        A.      To a degree.

        Q.      You clearly thought throughout the whole time that

you were with Mr. Johnson that he was talking to you in some

sort of a code?

        A.      Yes.

        Q.      But at no point in time did you ever have any

conversations with Mr. Johnson about the use of code; right?

Other than when you said "I'm tired of the code stuff" at the

very end?

1     A.     Yeah.  Just his initial statement that he could

2   refer to it as a project or van or remodeling, he would refer

3   to the project in different ways, which to me indicated that

4   that was a code for what he was wanting done.

5     Q.     But it could also be that that's what he wanted

6   done; right?  You're having to make an inference that he's

7   using a code, but maybe his actual words speak for themselves

8   as far as what he wanted done?

9     A.     Well -- I'm sorry --

10     Q.     It's one way to look at it.

11     A.     That would be -- they were not in context with the

12   rest of the conversations he was having.  He would refer to

13   the project and then he would refer to his ex-wife or his

14   custody issue.

15     Q.     Well, at the end of that Waterworks meeting, I

16   believe, and if I'm incorrect please correct me.

17     A.     Uh-huh.

18     Q.     You indicated something about:  If you want the

19   project, or if you want the problem terminated, and his

20   response was "That's not why we are chatting today.  I just

21   want you to get the van hauled off."

22     A.     Yeah, I think he said -- "Of course, that's not

23   why we're here today.  I just want the van hauled off."  There

24   were several statements such as that one and a couple of

25   others that were made that I had a different impression of.

1          Q.    Okay.

          2          A.    Because he felt the conversation was being

          3    recorded, that was his way of diverting it off on another.

          4          Q.    So you believe that Mr. Johnson thought that he

          5    was being recorded by you?

          6          A.    Well, he made the comment during one of our

          7    conversations that anything anywhere can be recorded.

          8          Q.    It's not necessarily that you thought he knew that

          9    you were recording him, but he was aware of that being a

         10    possibility?

         11          A.    I believe so.

         12          Q.    Oh, and just one other thing about the Waterworks

         13    deal, and this may just be a problem I have with just a

         14    section of that transcript that you heard?

         15          A.    Uh-huh.

         16          Q.    There was a reference to referring to the project,

         17    and you said:  We can either get 'er done or get her done.

         18    And it reads "get her done" on the transcript.  Do you know

         19    what I'm referring to?

         20          A.    Yeah.  It was just a general statement "get 'er

         21    done."

         22          Q.    So we're not necessarily trying to emphasize the

         23    word "her," meaning reference a female person.  It's just

         24    getting a project done?

         25          A.    Correct.

1    Q.    All right.  After that you had a phone call with
2    Mr. Johnson the following day.  And during what's referred to
3    as "phone call number one, May 22nd," we're no longer talking
4    about hauling off junk, we're talking about doing private
5    detective work?
6    A.    Yes.
7    Q.    Okay.  And he told you that he wants her to be
8    investigated.  He tells you what kind vehicle she drives.  He
9    gives you information about going to see the therapist, things
10   like that?
11   A.    Yes, sir.
12   Q.    Did you at any point in time during the May 22nd
13   conversation, did Mr. Johnson specifically ask you to kill his
14   ex-wife?
15   A.    No, sir.
16   Q.    Okay.  Okay.  At any point in time in either your
17   first meeting with Mr. Johnson at Waterworks Park or this
18   phone call or any subsequent phone call, did Mr. Johnson
19   indicate to you that he specifically wanted you to overdose
20   her on pills?
21   A.    No, he did not refer to that.
22   Q.    At any point in time during this conversation,
23   previous conversation at Waterworks, subsequent conversation
24   at State Line, did Mr. Johnson tell you that he wanted you to
25   burn her house down?

```
 1        A.      No, sir.

 2        Q.      And the same goes for did Mr. Johnson ever tell

 3   you that he wanted you to do a drive-by shooting on her?

 4        A.      No, sir.

 5        Q.      So after the second meeting -- I'm sorry -- the

 6   first phone call, there was supposed to be a meeting that

 7   takes place at Waterworks Park again?

 8        A.      Yeah.

 9        Q.      And there was another phone call that takes place

10   that we didn't have the benefit of having a transcript done

11   that takes place before what's referred to as the second phone

12   call; is that correct?

13        A.      Yeah.  There was one where Mr. Johnson calls me in

14   the park, yes, sir.

15        Q.      Do you have any idea why there's no transcript of

16   that phone call?

17        A.      No, I don't know, sir.

18        Q.      So there's actually during the second phone call

19   we don't have a transcript of it?

20        A.      Uh-huh.

21        Q.      Mr. Johnson calls you to cancel the meeting at the

22   Waterworks Park?

23        A.      No.  He just calls me to tell me that he can't

24   make it there, that he's in Kansas City, Missouri.

25        Q.      He may have said Lee's Summit?
```

```
 1        A.     That could be, sir.

 2        Q.     And indicated to you that he wouldn't be making a

 3   meeting?

 4        A.     That he wouldn't be making that meeting; correct.

 5        Q.     That meeting or any meeting?

 6        A.     My impression was that meeting.

 7        Q.     But we don't have the benefit of the transcript to

 8   see what exactly was said?

 9        A.     No.  It wasn't in person so I wasn't set up to

10   record the call.

11        Q.     So then we have another meeting.  Mr. Johnson

12   tells you I'm not going to Waterworks.  I'm over in Lee's

13   Summit, and then you call him back and tell him that you have

14   a window of opportunity starting at about 5:30 p.m.; correct?

15        A.     Yeah.  That's what the phone call in the park, I

16   had told him that I was -- I can't remember what his request

17   was, but I told him I was tied up for the night, that I would

18   need to clear my schedule and get back with him.

19        Q.     Okay.  Would you agree that you started -- well,

20   you asked him whether or not he still wanted you to do the

21   original project or the investigative work; correct?

22        A.     Yeah.  Because I didn't understand how I made the

23   leap from hauling vans off to investigative work.

24        Q.     As you're talking with Mr. Johnson, he becomes

25   hesitant; correct?  I mean he says things like "I probably
```

