IN THE DISTRICT COURT OF JOHNSON COUNTY, KANSAS
CRIMINAL DEPARTMENT

STATE OF KANSAS,

      Plaintiff,

vs.                Case No.: 12CR1074
                    Appellate Case No.: 11837A

RHEUBEN JOHNSON,

      Defendant.

**TRANSCRIPT OF PROCEEDINGS**
**(Motion Hearing)**

      The above-captioned matter came on for a motion hearing before the HONORABLE BRENDA M. CAMERON, Judge of the Tenth Judicial District of Kansas, Division 13, at Olathe, Kansas, on the 6th day of June, 2013.

**APPEARANCES**:

FOR THE STATE:            Mr. Keith Henderson &
                              Mr. Will Hurst
                              100 North Kansas Avenue
                              Olathe, Kansas 66061

FOR THE DEFENDANT:       Mr. Scott Toth
                              105 East Park Street
                              Olathe, Kansas 66061

        REPORTED BY GLORIA J. O'MALLEY, CSR, CCR

1                                **INDEX**

2      **WITNESS:**

3      **RICHARD PORTERFIELD**

4              Direct Examination by Mr. Henderson. . . . . . . .4

5              Cross-Examination by Mr. Toth. . . . . . . . . .17

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
         * * * * * * * P R O C E E D I N G S * * * * * * * *
```
1

2              THE COURT:  The State of Kansas versus

3    Rheuben Clifford Johnson, III, 12CR1074.

4              MR. HENDERSON:  May it please the Court,

5    the State appears by Keith Henderson.

6              MR. TOTH:  May it please the Court, Rheuben

7    Johnson appears in person along with his attorney Scott Toth.

8              THE COURT:  There is a second amended

9    complaint here at my bench.  Mr. Toth, did you and your client

10   receive a copy?

11             MR. TOTH:  Yes.

12             THE COURT:  Is there any objection to the

13   filing of that?

14             MR. TOTH:  We'd defer until after the

15   evidence on Count III, but I guess procedurally we do not.

16   We'll have argument regarding the probable cause issue, Judge.

17             THE COURT:  Okay.  Mr. Henderson, any

18   comment regarding that?

19             MR. HENDERSON:  No, Judge, not at this

20   point.

21             THE COURT:  I'm going to allow the second

22   amended complaint.  Not to say that there's probable cause,

23   but that the filing of it be allowed by this Court, and we are

24   ready for preliminary hearing; is that right?

25             MR. HENDERSON:  Yes, Judge.

1              THE COURT:  The State may call its first

         2    witness.

         3                      **RICHARD PORTERFIELD,**

         4    **having been duly sworn to tell the truth, the whole truth and**

         5    **nothing but the truth, testified as follows:**

         6                      <u>**DIRECT EXAMINATION**</u>

         7    **BY MR. HENDERSON:**

         8         Q.     Sir, could you state your name for the record.

         9         A.     Richard Porterfield.

        10         Q.     Mr. Porterfield, could you maybe pull that

        11    microphone just a little closer to you.

        12         A.     Okay.

        13         Q.     I'm a little hard of hearing.

        14    Mr. Porterfield, could you tell me how old you are?

        15         A.     I'm 51.

        16         Q.     Let's cover some obvious things.  You are

        17    currently in custody?

        18         A.     Yes, sir.

        19         Q.     Is that on Johnson County case number 13CR134?

        20         A.     Sounds right.

        21         Q.     What are your charges?

        22         A.     Burglary.

        23         Q.     Is that aggravated?

        24         A.     Three aggravated burglaries and two stealing

        25    charges.

```
 1      Q.      Two theft charges?

 2      A.      Theft, yeah.

 3      Q.      Your attorney on that case is Mr. Mark Bostwick?

 4      A.      Yes, sir.

 5      Q.      I believe he's in the back of the courtroom?

 6      A.      Yes, sir.

 7      Q.      Mr. Porterfield, do you have other crimes of

 8 convictions in your past?

 9      A.      Oh, yeah.

10      Q.      Tell me about them.

11      A.      I got a lot of forgery charges and stealing

12 charges.

13      Q.      Have you ever been to prison before?

14      A.      Yes, sir.

15      Q.      What state?

16      A.      Missouri.

17      Q.      How long were you incarcerated in Missouri?

18      A.      Oh, eight years this last time, eight years before

19 that, a three-year bit, and I've done a four-year sentence

20 also.  Altogether probably 10 years altogether, probably.

21      Q.      And you are testifying today in part because you

22 have been offered a plea agreement on your 13CR134 case; is

23 that correct?