1    need to think about this some more"?

2         A.    He made those statements, yes.

3         Q.    So he's clearly hedging on whether or not he wants

4    you to do any work for him; right?

5         A.    Yeah.  It appears he's thinking about that.

6         Q.    So the more you talk about it, then Mr. Johnson

7    says, "Well, I want to meet you in Missouri."  And you tell

8    him "I can't go to Missouri"?

9         A.    Correct.

10        Q.    But he's insistent that he wants you to come over

11   to Missouri, and you suggested somewhere in Johnson County,

12   and basically he says at one point, "I'm probably going to

13   have to go back to thinking about this."  He tells you that?

14        A.    Yes, sir.

15        Q.    Then you tell him, "Well, I'm leaving town."  He

16   says "Maybe I'll holler at you next week."  You said "I won't

17   be around.  Goodbye."  The phone conversation ends?

18        A.    Correct.

19        Q.    So clearly he had ended this conversation by

20   indicating to you whatever it is that you had discussed, he's

21   now backing out of it.  He doesn't want you to do any work;

22   right?

23        A.    That was not my impression, no.

24        Q.    Well, His exact words were "I'm probably going to

25   have to go back to thinking about this whole thing," which

1    means he's not sure what he wants to do; right?
                      2         A.    That was a little earlier before we terminated the
                      3    conversation, he did that.
                      4         Q.    You terminated the conversation, did you not?
                      5         A.    Yes, sir.
                      6         Q.    You terminated the conversation because you
                      7    couldn't get him off the fence to go into Kansas?
                      8         A.    No, not entirely.  I mean I terminated because he
                      9    wanted the meeting in Missouri, and I wanted to consult with
                     10    the other detectives before.  I wanted to.
                     11         Q.    You know there are jurisdictional problems by
                     12    having any sort of agreement or a contract that takes place in
                     13    Missouri?
                     14         A.    I typically prefer to keep things in Kansas.
                     15         Q.    You don't have the jurisdiction to arrest him in
                     16    Missouri?
                     17         A.    I don't have enforcement powers, no.
                     18         Q.    You don't have enforcement powers and the Kansas
                     19    courts don't have jurisdiction over offenses in Missouri;
                     20    right?
                     21         A.    Yeah, but it started in Kansas, so we continued
                     22    the investigation.
                     23         Q.    Unless there was some sort of termination or
                     24    withdrawal; right?
                     25         A.    That did not occur.

```
 1        Q.    We may agree to disagree about that.

 2        A.    Okay.

 3        Q.    But there certainly are jurisdictional issues that

 4   are prevalent throughout this whole meeting out at State Line;

 5   okay?

 6        A.    Okay.

 7        Q.    So you get a hold of your superiors, and you guys

 8   talk about it, and essentially is it fair that you guys said

 9   "Well, it doesn't matter, we're going to worry about the

10   jurisdictional elements later.  Let's finish this then."

11   Right?

12        A.    No.  That wasn't any part of my conversations.

13        Q.    Okay.

14        A.    I asked the detectives running the case whether

15   they wanted to continue to meet in Missouri, and I was advised

16   that they did.

17        Q.    Okay.  Okay.  So somebody, one of your superiors

18   said "Go ahead and meet in Missouri"?

19        A.    Yeah.  I wasn't running this case.  I was acting

20   in an undercover capacity.

21        Q.    Okay.  So before you meet at State Line, isn't

22   there another phone call that is missing here, and that's the

23   phone call that you made back to Mr. Johnson to reinitiate

24   some sort of transaction?

25        A.    I called him back to set up another meet to tell
```

him I needed the money.