24      A.      Yes, sir.

25      Q.      What is your understanding of what that offer is?
```

1       A.      It would be 120 months with the stipulation to go
        2   to TC, treatment center, yes, sir.
        3       Q.      So a 120-month underlying sentence?
        4       A.      Right.
        5       Q.      And then you'd get probation at the Therapeutic
        6   Community, assuming that the Judge goes along with the
        7   departure?
        8       A.      Yes, sir.
        9       Q.      Mr. Porterfield, do you know an individual by the
       10   name of Rheuben Johnson?
       11       A.      Yes, sir.
       12       Q.      Is that individual in the courtroom today?
       13       A.      Yes, sir.
       14       Q.      Could you point him out and tell me what he's
       15   wearing?
       16       A.      Right there in the stripes.
       17               MR. HENDERSON:  For the record, you've
       18   identified the defendant Mr. Johnson.
       19       Q.      (By Mr. Henderson) Where did you first have
       20   occasion to meet Mr. Johnson?
       21       A.      That had been over there across the street at the
       22   Olathe County Jail there.
       23       Q.      And when would that have been?
       24       A.      The end of January.
       25       Q.      Of this year?

1        A.      Yes, sir, 2013.

         2        Q.      Was that while you were in custody on your current

         3   case?

         4        A.      Yes, sir.

         5        Q.      In January of 2013, where were you housed in the

         6   jail, the Olathe Jail?

         7        A.      It would be 4-B, upstairs.

         8        Q.      What about Mr. Johnson?

         9        A.      He was in the same area.

        10        Q.      Now, what sort of a cell were you in at that point

        11   in time?

        12        A.      It was a one-man cell.

        13        Q.      What about Mr. Johnson?

        14        A.      The same thing.

        15        Q.      What sort of opportunities would you have for

        16   interaction with Mr. Johnson while you were over at the Olathe

        17   Jail?

        18        A.      I was just out in the dayroom area.  We got a TV

        19   and walked around and would sit down at the table and play

        20   cards, that kind of thing.

        21        Q.      Did you and Mr. Johnson ever talk to each other?

        22        A.      Yeah, a few times.

        23        Q.      Generally, what sort of stuff would you talk

        24   about?

        25        A.      We would just talk about that I've been in prison

1 and that kind of thing, what he was in for, what I was in for,

2 just basically small talk.

3     Q.    What would you tell him about your time in prison?

4     A.    We talked about how I was -- I made it sound like

5 I was in a gang over there like the Arian Nation Gang, and

6 that I was beating up child molesters over there kind of

7 thing, and basically making myself out to be like a big guy in

8 prison, whatever.  He seemed kind of impressed about that.

9     Q.    Now, was there a point in time where you were

10 moved to a different facility?

11     A.    Yes, sir.

12     Q.    Where were you moved to?

13     A.    It had been out -- what's the name of that, still

14 Olathe jail, but it's --

15     Q.    The one out in Gardner?

16     A.    Gardner, thank you, I forget.

17     Q.    When, approximately, did that happen?

18     A.    That would have been right around the end of

19 February, I'd say, and I'm not sure exactly what day.  It was

20 about around the end of February, I would imagine.

21     Q.    What about Mr. Johnson, do you know if he was ever

22 moved out to Gardner?

23     A.    Yeah.  We went out there the same time.

24     Q.    The same day?

25     A.    The same day, same bus.

```
 1        Q.     Same bus?

 2        A.     Uh-huh.

 3        Q.     When were you housed at Gardner, where were you

 4   moving then?

 5        A.     11-C.

 6        Q.     And what about Mr. Johnson?

 7        A.     Same thing.

 8        Q.     11-C?

 9        A.     Yeah.

10        Q.     For those of us not familiar with the Gardner

11   Jail, can you describe what that 11-C means?

12        A.     It's an eight-man cell.  It's basically the same

13   where we were instead of a one-man cell, it was an eight-man

14   cell.  If I was in an eight-man cell at the end of the block,

15   he was in the other area.  We didn't come in the same area,

16   but the same rec times and played cards.

17        Q.     Is 11-C, is that an area with single or multiple

18   floors?