          Q.    And was that phone call recorded?

          A.    Yes, sir.

          Q.    We, obviously, didn't see a transcript of that
     phone call.

          A.    No, sir.

          Q.    Any reason why?

          A.    I don't know, sir.

          Q.    You were the one that was clearly initiating
     contact back with Mr. Johnson and said "Well, I'll go ahead
     and meet you in the State of Missouri?

          A.    Yeah.  Our initial agreement was that I would call
     him on the initial meeting.

          Q.    Okay.  But he was not the one to call you to say:
     Come on over.  You called him and said, "I'll come over"?

          A.    In that last phone call, yes, sir.

          Q.    Then we have the last transaction -- last
     transcript, which is the meeting at the Wal-Mart parking lot.
     He tells you during this last meeting, again reiterating, that
     things are going pretty good as far as his wife goes and
     things like that; correct?

          A.    Yes.

          Q.    When you asked him at some point, you said, you
     asked him, "Is this the vehicle you want to disappear?"  He
     responds back without hesitation and said, "You mean to do

```
 1   investigative work?"  Right?
 2        A.     No.  His initial response was:  Yes -- or okay.
 3        Q.     To do the investigative work?
 4        A.     He continued to that part of the conversation.
 5   His initial response was "Yes."  And then after another
 6   conversation he made the comment, "Yeah, that's it," but there
 7   was no vehicle in the picture.
 8        Q.     No, I understand that.  I understand that part of
 9   it.  But for the sake of argument, he clarified his position
10   and said, "You mean to do the investigative work, yes."
11        A.     He made a further statement to that effect, yes,
12   sir.
13        Q.     Very good.
14        Now, the one phone call that we've decided that we don't
15   have, we've got -- let me ask this in a way that makes sense.
16        The phone call where you hang up on Mr. Johnson?
17        A.     Okay.
18        Q.     I call it the withdrawal phone call, and you call
19   it the continuation phone call.
20        A.     Okay.
21        Q.     That phone call -- well, would you agree with me
22   that it took about 45 minutes after that phone call before you
23   called Mr. Johnson back to reinitiate something?
24        A.     Yeah.  I guess half an hour, 45 minutes.  I'm not
25   sure exactly what the timeframe was.
```

1    Q.    There would have been some additional time that
2 took place before you actually met at the Wal-Mart in
3 Missouri; right?
4    A.    Yeah, we left.  It was shortly after that phone
5 call that we left our station, but there was drive time.
6    Q.    About an hour, hour and a half, somewhere in that
7 range?
8    A.    After that phone call.
9    Q.    Yeah.
10    A.    I don't believe it was that long.  The initial
11 meeting was supposed to be around four.  The next phone call
12 was probably 4:45 to five.  So maybe actually maybe 15 to 30
13 minutes.
14    Q.    Okay.
15    A.    Because we were all ready to leave.  We were
16 already prepared for a meeting.  We just had to move the
17 location.
18    Q.    Let me ask you this, when you're at Wal-Mart,
19 you're obviously getting a little irritated with Rheuben, or
20 Mr. Johnson, about this code thing, and that's when you say,
21 "Hey, I'm done with the code stuff."  You expressed that
22 pretty clearly to him?
23    A.    Yes.
24    Q.    Why didn't you then just say:  "Do you want to
25 kill your wife or not?  I've done everything you want me to.

```
 1   You've given me the money, you've given me the picture, do you
 2   want me to kill her or not?"  Why didn't you do that?
 3        A.    Because I'm trying to give him the benefit of the
 4   doubt.  I don't want to put anything in his mind at that
 5   point.  Even at that point I'm still trying to determine.
 6        Q.    Because you weren't sure yourself, right, because
 7   he's kind of going round and round talking about junk, private
 8   detective stuff, wants to meet with you and doesn't want to
 9   meet with you.  He's not making his intentions crystal clear?
10        A.    My personal opinion was, I was already aware of
11   what he wanted.  I wanted to make sure it was clear for
12   everyone else.
13        Q.    But that information came third party through
14   another detective who interviewed Mr. Nodwell?
15        A.    No.  Mr. Nodwell said this during my meetings with
16   him.
17        Q.    You may have had a hunch, a strong hunch?
18        A.    I was fairly certain.  I would say it's more than
19   a hunch.
20        Q.    To seal the deal though, would you agree with me
21   that it would have been beneficial to have him admit to what
22   you strongly believed?
23        A.    Ideally, yes, it would have been.
24        Q.    All right.
25                   MR. TOTH:  That's all, Your Honor.  Thank
```