19        A.     Two floors.

20        Q.     Which floor were you on?

21        A.     The top floor.

22        Q.     What about Mr. Johnson?

23        A.     The same thing.

24        Q.     But were you at different ends of the block?

25        A.     Right.
```

1      Q.      Is there any common area?

2      A.      Yeah, that's downstairs.  We go there on rec time.

3  If we were upstairs, we both went downstairs at the same time

4  to have rec.

5      Q.      Approximately, how often would you get rec time?

6      A.      One day it would be three hours, and the next day

7  it would be five hours.  You're out like an hour at a time,

8  and then an hour, and you're locked down for an hour and back

9  out for an hour.

10     Q.      It varied?

11     A.      Yeah, kind of crazy.

12     Q.      While you were at the Gardner jail, did you have

13 an occasion to speak with Mr. Johnson further?

14     A.      Yes, sir.

15     Q.      Was there a particular conversation that you

16 recall out in Gardner that started out talking about work?

17     A.      Yes, sir.

18     Q.      Tell me how -- well, first of all, where did that

19 conversation take place?

20     A.      That would have been out at Gardner.

21     Q.      Where physically in the Gardner jail?

22     A.      In the dayroom.

23     Q.      Can you describe the dayroom for me, please?

24     A.      There's like long tables there like where we eat

25 at, whatever, and there's a TV set you can watch TV and play

1  cards.  There's a walking around area where you can walk
2  around.  There's not a whole lot.
3      Q.    Where in the dayroom did that conversation take
4  place?
5      A.    At the tables.
6      Q.    Who all participated in the conversation?
7      A.    Just me and him.
8      Q.    You and Mr. Johnson?
9      A.    Yes, sir.
10     Q.    Was anyone else overhearing any part of your
11  conversation?
12     A.    No.  There were people around, but they wouldn't
13  hear or nothing.
14     Q.    Tell me how that conversation got started, please.
15     A.    We was talking about, I asked him what he did for
16  a living.  He said that he got rid of pests, animals or small
17  animals.  I said that I was looking for a job.  I said I was a
18  painter.  I said I doubted if I'd be any good at that.  He
19  said "You're probably better at getting rid of humans."
20     Q.    What was your reaction?
21     A.    "Yeah.  It was up more my alley."  I didn't know
22  what to say.  It took me back.
23     Q.    What happened next?
24     A.    He asked me if I would be interested in doing
25  anything like that.  I said "What?"  He said "Getting rid of

```
 1   somebody.".  I said "What?"  He said "My ex-wife."  I said,
 2   "Well, how much would something like that cost?"  He said
 3   "About eight to $10,000."
 4        Q.     Let me back you up a little bit.  He said -- well,
 5   he asked you if you'd be interested in that type of work?
 6        A.     Yeah.
 7        Q.     What was your response to that?
 8        A.     I was just like "Yeah, it would be more up alley."
 9        Q.     What did Mr. Johnson say after you said that?
10        A.     He asked me if I would be interested in something
11   like that.
12        Q.     Did you say that you were?
13        A.     Yeah.
14        Q.     What did he say after you said that you were?
15        A.     He was asking me when do I get out.
16        Q.     What did you tell him?
17        A.     I told him I didn't know for sure.  I said
18   "Hopefully soon."  He said "So do I."
19        Q.     Now, he mentioned a wife or ex-wife; correct?
20        A.     Yeah.
21        Q.     Did he say specifically what he wanted you to do
22   with that person?
23        A.     Yeah.  He asked me to kill her.
24        Q.     Did he use the word "kill"?
25        A.     Yes.
```

**12**
**OFFICIAL TRANSCRIPT**

1       Q.      Now, the part where he asked you to kill the wife
2   or ex-wife, was that before or after you talked about when you
3   were going to be getting out?

4       A.      It was before.

5       Q.      Just so I got the sequence right, you talked about
6   started out talking about work; right?

7       A.      Right.

8       Q.      He asked if you were interested in getting rid of
9   somebody and mentioned killing his wife.  He talked about how
10  much money that would be?

11      A.      Right.

12      Q.      How much money was it?

13      A.      He said eight to $10,000.  I kind of said $10,000,
14  I kind of said "that ain't very much.".

15      Q.      And then at the end you talked about when you
16  think you're going to be getting out?

17      A.      Right.

18      Q.      What was your reaction to this whole conversation?

19      A.      I was -- I knew he was serious, but I was kind of
20  playing along with it.  I was kind of scared.  I didn't really
21  think about it to tell you the truth.

22      Q.      Did you have any intention of actually going
23  through with this?

24      A.      Oh, no, no.

25      Q.      Do you remember, approximately, when this

1   conversation took place?

2       A.    It would have been around the 1st of March -- not

3  necessarily March 1st, around the first like the first week or

4  whatever.

5       Q.    The first part of March?

6       A.    Right.

7       Q.    And what makes you think it was around the first

8  part of March?

9       A.    Well, I remember it was.

10       Q.    My mother passed away, and my mother passed away

11  March 10th when I was in, and it was about three or four days

12  before that actually.

13       A.    I kind of used that as a thing because I lose

14  track of time in jail in there.  One day leads to another in

15  there.

16       Q.    Did you and Mr. Johnson ever talk about the

17  details of his case that he was in there for?

18       A.    No, no, not really.

19       Q.    Did you know what he was charged with?

20       A.    Not specifically.  I knew he was in there for --

21  he told me he was in there for trying to hire somebody to kill

22  his wife.

23       Q.    What did he say about that?

24       A.    He said he trusted the wrong person.

25       Q.    After the conversation that you were talking about

1  around the first of March, did you ever speak with Mr. Johnson

2  again about killing his ex-wife?

3      A.     No, not after that, no.  I ended up getting moved.

4  He ended up getting moved, and I ended up getting moved to

5  different places.

6      Q.     Did you ever talk to him about his wife at all?

7      A.     Yeah, a little bit.  I just asked him about his

8  wife.  He said, "Yeah, she's pretty."  I said, "Oh, yeah?"  He

9  said, "Yeah, she's beautiful."

10     Q.     Did he mention what she did for a living?

11     A.     Yeah, he told me she was a nurse.

12     Q.     Was this conversation before or after the one

13  where he talked about killing his wife?

14     A.     After that.  It was a couple days.  We was still

15  there at the jail there.

16     Q.     Approximately, how long was it before you two were

17  separated out there at the Gardner jail?

18     A.     After that?

19     Q.     After that, yes, sir.

20     A.     It was like a couple days.

21     Q.     So not very long?

22     A.     No, not very long at all, a couple days, all of a

23  sudden.  It wasn't supposed to happen that way or something.

24     Q.     Mr. Porterfield, who all did you talk to about

25  this conversation?

**15**
**OFFICIAL TRANSCRIPT**