1    you.
 2                      THE COURT:  Thank you.  Any redirect?
 3                      MR. HENDERSON:  Yes, Judge.
 4                      **REDIRECT EXAMINATION**
 5    BY MR. HENDERSON:
 6         Q.    Sergeant Stites, are you involved in any way with
 7    the supervision or management of Mr. Johnson's child custody
 8    case, divorce case?
 9         A.    No.
10         Q.    Do you have any personal knowledge.  I'm not
11    talking what you might have read in the report, but personal
12    knowledge of the status of that case in the months of March,
13    April, and May 2012?
14         A.    No, sir.
15         Q.    Do you have any personal knowledge that you could
16    rely upon to verify the defendant's statement to you that his
17    child custody case was going well?
18         A.    No, sir.
19         Q.    Mr. Toth asked you some questions about the
20    defendant sounding hesitant on the phone call?
21         A.    That's correct.
22         Q.    He termed it as a withdrawal?
23         A.    Yes, sir.
24         Q.    Did he ever say anything to the effect that:  I do
25    not want you to kill my wife any more?

1        A.      No, sir.

2        Q.      Did he ever say anything to the effect of:  I do

3   not want you to haul that van away or these vans away?

4        A.      No, sir.

5        Q.      Did he say anything about please don't investigate

6   Annie Johnson?

7        A.      No, sir.

8        Q.      Did he show up on May 22nd at Wal-Mart?

9        A.      Correct.

10        Q.      Did he bring some money with him?

11        A.      Yes.

12        Q.      How much?

13                    MR. TOTH:  Objection.  Asked and answered

14   multiple times.

15                    THE COURT:  I believe it has been answered.

16   Sustained.

17                    MR. HENDERSON:  That's all I have, Judge.

18   Thank you.

19                    THE COURT:  Any recross?

20                    MR. TOTH:  No, thank you.

21                    THE COURT:  Thank you for your testimony.

22   You may step down.

23                    (Whereupon, there was an off-the-record

24   discussion at the bench.)

25                    THE COURT:  Okay.  We're at a point where

```
 1   it's probably a good time to break.  The next witness may be
 2   lengthy and it's 4:30.  It's been a long day for everybody.
 3   We're going break for the evening.  I would ask that you be
 4   ready at nine o'clock.  We'll have coffee and treats for you.
 5   Come a little bit early so we can start promptly at nine
 6   o'clock.
 7        I will remind you of the Court's admonition to not
 8   discuss the case with anyone or let anyone discuss it with
 9   you, and certainly don't look up anything.  We'll stand in
10   recess.
11                       (Whereupon, jury left the courtroom at
12   4:30 p.m.)
13                       THE COURT:  Do we need to take up anything
14   before we leave?
15                       MR. HENDERSON:  No.
16                       MR. TOTH:  No.  Will you be locking the
17   courtroom up?
18                       THE COURT:  You can leave your stuff.
19   Leave it as you wish.  We will be adjourned.
20                       (Whereupon, Court adjourned 4:32 p.m.)
21            * * * * * * * * * * * * *
22
23
24
25
```

```
 1                    C E R T I F I C A T E

 2

 3     STATE OF KANSAS   )

 4     JOHNSON COUNTY    )

 5

 6              I, Gloria J. O'Malley, a certified

 7     shorthand reporter, and the regularly appointed,

 8     qualified, and Acting Official Reporter of Division

 9     No. 13 of the Tenth Judicial District of the State of

10     Kansas, do hereby certify that as such Official

11     Reporter, I was present at and reported in machine

12     shorthand the above and foregoing proceedings.

13              I further certify that a transcript of

14     my shorthand notes was typed, and that the foregoing

15     transcript is a true and correct transcript of my

16     notes in said case to the best of my knowledge and

17     ability,

18              SIGNED, OFFICIALLY SEALED, AND FILED

19     WITH THE CLERK OF THE DISTRICT COURT OF JOHNSON COUNTY

20     KANSAS.

21

22

23

24              Gloria J. O'Malley, CSR No. 1383

25
```

Gloria J. O'Malley, CSR No. 1383