```
 1        A.     I never talked to nobody but my lawyer.

 2        Q.     And then at some point, you were interviewed by an

 3   Olathe detective; is that correct?

 4        A.     Yes.

 5        Q.     And then I spoke with you this morning?

 6        A.     Yes, sir.

 7        Q.     Mr. Porterfield, what was your reason for coming

 8   forward with this information?

 9        A.     Well, at first I was kind of scared about possibly

10   this coming back and biting me in the ass or something.  Maybe

11   possibly getting in trouble about it, and I also wanted to

12   help myself too.  I seen a way that I might be able to help

13   myself here.

14        Q.     When you say you were worried about coming back

15   and biting you?

16        A.     Yeah.

17        Q.     What was your concern there?

18        A.     I was kind of like a conspiracy thing.  I'm not

19   too smart about that kind thing, but I know that talking with

20   somebody about a certain crime or something can come back and

21   get you for conspiracy.  Someone could construe that I was

22   thinking about carrying this out or doing something.  It can

23   come back where I could be sitting over there or whatever.

24        Q.     You said you also wanted to help yourself out?

25        A.     Sure.
```

1     Q.     What do you mean by that?

2     A.     Kind of get a better deal.  You know, I've never

3  done this before, and I heard of people doing it.  You know

4  what I mean?  I've seen it a lot of times, they call these

5  guys "snitches" or whatever.  They help themselves out by

6  getting a better deal.

7                     MR. HENDERSON:  Judge, I don't have any

8  further questions.

9                     THE COURT:  Cross-examination?

10                    MR. TOTH:  Thank you.

11                    **CROSS-EXAMINATION**

12  **BY MR. TOTH:**

13     Q.     Mr. Porterfield, I'm going to start with the last

14  exchange you had with Mr. Henderson where you talked about

15  that you did this, you came forward because of two reasons:

16  Number one, you are scared.

17     Number two, because you wanted to help yourself; correct?

18     A.     Yes, sir.

19     Q.     And when you talk about helping yourself, you

20  indicated that you've heard of people doing this before?

21     A.     Uh-huh.

22     Q.     And what you're referring to is providing

23  information to the authorities in exchange for getting a plea

24  deal; correct?

25     A.     Yes.

Q.     And you are aware certainly over the years that
you've been in prison and been around with people that have
been through the court system that sometimes individuals are
successful in getting a better deal for themselves if they
would turn on another inmate; correct?

        A.     Right.

        Q.     You've seen that before?

        A.     Yes, sir.

        Q.     You've just never done that in this case?

        A.     No, I've never done it.

        Q.     You've never done it before until this case?

        A.     I've never done it ever, period.

        Q.     But you saw this as a very good opportunity to try
to get a deal for yourself?

        A.     Yes, sir.

        Q.     Would you also agree with me that you are, because
of your criminal history, you're what we call "presumptive
prison" if you get convicted of any of these aggravated
burglaries?

        A.     Yes, sir.

        Q.     Okay.  And that's based on the fact that you've
got enough criminal history that unless some sort of miracle
takes place, you're going to go to prison for a substantial
period of time if you get convicted of these offenses without
help; right?

1      A.    Yes, sir.

2      Q.    Would you also agree with me that before you came

3 forward, before March of 2013, you had not gotten that kind of

4 help from the authorities; correct?

5      A.    That's correct.

6      Q.    Your case has been floundering around for many

7 months now with no apparent plea agreement in sight, would you

8 agree with me then?

9      A.    Me and my attorney, we talked about this, before

10 all this even came out, we talked about this treatment center

11 before they even came and interviewed me before all this.

12      Q.    Okay.  So they screened you for the Therapeutic

13 Community before you came forward?

14      A.    Yes, sir.

15      Q.    And were you accepted into the Therapeutic

16 Community?

17      A.    Yes, sir.

18      Q.    But it would still take a motion for a mitigated

19 departure to get you into the Therapeutic Community; correct?

20      A.    I don't understand.

21      Q.    It's going to take some help from somebody?

22      A.    Sure, yeah.

23      Q.    And can you tell me when it was that you

24 solidified your plea agreement on your case so that now you

25 don't have to do 10 years in prison, and you can get probation

```
 1    instead?

 2         A.    Just this morning, I believe.

 3         Q.    Just this morning?

 4         A.    Yes, sir.

 5         Q.    Was Mr. Henderson -- did Mr. Henderson convey that

 6    offer to your attorney, Mr. Bostwick, this morning?

 7         A.    Yes, sir.

 8         Q.    And I'm assuming that was contingent upon you

 9    testifying in this case this afternoon that Mr. Johnson

10    approached you to kill his wife?

11         A.    It was contingent upon me telling the truth, yes,

12    sir, that's what he said.

13         Q.    Well, if you would have gotten up here and said,

14    maybe I misinterpreted this, or I wasn't being truthful about

15    this, your deal would just be gone; right?

16         A.    Could you repeat that again?

17         Q.    Okay.  You had to testify this afternoon

18    consistent with what you have told police or else you get no

19    deal?

20         A.    Right, yeah, yeah.

21         Q.    Okay.  So in your mind, you have fulfilled your

22    end of the bargain by testifying against Mr. Johnson today?

23         A.    Sure.

24         Q.    Well, you got a heck of a deal, would you agree

25    with me there?
```

```
 1        A.      No, not really.

 2        Q.      Ten years in prison?

 3        A.      I was much better.  That's the worst I've ever

 4   gotten was 10 years in prison.

 5        Q.      But you're looking at doing 10 years in prison

 6   unless you testify against Mr. Johnson?

 7        A.      Possibly.  I mean, not necessarily.  It depends.

 8   I'm in a different kind of box area right now thing.  It

 9   wasn't what I was looking at to begin with, no.  In my eyes it

10   wasn't.  I was wanting to fight it and everything else.  I'm

11   an optimist when it comes to my own things.  I wasn't -- I

12   didn't think I was looking at that much time.  I'll put it to

13   you that way.

14        Q.      But you realize now that you are?

15        A.      Yeah, yeah.

16        Q.      All right.  So that's one reason why you've come

17   forward.  You said another reason was that you were scared.

18   Can you again explain to me what you mean by that?

19        A.      Well, I was concerned about the conspiracy thing.

20        Q.      You were worried that you might be lumped in as a

21   conspirator with Mr. Johnson to kill his wife?

22        A.      Yeah, I guess, something like that.

23        Q.      But you had testified earlier this afternoon that

24   you are certain nobody heard your conversations?

25        A.      Right.
```

```
 1      Q.      So what is it you'd have to be afraid of?
 2      A.      You know how people -- he could be wearing a wire
 3  as far as I know.
 4      Q.      He would be wearing a wire?
 5      A.      Yeah.
 6      Q.      Okay.  You've started off your relationship with
 7  Mr. Johnson in Olathe, and then you guys were both transferred
 8  to Gardner; correct?
 9      A.      Right.
10      Q.      And when you were in Olathe, you were in
11  individual-man cells; right?
12      A.      Right.
13      Q.      Now, as I understand it, and please correct me if
14  I'm wrong, not everybody in 4-B gets out at the same time for
15  rec time and for meals; is that right?
16      A.      That's correct.
17      Q.      How many -- what percentage of inmates get out at
18  the same time for rec time and meet?
19      A.      They go by a top floor and bottom floor.  The top
20  floor comes out at the same time, and the bottom floor never
21  gets out at the same time.
22      Q.      The top floor comes out, the bottom floor is in
23  their cells, and then when the top floor goes to their cells,
24  the bottom can come out?
25      A.      That's right.
```

```
 1      Q.      You and Mr. Johnson were both on the same floor?

 2      A.      That's correct.

 3      Q.      Which floor were you on?

 4      A.      The top floor.

 5      Q.      The top floor?

 6      A.      Yes, sir.

 7      Q.      Do you remember the name of your room, what number
 8 room you were in?

 9      A.      In Olathe?

10      Q.      Yes.

11      A.      Boy, 30-something, I believe it was.  I ain't so
12 sure.  It would be an odd number.  Odd numbers are upstairs
13 and even numbers are downstairs, if I remember correctly.

14      Q.      So it probably would be 31, 33, 35, 37 and 39?

15      A.      Something like that, yes.

16      Q.      And how close was your cell to Mr. Johnson's cell?

17      A.      It was quite a ways from mine.

18      Q.      So when you would get out at the same time as Mr.
19 Johnson for rec or TV or whatever, how often would you have
20 conversations with him?

21      A.      Some days we wouldn't even talk at all.  Some days
22 we would and some days we wouldn't.  Some days we wouldn't
23 talk about hardly anything.

24      Q.      As I understand it, especially if you're in 4-B
25 for longer than a couple weeks, over time you develop a
```

1    comfort level with certain individuals and you don't spend
2    more time with them when you're doing rec; is that right?
3         A.    Yes, uh-huh, yes.
4         Q.    You would not characterize Mr. Johnson as one of
5    those individuals that you had a comfort level that you would
6    hang out with for the most part; correct?
7         A.    I would or wouldn't?
8         Q.    You would not?
9         A.    I would say I would.
10        Q.    You say you would hang out with him?
11        A.    Yeah, I would a little bit, not a lot.
12        Q.    Well, during that period of time, what would you
13   talk about?
14        A.    Everything.  He talked about that he had a little
15   card making thing that he was doing, and that kind of thing.
16        Q.    And that card-making thing is he would take
17   greeting cards and attach candy to it and try to sell it?
18        A.    Yeah.
19        Q.    As a matter of fact, around Valentine's Day he
20   gave you a card; correct?
21        A.    Yes, sir, he did.
22        Q.    Do you remember the conversation that you had with
23   him about that card?
24        A.    He just asked me if I wanted to buy one.  I said I
25   didn't want to buy one.  He said "Well, I'll just give you

1    one."

2         Q.     As I understand it, based on your interview with

3    Mr. Campbell, you took the card and took the candy off and

4    threw away the card?

5         A.     Yes, sir.

6         Q.     Did you ever have any other types of exchanges

7    like that with Mr. Johnson?

8         A.     Yeah, with card things?

9         Q.     Yeah.

10        A.     When he walked by when he was doing a card, I'd

11   say "Hey, how are you doing?"  Just small talk type of stuff.

12        Q.     Now, did Mr. Johnson have a reputation amongst the

13   inmates in 4-B as a person that would barter or sell food or

14   things like that?

15        A.     Yeah.

16        Q.     So he's pretty well known for being somebody that

17   does that kind of stuff; correct?

18        A.     By bartering, trading?

19        Q.     Yeah.

20        A.     Yeah.  Pretty much everybody does that.

21        Q.     Would it be fair to characterize Mr. Johnson's

22   reputation amongst the inmates as an inmate who ran his mouth

23   a lot?

24        A.     That does what?

25        Q.     Runs his mouth a lot.

1      A.      I wouldn't say that.

2      Q.      You wouldn't say that?

3      A.      You mean runs his mouth a lot, do you mean gets

4  mouthy with people?

5      Q.      No, no, no.  I'm talking about probably doesn't

6  exercise very good judgment in keeping his mouth shut about

7  the things that you or I would keep our mouths shut about?

8      A.      Yeah, that's obvious.

9      Q.      As a matter of fact, you've characterized Mr.

10  Johnson in your interview with Mr. Campbell as being a dumb

11  ass?

12      A.      Basically, yeah.

13      Q.      You called him that because he's running his mouth

14  about his case to all the inmates; right?

15      A.      No, not to all of them, no.

16      Q.      But there are certainly many inmates that were

17  aware of what Mr. Johnson was charged with in Olathe before

18  you guys got moved to Gardner --

19                  MR. HENDERSON:  Judge, I think I have to

20  object to foundation.  I don't think Mr. Porterfield knows

21  what many inmates know.

22      Q.      (By Mr. Toth)  If you know.

23                  THE COURT:  It's sustained.

24      A.      Could you repeat question.

25      Q.      (By Mr. Toth)  Are you aware whether or not other

1    inmates knew what Mr. Johnson was charged with?

2        A.    I don't know whether they did our not.

3        Q.    You wouldn't know?

4        A.    No.

5        Q.    Have you ever been talked to by any other inmate

6    about what Mr. Johnson had been charged with?

7        A.    No.

8        Q.    That would include Eric Mendoza?  Have you ever

9    talked to Eric Mendoza about what Mr. Johnson was charged

10   with?

11       A.    I've talked to Eric Mendoza, but not about that

12   kind of stuff.

13       Q.    Have you talked to Eric Mendoza about what Mr.

14   Johnson was charged with?

15       A.    No.

16       Q.    So if Mr. Mendoza were to take the stand, he would

17   indicate that you guys never talked about Rheuben?

18       A.    We've talked about Rheuben but not about what he's

19   charged with.

20       Q.    What do you talk with Rheuben about?

21       A.    What do I talk to Rheuben about?

22       Q.    What do you talk with Eric Mendoza about Rheuben?

23       A.    Playing cards, basically, that's it.

24       Q.    You were aware about some details of his case

25   before you were moved out to Gardner; correct?

```
 1        A.      Yes, sir.

 2        Q.      Okay.  And so I would assume that would mean that

 3   before this conversation took place in Gardner, you were at

 4   least aware that he was charged in a murder-for-hire plot

 5   related to his wife or ex-wife?

 6        A.      Yes.

 7        Q.      And then you get sent out to Gardner, and then

 8   it's your testimony you have further conversations with Mr.

 9   Johnson that start over work and what you guys do for a

10   living; correct?

11        A.      Right.

12        Q.      And it's your testimony that Mr. Johnson indicated

13   to you that he was in the pest control business, and somehow

14   this conversation moves into a discussion about whether or not

15   you would be better suited to get rid of animals or people?

16        A.      Right.

17        Q.      And it's your testimony that Mr. Johnson suggested

18   you would be better getting rid of people?

19        A.      Yeah.

20        Q.      Would you agree with me that Mr. Johnson never

21   specifically used the word "kill"?

22        A.      He did use the word "kill."

23        Q.      Would you agree with me in your statement to

24   Detective Campbell where your attorney was present, you never

25   said that Mr. Johnson specifically told you he wanted you to
```

1  kill his wife?

2      A.      He told me he wanted me to get rid of his wife.

3      Q.      He told you he wanted you to get rid of his wife?

4      A.      And I was like "What do you mean by that?"  And he

5  said, "You know, kill my wife."

6      Q.      Oh, and he followed up, he said "Kill my wife"?

7      A.      Sure.

8      Q.      Would you agree with me you never told that to

9  Detective Campbell?

10     A.      I don't know if I told him he asked me to kill his

11 wife, yeah.

12     Q.      Have you had a chance to listen to your interview

13 with Detective Campbell?

14     A.      No.

15     Q.      All right.  Did he ever indicate to you why he

16 wanted you to get rid of his wife?

17     A.      No.

18     Q.      Did he ever indicate to you why he wanted you to

19 get rid of his wife?

20     A.      No.

21     Q.      Did he ever have any specific conversations with

22 you at all about how this was supposed to take place?

23     A.      No.  We kind of agreed that that would come around

24 later on.  We was -- we got to talking, and we got cut off

25 because it was time to go to lock down, whatever, and I said

1    "We'll talk about it some other time."  Because the next
2    couple of days, that's when I got transferred out of there.  I
3    never thought I would get transferred out like I did.  It was
4    kind of weird how we got separated or whatever.
5        Q.    Right.  No, I remember that.  Because he went
6    through the same thing you did.  So no discussions about
7    money, payment, anything like that?
8        A.    Yeah, money was mentioned, yeah.
9        Q.    Well, the eight to $10,000, yeah, but as far as
10   how you were supposed to get paid?
11       A.    No.
12       Q.    Did you have any reason to believe that Mr.
13   Johnson even had eight to $10,000?
14       A.    I was wondering, but, no, I don't know whether he
15   did or not.
16       Q.    How long after you had this conversation with Mr.
17   Johnson was it before you went to your attorney and gave him
18   that information?
19       A.    It was probably a couple weeks.
20       Q.    Now, and this conversation would have taken place
21   in March of 2013?
22       A.    Right.
23       Q.    Okay.  And you had a court hearing on March 12th,
24   2013, at which time your attorney continued your case, and you
25   were ordered screened for the Therapeutic Community; is that

```
 1    your recollection?

 2        A.      Yeah, that sounds about right.

 3        Q.      Would the conversation with Mr. Johnson have taken

 4    place before or after that court appearance?

 5        A.      Before.

 6        Q.      Before.  All right.  Because -- okay.  And then

 7    you had an appearance in April, and it looks like your case

 8    was set for a plea, a plea for May 16th, 2013?

 9        A.      That sounds right, yes, sir.

10        Q.      Okay.  And then on May 16th it was continued out

11    to June 19th, and I suppose on June 19th you were going to

12    enter into your plea; right?

13        A.      Yes, sir.

14        Q.      And you're going to enter into a plea agreement,

15    and it's going to say that you get to go into the Therapeutic

16    Community instead of 10 years in prison?

17        A.      I hope so.

18                    MR. TOTH:  I believe that's all the

19    questions I have, Your Honor.

20                    THE COURT:  Any redirect?

21                    MR. HENDERSON:  No, ma'am.

22                    THE COURT:  Thank you for your testimony.

23    You may step down.

24                    MR. HENDERSON:  The State rests.

25                    THE COURT:  Does the defense wish to
```

1   present any evidence today?

2                    MR. TOTH:  No, Your Honor.  Thank you very

3   much.

4                    THE COURT:  Any closing comments?

5                    MR. TOTH:  I would ask the Court to dismiss

6   Count III.  I think the State has failed in meeting its burden

7   at the preliminary hearing.

8        Obviously, Mr. Porterfield has a very firm -- well, this

9   is the first time he's ever testified that Mr. Johnson has

10  said that he wants to have his wife killed.  I'd ask the Court

11  to take that into consideration and ask the Court to dismiss

12  Count III.

13                   MR. HENDERSON:  Judge, for the record, I

14  just think the evidence presented today in the light most

15  favorable to the State is certainly enough to bind over.

16                   THE COURT:  I believe the State has shown

17  probable cause to believe that this felony in Count III was

18  committed by this defendant here in Johnson County, Kansas.

19  Therefore, he will be bound over for trial on that.

20       Does he wish a formal reading of the charge?

21                   MR. TOTH:  No, Judge, we enter a not guilty

22  plea.

23                   THE COURT:  A not guilty plea is entered.

24  I'll set the matter for jury trial.  How many days, Counsel?

25                   MR. TOTH:  Three.

**32**
**OFFICIAL TRANSCRIPT**

1          MR. HENDERSON:  Three, Your Honor.

2          THE COURT:  July 29th.

3          MR. TOTH:  That will work, Your Honor.

4          MR. HENDERSON:  That's fine, Your Honor.

5          THE COURT:  It's set for jury trial July

6   29th at nine a.m.  The defendant will be ordered to appear.

7   Pretrial conversations will be July 26th at nine.

8      All jury instructions will need to be filed before that

9   time, and any motions prior to that time will need to be heard

10  prior to pretrial conference because I have other things set

11  later that morning.  So just jury instructions and

12  announcement of whether you're ready for trial.  Anything

13  further?

14          MR. HENDERSON:  Judge, do you want to give

15  us a motions date?  I'll have a motion to endorse.  I'll

16  probably have folks from the jail that I'll want to bring.

17          THE COURT:  Yes.  For motions, July 8th at

18  11.

19          MR. HENDERSON:  Could we do 10:30 or 11:30?

20          THE COURT:  Let's do 10:30.  Does that work

21  for your calendar, Mr. Toth?

22          MR. TOTH:  I think so.  I'm supposed to

23  have a trial in federal court.  If there's a problem, I'll let

24  the Court know.

25          THE COURT:  Just let me know.  Otherwise, I

```
 1  put time aside for motions July 8th at 10:30.  I'd ask that
 2  any motions either of you have be on file by June 26th.
 3                   MR. TOTH:  That's fine.
 4                   MR. HENDERSON:  Thank you, Judge.
 5                   THE COURT:  The defendant will be ordered
 6  to appear that day, July 8th at 10:30, July 26th at nine, July
 7  29th at nine.  Is there anything further?
 8                   MR. TOTH:  No, Your Honor.
 9                   MR. HENDERSON:  No, Judge.
10                   THE COURT:  Thank you very much.
11             * * * * * * * * * * * * * * *
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**34**
**OFFICIAL TRANSCRIPT**

C E R T I F I C A T E

STATE OF KANSAS    )

JOHNSON COUNTY     )

          I, Gloria J. O'Malley, a certified shorthand reporter, and the regularly appointed, qualified, and Acting Official Reporter of Division No. 13 of the Tenth Judicial District of the State of Kansas, do hereby certify that as such Official Reporter, I was present at and reported in machine shorthand the above and foregoing proceedings.

          I further certify that a transcript of my shorthand notes was typed, and that the foregoing transcript is a true and correct transcript of my notes in said case to the best of my knowledge and ability,

          SIGNED, OFFICIALLY SEALED, AND FILED WITH THE CLERK OF THE DISTRICT COURT OF JOHNSON COUNTY KANSAS.

Gloria J. O'Malley, CSR No. 1383