IN THE DISTRICT COURT OF JOHNSON COUNTY, KANSAS
CRIMINAL DEPARTMENT

STATE OF KANSAS,

        Plaintiff,

vs.                        Case No. 12CR1074
                            Appellate No.: 110837A

RHEUBEN CLIFFORD JOHNSON, III,

        Defendant.


**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
(Day 2, Volume II)

    PROCEEDINGS HAD before the HONORABLE BRENDA CAMERON, Judge of Court 13 of the Tenth Judicial District of the State of Kansas at Olathe, Kansas, and a jury of twelve, July 29th, 30th, and 31st, 2013.

**APPEARANCES**:

    The Plaintiff appeared by Mr. Keith Henderson and Mr. Will Hurst, Assistant District Attorneys, Office of the District Attorney, Johnson County Courthouse, 100 N. Kansas Avenue, Olathe, Kansas.

    The Defendant appeared in person and by Mr. Scott Toth, Attorney at Law, 105 East Park Street, Olathe, Kansas.



        REPORTED BY GLORIA J. O'MALLEY, CSR, CCR

                              <u>INDEX</u>

**WITNESSES:**

**<u>LONNIE STITES</u>**

        Direct Examination by Mr. Henderson. . . . .5

**<u>ANNIE JOHNSON</u>**

        Direct Examination by Mr. Henderson. . . . .8
        Cross-Examination by Mr. Toth. . . . . . .19
        Redirect Examination by Mr. Henderson. . .25
        Recross-Examination by Mr. Toth. . . . . .26

**<u>DAWN WAKE</u>**

        Direct Examination by Mr. Hurst. . . . . .27
        Cross-Examination by Mr. Toth. . . . . . .35

**<u>RICHARD PORTERFIELD</u>**

        Direct Examination by Mr. Hurst. . . . . .41
        Cross-Examination by Mr. Toth. . . . . . .49
        Redirect Examination by Mr. Hurst. . . . .64
        Recross-Examination by Mr. Toth. . . . . .65

**<u>MATT CAMPBELL</u>**

        Direct Examination by Mr. Henderson. . . .66
        Cross-Examination by Mr. Toth. . . . . . .82

STATE RESTS. . . . . . . . . . . . . . . . . .91

DEFENSE'S MOTION FOR JUDGMENT OF ACQUITTAL . . .88

**<u>DEFENSE'S CASE IN CHIEF</u>**

**WITNESS:**

**<u>KATHY KLOSTERMANN</u>**

        Direct Examination by Mr. Toth. . . . . . .91
        Cross-Examination by Mr. Hurst . . . . . .114

**2**
**OFFICIAL TRANSCRIPT**

## INDEX (Continued)

**STATE'S REBUTTAL EVIDENCE**

**LONNIE STITES**

    Direct Examination by Mr. Hurst. . . . . .134
    Cross-Examination by Mr. Toth. . . . . . .135

INSTRUCTIONS CONFERENCE. . . . . . . . . . . . 120
INSTRUCTIONS READ. . . . . . . . . . . . . . 138
CLOSING ARGUMENT BY THE STATE. . . . . . . . 145
CLOSING ARGUMENT BY THE DEFENSE. . . . . . . . 154
FINAL ARGUMENT BY THE STATE. . . . . . . . . . 167

## EXHIBIT INDEX

| EXHIBIT: | | OFFERED | ADMITTED |
|---|---|---|---|
| State's  9 | Audio | 6 | 6 |
| State's 10 | Audio | 7 | 7 |
| Defendant's A | Motion to Modify | 24 | 24 |
| Defendant's B | Court Order | 24 | 24 |
| Defendant's C | Plea Agreement | 65 | 65 |
| Defendant's D | Photograph | 99 | 99 |
| Defendant's E | Photograph | 99 | 99 |
| Defendant's F | Photograph | 99 | 99 |
| Defendant's G | Photograph | 99 | 99 |
| Defendant's H | Photograph | 99 | 99 |
| Defendant's I | Photograph | 99 | 99 |
| Defendant's J | Photograph | 99 | 99 |
| Defendant's K | Photograph | 99 | 99 |
| Defendant's L | Photograph | 99 | 99 |
| Defendant's M | Photograph | 99 | 99 |
| Defendant's N | Photograph | 99 | 99 |
| Defendant's O | Photograph | 99 | 99 |
| Defendant's P | Photograph | 99 | 99 |
| Defendant's Q | Photograph | 99 | 99 |
| Defendant's R | Photograph | 99 | 99 |
| Defendant's S | Photograph | 99 | 99 |
| Defendant's T | Photograph | 99 | 99 |
| Defendant's U | Photograph | 99 | 99 |
| Defendant's V | Photograph | 99 | 99 |
| Defendant's W | Photograph | 99 | 99 |
| Defendant's X | Photograph | 99 | 99 |
| Defendant's Y | Photograph | 99 | 99 |
| Defendant's Z | Photograph | 99 | 99 |
| Defendant's AA | Photograph | 99 | 99 |
| Defendant's GG | Photograph | 99 | 99 |

```
 1                        EXHIBIT INDEX

 2   EXHIBIT:                           OFFERED   ADMITTED

 3   Defendant's HH    Orion Records       109       109
     Defendant's II    E-mail              110
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          * * * * * * P R O C E E D I N G S * * * * * *

 2                    (Whereupon, the jury entered the courtroom

 3  at 9:02 a.m.)

 4                    THE COURT:  The State of Kansas versus

 5  Rheuben Clifford Johnson, III, 12CR1074.  Will the parties

 6  enter your appearances, please.

 7                    MR. HENDERSON:  May it please the Court,

 8  the State appears by Keith Henderson and Will Hurst.

 9                    MR. TOTH:  Good morning, Mr. Johnson

10  appears with his attorney Scott Toth and Deborah Johnson.

11                    THE COURT:  Thank you.  We're back for day

12  two of the jury trial after taking recess.  Welcome back

13  everyone.  I hope you had a good evening.  We are now ready

14  for further presentation by the State.

15                    MR. HENDERSON:  Thank you.
```

**LONNIE STITES,**

**having been duly sworn to tell the truth, the whole truth and
nothing but the truth, testified as follows:**

<u>DIRECT EXAMINATION</u>

**BY MR. HENDERSON:**

```
21       Q.     Welcome back.

22       A.     Yeah.

23       Q.     There was some conversation yesterday about a

24  couple of phone calls that we didn't play audio of.  Do you

25  remember that?
```

```
 1        A.     Yes.
 2        Q.     One of the phone calls was a call from the
 3   defendant to you while were you at the Waterworks Parks?
 4        A.     Yes.
 5                     MR. HENDERSON:  May I approach the witness,
 6   Judge?
 7                     THE COURT:  Yes.
 8        Q.     (By Mr. Henderson) Sergeant Stites, I'm handing
 9   you State's No. 9.  Have you had an opportunity to view that?
10        A.     Yes, I have.
11        Q.     Is that the audio of the phone call we were just
12   talking about?
13        A.     Yes, it is.
14        Q.     This is a relatively short audio?
15        A.     Yes, it is.
16                     MR. HENDERSON:  Your Honor, I'd move for
17   admission of State's No. 9 at this time.
18                     THE COURT:  Any objection?
19                     MR. TOTH:  No objection.
20                     THE COURT:  Exhibit 9 is admitted.
21                     MR. HENDERSON:  May I approach, Judge, and
22   publish, Judge?
23                     THE COURT:  You may.
24                     (Whereupon, the DVD was published.)
25        Q.     (By Mr. Henderson) Sergeant, just to put that call
```

**6**
**OFFICIAL TRANSCRIPT**

1    back in the context of the sequence of events.  You're at the

2    Waterworks Park?

3         A.    Yeah.  This was at Waterworks Park when we are to

4    have a second meeting.

5         Q.    And after this you kind of went back to the

6    station to kind of re-gather, regroup, and then you met up

7    with the defendant later?

8         A.    Correct.

9         Q.    There was also a phone call you made, not

10   defendant shortly after meeting him at the Wal-Mart?

11        A.    Yes.

12                  MR. HENDERSON:  May I approach?

13                  THE COURT:  Yes.

14        Q.    (By Mr. Henderson) This time, Sergeant, take a

15   look at State's 10.  Have you reviewed that?

16        A.    Yes.

17        Q.    Is it an accurate audio recording that we were

18   discussing?

19        A.    Yes, it is.

20                  MR. HENDERSON:  Your Honor, I move for the

21   admission of State's 10.

22                  THE COURT:  Any objection?

23                  MR. TOTH:  No objection to State's 10.

24                  THE COURT:  State's 10 is admitted.

25

1                      (Whereupon, State's Exhibit No. 10 was

         2      admitted into evidence.)

         3                      MR. HENDERSON:  May I publish, Judge?

         4                      THE COURT:  Yes.

         5                      (Whereupon, the DVD was published to the

         6      jury.)

         7          Q.     (By Mr. Henderson) Sergeant, we've now listened to

         8      all of your conversations with the defendant?

         9          A.     Yes.

        10                      MR. HENDERSON:  Nothing further, Judge.

        11                      THE COURT:  Thank you.  Cross-examination?

        12                      MR. TOTH:  No questions, Your Honor.

        13                      THE COURT:  Thank you for your testimony.

        14      You may step down.  The State's next witness is Annie Johnson.

        15                      **ANNIE JOHNSON,**

        16      **having been duly sworn to tell the truth, the whole truth and**

        17      **nothing but the truth, testified as follows:**

        18                      <u>**DIRECT EXAMINATION**</u>

        19      **BY MR. HENDERSON:**

        20          Q.     Ma'am, could you please state your name for the

        21      record, please.

        22          A.     Annie Johnson.

        23          Q.     And, Ms. Johnson, how old are you?

        24          A.     I'm 40 years old.

        25          Q.     Do you know an individual by the name of Rheuben

1  Johnson?

2      A.     Yes, I do.

3      Q.     Did you used to be married to him?

4      A.     Yes, I was.

5      Q.     Could you pull the mic down just a little bit

6  closer to you.

7      A.     Like this?  Can I hold it?

8                  THE COURT:  Sorry.  I've asked for a longer

9  one.  It's supposed to be coming.

10                  THE WITNESS:  Okay.

11     Q.     (By Mr. Henderson) Did you used to be married to

12 Rheuben Johnson?

13     A.     Yes, sir.

14     Q.     Is he in the courtroom today?

15     A.     Yes, he is.

16     Q.     Could you point him out and tell me what color

17 clothing?

18     A.     Right there.  He's wearing a black suit, a white

19 shirt and a gray tie.

20     Q.     Did you and the defendant have any children

21 together?

22     A.     We did.

23     Q.     How many?

24     A.     One child.

25     Q.     A boy or girl?

```
 1       A.      A boy.

 2       Q.      And what is his name?

 3       A.      Rheuben Johnson, Rheuben Johnson, IV.

 4       Q.      Did you typically refer to him as little Rheuben?

 5       A.      Yes.

 6       Q.      What is little Rheuben's date of birth?

 7       A.      9/13/2006.

 8       Q.      I'd like you to tell me when you and the defendant

 9  were married?

10       A.      We got married in October 2005.

11       Q.      And was there a point in time where the two of you

12  separated?

13       A.      Yes.  I left in October 2009.

14       Q.      And at some point in time was the divorce

15  finalized?

16       A.      It was finalized in January of 2012.

17       Q.      So you were legally married to the defendant for

18  seven years; is that correct, roughly?

19       A.      Roughly, yes.

20       Q.      You were together for roughly four years before

21  you separated?

22       A.      Four years before we separated, yes.

23       Q.      During the course of time that you were legally

24  married to the defendant, I'm talking about from October of

25  2005 all the way through January 2010, were you familiar with
```

```
 1   what sort of business this is?

 2        A.     Yes.

 3        Q.     Was he involved with an extermination or pest

 4   control business?

 5        A.     Yes.

 6        Q.     Was he involved in other business projects as

 7   well?

 8        A.     Yes.

 9        Q.     How lucrative were Mr. Johnson's business

10   projects?

11                    MR. TOTH:  Judge, relevance.

12                    THE COURT:  Overruled.  You may answer.

13        A.     He roughly may have had between $300,000 and

14   $500,000 a year.

15        Q.     (By Mr. Henderson) Was Mr. Johnson, to your

16   knowledge over the course of your marriage a person who would

17   have access to large sums of cash when he needed it?

18        A.     Absolutely.

19        Q.     Would he have been the type of person who would

20   have had access to $10,000, $20,000 of cash over the course of

21   your marriage?

22        A.     Absolutely.

23        Q.     Now, Ms. Johnson, would it be fair to say that

24   there is a court case governing your divorce from the

25   defendant?
```

```
 1        A.    Yes, sir.

 2        Q.    Is there also a part of that case having to deal

 3   with child custody arrangements?

 4        A.    Yes, sir.

 5        Q.    Regarding little Rheuben?

 6        A.    Yes.

 7        Q.    Currently, what is -- well, strike that.  In the

 8   months of March, April and May of 2012, what was the status of

 9   the defendant's visitation rights with little Rheuben?

10        A.    It was mostly supervised.  It was a little

11   unsupervised.  I believe it switched all the time, about two

12   hours were supervised, and then he was allowed one hour of

13   unsupervised, I believe, I'm guessing.

14        Q.    A little while ago?

15        A.    Yes.

16        Q.    Would it be fair to say that the status of the

17   defendant's visits with little Rheuben fluctuated from time to

18   time?

19        A.    Yes.

20        Q.    Did they go from supervised to unsupervised to

21   supervised and back and forth?

22        A.    Yes, sir.

23        Q.    For those of us who are not familiar with

24   Court-supervised visitations, in your experience what is a

25   supervised visit?  What is a supervised visit for Mr. Johnson
```

**12**
**OFFICIAL TRANSCRIPT**

1    in your case?

2         A.    It was a social worker, Trina Nudson, who is the

3    owner of the Layne Project who is also an attorney.  And she

4    would be at the visitations, and they could not be within

5    whispering reach of each other, nothing could be whispered and

6    things like that.  She would watch it.

7         Q.    What is the Layne Project?

8         A.    The Layne Project is what she owns, and it is

9    supervised.  They provide supervised visitations.

10        Q.    And where is the Layne Project located?

11        A.    In Olathe.

12        Q.    Is it pretty close to the courthouse?

13        A.    Yes, it is.  I think it's on Chestnut, I think.

14        Q.    So that would just be a block or two to the east?

15        A.    East, yes -- no, to the north.

16        Q.    All right.  To the north.  How frequent to the

17   months we're talking about, March, April and May of 2012, how

18   frequent was the defendant supervised with visits with little

19   Rheuben?

20        A.    I think it was twice a week.

21        Q.    Were there particular days that the visits were to

22   take place on?

23        A.    I don't remember.

24        Q.    Fair enough.  Are you familiar with the

25   defendant's reactions to the supervised visits?  Was he happy

1    about having supervised visits or unhappy?

       2                    MR. TOTH:  Objection.  Calls for

       3    speculation.

       4                    THE COURT:  Overruled.  She can answer, if

       5    she knows.

       6        A.    I don't know.  I never had contact with him, so I

       7    never knew directly.

       8        Q.    (By Mr. Henderson) What sort of contact were you

       9    and the defendant allowed to have at that point?

      10        A.    No contact.

      11        Q.    No contact whatsoever?

      12        A.    No.

      13        Q.    Where were you living around the months we're

      14    talking about, March, April, May 2012?

      15        A.    Well, I had a fire, so I lived in two different

      16    places.  I lived at my apartment at 9506 West 80th Place,

      17    Apartment 2301, Overland Park, Kansas 66204.

      18        Q.    Johnson County?

      19        A.    Yes.

      20        Q.    Is that the apartment that had the fire?

      21        A.    Yes.

      22        Q.    Describe that apartment complex?

      23        A.    It's a large apartment.  It's a gated community.

      24    It's considered a luxury apartment style.

      25        Q.    And were you working at that point in time?

```
 1        A.       At Research Medical Center.

 2        Q.       Was there -- are you a coffee drinker?

 3        A.       Oh, yes.

 4        Q.       Is there a particular place you like to get your

 5   coffee?

 6        A.       Yes.

 7        Q.       Where is that?

 8        A.       I go to McDonald's a lot.

 9        Q.       Any particular McDonald's you like to go to?

10        A.       On 75th Street right across from Shawnee Mission

11   Medical Center.

12        Q.       Going back to around that time, were you taking

13   any medications that were prescribed to you by a doctor?

14        A.       Yes.

15        Q.       Several medications?

16        A.       Yes.

17                 MR. HENDERSON:  May I approach the witness,

18   Judge?

19                 THE COURT:  Yes.

20        Q.       (By Mr. Henderson) Now, Ms. Johnson, I'm showing

21   you a map that's been admitted as State No. 1.  Is your

22   apartment on this map?

23        A.       Yes, sir.

24        Q.       Can you point it out for us, please?

25        A.       Right there.  (Indicating.)
```

```
 1       Q.     Right there where the bubble is?

 2       A.     I guess.  It's a rough estimation, but it's hard

 3  to tell, but I believe it is right there.

 4       Q.     In that general area?

 5       A.     Yes.

 6       Q.     Is the McDonald's that we're talking about that

 7  you like to get your coffee pictured on this map?

 8       A.     Right here.  (Indicated.)

 9       Q.     Now, did you actually work at Shawnee Mission

10  Medical Center?

11       A.     No.

12       Q.     You were working at Research Medical?

13       A.     Yes.

14       Q.     Okay.  Fair enough.  Ms. Johnson, at some point in

15  time were you notified that your ex-husband was alleged to

16  have tried to hire someone to kill you?

17       A.     Yes, I was.

18       Q.     Who told you that?

19       A.     Detective McMillian.

20       Q.     From the Olathe Police Department?

21       A.     Yes.

22       Q.     Where did that conversation take place?

23       A.     He called me on my phone, and he told me he was at

24  my place and I was not there.  I actually was at my

25  boyfriend's place.
```

1     Q.    Did he eventually meet you at your boyfriend's
2  place?
3     A.    Yes, sir.
4     Q.    Did he talk to you about what he could about the
5  case?
6     A.    Yes, sir.
7                 MR. HENDERSON:  May I have a moment, Judge?
8                 THE COURT:  Yes.
9                 MR. HENDERSON:  May I approach the witness,
10 Judge?
11                THE COURT:  Yes.
12                THE COURT:  If it would help to hold the
13 microphone, you can, whatever works.
14    Q.    (By Mr. Henderson) Ms. Johnson, I want to show you
15 two exhibits.  The first one is State's Exhibit No. 6.  Do you
16 recognize that photograph?
17    A.    Yes, I do.
18    Q.    Who all is in it?
19    A.    It's me, it's Rheuben Johnson and my son.
20    Q.    Little Rheuben down there at the bottom?
21    A.    Yes.
22    Q.    At this time, Ms. Johnson, I want to show you
23 what's been admitted as State's Exhibit No. 7.  It's
24 double-sided.  The side with the exhibit sticker on it, does
25 that appear to be a map?

```
 1        A.      Yes.

 2        Q.      What things are depicted on that side of the map?

 3        A.      This is Rheuben Johnson's handwriting.  This is

 4   the Layne Project.  This is Santa Fe, and this says

 5   "courthouse."  So this is a map of the Layne Project.

 6        Q.      Let's flip it over then.  On the side of the map

 7   without the exhibit sticker, is that also has a little

 8   hand-drawn map?

 9        A.      Yep, in his handwriting.

10        Q.      In whose handwriting?

11        A.      Rheuben Johnson's handwriting.

12        Q.      What is shown on that little map?

13        A.      My apartment complex.  There's a school that's

14   near my place, Grant Street is present.  There's a question

15   mark.  That's marked 79th Street, and it says "1:30 court

16   Wednesday, 2:45, 3 p.m., drop off Layne, 7 o'clock pick up."

17                   MR. HENDERSON:  Thank you, Judge.  I have

18   no further questions.

19                   THE COURT:  Cross-examination.

20                   MR. TOTH:  Thank you, Your Honor.

21

22

23

24

25
```

<u>CROSS-EXAMINATION</u>

2    BY MR. TOTH:

3                         (Whereupon, Defendant's Exhibits A and B

4    were marked by the reporter for identification.)

5         Q.    (By Mr. Toth)  Good morning, Mrs. Johnson.

6         A.    Good morning.

7         Q.    You and Rheuben were married in October of 2005?

8         A.    Yes, sir.

9         Q.    And then divorced in January of 2012?

10        A.    Yes.

11        Q.    And I believe you indicated that you had left him

12   in October 2009?

13        A.    Yes.

14        Q.    So I take it that you had been separated for

15   almost two and a half years, I guess?

16        A.    Yes.

17        Q.    If my math is correct?

18        A.    Yes.

19        Q.    You had been separated for that time?

20        A.    Yes.

21        Q.    During the separation who had custody of little

22   Rheuben?

23        A.    It went back and forth.

24        Q.    All right.  So we didn't have any court's

25   intervention as far as visitation until the divorce actually

1    went through, is that correct; or did the Court have some
        2    orders in place before your divorce went through?
        3        A.    I believe the Court had orders that were changing
        4    all the time.
        5        Q.    Okay.  So this was something that was pretty
        6    fluid.   It was never constant; is that right?
        7        A.    Yes.
        8        Q.    Now, I have had an opportunity to go back and look
        9    at the divorce documents in your case, and it appears to me
       10    that when the divorce decree was granted in January of 2012,
       11    your ex-husband, Mr. Johnson, was allowed parenting time on
       12    Wednesday from four to seven, and then two hours of
       13    unsupervised visitation at the Layne Project.  Does that sync
       14    with what your memory was?
       15        A.    Possibly, yes.
       16        Q.    Okay.  And then it appears that in March of 2012,
       17    two months later, the Court modified the child custody
       18    arrangements or the visitation arrangement to allow Mr.
       19    Johnson two three-hour visits per week and two hours of
       20    unsupervised visits at the Layne Project as opposed to one.
       21    So would it appear that the Court had increased the amount of
       22    visitation Mr. Johnson had a couple months before the divorce
       23    went through?  Does that jive with your recollection?
       24        A.    I don't have the records in front of me, but if
       25    that's what it states, yes.

1      Q.     Now, about a week before you were contacted by
2    Detective McMillian, there apparently was another court date
3    that took place.  And at this particular court date it
4    indicates the visitation was changed again so that Mr.
5    Johnson could have 12 hours every other weekend with no more
6    than eight consecutive hours, and then four hours of
7    visitation every other Wednesday.  That would be a significant
8    increase in the amount of visitations that he had with little
9    Rheuben.  Would you agree with me there?
10     A.     If that is -- like I said, I don't have it in
11   front of me, but if that's what it says, correct, yes.
12     Q.     Well, do you recollect that his visitation in that
13   last court hearing was increased over where he had been
14   before?
15     A.     I don't remember, to be honest.
16     Q.     Prior to -- well, during this whole time, did you
17   and Mr. Johnson have discussions about your ability to parent
18   little Rheuben?
19     A.     In the beginning, yes.
20     Q.     Did he ever express to you concerns he had about
21   your ability to parent little Rheuben?
22     A.     He was very controlling, so, yes, he did.
23     Q.     Well, I'm not asking about personality
24   characteristics, I asked if he mentioned to you?
25     A.     Everything I did, yes, he did complain about.

1    Q.    And would that relate to things like who you were
2 hanging out with, things of that sort?

3    A.    No.

4    Q.    No.  All right.  Now, you had testified here just
5 a few minutes ago that your recollection was that Mr. Johnson
6 was making about $300,000 to $500,000 a year.  I guess that
7 would be at about the time that your divorce went through; is
8 that correct?

9    A.    That was when I left him.

10    Q.    When you left him?  When you left him in 2009.
11 Okay.  Well, how much was he making in 2012?

12    A.    I don't know.  He didn't file tax returns.  I
13 don't know.

14    Q.    Well, I'm sorry, I beg to differ with that a
15 little bit because there are court documents that indicate how
16 much child support he's supposed to pay based on an annual
17 yearly income. You're aware of that; correct?

18    A.    Actually, the Judge kind of made an estimated
19 amount.  He was very confused, actually, and didn't know how
20 to.

21              MR. TOTH:  May I approach the witness, Your
22 Honor.

23              THE COURT:  Yes.

24    Q.    (By Mr. Toth) I'm going to show you two documents,
25 ma'am.  First is Defendant's Exhibit A.

1      A.      Okay.

2      Q.      Which could you read what the purported title of

3 the document is now?

4      A.      Amended Motion to Modify Child Support and Modify

5 Visitation and Enforce Settlement Agreement.

6      Q.      All right.  If you were to draw your attention

7 down to paragraph, I believe, paragraph number two, it

8 indicates that official documents had been filed with the

9 Clerk of the Court indicating both what your income is,

10 verified income is, and what Mr. Johnson's verified income is

11 back in 2012; is that correct?

12      A.      On the number two?

13      Q.      Yeah.

14      A.      It says at this time respondent was self-employed

15 and in a pest control business and the Court based the child

16 support obligation on respondent's gross income,

17 self-employed, of the Child Support Worksheet in the amount of

18 $7,435 per month and Petitioner's monthly income of $5,757 per

19 month with credit for health and dental insurance premiums and

20 work-related daycare costs paid by petitioner.

21      Q.      So that document would indicate that Mr. Johnson

22 had a gross annual income, according to the Courts, of $7,435

23 per month, or about $84,000 a year; right?

24      A.      He did say that, yes.

25      Q.      Now, the other document I'd like to show you is

1  Defendant's Exhibit B, and that's the Judge's order that was
2  filed May 15th, 2012, the most recent modification to the
3  visitation schedule.  Had you had a chance to see that before?
4  It is an official court document.
5       A.    I'm looking at it.  There have been so many.
6       Q.    That's okay.
7       A.    No.  You're fine.  You're fine.  I just need to
8  look at it.  Yes, I do remember this.
9       Q.    Okay.  Great.  Thank you, ma'am.  You can go ahead
10 and set it down.
11      A.    Thank you.
12      Q.    Now, during May of 2012, did you have the ability
13 to communicate with Mr. Johnson by way of e-mail, things of
14 that sort?
15      A.    No.
16            MR. TOTH:  Your Honor, at this point in
17 time, I don't have any further questions, but I would move for
18 admission of Defendant's A and B as official court documents.
19            THE COURT:  Any objection?
20            MR. HENDERSON:  I haven't seen that yet.
21            MR. TOTH:  I'm sorry.  My bad.
22            MR. HENDERSON:  No, Judge, I don't any
23 objection.
24            THE COURT:  Defendant's A and B are
25 admitted.

1          (Whereupon, Defendant's A and B were

2    admitted into evidence.)

3          THE COURT:  Any redirect?

4          MR. HENDERSON:  Yes, Your Honor.

5                **REDIRECT EXAMINATION**

6    BY MR. HENDERSON:

7      Q.    Ms. Johnson, Mr. Toth asked you about some changes

8    in the amount of parenting time that the defendant was getting

9    of little Rheuben; is that right?

10     A.    Yes.

11     Q.    He talked about shortly after the divorce was

12   filed his parenting time was increased; is that correct?

13     A.    Yes.

14     Q.    Mr. Toth talked to you about sometime after that

15   he was actually granted 12 hours of unsupervised visits every

16   weekend.  Do you remember him talking about that?

17     A.    Yes.

18     Q.    Mr. Toth asked you if that changed to 12 hours

19   unsupervised every other weekend.  It was significantly

20   increased, and I think you said it was?

21     A.    Yes.

22     Q.    Do you know if after that significant increase,

23   Mr. Johnson's parenting time was significantly cut back?

24     A.    I need to think.

25     Q.    Sorry?

```
 1        A.      I need to think about that.

 2        Q.      Okay.

 3        A.      Honestly, I don't remember.  I don't have the

 4   court documents.

 5        Q.      But if Mr. Johnson's parenting time was then cut

 6   back to just supervised visits at the Layne Project, would you

 7   agree with me that that would be a significant decrease?

 8        A.      Yes.

 9                    MR. HENDERSON:  That's all I have, Judge.

10                    THE COURT:  Recross?

11                    MR. TOTH:  Thank you.

12                    **RECROSS-EXAMINATION**

13   **BY MR. TOTH:**

14        Q.      Ms. Johnson, I'm not aware of any court documents

15   that shows a substantial decrease in visitation.  Are you

16   saying that after May 15th, 2012, his parenting time was

17   decreased?

18        A.      I said I didn't know.

19        Q.      You didn't know, thank you.

20                    THE COURT:  Thank you for your testimony.

21   You may step down.

22                    THE WITNESS:  Thank you.

23                    THE COURT:  The State's next witness.

24

25
```

```
 1                         DAWN WAKE,

 2   having been duly sworn to tell the truth, the whole truth and

 3   nothing but the truth, testified as follows:

 4                     DIRECT EXAMINATION

 5   BY MR. HURST:

 6        Q.    Good morning.

 7        A.    Good morning.

 8        Q.    Could you tell us your name for the record.

 9        A.    My name is Dawn Wake.

10        Q.    And, Ms. Wake, what is your current occupation?

11        A.    I am a clinical social worker.  I do individual

12   and family therapy with children and families.

13        Q.    Do you know a person through your job by the name

14   of Rheuben Johnson, III?

15                    THE WITNESS:  Can I ask that I be compelled

16   to testify just to make sure?

17                    MR. HURST:  Judge, I would ask at this

18   point.

19                    THE COURT:  Yes.  You have been subpoenaed

20   to testify.  You are compelled to testify and answer the

21   questions.

22                    THE WITNESS:  Thank you.

23        A.    Yes, I do.

24        Q.    Do you see him in the courtroom today?

25        A.    Yes, I do.
```

```
 1        Q.     Do you see where he's at and give a general
 2   description of what he's wearing?
 3        A.     A black jacket and a gray and black striped tie.
 4                    MR. HURST:  Judge, I ask that the record
 5   reflect that the witness has identified the defendant in this
 6   case.
 7                    THE COURT:  It does.
 8        Q.     (By Mr. Hurst) Do you also know -- do you know a
 9   person by the name of Annie Johnson?
10        A.     Yes, I do.
11        Q.     And are you aware of the fact that the defendant
12   and Annie Johnson were married?
13        A.     Yes.
14        Q.     Are you aware of the fact that they had a divorce
15   case back in 2012?
16        A.     Yes.
17        Q.     Now, are you aware of the fact that the two of
18   them had a child together?
19        A.     Yes.
20        Q.     What was the name of that child?
21        A.     Rheuben.
22        Q.     Did he go by "little Rheuben"?
23        A.     Little Rheuben or R4.
24        Q.     Now, through your occupation were you involved at
25   all when it came to little Rheuben and the child custody
```

1    dispute that was part of this divorce case?

           2         A.    Yes.

           3         Q.    And what specifically was your role when it came

           4    to your divorce case?

           5         A.    I was working with R4, little Rheuben,

           6    individually, and I was also doing some family work with

           7    Rheuben and the mother Annie and also Rheuben and the father

           8    Rheuben.

           9         Q.    So you're having sessions with little Rheuben;

          10    correct?

          11         A.    Correct.

          12         Q.    Defendant?

          13         A.    Yes.

          14         Q.    And also Annie Johnson?

          15         A.    Yes.

          16         Q.    Now, are you going there by yourself or are you

          17    part of a team of some kind?

          18         A.    I was part of a team.

          19         Q.    Can you just tell me what the purpose of this team

          20    was?

          21         A.    There was a team that was created to be able to

          22    address the issues as far as the parenting plan and working

          23    with little Rheuben to feel comfortable being able to navigate

          24    between both homes.

          25         Q.    And as part of your involvement in this divorce

1    case and being part of this team, are you aware of generally

2    the visitation that both Annie Johnson and the defendant had

3    with little Rheuben?

4        A.    Yes.

5        Q.    Now, before I get too much further into this, are

6    you also aware of an organization called the Layne Project?

7        A.    Yes.

8        Q.    What was the Layne Project?

9        A.    The Layne Project is an organization set up here

10   in Olathe that provides for supervised visitation.

11       Q.    And what, if any, role did the Layne Project play

12   in this divorce case?

13       A.    They supervised the visitation between little

14   Rheuben and his father.

15       Q.    Now, were you and this team working with the

16   defendant back in Spring of 2012?

17       A.    Yes.

18       Q.    And during this time, how often are you meeting

19   with the defendant, just an estimation?

20       A.    I started with working in family sessions with

21   little Rheuben and big Rheuben about February and by probably

22   five or six sessions since the last session that I saw him.

23       Q.    I'd like to ask you a little detail about your

24   interaction with the defendant.  Now, I don't want to get into

25   all about why these changes were made.  But sometime about the

1  beginning of the year 2012, was there a change in the type of

2  visitation that the defendant had with his son?

3      A.    Yes.

4      Q.    And how was that visitation changed?

5      A.    It went to supervised visits.

6      Q.    So from unsupervised to supervised?

7      A.    Yes.

8      Q.    Now, at this time you're meeting with the

9  defendant from time to time?

10      A.    Yes.

11      Q.    Are you having or did you have any conversations

12  with him about this change?

13      A.    Yes.

14      Q.    And what was the defendant's demeanor like when

15  discussing this change in the visitation he had with his son?

16      A.    He was upset and he felt like the situation

17  process was going way too slow and he felt like people were

18  focusing on very trivial stuff and the situation.  The

19  movement forward was not going fast enough.

20      Now, in moving forward a little bit in either April or

21  May of 2012, did you participate in depositions in the divorce

22  case?

23      A.    Yes, I did.

24      Q.    Again, not getting into reasons at all, but did

25  you make a recommendation at that deposition regarding the

1  defendant's visitation rights with his son?

2       A.     Yes, I did.

3       Q.     What's that recommendation?

4       A.     That we remained supervised until we can get

5  situations settled down further and little Rheuben being able

6  to feel comfortable between both homes.

7       Q.     Did you and other members of this team devise a

8  plan to be able to work from supervised visitation to

9  unsupervised visitation?

10      A.     Yes, we did.

11      Q.     What would you call this type of plan?

12      A.     It was called a "Step-Up" plan is what I referred

13  to it as.

14      Q.     When was this plan put in place?

15      A.     I believe it was put in place around mid April of

16  2012.

17      Q.     Now, did you have discussions with the defendant

18  about not only your recommendation at the deposition but also

19  him being in the Step-Up plan?

20      A.     Yes.

21      Q.     Again, what was the defendant's reaction to your

22  recommendation on the Step-Up plan?

23      A.     He felt like the preliminary steps of the plan he

24  had already completed and felt like the process was going too

25  slow and that people were focusing on trivial things that

1   didn't need to be focused on.

2       Q.      Now, when he was discussing these things with you,

3   how would you describe his demeanor?

4       A.      Well, I documented in my notes several times that

5   he appeared agitated and upset.  I felt like he was kind of

6   hopeless because he felt like there wasn't an end to the

7   situation.

8       Q.      And the final specific interaction with the

9   defendant that I'd like to ask you about is on May 22nd of

10  2012.  Was that your last meeting with the defendant?

11      A.      It was a family session between Mr. Johnson and

12  his child Rheuben, yes.

13      Q.      So it's little Rheuben and the defendant and you

14  at this particular meeting?

15      A.      Yes.

16      Q.      Now, during your interaction with the defendant on

17  that day, did you have an opportunity for him to discuss how

18  that Step-up plan was going?

19      A.      Yes.

20      Q.      And what did the defendant tell you at that point

21  about the Step-up plan?

22      A.      Again, that he felt like it was going too slow,

23  there were trivial preliminary steps that had already been

24  completed, he didn't feel like he needed to go through that

25  plan, and he was upset and felt like people were focused on

1    insignificant things.

          2         Q.    And, again, his demeanor when discussing these

          3    things with you?

          4         A.    I had noted in my notes that he was agitated.

          5         Q.    Now the Step-Up plan, when you were meeting with

          6    him on the 22nd of May, if you had to describe the defendant's

          7    progress in going up those steps, how would you describe it?

          8         A.    He hadn't made a lot of progress.  It was very

          9    much in the beginning.  We were still focused on some of the

         10    steps that he felt he had already completed prior to the

         11    development of the plan.

         12         Q.    Now, you had been meeting with him more than just

         13    these three times that I just asked you about?

         14         A.    Yes.

         15         Q.    You described his demeanor as being agitated; is

         16    that right?

         17         A.    Yes.

         18         Q.    Is it fair to say that attitude and demeanor was

         19    constant throughout your interaction with the defendant?

         20         A.    I think that he sometimes appeared hopeless.  He

         21    sometimes appeared agitated.  He sometimes felt like it was

         22    injustice.

         23         Q.    And this agitation and frustration that he had

         24    with what was going on, was it ever directed at any

         25    individuals in particular?

```
 1      A.      Yes.

 2      Q.      Who would those individuals be?

 3      A.      Annie, and he sometimes voiced anger at Trina

 4 Nudson, who was the supervisor.

 5                      MR. HURST:  Judge, could I just have one

 6 moment?

 7                      THE COURT:  Yes.

 8      Q.      (By Mr. Hurst) Just one quick question about May

 9 22nd.  Do you know the time or did you document the time that

10 that meeting occurred with you and little Rheuben?

11      A.      Yes.

12      Q.      If you could look at that to refresh your memory?

13      A.      I did a family session between 1:30 and 2:30, and

14 then I remained 30 minutes after that.  From 2:30 to three

15 just with Mr. Johnson and myself to discuss the situation and

16 the thought process of the plan and the direction of the goals

17 and treatment.

18                      MR. HURST:  I have nothing else.

19                      THE COURT:  Thank you.  Cross-examination?

20                      MR. TOTH:  Thank you.

21                      **CROSS-EXAMINATION**

22 **BY MR. TOTH:**

23      Q.      Ms. Wake, you and I have talked on the phone

24 before?  I'm Scott Toth, how are you?

25      A.      Fine, thank you.
```

1        Q.    Good.  And when you had visited about Mr.

          2    Johnson, one thing that my notes indicate is that you did tell

          3    me that he was making some progress on the steps that he was

          4    supposed to, but maybe he wasn't progressing as quickly as

          5    what everybody was hoping?

          6        A.    Yes.

          7        Q.    Would you explain that for me, please?

          8        A.    The parenting plan had four steps, and there was

          9    six weeks through step 2, step 3 and step 4.  Every step that

         10    he had to move towards to get back to unsupervised visitation.

         11    At the time that we talked in the deposition, he was still

         12    trying to progress forward and trying to get through the first

         13    step.  I don't believe he got to step 2 yet.

         14        Q.    Okay.  Do you remember what the projected

         15    timeframe was supposed to be for him to get to that?

         16        A.    Well, we started on step 1 immediately after the

         17    parenting plan was put in place in April, and then there was

         18    six weeks he had to work through on each step.  So 6 times 4,

         19    24 weeks, around 20 to 24 weeks.

         20        Q.    Okay.  So we're talking about a third to half of a

         21    year essentially to complete the task?

         22        A.    Yes.

         23        Q.    And you guys had just gotten started on this for

         24    the most part; right?

         25        A.    Yes.

1      Q.     Okay.   Okay.   Now, you've indicated that Mr.
2   Johnson expressed some frustration about the speed about which
3   this was moving, but was it clear that there is an end in
4   sight at some point if you do the steps correctly?
5      A.     Yes.
6      Q.     Ultimately what would have been the objective if
7   we would have gotten to that point, if we would have gotten
8   through those steps?
9      A.     Unsupervised time with his son.
10      Q.     How much unsupervised?
11      A.     I don't recall exactly all the details exactly
12   what it was going to end up.  It was holidays.  It was pretty
13   much a typical schedule for a parenting plan.
14      Q.     Okay.   Okay.   And you had interaction with Mr.
15   Johnson and little Rheuben on numerous occasions, just the two
16   of them?
17      A.     A number of occasions, yes.
18      Q.     And as I understand, sometimes you guys go outside
19   for walks and things like that just to see how they are
20   interacting?
21      A.     Yes.
22      Q.     Did everything seem okay?
23      A.     Yes.
24      Q.     Mr. Johnson -- well, how did Mr. Johnson treat
25   you?

1    A.    He was always very cordial and nice to me.

2    Q.    Okay.  When you are referring to him as being

3  agitated, I want to make sure we have some clarity as to what

4  that descriptive word means.  Does that mean that it's just

5  somebody that is annoyed or upset as opposed to somebody that

6  is angry and something more forceful along those lines?

7    A.    I had documented in my notes on 5/22 that he

8  appeared agitated, and he felt that everyone was focusing in

9  on insignificant small details and just felt like things

10  weren't moving fast enough.  I mean, I'm not sure I'm

11  understanding what your question is.

12    Q.    No, you're answering it to my satisfaction.

13    A.    Okay.

14    Q.    But he never made any threats or indicated he was

15  going to do anything irrational or stupid as a result of his

16  frustration with the speed?

17    A.    No.

18    Q.    Have you ever had clients that have done that

19  before that have made threats, open threats, against their

20  soon-to-be ex-spouses, things like that?

21    A.    No, but angry.

22    Q.    Angry?

23    A.    Uh-huh.

24    Q.    Angry as opposed to agitated?

25    A.    I'm not sure I understand your question.

1      Q.      Okay.  Would it be fair to say that you have other
2   families that you've dealt with where either the husband or
3   the wife will openly make disparaging comments to the other to
4   the point where it's obvious anger towards the other person?
5      A.      Yes.
6      Q.      And that's not what we're talking about in Mr.
7   Johnson's case?
8      A.      There were comments made that he was angry with
9   Annie and some of the things that he felt had occurred.
10     Q.      Okay.  But he never said something along the lines
11  to you as, you know:  She better knock this off, or I'm going
12  to do something to her or something along those lines?
13     A.      No, no comments like that.
14     Q.      When people come to see you, is it usually because
15  they have problems when they are going through this, or does
16  anybody that files for divorce in Johnson County have to go
17  through this if they are parents?
18     A.      No.  They don't have to go through it if they are
19  parents.  There are things that are set up with the County,
20  classes and things that they go through.  He was on a
21  recommendation that they schedule an intake with me.  I do a
22  lot of work with divorced families as well as other clients.
23  I mean, I specialize in abuse.  I specialize in working with
24  children.
25     Q.      I've gotcha.  And would the primary objective be

```
 1   to allow the child to transition into a divorced atmosphere
 2   and also let the parents know that they need to not be so
 3   disparaging to each other so that the family unit can
 4   cohesively coexist?
 5       A.    Yes.  And to help the child not be in the middle
 6   of their parents' divorce.
 7       Q.    Right.  Because that happens all the time?
 8       A.    Yes, it does.
 9       Q.    The parties blame each other for the divorce and
10   they want to put their kids in the middle?
11       A.    Sometimes.  Not every divorce is that way.
12       Q.    Right.  But there's a reason why people come see
13   you as a licensed therapist?
14       A.    Yes.
15       Q.    Because there's usually a problem going on?
16       A.    Yes.
17       Q.    It doesn't mean that they necessarily want to go
18   out and kill each other?
19       A.    No.
20       Q.    But there are sometimes deep-seated anger issues
21   with the other side?
22       A.    Yes.
23       Q.    All right.  Very good.
24             MR. TOTH:  That's all I have, Your Honor.
25   Thank you.
```

```
 1                    THE COURT:  Any redirect?
 2                    MR. HURST:  No, Judge.  Thank you.
 3                    THE WITNESS:  Am I excused for the day?
 4                    THE COURT:  May she be excused?
 5                    MR. HURST:  Please.
 6                    THE COURT:  Thank you.  You are excused.
 7                    MR. HURST:  Thank you.
 8                    THE WITNESS:  Thank you.
 9                    THE COURT:  The State's next witness.
10                    MR. HURST:  The State calls Richard
11     Porterfield.
12                         **RICHARD PORTERFIELD,**
13     **having been duly sworn to tell the truth, the whole truth and**
14     **nothing but the truth, testified as follows:**
15                         <u>**DIRECT EXAMINATION**</u>
16     **BY MR. HURST:**
17                    MR. HURST:  May I proceed, Judge?
18                    THE COURT:  Yes.
19         Q.    (By Mr. Hurst) Could you tell us your name for the
20     record?
21         A.    Richard Porterfield.
22         Q.    Sir, how old are you?
23         A.    I'm 51.
24         Q.    And is it correct you are currently in custody?
25         A.    Yes, sir.
```

```
 1      Q.    Is that over here at the Johnson County Jail at
 2 New Century?
 3      A.    Yes, sir.
 4      Q.    And what are you currently in custody for?
 5      A.    For burglary.
 6      Q.    And do you have an attorney in that case?
 7      A.    Yes, sir.
 8      Q.    What is his name?
 9      A.    Mark Bostwick.
10      Q.    Now, in addition to this case, you also have some
11 prior convictions; is that correct?
12      A.    Yes, sir.
13      Q.    And could you tell us just generally what you've
14 been convicted for in the past?
15      A.    Forgeries and stealing charges.
16      Q.    Now, as part of your testifying in this case, did
17 you have -- did you get to work out a plea agreement with the
18 State?
19      A.    Yes, sir.
20      Q.    And for testifying today, what are you receiving
21 in your pending case?
22      A.    The treatment center with either a four-year or a
23 10-year backup depending on which box I fall in.
24      Q.    So you're going to be sent to the Therapeutic
25 Community Treatment Facility?
```

```
 1        A.      Right.
 2        Q.      And there's also a reduction in your underlying
 3   sentence somewhere between 8 to 10 years?
 4        A.      Right, 4 to 10 years.
 5        Q.       Do you know a person by the name of Rheuben
 6   Johnson?
 7        A.      Yes, sir.
 8        Q.      Do you see him in the courtroom today?
 9        A.      Yes, sir.
10        Q.      Can you see where he's at?
11        A.      Yes, sir.  Right there with the black and gray
12   tie.
13                     MR. HURST:  Your Honor, I ask that the
14   record reflect that the witness identified the defendant in
15   this case.
16                     THE COURT:  It does.
17        Q.      (By Mr. Hurst) How long have you known the
18   defendant?
19        A.      Since last January.
20        Q.      And where were you when you first met the
21   defendant?
22        A.      Over across the street, in the jail across the
23   street.
24        Q.      In Olathe?
25        A.      Olathe.
```

```
 1        Q.      In Johnson County, Kansas?

 2        A.      Right.

 3        Q.      Now, how did you come -- I understand you were in

 4   the same jail, but how did you come to meet up or talk to the

 5   defendant?

 6        A.      We was in the same module together.

 7        Q.      Now, I just want to clarify.  When you say "same

 8   module," is that the same actual cell?

 9        A.      No, there's different cells.  There's one-man

10   cells, and we all come out in the common dayroom.

11        Q.      So there's one module that has lots of cells?

12        A.      Right.

13        Q.      You didn't have the same cell, but the same

14   module?

15        A.      Right.

16        Q.      The individuals in the same module although they

17   are not in the same cell have an opportunity to interact?

18        A.      Yes, sir.

19        Q.      Was it at this time that you were introduced to

20   the defendant?

21        A.      Yes, sir.

22        Q.      Now, tell me what types of interaction that you

23   had with the defendant initially?

24        A.      Just small talk, really.

25        Q.      At some point, did the two of you discuss what you
```

1   do for a living?

2       A.      Yes.  That was over here in Olathe.  We talked

3   about like I was in prison.  We talked about that and talked

4   about what I did for a living, what he did for living, stuff

5   like that.

6       Q.      What do you do for a living?

7       A.      I'm a painter.

8       Q.      What did the defendant tell you that he does for a

9   living?

10      A.      He said he got rid of animals.

11      Q.      Pest control?

12      A.      Pest control, animal control.

13      Q.      Now, did you ever make any comments in speaking

14  with the defendant whether or not you'd be any good at pest

15  control?

16      A.      Oh, yes.  It came up, and I told him that, and he

17  said, "you'd probably be better at getting rid of humans."

18      Q.      And what did you say when the defendant made that

19  remark to you?

20      A.      I said, "Yeah, that's probably more up my alley."

21      Q.      Was that really more up your alley?

22      A.      No, I was playing along.

23      Q.      What else did the defendant say about getting rid

24  of humans?

25      A.      He asked me if I'd be interested in doing

1    something like that.  I said, "What?"  He said, "Killing my
2    wife."  And I said, "How much does something like that pay?"
3    He said "8 to $10,000."  I was thinking that wasn't a very
4    good deal, but I was playing along with it anyway because I
5    was kind of concerned at that time.  I didn't know, it kind of
6    threw me for a loop.
7        Q.    It threw you for a loop.  Is that what you said?
8        A.    Yeah.
9        Q.    Just so we're clear, at any time when the
10   defendant is discussing this with you, did you have the
11   intention of killing his ex-wife?
12       A.    No, never.
13       Q.    And there was a discussion about money?
14       A.    Yeah.
15       Q.    And, again, what was the value?
16       A.    He said "8 to $10,000."
17       Q.    And what was your reaction?  What did you tell him
18   when he offered to pay you 8 to $10,000?
19       A.    I said "I could probably use that when I get out
20   of prison.  I'm going to need some money to get my painting
21   business started."  I was kind of playing along whatever.
22       Q.    Now, again, did the two of you -- you were in
23   custody at this point?
24       A.    Yes, sir.
25       Q.    In the Olathe, Johnson County Jail?

**46**
**OFFICIAL TRANSCRIPT**

1          A.          No.  That conversation happened over in New
          2    Century.
          3          Q.          New Century, in Johnson County, Kansas?
          4          A.          Right.
          5          Q.          Do you know approximately when this conversation
          6    took place?
          7          A.          It was around the first week of March.
          8          Q.          Of what year?
          9          A.          This year.
         10          Q.          Of this year?
         11          A.          Yes, sir.
         12          Q.          And why are you so sure that's when it happened?
         13          A.          Well, my mom passed away like that March 10th, so
         14    I know it was right before then is the way -- I ain't too good
         15    at dates.
         16          Q.          But somewhere around March 10th?
         17          A.          Yeah.
         18          Q.          And you stated that you were at the New Century
         19    Jail.  Where exactly are you having this conversation at?  Are
         20    you in a particular cell or module or where?
         21          A.          We was in the dayroom.  They call it a module or
         22    whatever.  Over there they got eight-man cells.  We wasn't in
         23    an eight-man cell together.  We were was on the same walk, so
         24    that way we got outside at the same time.
         25          Q.          Now, did the two of you ever have a discussion

**47**
**OFFICIAL TRANSCRIPT**

1    about how much longer you were going to be in the jail?

2         A.    He asked me how long I was going to be in.  I said

3    "I don't know for sure."  He said, "I hope it's soon."  I said

4    "I do too."

5         Q.    I'd like to ask you a little bit about your

6    knowledge of the defendant and his family history.  Did he

7    ever talk about his ex-wife a lot?

8         A.    Just a little bit, yeah.

9         Q.    What do you know about his ex-wife?

10        A.    That she was a nurse, and that she was very pretty

11   or whatever.

12        Q.    Did the defendant ever say anything about any

13   other members of his family that you remember?

14        A.    He had a sister that was an attorney, I believe.

15               MR. HURST:  Just a moment, Judge.

16        Q.    (By Mr. Hurst) Now, you've discussed, we've

17   discussed rather, the fact that you are getting some

18   consideration in your case for testifying today; correct?

19        A.    Yes, sir.

20        Q.    Why did you decide to let law enforcement know of

21   your conversations with the defendant?

22        A.    Well, I was kind concerned at first because I

23   didn't know, you know, this is kind of a murder thing, and

24   that's not up my alley for real.  I was kind of scared if it

25   was kind of a set-up or what it was.  I didn't know for sure.

```
 1              MR. HURST:  I have nothing further.

 2              THE COURT:  Cross-examination?

 3              MR. TOTH:  Thank you, Your Honor.

 4                    CROSS-EXAMINATION

 5    BY MR. TOTH:

 6         Q.    All right.  Mr. Porterfield, this is the second

 7    time that you've testified regarding this; correct?

 8         A.    Yes, sir.

 9         Q.    All right.  And as I understand it, at some point

10    you decided to go over to your attorney and tell him that you

11    had some information that you wanted to share with law

12    enforcement; is that correct?

13         A.    Yes, sir.

14         Q.    So your attorney got a hold of the DA's office

15    which got a hold of the Olathe Police Department and then a

16    detective as well as one of these gentlemen interviewed you

17    along with your attorney; is that correct?

18         A.    Yes, sir.

19         Q.    And that conversation would have taken place, oh,

20    probably two months ago, I imagine something like that?

21         A.    I reckon, yeah.

22         Q.    And Mr. Hurst just asked you, the last question he

23    asked you why -- basically, why did you come forward and you

24    indicated that you came forward because you had some real

25    concerns.  You've got some worries about whenever you're
```

1    talking about murder or something like that, I'm assuming

2    that's a serious deal, and that's somewhat spooky and scary

3    and so you thought the police should know about it; correct?

4        A.    Basically, yeah, yeah.

5        Q.    Now, would you agree with me that when you met

6    with the detectives and were asked that particular question

7    about why you had come forward, you told Detective Campbell

8    quote, "Fuck it, I want to try and help myself," end quote.

9        A.    That was part of the conversation, sure.  I don't

10   know if I used that language or not.  I don't remember.

11       Q.    Well, I have it in quotes, and I take pretty good

12   notes.

13       A.    It sounds like maybe something I'd say.

14       Q.    Okay.  So you're not telling the police that

15   you're coming forward because you've got concerns about

16   whether or not somebody is going to be killed.  You're telling

17   the police you are coming forward because you want to help

18   yourself; right?

19       A.    Well, I think I told them both, to tell you the

20   truth, yeah.

21       Q.    The reality is this:  That you are facing up to a

22   10-year prison sentence, and you need help from the

23   Prosecutor's Office so that you don't have to go to prison for

24   10 years; correct?

25       A.    Yeah.

Q.      And that's because you have such a substantial
criminal history that under Kansas law you are presumptive for
prison for the burglaries that you have pled guilty to?
          A.      Right.
          Q.      And you have to have what's called a motion for a
departure, a departure downward, which is a legal document
that your lawyer prepares that is submitted to the Judge which
recommends that you get something less than what it normally
would be, and you need the DA's Office to help you get that
past the Judge; correct?
          A.      I guess so, yeah.
          Q.      And when we last talked, you were in the process
of trying to work out your deal with the Prosecutor's Office;
right?
          A.      Yes, sir.
          Q.      And you now have your deal in place, do you not,
sir?
          A.      Well, it's still kind of up in the air on the
back-up time still, but yeah.
          Q.      Well, I'm looking at a plea agreement that appears
to have your signature on it, and I'll get it marked here in a
second.  But it seems to indicate that you entered your plea
on July 22nd, 2013, which is about a week ago?
          A.      Yeah.
          Q.      Last Monday?  Last Tuesday?

1          A.      Last Monday, yeah.

2                        (Whereupon, Defendant's C was marked by the

3      reporter for identification.)

4                        MR. TOTH:  May I approach?

5                        THE COURT:  Yes.

6          Q.      (By Mr. Toth) Mr. Porterfield, I'm handing you

7      Defendant's Exhibit C?

8          A.      Uh-huh.

9          Q.      I ask you if you recognize what that is?

10         A.      It says "plea agreement.".

11         Q.      Okay.  Does your signature appear on that

12     document?

13         A.      Yes, sir.

14         Q.      All right.  And that sets out the terms of the

15     agreement that you've entered into with the Prosecutor's

16     Office; right?

17         A.      Yes, sir.

18         Q.      And would you agree with me that condition number

19     five says that your deal is void and you don't get to go to

20     the Therapeutic Community unless you come in here and testify

21     against Mr. Johnson today?

22         A.      That's true.

23         Q.      And what is the Therapeutic Community?  What is

24     this place that you're going to go to?  Can you tell the jury

25     that?

1    A.    I've never been there, but it's a treatment center
2    for alcoholic and drug addicts.
3    Q.    And typically how long have you been told that
4    somebody would stay at this treatment center?
5    A.    Oh, six months.
6    Q.    Six months?
7    A.    Yeah.
8    Q.    This treatment center is located out in Gardner,
9    close to New Century Jail where you're at?
10    A.    Yes.
11    Q.    So it's not a place where there are bars or guards
12    like you've had before over at this jail or in Gardner;
13    correct.  It's not a prison?
14    A.    No.  It's part of the Department of Corrections
15    though.
16    Q.    Yeah.  It's kind of the last step that people get
17    before going to prison?
18    A.    Right.
19    Q.    So you're going to be given the opportunity, the
20    benefit to get placed in a facility that's not a jail or
21    prison for a period of six months, and then if you're
22    successful, then you just go straight out on probation?
23    A.    Right.  You've got to go through that six months,
24    and then you've got another six months of halfway houses.
25    Q.    Well, yeah, that's all part of the probation part

1   of it.  Usually you go to Oxford House or something like that?

2        A.      Right, exactly.

3        Q.      It beats prison?

4        A.      It beats prison.  Well, some people say it does,

5   and some people say it don't.  Myself, I wouldn't think so.

6        Q.      Well, it beats 10 years of prison?

7        A.      It beats 10 years of prison, yes, sir.

8        Q.      Now, when you first met Mr. Johnson, you had two

9   stints with him.  One over here in Olathe and one in Gardner?

10       A.      Yes, sir.

11       Q.      And you were in the same pod in both places with

12  Mr. Johnson?

13       A.      That's right.

14       Q.      Let's talk about Olathe first.  How were the pods

15  set up.  Can you explain that to the jury?

16       A.      It's one big open area.  You've got single-man

17  cells all throughout the jail, and it's -- there's like

18  40-something cells, and then there's the common area where

19  there's TV sets down there and tables and telephones usually.

20       Q.      How often were you allowed to come out of your

21  cell and go down into the common area?

22       A.      Not very much really.  It was like four hours a

23  day, something like that, nothing over an hour here, an hour

24  there.

25       Q.      During that time that you're in the common area,

1    would you agree with me that certain inmates tend to associate

2    with other inmates?

3        A.    Yeah.

4        Q.    And would you agree with me that you had a certain

5    group of inmates that you tended to hang out with more,

6    certainly much more than hang out with Mr. Johnson?

7        A.    I really didn't hang out with -- I just played

8    cards, yeah.

9        Q.    Okay.  You played poker?

10       A.    Yeah, I played poker.

11       Q.    And there was a group of people that would usually

12   play cards with you?

13       A.    Yeah.  We had different people, yeah.

14       Q.    Did Mr. Johnson play cards with you?

15       A.    He did a few times.

16       Q.    Now, when you're playing cards, would you agree

17   with me that it's typical, depending on what your personality

18   is, but you see individuals talk about their cases?

19       A.    While we're playing poker, no, not really.  People

20   do, I guess, I don't know.

21       Q.    Would you agree with me that at times when you're

22   not playing poker, inmates tend to talk about their cases?

23       A.    Some of them do, yeah.

24       Q.    And would you agree with me that Mr. Johnson had

25   the reputation as being one of those individuals that would

1    like to talk about his case?

        2        A.    Not that I know of.

        3        Q.    Well, you guys would all make fun of Mr. Johnson,

        4    right, because he's different, he's odd?

        5        A.    He had a reputation as kind of a smooth dealer

        6    like selling stuff and stuff like that.

        7        Q.    What do you mean by that?

        8        A.    He used to make these cards up like greeting cards

        9    up or whatever.  He'd sell those or trade them or whatever.

       10        Q.    So he'd actually make greeting cards and trade

       11    them to other inmates for certain things?

       12        A.    Yeah, or sell them or whatever.

       13        Q.    Or sell them?

       14        A.    Commissary, whatever.

       15        Q.    So he'd go around and try to market himself and

       16    say:  Hey, if you want one of these cards, I'll take coffee or

       17    stuff like that?

       18        A.    Sure.

       19        Q.    As a matter of fact, he made a greeting card for

       20    you; right?

       21        A.    Yes.

       22        Q.    This is a Valentine's Day card?

       23        A.    I believe it was Valentine's Day.

       24        Q.    And didn't he like glue candy on the cards?

       25        A.    Yeah.  He makes them out of candy.

1    Q.    He makes them out of candy?

2    A.    Yeah.

3    Q.    Do you remember your conversation with him when he
4  made you that card?

5    A.    He was going to sell one, and he said, "I'll just
6  give you one."

7    Q.    And what did you do with it?

8    A.    I ate it.

9    Q.    You took the candy off and threw the card away?

10   A.    Yeah.

11   Q.    That's kind of your reflection of what you thought
12  about Mr. Johnson?

13   Q.    Haven't you referred to him on the record as being
14  a "dumb ass"?

15   A.    Yeah, kind of, but not for that.

16   Q.    He doesn't have a good reputation among the
17  inmates, does he?

18   A.    They don't like him.

19   Q.    You don't like him?

20   A.    There are some people that don't like him.  I
21  didn't really have no problems with him, to tell the truth,
22  nothing.  There was people that did.  He came across as
23  arrogant, and he got some guy thrown out of the wing.  He got
24  known for being a snitch in there.  So, yeah, some people
25  didn't like him about that.

1    Q.    Yeah.  I can see why inmates wouldn't like
2  something like that.
3    A.    Right.
4    q.    Did you ever share your case with Mr. Johnson?
5    A.    No.
6    Q.    Are there individuals in there that liked to talk
7  about their cases though?
8    A.    Sure, yeah.
9    Q.    When you were having these conversations with Mr.
10 Johnson, where would you be at?
11   A.    In the dayroom there in the common area.
12   Q.    The common area?
13   A.    Yeah.
14   Q.    Would there be other inmates around?
15   A.    Not usually, no.  When we was talking, those
16 conversations, there wasn't usually nobody around because they
17 was all mostly people walking around or using the phone.  Very
18 seldom were people just sitting at the table just sitting
19 there.
20   Q.    It's been my experience, because obviously I've
21 had clients over there and I've visited with them before that
22 you usually have guys that are walking around sometimes in
23 groups talking to each other?
24   A.    Yeah.
25   Q.    You've got guys watching TV?

1    A.    Yeah.

2    Q.    You've got guys sitting around playing cards?

3    A.    Yeah.

4    Q.    You've some guys standing around, some of them

5    hanging over at the guard station?

6    A.    Yeah.

7    Q.    And there are guards there?

8    A.    There's just one, yeah.

9    Q.    And they've got TV cameras, and, you know, all

10   this stuff so that they can keep an eye on everything?

11   A.    Right, yeah.

12   Q.    It's not exactly what you would call a private

13   area; correct?

14   A.    Well, not where you can't get away with smoking a

15   cigarette in there without getting caught, nothing like that.

16   They have got cameras all over the place to watch every area.

17   They can't pick up conversations or anything like that.  You

18   can talk about anything you want to.  You can't do anything

19   you want to.

20   Q.    It depends on how close you are to somebody as to

21   whether or not you pick up their conversation?

22   A.    Sure, right.

23   Q.    In Gardner, how is that?

24   A.    The same way, really.  Its only difference is

25   you've got an eight-man cells there instead of one single-man

```
 1   cell, but you've still got a common area.
 2        Q.    Now, the conversation you had with Mr. Johnson
 3   about the eight to $10,000 to kill his wife, did that take
 4   place in Olathe or in Gardner?
 5        A.    In Gardner.
 6        Q.    In Gardner?
 7        A.    Yeah.
 8        Q.    You were not a cell mate of Mr. Johnson's?
 9        A.    No.
10        Q.    The common area in Gardner is laid out about the
11   same as it is in Olathe?
12        A.    Well, not really.  I guess it is in a way, but in
13   a way it ain't.  I don't know, it's different.  It's got
14   longer -- they have got a long table, and in Olathe you've got
15   little round tables, that basically is the only difference.
16        Q.    Do people still walk around, stuff like that?
17        A.    Yeah.
18        Q.    Is there a more private area that you can have a
19   conversation at in Gardner like a private room or something
20   like that?
21        A.    You can go outside if you want to.  They have got
22   a little outside area, if you want to do something like that.
23        Q.    But this conversation with Mr. Johnson never took
24   place in an outside secluded area.  It's in a place in the
25   common area?
```

1        A.      Yes, sir.

2        Q.      Would you agree with me that if you really wanted

3   to make this a confidential conversation, it would make more

4   sense to go to outside where there was nobody around rather

5   than talk about it on the inside?

6        A.      It depends.  Sometimes there's people outside so

7   you can't really go out there either.

8        Q.      But if there was nobody out there, that could be?

9        A.      If there was nobody out there, sure.

10       Q.      Right.

11       A.      But if there's nobody sitting at the table, why

12  not sit there?  It just depends on the jail.  You've got to go

13  where everybody else ain't.  Somebody might be over here by

14  the phones so you go over here.  Somebody might be over here,

15  so you go there.  It is not always the same.

16       Q.      Did you make any notes about your conversation

17  with Mr. Johnson?

18       A.      Notes, no.

19       Q.      It's not like you wrote this down and turned it

20  over to and handed it over to your attorney about what you

21  remember about the conversation?

22       A.      No, I didn't write nothing down.

23       Q.      You didn't write nothing down.  If you had your

24  meeting with your attorney on May 5th -- well, you met with

25  your attorney May 15th, 2013, so a little over a couple months

1   ago.  When would you have had this conversation with Mr.
2   Johnson?
3        A.    This was back in March.
4        Q.    March, April, May, and why is it that you waited
5   until May to come forward?
6        A.    That's the only time I could get a hold of my
7   attorney.  I can't call him or nothing.  I've got to wait for
8   him to get a hold of me.
9        Q.    So you didn't hear from your attorney between
10  March and May of 20132?
11       A.    Well, I got a hold of him before then, but he kind
12  of put me on hold for a while.  He said something about he'd
13  be down to talk to me about it before long or something or
14  other.
15       Q.    You've indicated on direct examination that you
16  expected -- well, let me -- strike that.
17       You had a conversation with Mr. Johnson about your case.
18  He knew that you were in on some burglaries?
19       A.    Yeah.  I might have mentioned about the
20  burglaries, but I didn't go into particulars about it.
21       Q.    Would you agree with me that you told him that you
22  were looking at going to prison?
23       A.    Back then I was trying to go to the treatment
24  center over there.  That was when I first came down, I was
25  talking about that.  That's why -- I really think -- this

```
 1    ain't nothing against the prosecution, but I really thought
 2    that I was going to get a better deal.  I expected this deal
 3    to begin with.
 4         Q.    But you understand that with your criminal history
 5    and Kansas law you can't get a deal like that unless you get
 6    significant help?
 7         A.    You can go over there to the treatment center.
 8    There's guys that go there with a bad backup.  As a matter of
 9    fact, you can't go over there -- you can't go over there
10    unless you have two prior --
11         Q.    Failed drug attempts.
12         A.    Yeah.
13         Q.    That's right, but if you're presumptive prison,
14    you have to have a departure that's agreed to by the Judge?
15         A.    You get that with every plea bargain you get.  You
16    plea bargain down.  I mean, that's the deal.
17                    MR. TOTH:  Judge, I object as asked and
18    answered.  I think we've covered this.
19                    THE COURT:  Overruled.
20         Q.    (By Mr. Toth) Well, you're presuming quite a bit
21    there that all of this was supposed to fall into place for
22    you; right?
23         A.    I'm an optimist.  I always believe I'm going to
24    come out smelling like a rose.
25         Q.    Well, I would agree with you that you are coming
```

1   out smelling like a rose.

2       A.      I don't know.  It smells like shit over here to

3   me.

4                   MR. HURST:  I object.

5                   THE COURT:  Sustained.

6                   MR. TOTH:  That's all.

7                   THE COURT:  Any redirect?

8                   MR. HURST:  Just a minute.

9                   **REDIRECT EXAMINATION**

10  BY MR. HURST:

11      Q.      Do you have your glasses with you?

12      A.      Yes, sir.

13      Q.      I'm going to ask you just a question about

14  Defendant's Exhibit C.  You were asked about that on

15  cross-examination; correct?

16      A.      Yes, sir.

17      Q.      And this last line here, actually, it starts on

18  number 5 and goes down to number 6, could you read that and

19  let me know.  Just read it to yourself and let me know when

20  it's done.

21      A.   "The defendant must" --

22      Q.      Just read it to yourself.

23      A.      Yes.

24      Q.      And does it say on there that you have to testify

25  against the defendant to get this deal?

```
 1        A.      No.

 2        Q.      And you started to, but go ahead and tell the jury

 3  what that line says about your obligations?

 4        A.      It says that I must truthfully testify in this

 5  case.

 6                        MR. HURST:  I have no further questions.

 7                        THE COURT:  Recross?

 8                        MR. TOTH:  Thank you, Your Honor.

 9                        RECROSS-EXAMINATION

10  BY MR. TOTH:

11        Q.      Who makes that determination whether you're being

12  truthful or not?  Isn't it the prosecutor?

13        A.      Yes, and myself.

14                        MR. TOTH:  Thank you.

15                        THE COURT:  Anything further?

16                        MR. HURST:  No, Judge.

17                        MR. TOTH:  May I move for the admission of

18  Defendant's C, if I haven't?

19                        THE COURT:  Any objection?

20                        MR. HURST:  No objection.

21                        THE COURT:  Defendant's C is admitted.

22                        (Whereupon, Defendant's Exhibit C was

23  admitted into evidence.)

24                        THE COURT:  Thank you for your testimony.

25  You may step down.
```

1      This is probably a good time for our morning recess.

2 Let's take 15 minutes.  I will remind you of the Court's prior

3 admonition not to discuss this case with anyone.  We'll be in

4 recess.

5                         (Whereupon, a recess was taken at 10:20

6 a.m., and proceedings resumed at 10:44 a.m.)

7                         THE COURT:  We are back on the record in

8 State of Kansas versus Rheuben Clifford Johnson, III,

9 10CR1074.  The parties appear as before, including the

10 defendant with his counsel.  The jury is in place after our

11 morning recess.  We are ready for further presentation of

12 evidence by the State.

13                         MR. HENDERSON:  Thank you, Your Honor.

14                         **MATT CAMPBELL,**

15 **having been duly sworn to tell the truth, the whole truth and**

16 **nothing but the truth, testified as follows:**

17                         <u>**DIRECT EXAMINATION**</u>

18 **BY MR. HENDERSON:**

19      Q.      Sir, state your name for the record.

20      A.      My name is Matt Campbell.

21      Q.      And what do you do for a living?

22      A.      I'm a detective with the City of Olathe Police

23 Department.

24      Q.      And what are your general job duties and

25 responsibilities as a detective?

1     A.     We are assigned a specific case load.  Our agency
2  divides our detectives up into persons and property divisions.
3  Within each division there are little subsections.  I happen
4  to be in the place in the Domestic Violence Division at this
5  point.
6     Q.     How long have you been a police officer?
7     A.     Fifteen years.
8     Q.     How long have you been a detective?
9     A.     Four years.
10     Q.     Have you spent your entire career with the Olathe
11  Police Department?
12     A.     No, I have not.  My first job assignment in Kansas
13  with law enforcement was with the Fort Scott Police
14  Department, and then I went to the Gardner Police Department
15  for five years and have been with Olathe approximately nine.
16     Q.     Detective Campbell, were you the lead detective on
17  a case involving Rheuben Johnson?
18     A.     I was.
19     Q.     How did you initially become involved in this
20  particular case?
21     A.     I got a phone call from my direct supervisor,
22  Sergeant Tim Sweany, which was on the 18th of May, 2012.
23  Detective Sweany -- Sergeant Detective Sweany called me and
24  advised that he had received a telephone call from an
25  individual by the name of Ron Nodwell who wanted to report a

1   an incident involving being solicited to commit murder.

2       Q.      And through the course of your investigation, were

3   you able to determine who Nodwell said spoke to him?

4       A.      Yes.  During my investigation it was determined

5   that a Rheuben Johnson was the person who he spoke to.

6       Q.      And during the course of the investigation, were

7   you able to likewise determine who the subject of the murder

8   was supposed to be?

9       A.      Yes.  His wife, ex-wife, Annie Johnson.

10      Q.      And we're on May 18th.  Did you have occasion to

11  speak with Mr. Nodwell?

12      A.      Yes.

13      Q.      Where did that interview take place?

14      A.      It took place at the Olathe Police Department in

15  one of our interview rooms.

16      Q.      What did Mr. Nodwell tell you?

17      A.      Mr. Nodwell advised me that three to four weeks

18  ago, before he had contact with our department, he had been

19  approached.  He had been introduced, if you will, to Mr.

20  Rheuben Johnson through a mutual friend.  The meeting,

21  according to Mr. Nodwell, was in reference to work.  Mr.

22  Nodwell is kind of a handyman, kind of construction type is

23  how he describes himself, a construction person.  He was

24  introduced to Mr. Johnson who owned his own kind of pest

25  control company, and they might have work for him from time to

1  time.

2      Q.     Did Mr. Nodwell tell you where they met?

3      A.     He did.  He said they met for lunch at Mr.

4  Goodcents off Ridgeview and K-10 Highway.

5      Q.     In Johnson County, Kansas?

6      A.     Yes.

7      Q.     What did Mr. Nodwell tell you was the subject

8  matter of this conversation with the defendant while at Mr.

9  Goodcents?

10     A.     According to Mr. Nodwell, rather quickly during

11  the conversation the conversation turned to Mr. Johnson's

12  ex-wife.

13     Q.     And what did Mr. Nodwell say the defendant said

14  about his ex-wife?

15     A.     He informed Mr. Nodwell -- Mr. Johnson informed

16  Mr. Nodwell that he called Ms. Johnson the root of all his

17  problems, and that he was looking to see for somebody to kill

18  her.

19     Q.     What, if anything, did Mr. Nodwell tell you

20  happened after lunch?

21     A.     After lunch Mr. Johnson decided that he would

22  drive Mr. Nodwell to where his ex-wife, Annie Johnson, lived.

23  They drove to an apartment complex, and Mr. Nodwell was not a

24  hundred percent sure where it was, but he described it between

25  I-35, between 85th and 75th Street.  He described it as a

1   gated community.

2       Also, he said that Mr. Johnson told him what his wife

3   drove, where she worked, where she stopped at the local

4   McDonald's to get her coffee in the morning, things along

5   those lines.

6       Q.    According to what Mr. Nodwell told you, whose

7   apartment was it that Mr. Johnson was showing you?

8       A.    That was Annie Johnson's apartment.

9       Q.    The ex-wife?

10      A.    Yes.

11      Q.    Did Mr. Nodwell tell you if he was given any

12  suggestions as to how he should complete this task?

13      A.    He did.  During the conversation it came up that

14  Mr. Johnson had a couple of ideas.  One of them being that she

15  could overdose on pills is what he referred to it as.

16      Q.    Now, did Mr. Nodwell tell you how he left it, how

17  he left that particular encounter?

18      A.    He did.  Mr. Nodwell informed me that he would

19  contact, or he said he would contact Mr. Johnson at a later

20  time after he had a chance to think about it.  He advised me

21  at which time he had not contacted him.  However, he did say

22  that Mr. Johnson did contact him a couple, two or three

23  different times.

24              (Whereupon, a train whistle blew.)

25              MR. HENDERSON:  Let's wait for the trains.

```
 1                 THE WITNESS:  That's fine.

 2        Q.     (By Mr. Henderson) So Mr. Nodwell said that he was

 3   contacted by the defendant; is that correct?

 4        A.     That's correct.

 5        Q.     What sort of contact was he talking about?

 6        A.     Telephone contact.

 7        Q.     Now, during your interview with Mr. Nodwell at the

 8   station that particular day, was there any discussion as to

 9   whether or not Mr. Nodwell might have some messages left on

10   his phone from the defendant?

11        A.     He thought that he had messages on his phone at

12   one point from Mr. Johnson, and I don't recall exactly what

13   phrase he used, if they were deleted or whatever the situation

14   was, but he said he did not have them any longer.

15        Q.     Did you make inquiries about it?

16        A.     Yes, I did.

17        Q.     Were you able to retrieve those messages?

18        A.     No.

19        Q.     At the conclusion of your meeting with Mr. Nodwell

20   on May the 18th, was there any sort of plan put in place as

21   far as what law enforcement was going to do?

22        A.     There was.  It was determined after the meeting

23   with Mr. Nodwell that we would contact Mr. Johnson, or he

24   would contact Mr. Johnson and have a phone call recorded about

25   the situation.  And there was some talk of what we would like
```

to have done was introduce Mr. Johnson to one of our
undercover officers if there was something that he wanted to
move forward with.

Q.    Eventually was a meeting of that type set up on
Monday, May 21st, 2012?

A.    It was.

Q.    Where was that meeting originally supposed to take
place?

A.    It was supposed to take place at Oregon Trail
Park, which is on the western side of Olathe near Robinson
Street and Old 56 Highway.  We got there that day, and there
was baseball games going on and families were there, and it
was determined that we did not want to do that there because
we did not know what could possibly take place.  So we moved
it to Waterworks Park, approximately half a mile away from
there in a more secluded-type area.  It's 600 South Curtis.

Q.    In Johnson County, Kansas?

A.    Yes.

Q.    Did that meeting at Waterworks Park actually take
place?

A.    It did.

Q.    Did Mr. Johnson show up?

A.    He did.

Q.    He met with Mr. Nodwell?

A.    Yes.

```
 1        Q.      He talked to the undercover officer?

 2        A.      Yes.

 3        Q.      You're talking about Sergeant Stites?

 4        A.      I am.

 5        Q.      Let's jump forward to the next day, May 22nd,

 6   2012.  There was phone calls on that particular day between

 7   Sergeant Stites in his capacity as an undercover officer and

 8   the defendant?

 9        A.      That's correct.

10        Q.      What time was the first of those phone calls made,

11   approximately?

12        A.      If you don't mind, I'd like to check my report of

13   that day.

14        Q.      Sure.  Would that refresh your recollection?

15        A.      It would.  On the 22nd of May, I have the

16   approximate time of 12:30 p.m.

17        Q.      12:30 p.m.?

18        A.      Yes.

19        Q.      That's the first phone call?

20        A.      That's correct.

21        Q.      Now, was the purpose of that phone call to set up

22   a second meeting at the Waterworks Parks?

23        A.      Yes, it was.

24        Q.      To your knowledge, was that arranged?

25        A.      Yes, it was.
```

```
 1       Q.     Did law enforcement go to Waterworks Parks?

 2       A.     Yes.

 3       Q.     Did Mr. Johnson show up?

 4       A.     No, he did not.

 5       Q.     To your knowledge, did Sergeant Stites receive a

 6  phone call from Mr. Johnson while at the Waterworks Park on

 7  the 22nd?

 8       A.     He did.

 9       Q.     What time?

10       A.     Approximately four o'clock in the afternoon, if I

11  remember correctly, Mr. Johnson called and said that he was on

12  the Missouri side of State Line, and he was unable to make the

13  meeting.

14       Q.     So what happened next?

15       A.     We returned back to the Olathe Police Department

16  and regrouped, if you will.  In those type of situations, I

17  think we ended up having seven to eight officers in some shape

18  or form that were involved.  We regrouped into a conference

19  room and a phone call was made to Mr. Johnson.

20       Q.     So Mr. Johnson, your understanding was to move the

21  location of the meeting?

22       A.     Correct, correct.

23       Q.     And you've got several officers in surveillance

24  involved.  Is that something you can just do at a drop of a

25  hat?
```

1    A.    No.

2    Q.    Hence, the regrouping?

3    A.    Correct.

4    Q.    So a phone call was made by Sergeant Stites?

5    A.    I believe that is accurate, yes.

6    Q.    To the defendant?

7    A.    Yes.

8    Q.    We'll call it "the regrouping phone call."  What

9  time was that made?

10   A.    A four -- I want to say a little after four

11 o'clock.  I would say 30, 40 minutes after we left, closer to

12 five o'clock.

13   Q.    Closer to five o'clock?  All right.  To your

14 knowledge, during that phone call did the defendant again

15 insist on meeting in Missouri?

16   A.    Yes.

17   Q.    At the conclusion of that phone call, you folks

18 talked about that a little bit?

19   A.    Yes, we did talk about it.

20   Q.    Did Sergeant Stites call the defendant back again?

21   A.    Yes.

22   Q.    When, approximately, was that call?

23   A.    It was definitely after -- obviously after -- a

24 little after five, 5:30 -- I apologize.  I do not have the

25 statement down, but after we returned back to the station, and

1   that was around four o'clock, a little after 4:30.  So I would
        2   say that would be shortly after five, approximately.
        3       Q.      Shortly after five to 5:30?
        4       A.      Yes.
        5       Q.      And then eventually there was the meeting at the
        6   Wal-Mart; correct?
        7       A.      Correct.
        8       Q.      Sometime later you were made aware of the name
        9   Richard Porterfield?
       10       A.      I was, yes.
       11       Q.      How did you come to learn his name?
       12       A.      I was contacted by the District Attorney's Office
       13   that they were contacted by a defense attorney who informed
       14   them that one of their clients had some information involving
       15   this case.
       16       Q.      And was there a meeting arranged?
       17       A.      A meeting was arranged.
       18       Q.      And was there an interview of Mr. Porterfield?
       19       A.      Yes.
       20       Q.      What's the date of that?
       21       A.      It was five, which would have been May 15th, 2013.
       22       Q.      Was that meeting set up right away?
       23       A.      It was not, no.
       24       Q.      There was a bit of a delay?
       25       A.      A couple of weeks, if I'm not mistaken.

Q.    Do you recall any particular reason?

         A.    If I remember correctly, when I spoke with the
attorney, they were trying to figure out exactly who Mr.
Johnson was, and it took them a while to figure out who it was
that they were speaking about.  So once that was determined,
then, obviously, getting everybody's schedules aligned and
meeting at the location, contacting a different agency to make
those arrangements, those kind of things, that took time.

         Q.    When you say "meeting with the attorney," are you
referring to Mr. Porterfield's attorney?

         A.    Yes, I apologize.  Mr. Porterfield's defense
attorney.

         Q.    But, obviously, the District Attorney's Office
knew who Mr. Johnson was?

         A.    Correct.

         Q.    So let's talk about the interview with Mr.
Porterfield on May 15th.  Where did it take place?

         A.    It took place at the Johnson County Detention
Center in New Century, Kansas.

         Q.    What did Mr. Porterfield tell you as far as how he
learned and got to know Mr. Johnson?

         A.    According to Mr. Porterfield, he and Mr. Johnson
had met each other while they were in custody.  During that
time, they had discussed, and in my report it's quoted as
"prison life," and they talked about what they did for a

living.  Mr. Porterfield informed Mr. Johnson that he was a
painter.  Mr. Johnson told Mr. Porterfield that he owned his
own business, and it was a pest removal company.  And at this
point, Mr. Johnson -- excuse me, Mr. Porterfield said, "You
know, I probably wouldn't be good at that type of work."  Some
conversation took place between the two where, according to
Mr. Porterfield, Mr. Johnson said "Well, you'd probably be
better at getting rid of humans."  And Mr. Porterfield,
according to him, jokingly played along and said "Yeah, that's
more up my alley."

    Q.    During your interview with Mr. Porterfield, did he
tell you who Mr. Johnson wanted him to get rid of?

    A.    He did.  He informed Mr. Porterfield that he
wanted his ex-wife to be gotten rid of.

    Q.    Did they discuss a sum of money?

    A.    They did.  It was discussed between the two that
it was eight to $10,000.

    Q.    To get rid of the ex-wife?

    A.    That's correct.

    Q.    Did Mr. Porterfield tell you if there were any
conversations about when he might be getting out of custody?

    A.    That was a question that Mr. Johnson had
reportedly posed to Mr. Porterfield about when he would be
getting out.  Mr. Porterfield explained during the interview
that he told Mr. Johnson that he wasn't sure, but he thought

1  it would be soon, and Mr. Johnson said, "Well, I hope so."

2      Q.    During the interview, was Mr. Porterfield asked if

3  he knew any details about the ex-wife?

4      A.    What he did say was that he knew that she was a

5  nurse, and he knew some specifics such as that -- well, I'm

6  sorry -- he knew specifics about Mr. Johnson, about his wife,

7  his sister being an attorney, but he also knew that Annie

8  Johnson was a nurse.

9      Q.    Did Mr. Porterfield give you an idea as far as

10  when this conversation took place time wise?

11      A.    He did.  It was determined early March, he

12  thought, before March 10th, that the reason he recalled that

13  date was allegedly his mother had passed, Mr. Porterfield's

14  mother had passed away on March 10th, and he knew it was

15  before that, a few weeks before that.

16      Q.    Did you ask Mr. Porterfield why he was coming

17  forward with this information?

18      A.    I did.

19      Q.    What did he tell you?

20      A.    He was pretty open about it.  He thought that it

21  could probably help him out in his legal issues, which I

22  thought was a very honest answer.

23      Q.    Did Mr. Porterfield also tell you that he was

24  concerned that someone might be trying to get something on

25  him?

1          MR. TOTH:  Objection as leading, Your

2  Honor?

3          THE COURT:  Sustained.

4     Q.    (By Mr. Henderson) Did Mr. Porterfield give you

5  any other reasons why he was coming forward, other than

6  helping himself?

7     A.    Yes, he did.  He said during this conversation

8  between the two he was kind of thinking to himself, you know,

9  hoping anyway, that Mr. Johnson was not trying to get anything

10  on him such as trying to maybe trap him into agreeing to some

11  sort of criminal activity.

12     Q.    How long have you been a law enforcement officer

13  in the City of Olathe?

14     A.    In the City of Olathe, approximately, nine years.

15     Q.    During that time, I take it you have become

16  familiar with the city?

17     A.    Yes.

18     Q.    You are familiar with various businesses in the

19  city?

20     A.    Yes.

21     Q.    Cases involving theft in the city?

22     A.    Yes.

23     Q.    Are you familiar with if there are any businesses

24  or people or companies in the City of Olathe that deal with

25  hauling away trash, cars, junk, things like that?

A.     There are as far as business names in the City of
Olathe, I'm not a hundred percent sure, but I know for a fact
that we've dealt with what we call them scrappers if you will,
people that haul off scrap metal and basically anything they
can make some money on.
      Q.     Yesterday did you get on Google to see if you
could find scrappers in the City of Olathe?
      A.     I did.
      Q.     Tell us what you did?
      A.     I entered a couple of Google searches using one of
the most popular search engines with Google, and I typed in --
and I apologize, let me check here.  It was "Junk removal,"
and the first one that popped up immediately was
"1-800-GOT-JUNK."
                    MR. TOTH:  Pardon me, Detective.  I object
to this as hearsay.
                    THE COURT:  Overruled.  You may answer.
      A.     1-800-GOT-JUNK.  There was Kansas City Junk King,
and those were just in searching for the names of junk
removal.  Then I Googled "vehicle removal," and a whole list
popped up again.  Two of those at the top were "1-800-CASH
JUNK FOR CARS," and you call -- excuse me.  "YOU CALL, WE
HAUL."
      Q.     "YOU CALL, WE HAUL?
      A.     "YOU CALL, WE HAUL."

```
 1                    MR. HENDERSON:  That's all I have, Judge.
 2    Thank you.
 3                    THE COURT:  Cross-examination?
 4                    MR. TOTH:  Thank you, Your Honor.
 5                    CROSS-EXAMINATION
 6    BY MR. TOTH:
 7         Q.    Detective Campbell, so you did this Internet
 8    search yesterday?
 9         A.    Yes.
10         Q.    I assume that would be at the direction of Mr.
11    Henderson?
12         A.    Yes.
13         Q.    And do you have any specific knowledge about how
14    easy it is to take a scrapped car, a junk car, and actually
15    get it scrapped, I mean how much effort does it take; do you
16    know anything about that?
17         A.    I do not.
18         Q.    Do you know what you're supposed to do with the
19    title of the vehicles?
20         A.    Not necessarily, no.
21         Q.    Okay.  Fair enough.  Have you ever, as lead
22    detective, did you ever go out to Mr. Johnson's property to
23    inspect it?
24         A.    I did not, no.
25         Q.    As far as you know, has anybody from Olathe Police
```

Department gone out to the property to inspect it?

         A.     I don't believe anybody inspected it.  But I do
believe we drove by it at one point to get a legal description
of it.  I did not, but that was done.

         Q.     All right.  Fair enough.  Just a couple issues
here.

         As far as Mr. Porterfield goes, you had said something
about the delay in getting the information from his attorney
to you had nothing to do with the fact that you were trying to
figure out who Mr. Johnson was.  Can you explain what that
means?

         A.     Yes.  Mr. Bostwick, if I can use his name, the
defense attorney for Mr. Porterfield, had the information from
Mr. Porterfield, and he had contacted, and I don't know of the
exact sequence of events, but the DA's Office was contacted,
and Mr. Bostwick was trying to figure out who his client was
referring to.  He knew him by name, but from what I remember
from speaking with Mr. Bostwick about it, it might have been
the spelling of Rheuben they having a difficult time with was
Mr. Johnson's first name.  I obviously don't know exactly what
the issue was.  However, it did take, according to them, a
couple of weeks to get the information to me.

         Q.     I see.  All right.  Now, as it relates to Mr.
Nodwell, just a couple quick things here.

         A.     Okay.

```
 1        Q.      When he first came out and met with you, it was
 2   May 18th?
 3        A.      That's correct.
 4        Q.      He had originally told you that he had met with
 5   Mr. Johnson at the Goodcents on April 15th?
 6        A.      Approximately, four weeks ago, yes.
 7        Q.      So he waited about 33 days before he ever came to
 8   the police department?
 9        A.      About four weeks, 30 days, yes.
10        Q.      And when you met with him, you specifically asked
11   him if Mr. Johnson threw out or if Mr. Nodwell threw out a
12   price that it would take for Mr. Nodwell to kill Mr. Johnson's
13   ex-wife, and Mr. Nodwell never told you anything about the
14   specific price; correct?
15        A.      He never told me anything about a specific price.
16   I do believe that the conversation, according to Mr. Nodwell,
17   was Mr. Johnson wanted him to come up with a price.
18        Q.      Right.  Mr. Nodwell never told you that the price
19   would be five to $10,000 or $20,000, any of those three
20   figures?
21        A.      No.
22        Q.      And Mr. Nodwell, when you asked him about how the
23   job was supposed to be done, he did mention something about
24   having her overdose on some pills?
25        A.      That's correct.
```

1      Q.    Would you agree with me that he never mentioned to
2  you that Mr. Johnson said that Mr. Nodwell could also kill her
3  by burning her house down or by doing a drive-by shooting?
4      A.    I don't recall that.
5      Q.    Okay.  You would have indicated that in your
6  report had you remembered that; right?
7      A.    Yes.  That would have been noted.
8      Q.    Okay.  Thank you.  Oh, one last question --
9              MR. TOTH:  I'm sorry, Judge.
10             THE COURT:  That's okay.
11     Q.    (By Mr. Toth) Why didn't you guys go out and
12  arrest Mr. Johnson based on Mr. Nodwell's statement alone?
13     A.    That's a good question.  I do believe that we
14  wanted to try to verify a little bit of information first
15  before we went down that route as far as taking one person's
16  story against another.  We wanted to go ahead and verify as
17  much as we possibly could, which is why we did the
18  introduction the next day or I think it was two days later.
19     Q.    Is that a reflection of the fact that Mr. Nodwell
20  had been, you know, he kind of came with some baggage as far
21  as criminal history?
22     A.    I don't know if that was the reason or not, but I
23  do think in this type of situation in this type of case you
24  want to do as much investigation on that on the front side.
25     Q.    Okay.  Would you also agree with me that Mr.

1   Nodwell, when he spoke with you, did not specifically say that

2   Mr. Johnson told Mr. Nodwell that he wanted Mr. Nodwell to

3   kill his wife?

4        A.    I don't recall what phrase he used as far as kill.

5   But he said he wanted to make her disappear is what I believe

6   I have in my report.

7        Q.    All right.

8                     MR. TOTH:  Thank you.

9                     THE COURT:  Any redirect?

10                    MR. HENDERSON:  No, Your Honor.

11                    THE COURT:  Thank you for your testimony.

12  You may step down.

13                    THE WITNESS:  Thank you.

14                    THE COURT:  Can we approach, Judge?

15                    (Whereupon, there was an off-the-record

16  discussion at the bench.)

17                    THE COURT:  We need to take up a brief

18  legal issue outside the presence of the jury.  So we're going

19  to take a recess.  We think it will be brief, just five or six

20  minutes, so I'll have you just go back to the jury room.

21  Don't discuss the case, of course, at this time.  Go back to

22  the jury room, and we'll bring you back shortly.

23                    (Whereupon, the jury left the courtroom at

24  11:05 a.m.)

25                    THE COURT:  We are on the record in State

```
 1   of Kansas versus Rheuben Clifford Johnson, III, 12CR1074.  We
 2   are outside the presence of the jury.  Everyone is in place,
 3   including the defendant with counsel, and Mr. Henderson or Mr.
 4   Hurst, do you have a motion?
 5                    MR. HURST:  Judge, I do have just a brief
 6   motion in regards to Count III.  In looking at Count III, the
 7   second amended complaint, it lists the City of Olathe, County
 8   of Johnson, State of Kansas as the jurisdiction for this.  As
 9   the Court is well aware, the jurisdiction that truly matters
10   is in Johnson County, Kansas, which is what the testimony was.
11   However, when Mr. Porterfield, who is the subject of Count III
12   testified, his testimony was that although the events, the
13   solicitation occurred in Johnson County, Kansas, it was not in
14   Olathe.  So just, frankly, it's not an element of the crime,
15   but just as a clerical clean-up error, the State at this point
16   would move to strike City of Olathe from Count III.
17                    THE COURT:  Any objection to that?
18                    MR. TOTH:  No, Your Honor.
19                    THE COURT:  I will allow the State to
20   strike City of Olathe from Count III.  Anything else by the
21   State?
22                    MR. HURST:  Judge, at this point, the State
23   would rest.
24                    (Whereupon, the State rested its case.)
25                    THE COURT:  Mr. Toth, do you have a motion?
```

MR. TOTH:  I do, Your Honor.  I would move
on behalf of Mr. Johnson for a motion of a judgment of
acquittal.  I move for judgment of acquittal based on the fact
that insufficient evidence has been presented by the State.  I
think, quite frankly, all three counts have their own separate
issues.  Certainly that's going to be what I'm arguing to the
jury in closing.

     Mr. Porterfield has issues for his credibility.  I
understand what the law in Kansas is about whether or not it's
admissible or is enough to give to the jury, but I would
suggest the evidence is still lacking as it relates to him.
The same issue with respect to Mr. Nodwell.  A lot of
credibility issues, delays in reporting to the police, things
of that sort, and most importantly, he never specifically
testified that my client told him that my client wanted Mr.
Nodwell to kill his wife, kill his ex-wife.

     Now, as it relates to the count with Detective Stites.
Again, I would respectfully argue that there is insufficient
evidence and would also like to interject an argument relating
to abandonment or withdrawal, which might actually apply to
the count pertaining to Mr. Nodwell.  This is a continuing
transaction.  It starts with Mr. Nodwell and ends with
Detective Stites, and it clearly and unequivocally ends when
Mr. Stites hangs up on my client before they ever get together
and meet in Jackson County, Missouri.  So our position is

1    regardless of what you think my client's intent was, he did
2    withdraw from any solicitation, if that's what you think it
3    was.  And any criminal activity arguably, if we think for the
4    sake of argument that this was a solicitation, would have
5    taken place in the State of Missouri rather than the State of
6    Kansas, and this Court just simply doesn't have jurisdiction
7    over Mr. Johnson.
8                    THE COURT:  Thank you, Mr. Toth.  Does the
9    State have a response?
10                    MR. HENDERSON:  Judge, the State has
11   presented evidence from which a reasonable juror could find
12   all the elements to satisfy beyond a reasonable doubt.
13        With respect to Mr. Nodwell, no, he never used the word
14   "kill," but he did testify that the defendant did tell him to
15   shoot his ex-wife in the head, so that satisfies it.
16        Regarding withdrawal, the withdrawal defense requires the
17   defendant was trying to persuade that person to not commit a
18   crime.  There has been no evidence that the defendant ever
19   tried to persuade Mr. Nodwell to not commit the crime.
20        With respect to Sergeant Stites, again, the defendant is
21   required to persuade him, and it also requires that he meet
22   the voluntary abandonment of the defendant's criminal plan.
23   The audiotape indicated that the defendant at best said he
24   wanted to think it over.  That does not meet the voluntary
25   abandonment.  There is certainly sufficient evidence as to

1   Count III.

2                    THE COURT:  I understand and appreciate the

3   motion by the defense.  However, I do believe that a prima

4   facie case has been made, and I will overrule the motion for

5   judgment of acquittal.

6        Regarding the -- specifically the issue regarding

7   jurisdiction, the witnesses were clear that it was never their

8   understanding that there was any sort of abandonment, that it

9   was just a change of location, and that it was a continuing

10  solicitation, and that the defendant did not withdraw.  So a

11  prima facie case has been made.

12       The State will be resting.  Mr. Toth, are you ready for

13  presentation of evidence?

14                   MR. TOTH:  I am, Your Honor.  Judge, may I

15  have exhibits marked before they come in?

16                   THE COURT:  Yes.

17                   (Whereupon, Defendant's Exhibits D through

18  I and HH and II were marked by the reporter for

19  identification.)

20                   MR. TOTH:  Okay, Judge, we are ready.

21  Thank you.

22                   (Whereupon, the jury returned to the

23  courtroom at 11:15 a.m.)

24                   THE COURT:  We are back on the record in

25  the State of Kansas versus Rheuben Clifford Johnson, III,

**90**
**OFFICIAL TRANSCRIPT**

```
 1    12CR1074.  Parties appear as before, including the defendant
 2    and counsel.  The jury is in place.  We took a short recess
 3    for a legal matter, and we're now ready for further
 4    presentation of evidence.
 5         Does the State have additional evidence?
 6                    MR. HENDERSON:  Your Honor, at this time
 7    the State of Kansas rests.
 8                    (Whereupon, the State rested its case.)
 9                    THE COURT:  Thank you.  Mr. Toth, do you
10    wish to present evidence?
11                    MR. TOTH:  I do, Your Honor.  Thank you.
12                    THE COURT:  Call your first witness.
13                    MR. TOTH:  Thank you.  Kat Klostermann.
14                    KATHY KLOSTERMANN,
15    having been duly sworn to tell the truth, the whole truth and
16    nothing but the truth, testified as follows:
17                    DIRECT EXAMINATION
18    BY MR. TOTH:
19         Q.    Could you state your name, please.
20         A.    Kathy Klostermann.
21         Q.    And, Ms. Klostermann, do you know Rheuben Johnson?
22         A.    Yes.
23         Q.    How do you know Rheuben Johnson?
24         A.    I'm his girlfriend.
25         Q.    How long have you been Mr. Johnson's girlfriend?
```

1      A.     I met him in November 2011.

2      Q.     So at the time that you met Mr. Johnson, was he

3  going through his divorce with his ex-wife, Annie Johnson?

4      A.     Yes.

5      Q.     And so as far as your boyfriend/girlfriend

6  relationship with Mr. Johnson, can you on a spectrum of being

7  serious, not serious, just acquaintances, how would you

8  characterize it?

9      A.     Very serious.

10     Q.     And are you familiar with a lot of very personal

11 information about Mr. Johnson?

12     A.     Yes.

13     Q.     Do you know where Mr. Johnson lives?

14     A.     Yes.

15     Q.     Where does he live at?

16     A.     He lives off 143rd Street on the Olathe/Gardner

17 line.

18            THE COURT:  Can you try to scoot up and

19 talk into the microphone.

20                    THE WITNESS:  Sorry.

21            THE COURT:  Keep your voice up.

22     Q.     (By Mr. Toth) Can you describe the property that

23 Mr. Johnson lives on?

24     A.     It's a farm that has about 80 acres, a large

25 property, which there's a house, there's a large barn.  It's

1   not a functioning farm, but it had ferring house for animals,

2   but now it was converted into an office building for one of

3   his businesses.

4       Q.    Okay.  And I'm going to show you some pictures of

5   some property in just a little bit.  Have you spent time out

6   at that property?

7       A.    Yes.

8       Q.    Have you spent the night out at that property?

9       A.    Yes.

10      Q.    Since you brought up business, can you explain

11  what kind of business Mr. Johnson is in or what he was in at

12  the time you got together with him?

13      A.    He is in a bee removal, animal removal service.

14      Q.    What's the name of the company?

15      A.    Johnson ABee.

16      Q.    Can you explain to the jury how the business

17  works?

18      A.    Basically, he just does service calls when people

19  are in need of having either animals removed, skunks,

20  raccoons, any of those animals, or if you need bees removed

21  which is usually the situation for most people.

22      Q.    I can see that.  You mean somebody's got some bees

23  up in their attic?

24      A.    Or in a tree in their yard and someone is

25  allergic.

```
1       Q.      I see.  Have you ever been out with Mr. Johnson on
2   service calls to remove bees?
3       A.      Yes.
4       Q.      How did he do that?
5       A.      Basically, depending on the situation, it all
6   depends, and you have to, usually depending on if you're
7   obviously if it's animal, you have to figure out where it's
8   coming in.  If it's bees it needs to be the, if there's a
9   swarm, it needs to be removed.  You have hive boxes.
10      Q.      How does he get bees into hive boxes?
11      A.      By scooping them down and trying to get them in,
12  and using like a vacuum.
13      Q.      All right.  And then he also does pest removal for
14  other things like skunks, raccoons, things like that?
15      A.      Yes.
16      Q.      Had he been doing that business when you first met
17  Mr. Johnson?
18      A.      Yes.
19      Q.      Is there any other type of businesses that he
20  does?
21      A.      Currently, no.  He did have a lawn and landscaping
22  business.  I guess years -- I'm not exactly sure of the date
23  on that, but prior to this business.
24      Q.      Okay.  Do you know the name of that?
25      A.      Apex Lawn and Landscape.
```

Q.     Did he also do snow removal in the winter?

         A.     Yes.

         Q.     Prior to his divorce, is it your understanding
that his wife would work with him on the business?

         A.     Yes.

         Q.     Did you ever work with him on his business?

         A.     Yes and no.  I didn't really.  I was kind of
distant from it.  My profession -- I'm not in business.  I'm
in the healthcare industry, so I didn't really take an
interest.

         Q.     What do you do?

         A.     I'm a nurse.

         Q.     I see.  Well, you've indicated that you've been
out on service calls with Mr. Johnson before.  Have you had an
opportunity to see -- let me strike that.  I'm going to get
back to that.

         Did Mr. Johnson work alone, or did he have people that
worked with him and for him?

         A.     He did have people work for him.  He did work the
business himself too, so it was kind of a mix.  He had a
service person.

         Q.     And where did that person come from?

         A.     That person, he had them actually on his property.
He hired them by kind of having a swap where he would give
them free housing and they would work on the farm, and then he

1    would also, if needed, send them out on service calls to make

2    some money.

3        Q.    Okay.  All right.  Where would they stay at?

4        A.    He has a trailer on his property.

5        Q.    And how many different people did he have coming

6    in and working for him at various times?

7        A.    Since I've known him, well, there was three but

8    some would come and go.

9        Q.    Where does he find those guys at?

10       A.    He would place an ad on Craig's List, and

11   basically it's pretty detailed like swapping the housing for

12   working on the farm because the farm is quite large to do

13   mowing and any type of fixing that needed to be done, property

14   maintenance.

15       Q.    All right.

16       A.    And then he would train them to work for the

17   business.

18       Q.    How would you characterize Mr. Johnson as a

19   businessman?

20       A.    Not the best in my eyes.

21       Q.    As you say with affection; right?

22       A.    Yes.

23       Q.    Why would you say that he is not the best

24   businessman?

25       A.    I think a large part of it had to do with -- it

1    was his priority, his business, because he had to earn money
2    through this whole custody suit, he had to have enough money
3    to go on with the lawyers, and, you know, it was all for his
4    son in the end.  But as far as a businessman, he had, I think,
5    he had that in mind that he needed to make the money, and he
6    also characterized his customers as usually one-time customers
7    because everyone only gets struck by bees or animals in their
8    attic once.  So he just -- he didn't really focus a lot on his
9    customer base.
10       Q.     So by considering his customers to be one-time
11   customers, how do you think it reflected on his ability to be
12   a good businessman?
13       A.     Well, a lot of times there was customers that
14   didn't -- that were in a crisis situation and had him come
15   out,  do his job, and then would turn around as they are in
16   the crisis situation they needed it done.  And after it's all
17   over and signed and he needed the money, they canceled the
18   check or stopped payment on the check.  And then sometimes
19   that would create problems.  He'd have to be trying to get the
20   money, but a lot of times he just kind of let that slide
21   because --
22       Q.     Just the way he is?
23       A.     Yes.
24       Q.     How does he deal with confrontation?
25       A.     Not very well.

1      Q.      Why do you say that?

2      A.      He's very loving, and he doesn't want to cause any

3  conflict.  He doesn't want to ruffle any feathers.  He likes

4  keeping everything at peace and even.

5      Q.      All right.  Do you feel like he gets taken

6  advantage of at times?

7      A.      Yes.  I think he let's -- yes.

8      Q.      Was he bullied?

9      A.      Yeah.  I would say if someone wants to bully him,

10  yes.

11      Q.      How is his hearing?

12      A.      A lot of times I've thought my stories were dull

13  when I would tell him stories, but I think he probably has a

14  hearing deficit, but I think his mind also gets bored when

15  he's listening, and then he's wandering, and he's like

16  "uh-huh," and I'm like "Are you listening"."  So I think a lot

17  of times he has a little selective listening --

18      Q.      Okay.

19      A.      -- or hearing.

20              MR. TOTH:  May I approach the witness, Your

21  Honor?

22              THE COURT:  Yes.

23              MR. TOTH:  I have a series of photographs

24  here that I've marked as Defendant's Exhibit D all the way

25  through Z, and AA through GG.  So we're talking about 25

1    photographs.  Have you seen these photographs before?

2        A.     Yes.

3        Q.     Are those the photographs that we looked at in my

4    office last week?

5        A.     Yes.

6        Q.     Generally, what are they photographs of?

7        A.     Photographs of his property, and what's on it.

8        Q.     Are they fair and accurate representations of what

9    his property looks like?

10       A.     Yes.

11       Q.     All right.  All right.

12                    MR. TOTH:  I move for the admission.

13                    MR. HURST:  No objection.

14                    THE COURT:  Defendant's D through GG?

15                    MR. TOTH:  Yes.

16                    THE COURT:  They are admitted.

17                    (Whereupon, Defendant's Exhibits D through

18   Z and AA and GG were admitted into evidence.)

19       Q.     (By Mr. Toth) I'm going to ask you to describe

20   them so that we have a clear record here on what's included in

21   the exhibits, and the then jury can have this when they take

22   it back with them to deliberate.  Defendant's Exhibit H, can

23   you tell us what's depicted on that?

24       A.     This is the ferring house converted into an office

25   building, which has a big hole in it because one of his

1    employees ran the car into it at one point.

2        Q.    Okay.

3        A.    It never got fixed.

4        Q.    What is that building used for?

5        A.    Right now it's basically empty, storage.

6            MR. TOTH:  Your Honor, it actually would

7    make sense if I can go ahead and publish it and pass it around

8    while she is testifying.

9            THE COURT:  Sure.

10            MR. TOTH:  Okay.

11       Q.    (By Mr. Toth) Exhibits G can you tell us what that

12   is?

13       A.    That is the trailer with the work van in front of

14   it.

15       Q.    And whose work van is it?

16       A.    It's Rheuben's, but he lets the employees use it

17   on occasion, but mainly for the job.

18       Q.    The trailer that's depicted, what's the trailer

19   used for?

20       A.    The trailer, the person that's living in it

21   usually is either one of the employees and also farmhands that

22   helps keep the property moved and up-to-date.

23       Q.    Okay.  Very good.  Defendant's Exhibit F, can you

24   tell us what's depicted in that?

25       A.    Some old trailer that's purple.  Some cars and one

1    of his pulling trailers, or I don't know how you say that.

2          Q.      Okay.

3          A.      We call that a hauling trailer.

4          Q.      Now, we're going to see pictures of a whole bunch

5    of cars, vans, trucks?

6          A.      Yes.

7          Q.      Why are they there?

8          A.      Just because it's like kind of a junkyard.  Maybe

9    people have kind of asked him if they can drop their vans off,

10    or what have you, and he says "sure."

11          Q.      Have you talked to him about why he keeps

12    collecting all these cars and stuff.

13          A.      I don't really get an answer.

14          Q.      It's just the way he is?

15          A.      Yes.  Oh, he cannot throw anything away.  It might

16    be useful one day.

17          Q.      They might be useful one day for parts?

18          A.      Yeah.

19          Q.      Defendant's Exhibit E, what is that?

20          A.      That's down by the barn.  That's a picture of his

21    tractor and the buildings in the backdrop and his car.

22          Q.      Defendant's Exhibit D?

23          A.      That's a picture of part of his land with his

24    brush hog that attaches to the tractor-trailer.

25          Q.      Does the brush hog work?

```
 1        A.      Yes.

 2        Q.      Okay.   Defendant's I?

 3        A.      That is in the back a little bit where there's a

 4   bunch of, yeah, dropped off vans and metal and just stuff.

 5        Q.      What's the water?

 6        A.      Oh, he once had animals.   That is a watering thing

 7   that's he used to have horses and llamas.

 8        Q.      Okay.

 9        A.      Defendant's Exhibit J, again, back behind the

10   trailer and such.   He had a landscaping business, so he has

11   lots of supplies for landscaping.   These are just a lot more

12   junk.

13        Q.      That what these bricks are for?

14        A.      Yeah.   It's hard to say, but some of these are

15   more decorative.

16        Q.      For the landscaping business?

17        A.      Yeah.   Because he used to build ponds and water

18   sculptures back with his landscaping business.

19        Q.      I see.   Defendant's Exhibit K, what is that?

20        A.      That is the back side of one of the buildings.

21   Again, with broken down vehicles and gates and different

22   fencing, more stuff.

23        Q.      Defendant's Exhibit L?

24        A.      Again, more old junk.

25        Q.      Vans depicted here?
```

```
 1        A.     Yes.  He has multiple vans.

 2        Q.     Any of them working?

 3        A.     No.

 4        Q.     Defendant's Exhibit M?

 5        A.     Again, just old -- it looks like building

 6   material, windows and old broken down vehicles.

 7        Q.     Okay.  Defendant's Exhibit O?

 8        A.     An old work van, old trucks, work trucks he used

 9   to have, but obviously they --

10        Q.     They don't work anymore?

11        A.     No.

12        Q.     Okay.  Defendant's P?

13        A.     The same, yes, a cast iron old bathtub.

14        Q.     What did he get that for?

15        A.     Propane tanks.  It looks like an old one and an

16   old corn crib that had rolled over in the storm once.

17        Q.     Okay.

18        A.     Again, the same, trucks that he once used that are

19   damaged -- I don't know.

20                    THE COURT:  Your voice trails off.  Ms.

21   O'Malley needs to take down what you say and the jury needs to

22   hear you.

23        Q.     (By Mr. Toth) R?

24        A.     Just a lot of tin roofing metal.  I'm not sure if

25   that came off one of the buildings or corn crib.
```

1     Q.    S?

2     A.    Yes.  These are containers in which he used for

3 his landscaping business where his plants came in, and I think

4 he couldn't throw them away.

5     Q.    Why wouldn't you throw them away?

6     A.    They might be used for something.

7     Q.    I see.  What that is is yet to be seen; right?

8 All right.  T?

9     A.    The back side of the trailer, another truck that

10 just has his old weed eaters and things that he should have

11 thrown away.

12     Q.    U?

13     A.    That's up near the barn.  That is some old mowing,

14 lawnmowers that do not function.

15     Q.    Okay.  V?

16     A.    This is inside the barn.  It's his functioning

17 vehicle, and just inside barn.

18     Q.    Okay.  The next three I think are all taken from

19 the same spot different angles.  So W, X, Y, can you tell us

20 what those are?

21     A.    Again, inside the barn, some of little Rheuben's

22 toys, just the truck with snow plow on it and lawnmowers,

23 again, more toys.

24     Q.    Okay.  Z?

25     A.    That is an old truck he has, a '55 Dodge that one

1    day he wants to restore.

2         Q.     But it doesn't work right now?

3         A.     No.

4         Q.     We're almost done here.  AA?

5         A.     This is his work inside one of his rooms which is

6    kind of like his working area, cedar from his old business

7    that he was working on.

8         Q.     Okay.  Then BB and CC, DD and EE?

9         A.     Yeah.  A picture from the lane looking out at the

10   grass.  He has just old stuff.  A part where he had some of

11   his gravel for landscaping and for the lane.  He rebuilt the

12   road, some of buildings in the back, the side of the barn with

13   some old machinery that I guess he used to use here, and some

14   old trailers, a winch that was used for his stuff around the

15   farm, I guess.

16        Q.     And then the last two here FF?

17        A.     Yeah.  It's just more of the vehicles that don't

18   work.

19        Q.     Okay.  GG?

20        A.     And, again, that's probably a cut-down tree and

21   just the back part of his property.

22        Q.     Okay.

23        A.     And stuff.

24        Q.     Now, did you talk with Mr. Johnson about getting

25   rid of all that junk?

```
 1        A.     Yes.

 2        Q.     Did he know that it was not only an eyesore but

 3   probably a safety issue as well?

 4        A.     Yes.

 5        Q.     Now, when we're talking about a safety issue,

 6   we're obviously talking about little Rheuben.  He was a small

 7   child, I think about five, about the time that Rheuben got

 8   arrested?

 9        A.     Correct.

10        Q.     Okay.  You said that you were aware of the divorce

11   that was going on that was taking place; correct?

12        A.     Correct.

13        Q.     And as far as you were aware at about the time

14   that Mr. Johnson was arrested on May 22nd, were things

15   improving or were they regressing on the divorce case as it

16   related to child custody, child visitation, things of those

17   sort?

18        A.     It was improving.

19        Q.     Why do you say that?

20        A.     Because he only had from the prior weeks before,

21   he only had two days a week, two hours, and then it got

22   improved to Saturday and Sunday, six hours each day, I

23   believe, if I remember correctly.

24        Q.     Okay.  And that latest change just came about a

25   week before he was arrested?
```

1      A.     Yes.  That weekend was a great weekend.

2      Q.     Why was it a great weekend?

3      A.     Because he had six hours on Saturday in which he

4  brought little Rheuben to the zoo, and they had a great time,

5  and then on Sunday I was there, and we went to his parents'

6  house and we went swimming and just had another great day.

7      Q.     Okay.  And that was the week -- if he was arrested

8  on Tuesday, would it be that Saturday, Sunday?

9      A.     Saturday, Sunday, correct.

10      Q.     Had you ever heard Mr. Johnson indicate to you or

11  anyone else that he wanted his ex-wife killed?

12      A.     No.

13      Q.     Did he use disparaging words to describe her?

14      A.     No.  And he doesn't use disparaging words.  He's

15  very -- he wouldn't say bad things about anyone.

16      Q.     Okay.  Now, would he have -- at times would he

17  have expressed some frustration about the affairs and the

18  things that the speed in which things were moving?

19      A.     Yes.  I think in some respects I have always

20  questioned him why is it a certain way because it's very hard

21  to comprehend and understand the whole proceedings, especially

22  since I was his new girlfriend, I wanted to know some of the

23  answers and a lot them I didn't like a lot of the answers.

24      Q.     Just because of the system, how the system works?

25      A.     Yes, I mean, yes.  Because little Rheuben is such

a good kid.

          Q.    Okay.  Did he express any concerns about how his
ex-wife's personal lifestyle choices may affect her ability to
parent?

                    MR. HURST:  Judge, I am going to hearsay.
If he's asking about statements that his client made, that's a
problem.

                    THE COURT:  Sustained.

          Q.    (By Mr. Toth) Are you aware of whether or not Mr.
Johnson had intended to investigate his wife because of
personal lifestyle decisions that she may have had?

          A.    Yes.

          Q.    And are you aware whether or not he had done that
in the past?

          A.    Yes.

          Q.    All right.  I'm going to show you Defendant's
Exhibit --

                    MR. TOTH:  May I approach, Your Honor?

                    THE COURT:  Yes.

                    MR. TOTH:  Thank you.

          Q.    (By Mr. Toth) Exhibit HH.  And I know I showed
this to you before.  And for the record can I have you
indicate what your knowledge is about what these are?

          A.    That was a private investigator he had hired prior
to me knowing him that he had mentioned that nothing was

1   ever -- they didn't present anything to him.  They didn't do

2   much.

3       Q.     All right.  So he hired a private investigator,

4   and they didn't do much?

5       A.     Right.

6       Q.     But the folks were supposed to look at his

7   ex-wife?

8       A.     Correct.

9              MR. TOTH:  Your Honor, I move for the

10  admission HH, which are business records for Orion

11  Investigations.

12             MR. HURST:  May I just see them?

13             THE COURT:  Yes.

14             MR. HURST:  Judge, just one moment.

15             THE COURT:  Any objection?

16             MR. HURST:  No objection, Judge.

17             THE COURT:  HH is admitted.

18             (Whereupon, Defendant's Exhibit HH was

19  admitted into evidence.)

20      Q.     (By Mr. Toth) Now, were you last aware that Mr.

21  Johnson had conveniently, and when I say conveniently, at or

22  about the time planning on hiring a private investigator?

23      A.     Yes.

24      Q.     How do you know that?

25      A.     He sent me an e-mail while I was at work.

```
1       Q.      And if may approach, Your Honor?

2                       THE COURT:  Yes.

3       Q.      (By Mr. Toth) If I can direct your attention to

4  Defendant's Exhibit II and ask if you can identify what that

5  is?

6       A.      It's the e-mail that he sent to me.

7       Q.      All right.  And that was sent from him to you?

8       A.      Correct.

9       Q.      What's his e-mail address?

10      A.      Beecatch@aol.com.

11      Q.      Like it's bees?

12      A.      Yes.

13      Q.      Have you made any alterations or deletions to that

14 e-mail?

15      A.      No.

16      Q.      Is that an accurate exact copy of the e-mail you

17 received from Mr. Johnson?

18      A.      Yes.

19      Q.      When was it sent to you?

20      A.      5/22 at 2:26 p.m.

21      Q.      So 2:26 p.m., the same day he was arrested?

22      A.      Correct.

23                      MR. TOTH:  I move for the admission of

24 Exhibit II.

25                      MR. HURST:  Judge, we object.  It's clearly
```

1   hearsay if it's an e-mail from the defendant to her.

2                  THE COURT:  Sustained.

3       Q.    (By Mr. Toth) Had you been talking to Mr. Johnson

4   about him doing private investigation work?  You are aware

5   that he still had additional concerns; right?

6       A.    Yes.

7       Q.    But can you kind of explain how it was that at one

8   level things were progressing and going well, but at the same

9   time he still had some concerns about his ex-wife?

10      A.    Right.  He didn't know how little Rheuben was

11  being parented, and he always had concerns because his ex-wife

12  did have a history of alternative behavior.

13      Q.    Okay.  So he was concerned about how that might

14  affect little Rheuben?

15      A.    Right.  And when you only have a couple hours with

16  your son, you want to protect him, and it's hard when he's

17  always with her.

18      Q.    Sure.  Did it seem unusual to you that he wanted

19  to hire someone to look into his ex-wife?

20      A.    No.

21      Q.    Oh, the night -- the day that he was arrested,

22  which was Tuesday, May 22nd, are you aware of whether or not

23  Mr. Johnson -- well, strike that.

24      Mr. Johnson gave Detective Stites $3,000 cash before he

25  was arrested.  You are aware of that?

```
 1        A.      Yes.

 2        Q.      Do you know where the money came from?

 3        A.      He had gone to the casino the night before or

 4  Monday night into Tuesday morning.

 5        Q.      Were you staying at his residence that night?

 6        A.      Yes.

 7        Q.      Did you go with him?

 8        A.      No.

 9        Q.      How do you know that he went to the casino?

10        A.      Because he had some winnings and showed me or laid

11  them on the counter.

12        Q.      How much money did he have?

13        A.      I'm not one hundred percent, but I would have to

14  say at least that, or maybe -- it was a lot.

15        Q.      Could it have been about $3,000?

16        A.      Yes.  I know there were quite a few hundreds.

17        Q.      Okay.  Does Mr. Johnson have a lot of close

18  friends?

19        A.      No.

20        Q.      Does he kind of stay to himself?

21        A.      Yes, yes.  I mean he's likable, everybody likes

22  him and loves him, but he just doesn't have a lot of close

23  friends.

24        Q.      Just kind of his personality again?

25        A.      Yeah, yes.
```

```
 1       Q.    Okay.  The last issue here, there were some
 2  chickens that you bought for little Rheuben?
 3       A.    Yes, on Easter.  Well, probably a week before, so
 4  they would be big enough to handle.  We got him baby chicks.
 5       Q.    And where did you keep the baby chicks?
 6       A.    Well, we kept them in the house until they were
 7  old enough to go out to the shed.
 8       Q.    And to get from the house out to the shed where
 9  the chickens are at, would little Rheuben have to navigate
10  through that area that's got all of this --
11       A.    Yes --
12       Q.    -- equipment, machinery?
13       A.    Yes.
14       Q.    And had you discussed that as being an additional
15  safety concern that you guys had?
16       A.    Yes.  Because it was quite new.  We had just got
17  the chickens out there, and, yes, there's a whole area.
18       Q.    Did little Rheuben like to go see the chickens?
19       A.    Oh, yes, he loved them.
20       Q.    Okay.  Thank you.
21                    THE COURT:  Cross-examination?
22                    MR. HURST:  Thank you.
23                    **CROSS-EXAMINATION**
24  BY MR. HURST:
25       Q.    If I can have the photographs.  I don't know where
```

1    those ended up.  Good morning.
         2        A.     Good morning.
         3        Q.     And I apologize, is it Klostermann?
         4        A.     Correct.
         5        Q.     I apologize.  You made it very clear when you were
         6    asked questions by Mr. Toth that for the defendant his first
         7    priority was his son; is that right?
         8        A.     Yes.
         9        Q.     And part of the reason that all this stuff,
        10    vehicles, what I would determine junk, needed to be moved was
        11    because of a safety concern; right?
        12        A.     Just aesthetics.
        13        Q.     Aesthetics?
        14        A.     From my point of view.
        15        Q.     So we have referenced here these chickens, when
        16    did you guys buy the chickens?  Missed that?
        17        A.     I don't recall when Easter was, oh, maybe eight
        18    days before Easter, the weekend before Easter.
        19        Q.     So March of that year?
        20        A.     Yeah.
        21        Q.     So you two had had a discussion about the need to
        22    remove these items from the farm?
        23        A.     That was from day one.
        24        Q.     From day one?
        25        A.     Well --

1    Q.    That is not a new thing, to your knowledge?

2    A.    No.

3    Q.    So the fact that the defendant would be trying to

4    hire someone to remove these things certainly would be a shock

5    or a surprise to you?

6    A.    It would not.

7    Q.    Okay.  Now, just a real quick thing about the

8    child custody issue, you're not a party to that case, correct,

9    on that divorce?

10   A.    What do you mean?

11   Q.    Well, certainly the divorce case is between the

12   defendant and his ex-wife?

13   A.    Correct, yes.

14   Q.    I'm not trying to be unfair, but it would be fair

15   to say that the licensed therapist in that case will probably

16   have a pretty good idea about how the progress is going in

17   that case; fair to say?

18   A.    Yes, I guess.  I don't know the information, but

19   yes.

20   Q.    And I'd like to ask you a little bit about the

21   defendant's business practices.  You stated that he wasn't

22   necessarily the best businessman?

23   A.    Correct.

24   Q.    You stated that you were familiar with some of his

25   businesses; correct?

```
 1        A.      Yes.

 2        Q.      Anything you know about his businesses that would

 3   require him to meet people in Missouri?

 4        A.      Some of his customers, they are across the metro

 5   area.

 6        Q.      Anything about his business that you know of that

 7   would require him to leave large amounts of cash unlocked in

 8   his vehicle for people to pick up later?

 9        A.      Well, he often got paid in cash.

10        Q.      But certainly you would agree with me that leaving

11   large amounts of cash, let's say $7,000, unlocked in the back

12   of a vehicle for somebody to pick up later is an unusual

13   business practice?

14        A.      Yes.

15        Q.      Is there anything in his business that you're

16   aware of that would cause him to be concerned about phone

17   conversations being recorded?

18        A.      No.

19        Q.      Now, I just have a few questions about the

20   photographs themselves.  I take it you didn't take these

21   photographs?

22        A.      No.

23        Q.      And I think you said earlier that it's about 80

24   acres on this farm?

25        A.      Correct.
```

1      Q.     And that's a pretty decent-sized piece of land?

2      A.     Correct.

3      Q.     And, again, we can see on this that the terrain

4  doesn't look too difficult.  You can kind of walk around the

5  80 acres; right?

6      A.     Yes.

7      Q.     And these things that we're looking at in the

8  photographs, are they spread all over the property, or are

9  they all in one particular area?

10     A.     No, they are pretty much in one particular area

11 that is close to the road and the house and more of his living

12 space.

13     Q.     So near the house and near the path that little

14 Rheuben would have to take to get to these chickens?

15     A.     Yes.

16     Q.     Now, there wouldn't be any reason that if somebody

17 wanted to take these photographs that there would be any

18 difficulty doing this?

19     A.     Right.  Yes, correct.

20     Q.     Now, you would agree with me that on 80 acres of

21 land -- well, before I get there, we weren't talking about

22 removing everything that was on this property; correct?

23     A.     Correct.

24     Q.     So there are some things that need to be left and

25 some things that for whether it's for safety or just the way

1    it looks terrible or just plain junk that needs to go; right?

2        A.    Yes.

3        Q.    So you would agree with me that if you're going to

4    hire somebody to remove those items, it's probably pretty

5    important, number one, to let them know the address of the

6    farm; right?

7        A.    I guess, yes.

8        Q.    It's pretty hard to go remove stuff even if you

9    don't know the address of where it needs to be or where it's

10   at?

11       A.    Yes.

12       Q.    And even if the person knows where this farm is,

13   it would be pretty important to show somebody or describe to

14   somebody what items needed to be taken and which ones don't;

15   correct?

16       A.    Yes.

17       Q.    Where this stuff is that needs to be moved, its

18   location; correct?

19       A.    It's pretty obvious though.

20       Q.    In fact, these photographs which you say are

21   pretty easy to take, or you say there's no reason they would

22   be difficult to take them, this would be pretty helpful to

23   give somebody if you were hiring them to remove items off the

24   property; right?

25       A.    Yes.

```
 1      Q.      I'm going to show you --
 2                    MR. HURST:  If I may approach the witness?
 3                    THE COURT:  Yes.
 4      Q.      (By Mr. Hurst) I'm going to show you what has been
 5   marked as Exhibit No. 6.  Are there any vans or junk in that?
 6      A.      No.
 7      Q.      All right.
 8                    MR. HURST:  Judge, if I may have just one
 9   moment?
10                    THE COURT:  Sure.
11                    MR. HURST:  I have nothing else.  Thank
12   you.
13                    THE COURT:  Any redirect?
14                    MR. TOTH:  No, thank you, Your Honor.
15                    THE COURT:  Thank you for your testimony.
16   You may step down.
17                    THE COURT:  It is 11:57 and probably just
18   the right time for our noon recess for lunch.  Is an hour
19   enough, Counsel?
20                    MR. TOTH:  Yeah, can we approach, Your
21   Honor?
22                    THE COURT:  Sure.
23                    (Whereupon, an off-the-record discussion
24   occurred at the bench.)
25                    THE COURT:  It is 12 o'clock, and we're
```

```
 1    going to take an hour and fifteen minutes for the jury.  Be
 2    back in the jury room and ready to go at 1:15, and I'll remind
 3    you of the Court's admonition.  We stand in recess.
 4                        (Whereupon, the lunch recess was taken at
 5    12 noon and proceedings resumed at 1:15 p.m.)
 6                        THE COURT:  We're on the record in State of
 7    Kansas versus Rheuben Clifford Johnson, III, 12CR1074.  The
 8    parties appear as before.  We are outside the presence of the
 9    jury.  Everyone is here in court, including the defendant with
10    his counsel.  I have looked at both sets of jury instructions,
11    and I have provided those to you.  We'll talk about those in a
12    minute.  I want to cover first one thing, Mr. Toth, is it my
13    understanding that your intent is to rest?
14                        MR. TOTH:  It is, Your Honor.
15                        THE COURT:  You talked with your client
16    about his rights to testify?
17                        MR. TOTH:  I have.  I have talked with my
18    client about his right to testify.  I had indicated to him
19    that it is his and only his choice as to whether or not to
20    take the stand in this particular case.  We have discussed the
21    pros and cons of doing that.  I think he has a full
22    understanding of what his rights are under the constitution
23    and his ability to testify, and at this time I have been
24    advised by my client that he chooses to exercise his right to
25    remain silent.
```

```
 1                    THE COURT:  Is that correct, Mr. Johnson?
 2                    THE DEFENDANT:  Correct.
 3                    THE COURT:  You understand and agree with
 4   what your lawyer just said?
 5                    THE DEFENDANT:  Yes.
 6                    THE COURT:  You do understand that you do
 7   have a right to testify in court; correct?
 8                    THE DEFENDANT:  Yes.
 9                    THE COURT:  Have you discussed this fully
10   with him?
11                    THE DEFENDANT:  Yes.
12                    THE COURT:  Are you happy with his
13   services, Mr. Toth?
14                    THE DEFENDANT:  Yes.
15                    THE COURT:  Are you under the influence of
16   drugs or alcohol today?
17                    THE DEFENDANT:  No.
18                    THE COURT:  Has anyone made any promise to
19   you or threatened you in any way to induce you to make this
20   decision not to testify?
21                    THE DEFENDANT:  No.
22                    THE COURT:  And this is your decision and
23   your decision only, and you are exercising your right not to
24   testify; correct?
25                    THE DEFENDANT:  Yes.
```

```
 1                    THE COURT:  Okay.  Thank you.  You both
 2    have been provided with a set of instructions.  I appreciate
 3    that you've taken a look at those and made suggestions.  I'd
 4    like to go through these with you.  We'll take it up with you
 5    right before we close, but I believe we have almost all the
 6    evidence in here from the prosecution and defense, and I
 7    understand the State may have rebuttal, but we will take this
 8    up now and make a full record of this.
 9        Instruction No. 1:  It is my duty to instruct you in the
10    law, P.I.K. 50.040.  Any objection?
11                    MR. HURST:  No objection.
12                    MR. TOTH:  No objection.
13                    THE COURT:  Jury Instruction No. 2:  In
14    your fact finding, P.I.K. 50.050.  Any objection?
15                    MR. HURST:  No objection.
16                    MR. TOTH:  No objection.
17                    THE COURT:  Jury Instruction No. 3:  At
18    times during the trial, P.I.K. 50.060.  Any objection?
19                    MR. HURST:  No objection.
20                    MR. TOTH:  No objection.
21                    THE COURT:  Jury Instruction No. 4:
22    Statements, arguments and remarks, P.I.K. 50.070.  Any
23    objection?
24                    MR. HURST:  No objection.
25                    MR. TOTH:  No objection.
```

```
 1                    THE COURT:  Jury Instruction No. 5:  You
 2   are presented with audio recordings.  Any objection?
 3                    MR. HURST:  No objection.
 4                    MR. TOTH:  No objection to the instruction,
 5   Your Honor.
 6                    THE COURT:  Jury Instruction No. 6:  Your
 7   only concern in this case.  P.I.K. 50.080.  Any objection?
 8                    MR. HURST:  No objection.
 9                    MR. TOTH:  No objection.
10                    THE COURT:  If we go along, Counsel, if
11   there is a different order that you think makes sense, please
12   feel free to tell me.  You all have some of the same but in a
13   different order.  So if you have a different suggestion, I'm
14   certainly willing to go over that.
15       Jury Instruction No. 7:  It is for you to determine the
16   weight and credit, P.I.K. 51.060.  Any objection?
17                    MR. HURST:  No objection.
18                    MR. TOTH:  No objection.
19                    THE COURT:  Jury instruction No. 8 is
20   P.I.K. 51.080:  A defendant in a criminal trial.  Any
21   objection?
22                    MR. HURST:  No objection.
23                    MR. TOTH:  No objection.
24                    THE COURT:  Jury Instruction No. 9 is the
25   element instruction, P.I.K. 53.090.  Any objection?
```

1          MR. HURST:  No objection.

2          MR. TOTH:  No objection.

3          THE COURT:  Jury Instruction No. 10, the

4    element instruction for Count II.  Any objection?

5          MR. HURST:  No objection.

6          MR. TOTH:  No objection.

7          THE COURT:  Jury Instruction No. 11, the

8    elements instruction for Count III, any objection?

9          MR. HURST:  Judge, the only thing, we had

10   discussed this back in chambers, I believe there's been a

11   corrected copy of that with no objection with those

12   corrections.

13         MR. TOTH:  No objection.

14         THE COURT:  Jury Instruction No. 12 is the

15   one the State has submitted:  Premeditation means to have

16   thought the matter over beforehand, P.I.K. 54.150(d).  Any

17   objection?

18         MR. HURST:  No objection.

19         MR. TOTH:  No objection.

20         THE COURT:  Jury Instruction No. 13:  The

21   State must prove, P.I.K. 52.010.  Any objection?

22         MR. HURST:  No objection.

23         MR. TOTH:  No objection.

24         THE COURT:  Jury Instruction No. 14:  The

25   State has the burden, P.I.K. 51.010.  Any objection?

```
 1                    MR. HURST:  I have no objection.

 2                    MR. TOTH:  No objection.

 3                    THE COURT.  Jury Instruction No. 15:  Each

 4   crime charged against the defendant is a separate and distinct

 5   offense, P.I.K. 68.060.  Any objection?

 6                    MR. HURST:  No objection.

 7                    MR. TOTH:  No objection.

 8                    THE COURT:  Jury Instruction No. 16:  It is

 9   a defense to a charge of criminal solicitation.  This is one

10   Mr. Toth submitted only.  It's P.I.K. 53.100.  Any objection?

11                    MR. HURST:  I'm sorry, Judge, this would be

12   16?

13                    THE COURT:  Number 16.

14                    MR. HURST:  Which one was it?

15                    THE COURT:  It is a defense to a charge of

16   criminal solicitation, P.I.K. 53.100.

17                    MR. HURST:  Judge, it sounds like a defense

18   in this case, and we have no objection to that.

19                    MR. TOTH:  No objection.

20                    THE COURT:  Jury Instruction No. 17.  It is

21   also one that Mr. Toth submitted only:  The defendant raises

22   abandonment as a defense, P.I.K. 51.050.  Any objection?

23                    MR. HURST:  No objection.

24                    MR. TOTH:  No objection.

25                    THE COURT:  Jury Instruction 18:  Once you
```

retire to the jury room you will be provided with these
instructions.  Any objection?

                    MR. HURST:  No objection.

                    MR. TOTH:  No objection.

                    THE COURT:  And Jury Instruction 19:  Once
you retire -- strike that.

     When you retire to the jury room you will first select,
P.I.K. 68.010.  Any objection?

                    MR. HURST:  No objection.

                    MR. TOTH:  No objection.

                    THE COURT:  And the last forms are the
verdict forms for Counts 1, 2 and 3.  Any objection?

                    MR. HURST:  No objection.

                    MR. TOTH:  No objection, Your Honor.

                    THE COURT:  There was one instruction, Mr.
Toth, you had:  You must consider this case without
favoritism, P.I.K. 51.07.  I didn't find it in the new P.I.K.
Is there something you're requesting today?

                    MR. TOTH.  I don't know if that means I was
looking at the old P.I.K. or not, Your Honor.  Given the
circumstances of this particular case, I don't necessarily see
a reason for the Court to go ahead if it's not in the new
P.I.K.

                    THE COURT:  I didn't find it.  Are you
requesting this one?

1          MR. TOTH:  Not at this point, Your Honor.
2    We'll withdraw that.

3          THE COURT:  Thank you.

4          MR. HURST:  Judge, there is one instruction
5    that I provided a copy to defense counsel.  If I may approach?

6          THE COURT:  Yes.

7          MR. HURST:  And also, your Honor, I will
8    provide the Court with an unpublished Kansas case, *State vs.*
9    *Watts.*

10         Judge, what this instruction is, and just for the record,
11   it states that if you find that the defendant committed
12   criminal acts in the state which were part -- which were a
13   substantial and integral part of the overall continuing crime
14   plan in which were partial execution of that plan, the
15   prosecution may be in this state or other state in which such
16   acts occurred.

17         And, Judge, that P.I.K. comes directly from the case in
18   front of you, *State vs. Watts.*  That's a case out of actually
19   Division 19 with Judge Welch.

20         In that case, Judge Welch's court it was an aggravated
21   kidnapping that the State's theory was that it started in
22   Kansas and ended in Missouri.  And the State's perspective,
23   there was evidence, obviously, again, it started in Kansas and
24   ended in Missouri.

25         The defense in that, Your Honor, is pretty similar to

what we have in this case, and that is the defendant objected
to that instruction saying:  Hey, we have two separate acts
here, an act in Kansas and an act in Missouri, the two
separate acts.  And the Court, Judge Welch, gave the
instruction as it is given to the Court today, and the Court
of Appeals approved that relying in part on K.S.A. 21-3104.
And, Judge, actually that's the old statute.  It actually now
is K.S.A. 21-5106.  That statute says that a person is subject
to the prosecution and punishment under the law of the state.
If the person commits a crime wholly or partly within the
state.

     And the reason we're asking for this, Judge, is it's
become clear in the opening and through the questioning that
we've had in the presentation of evidence that one of their
theories is:  Hey, this happened in Missouri, not Kansas.  I
think it's important to instruct the jury on the relevant
jurisdictional law as to what they can consider and what they
can't.  We think that Judge Welch did the right thing in the
*Watts* case, and that's why we're asking for this instruction
in this case as well.

               THE COURT:  And the last line there, the
last phrase, should it read:  The prosecution may be in this
state.

               MR. HURST:  Yes, let me double-check.  I'm
sure that's just a typo on my part.  Let me --

**128**
**OFFICIAL TRANSCRIPT**

```
 1                    THE COURT:  I believe that's how it reads
 2    on page five also.
 3                    MR. HURST:  Yes, that's correct.  I
 4    apologize for the typo.
 5                    THE COURT:  That's fine.  Mr. Toth, any
 6    comment or objection?
 7                    MR. TOTH:  I do have an objection to the
 8    instruction.  After having briefly reviewed the case that Mr.
 9    Hurst has supplied to us, there's a couple of different points
10    I'd like to make.
11        First of all, this is clearly not a P.I.K. instruction.
12    So it has not been approved by P.I.K., which should be
13    position number one.
14        Secondly, the instruction says:  If you find the
15    defendant committed criminal acts in this state which were a
16    substantial and integral part of an overall continuing crime
17    plan and which were in partial execution of that plan, the
18    prosecution may be in this state or in another state.
19        The opinion references the Grissom case where the Court,
20    the Supreme Court, indicated that if you're going to give some
21    sort of instruction like this that the word "clearly" needs to
22    be inserted after -- it would be in the second line
23    "substantial and integral part of an overall continuing crime
24    plan and which were clearly in partial execution of that
25    plan."  So an emphasis needs to be placed on the fact that
```

there was clearly an execution of that plan and in the State of Kansas, and that opinion clearly says that it was error that the Court did not instruct in this unpublished case.

That being said, I don't think there's any evidence that Mr. Johnson did anything in Kansas, if you accept our argument on abandonment, which was clearly in partial execution of any plan because he clearly abandoned any sort of agreement that he had with Mr. Stites, Detective Stites.

And what happened after that is Detective Stites makes a phone call to Mr. Johnson, but Mr. Johnson was in the state of Missouri. So Mr. Johnson is completely outside of the state when things were reinitiated. I think the evidence is pretty clear on that. So I don't believe there were any acts as it relates to Detective Stites and/or a continuation of Mr. Nodwell's plan that was executed in the State of Kansas after Detective Stites essentially shut the whole thing down. So we do object to the instruction.

MR. HURST: Judge, just to briefly respond?

I see the *Grissom* part, and I don't have any objection to adding the word "clearly." However, Judge, the defendant is certainly entitled to make his defense and his position to the jury, but there certainly has been a substantial showing of evidence that what we are dealing with here is a crime that started in the State of Kansas and continued on to the State of Missouri, and that is exactly what the *Watts* case is

1   talking about.  That's exactly what K.S.A. 21-5106 is talking
2   about, Judge.  So we're asking for that instruction.
3                       THE COURT:  I think this is a question that
4   has been brought up in this trial, and one in which I'm going
5   it instruct.  I'm going to add the word "clearly," however,
6   after "were."  It will read, "and which were clearly in
7   partial execution of that plan."  The prosecution may be in
8   this state, so I'm going to give this instruction with those
9   additions and clarifications with the defense objection noted.
10  I think, do either of you have a suggestion as to where
11  placement should be for that?
12                      MR. HURST:  Judge, I would suggest, I
13  believe the last element instruction.
14                      THE COURT:  It's eleven.
15                      MR. HURST:  Well, Judge, how about after
16  16.  I think after 17, actually.
17                      MR. TOTH:  That would be fine.
18                      MR. HURST:  That's probably the easiest
19  we'll go back and number everything.
20                      THE COURT:  So this new one will be 18
21  which will make the following instruction 19:  Once you retire
22  to the jury room; and then 20:  When you retire to the jury
23  room.  That will be 20.  Do either of you have any other
24  requests?
25                      MR. HURST:  The State does not.

```
 1                    MR. TOTH:  No.

 2                    THE COURT:  Any other objections?

 3                    MR. HURST:  No.

 4                    THE COURT:  Okay.  Ms. Nelson will prepare

 5    that additional instruction number 18, and it's my

 6    understanding that the State will have some rebuttal.

 7                    MR. HURST:  Very brief, Judge.  I think it

 8    will take less than five minutes.

 9                    THE COURT:  For the closing arguments,

10    Counsel, how much time are you requesting?

11                    MR. HENDERSON:  Judge, I am going to be

12    doing PowerPoint for my closing.  I think about 30 minutes

13    long altogether.  I'd like to divide in half, if I can.

14                    THE COURT:  Did you say 30?

15                    MR. HENDERSON:  Yes, ma'am.

16                    MR. TOTH:  That seems to be a little

17    ambitious for me, but I won't go above 30.

18                    THE COURT:  You each have 30, and the State

19    wishes to split.  Do you wish 15 and 15.

20                    MR. HENDERSON:  Yes.

21                    THE COURT:  Do you wish a warning?

22                    MR. HENDERSON:  A five-minute warning.

23                    THE COURT:  How about you, Mr. Toth?

24                    MR. TOTH:  Ten minutes, Your Honor.

25                    THE COURT:  Is everybody ready to go?
```

```
 1                    MR. HENDERSON:  Yes.

 2                    MR. TOTH:  Yes.

 3                    THE COURT:  Okay.

 4                    (Whereupon, proceedings resumed in the

 5      presence of the jury back at 1:30 p.m.)

 6                    THE COURT:  We are back on the record in

 7      State of Kansas versus Rheuben Clifford Johnson, III,

 8      12CR1074.  Parties appear as before, including Mr. Johnson

 9      with his lawyers.  The jury is in place.  We took a recess for

10      lunch and got back on the record for further presentation of

11      evidence.  Mr. Toth, Ms. Johnson, do you wish to present any

12      further evidence?

13                    MR. TOTH:  No, Judge, the defense rests.

14                    (Whereupon, the State rested its case.)

15                    THE COURT:  Does the State have any

16      rebuttal?

17                    MR. HURST:  Judge, the State would briefly

18      recall Sergeant Lonnie Stites to the stand.

19

20

21

22

23                    LONNIE STITES,

24      having been previously sworn to tell the truth, the whole

25      truth and nothing but the truth, testified as follows:
```

<u>**DIRECT EXAMINATION**</u>

**BY MR. HURST:**

THE COURT:  Sir, I will just remind you that you are still under oath.

MR. HURST:  If I may approach?

THE COURT:  Yes.

Q.    (By Mr. Hurst) I'm going to hand you a stack of photographs labeled Defendant's Exhibit -- I believe that is E to GG, and just take a moment to quickly look through those and let me know when you're done.

A.    Yes, sir.

Q.    Do you recognize anything in any of those photographs?

A.    No, sir.

Q.    Have you ever seen anything in those photographs before?

A.    No, sir.

Q.    Any idea where they were taken?

A.    No, sir.

Q.    During your interaction with the defendant back in May of 2012, did the defendant ever provide you with any photographs that were even close to what we're seeing in those photographs?

A.    No, sir.

MR. HURST:  No further questions.

```
 1              THE COURT:  Cross-examination?
 2                  CROSS-EXAMINATION
 3  BY MR. TOTH:
 4      Q.    Sergeant Stites, would you agree with me that when
 5  you met with Mr. Johnson and Mr. Nodwell at Waterworks Parks
 6  on May 31st that Mr. Johnson indicated to you later Mr.
 7  Nodwell left that he assumed that Mr. Nodwell had filled you
 8  in on everything that needed to be done as far as the project?
 9      A.    I believe that's one of the statements he made.
10      Q.    And you never met with Mr. Nodwell personally to
11  debrief him or take his statement at the police station.  That
12  was done by Detective Campbell; correct?
13      A.    Correct.  I just spoke with Mr. Nodwell briefly.
14      Q.    As you're getting out to the park; right?
15      A.    No.  I spoke with him at the station, prior to.
16      Q.    And in that conversation, he never went into any
17  depth or detail of what it was that Mr. Johnson had requested
18  that he do?
19      A.    The only statement he made in reference to that
20  was that I wasn't going to like it very much what he had told
21  him because he told him to stop speaking so bluntly.
22      Q.    He never -- but as far as Mr. Johnson would have
23  told Mr. Nodwell:  This is where I live, this is the kind of
24  specific stuff that I need moved, all of that stuff, you have
25  no personal knowledge as to whether or not that took place?
```

1       A.      No, I don't.

2       Q.      Can you tell me, do you have any idea why it is

3    that the Olathe Police Department did not go out and take

4    photographs like this to look into Mr. Johnson's claims that

5    he had some trash that needed to be hauled off?

6       A.      To be perfectly honest, I wouldn't think there was

7    any need to.  I requested photographs of what he wanted, and

8    he gave me a photograph of his ex-wife.

9       Q.      I'm talking about after fact.  Nobody went out to

10   check the property.  Do you have any idea why that is?

11      A.      Just what I said, I wouldn't see any reason to.

12      Q.      Okay.  All right.  Fair enough.  Thank you.

13                      MR. HURST:  Nothing else, Judge.

14                      THE COURT:  Thank you for your testimony.

15   You may step down.

16                      MR. HURST:  The State has no further

17   rebuttal evidence.

18                      THE COURT:  Any surrebuttal by the

19   defendant?

20                      MR. TOTH:  No.

21                      THE COURT:  Well, the evidence is all in

22   and things went much more quickly than we all anticipated, so

23   we're going to be ready for jury instructions and closing

24   arguments.  Ms. Nelson is typing up the last few corrections

25   to the jury instructions and we'll be ready to go.  Each

lawyer has requested 30 minutes for closing arguments, and the State can elect, and has elected, to be split. Since they have the burden of proof, they can split their argument in two. They will go the first and last 15 minutes.

Each has asked for a warning when they get somewhere close to the end of their argument. The State has asked for a five-minute warning in the first half and second half. The defense has requested a 10-minute warning. So I brought my phone out here. It has a stopwatch on it. It's very fancy. I have this out here not to check messages or anything like that, but it's so that I have a stopwatch here. And that first instruction about tweeting and blogging, and I really don't even know what most of that is, but I do know that this has a stopwatch, so I will be able to give them their warnings of when it's time.

I think Ms. Nelson is finishing up so I think she should just take a couple of minutes. Everyone take a restroom break, and we'll have about an hour and fifteen minutes. We'll be going until she's ready. Until she's ready, we'll take just a few minutes.

(Whereupon, the jury left the courtroom at 1:45 p.m.)

THE COURT: We're outside the presence of the jury. We had one last witness. Counsel, do either of you have anything further regarding instructions?

1                    MR. HURST:  No, Judge.

         2                    MR. TOTH:  No, Judge.

         3                    THE COURT:  It should be just a couple

         4    minutes before Ms. Nelson has the final packet.  If you need

         5    to take a few minutes to use the restroom.  Do that, and as

         6    soon as she's ready, it should be a couple of minutes.

         7                    (Whereupon, a recess was taken at 1:45

         8    p.m., and proceedings resumed at 1:45 p.m.)

         9                    THE COURT:  We are back on the record in

        10    State of Kansas versus Rheuben Clifford Johnson, III,

        11    12CR1704.  The parties appear as before, and the defendant

        12    appears with his counsel.  The jury is in place.  We took one

        13    more recess so that we could get the jury instructions

        14    finalized, and we have done that, and we're now ready for jury

        15    instructions and closing arguments.

        16        I'm going to read these instructions to you on the

        17    record.  You will have a copy when you go back to deliberate.

        18    Don't worry about that, but I do need to read them into the

        19    record to you.

        20        Jury Instruction No. 1:  It is my duty to instruct you in

        21    the law that applies to this case, and it is your duty to

        22    consider and follow all of the instructions.  Your must decide

        23    the case by applying these instructions to the facts as you

        24    find them.

        25        Jury Instruction No. 2:  In your fact finding you should

1    consider and weigh everything admitted into evidence.  This
2    includes testimony of witnesses, admissions or stipulations
3    of the parties and any admitted exhibits.  You must disregard
4    any testimony or exhibit which I did not admit into evidence.
5        Jury Instruction No. 3:  At times during the trial, I
6    have ruled upon the admissibility of evidence.  You must not
7    concern yourself with the reasons for these rulings.  I have
8    not meant to indicate any opinion as to what your verdict
9    should be by any ruling that I have made or anything that I
10   have said or done.
11       Jury Instruction No. 4:  Statements, arguments and
12   remarks of counsel are intended to help you in understanding
13   the evidence and in applying the law, but they are not
14   evidence.  If any statements are made that are not supported
15   by evidence, they should be disregarded.
16       Jury Instruction No. 5:  You were presented with audio
17   recordings of conversations between various witnesses in this
18   case, including the defendant.  The voices on the recordings
19   and what those voices say are the evidence in this case.  A
20   transcript was presented along with audio recordings.  The
21   transcript has been prepared to aid you in understanding what
22   was said on the recordings.  However, the transcript is not
23   evidence.  It is for you to decide what was said or not said
24   on the recordings.  If you find the transcript is inaccurate,
25   you should disregard the transcript.

Instruction No. 6:  Your only concern in this case is determining if the defendant is guilty or not guilty. The disposition of the case thereafter is a matter for determination by the Court.

Jury Instruction No. 7:  It is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use common knowledge and experience in regard to the matter about which a witness has testified.

Jury Instruction No. 8:  A defendant in a criminal trial has a constitutional right not to be compelled to testify. You must not draw any inference of guilt from the fact that the defendant did not testify, and you must not consider this fact in arriving at your verdict.

Jury Instruction No. 9:  The defendant is charged with solicitation to commit murder in the first degree, a felony. The defendant pleads not guilty.

To establish this charge, each of the following claims must be proved:

1.  The defendant intentionally encouraged or requested Lonnie Stites to commit murder in the first degree, a felony.

2.  This act occurred on or between the 1st day of May, 2012, and the 22nd day of May, 2012, in Johnson County, Kansas.

The definition of murder in the first degree, the felony charged to be the subject of the solicitation is as follows:

1    1.  The defendant intentionally killed Annie Johnson.

2    2.  The killing was done with premeditation.

3    3.  This act occurred on or between the 1st day of May,

4  2012, and the 22nd day of May, 2012, in Johnson County,

5  Kansas.

6    Jury Instruction No. 10, Count 2:  The defendant is

7  charged with solicitation to commit murder in the first

8  degree, a felony.  The defendant pleads not guilty.

9    To establish this charge, each of the following claims

10 must be proved:

11   1.    The defendant intentionally encouraged or

12 requested Ronald Nodwell to commit murder in the first degree,

13 a felony.

14   2.    This act occurred on or between the 10th day of

15 April, 2012, and the 22nd day of May, 2012, in Johnson County,

16 Kansas.

17   The definition of murder in the first degree, the felony

18 charged to be the subject of the solicitation is as follows:

19   1.    The defendant intentionally killed Annie Johnson.

20   2.    The killing was done with premeditation.

21   3.    This act occurred on or between the 10th day of

22 April, 2012, and the 22nd day of May, 2012, in Johnson County,

23 Kansas.

24   Jury Instruction No. 11 is Count 3:  The defendant is

25 charged with solicitation to commit murder in the first

degree, a felony.  The defendant pleads not guilty.

To establish this charge, each of the following claims must be proved:

1.    The defendant intentionally encouraged or requested Richard Porterfield to commit murder in the first degree, a felony.

2.    This act occurred on or between the 1st day of March, 2013, and the 31st day of March, 2013, in Johnson County, Kansas.

The definition or murder in the first degree, the felony charged to be the subject of the solicitation is as follows:

1.    The defendant intentionally killed Annie Johnson.

2.    The killing was done with premeditation.

3.    The act occurred on or between the 1st day of March, 2013, and the 31st day of March, 2013, in Johnson County, Kansas.

Jury Instruction No. 12:  Premeditation means to have thought the matter over beforehand; in other words, to have formed the design or intent to kill before the act.  Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life.

Jury Instruction No. 13:  The State must prove that the defendant committed the crime of solicitation to commit murder in the first degree intentionally.

A defendant acts intentionally when it is the defendant's desire or conscious objective to cause the result complained about by the State.

Jury Instruction No. 14:  The State has the burden to prove the defendant is guilty.  The defendant is not required to prove he is not guilty.  You must presume that he is not guilty unless you are convinced from the evidence that he is guilty.

The test you must use in determining whether the defendant is guilty or not guilty is this:  If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty.  If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find the defendant guilty.

Jury Instruction No. 15:  Each crime charged against the defendant is a separate and distinct offense.  You must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge.  The defendant may be convicted or acquitted on any or all of the offenses charged.  Your finding as to each crime charged must be stated in a verdict form signed by the presiding juror.

Jury Instruction No. 16:  It is a defense to a charge of criminal solicitation that the defendant, after soliciting another person to commit a felony, persuaded that person not

1   to do so or otherwise prevented the commission of the felony,

2   under circumstances demonstrating a complete and voluntary

3   abandonment of the defendant's criminal plan.

4      Jury Instruction No. 17:  The defendant raises

5   abandonment as a defense.  Evidence in support of this defense

6   should be considered by you in determining whether the State

7   has met its burden of proving that the defendant is guilty.

8   The State's burden of proof does not shift to the defendant.

9      Jury Instruction No. 18:  If you find that the defendant

10  committed criminal acts in this state which were a substantial

11  and integral part of an overall continuing crime plan, and

12  which were clearly in partial execution of that plan, the

13  prosecution may be in this state or any other state in which

14  such acts occur.

15     Jury Instruction No. 19:  Once you retire to the jury

16  room, you will be provided with these instructions.  All

17  future communications to the Court should be in writing and

18  delivered to the bailiff to be taken up in the courtroom and

19  recorded by the court reporter.  You will find a call buzzer

20  located by the door in the jury room should you need the

21  bailiff for any reason.

22     Jury Instruction No. 20:  When you retire to the jury

23  room, you will first select one of your members as presiding

24  juror.  The person selected will preside over your

25  deliberations, will speak for the jury in court and will sign

1    the verdict upon which you all agree.

2          Your verdict must be founded entirely upon the evidence

3    admitted and the law as given in these instructions.

4          Your agreement upon a verdict must be unanimous.  Signed

5    here in court, Brenda M. Cameron, District Court Judge.

6          The last forms, the last pages are the verdict forms.

7          We are now ready for closing arguments, and the State

8    will go first.

9                    MR. HENDERSON:  Murder for hire.  Yesterday

10   afternoon in his opening statement, Mr. Hurst told you that

11   that's what this case would be about.  This case would be a

12   case of murder for hire.  And that is precisely what the

13   evidence over the course of the last day and a half have shown

14   you this case as being.

15         The defendant, Rheuben Johnson attempted to hire three

16   men, Mr. Nodwell, Sergeant Stites and Mr. Porterfield to kill

17   his ex-wife, Annie Johnson.  He did so because he was

18   agitated, frustrated about his custody situation and not

19   having the access to his son that he would like to have.

20   That's why we're here, that's why this is a case about murder

21   for hire, and that's why you are going to find the defendant

22   guilty, because we have proven these offenses to you beyond a

23   reasonable doubt.  We have satisfied all of the elements that

24   are necessary to prove that this defendant is guilty of these

25   crimes that he tried to hire these men to kill his wife, and

1  you should convict him for it.

2      Now, before we go too much farther in talking about the

3  evidence, I want to talk about some of the instructions that

4  the Judge just read to you.

5      The first one, or actually there are three instructions

6  that I want to talk about, Instructions 9 through 11.

7      In jury selection we talked a little about grape jelly

8  sandwiches and the elements that are required to convict a

9  person of a crime.

10      Well, the crime for criminal solicitation has two

11  elements, and they are on the screen in front of you.

12      First, that the defendant intentionally encouraged or

13  requested, and there's one for each person, Mr. Nodwell,

14  Sergeant Stites and Mr. Porterfield to kill his ex-wife Annie

15  Johnson.

16      And the second element is that this happened on the dates

17  listed in the counts and instructions in Johnson County,

18  Kansas.  It's pretty simple, pretty straightforward.

19      But let's take a look at it.  What does it say?  It says

20  encouraged or requested.  There's no requirement there that I

21  prove that money necessarily changed hands.  There's no

22  requirement that the person he was soliciting actually agreed

23  to commit the homicide.  I have to prove to you that this man

24  encouraged or requested those three individuals to kill his

25  ex-wife, and we've done that.  There's plenty of

1    encouragement.  There's lots of requests.

2        No, I'm sure the defense will point out that we don't

3    have him on tape saying:  I want you to kill my wife.

4        We have Mr. Nodwell saying "He told me to shoot her in

5    the head."  We have Sergeant Stites testifying they are

6    talking about a hauling off a clean-up problem.  He was

7    presented with a picture of Annie, you have Richard

8    Porterfield as well as.  Those elements have been satisfied.

9        Now, there's another instruction I want to talk about,

10   number 16.  It's what we call the withdrawal or abandonment

11   defense.

12       Now, what it says is that it is a defense to a charge of

13   criminal solicitation that the defendant, after soliciting,

14   persuaded that person not to commit the crime or otherwise

15   prevented the commission of the felony under circumstances

16   demonstrating a complete and voluntary abandonment.

17       Now, how does this come into play?  You will be told that

18   the defendant's statement during his second phone call that we

19   played for you where he said "I need to think things over" is

20   somehow an abandonment of the crime.  But that's not what

21   happened.  He didn't say, "Don't do it."  It's not a complete

22   and voluntary abandonment, and that's what's required to get

23   this defense.  You have to have a complete and voluntary

24   abandonment.

25       He said "I want to think about it."  Not, I don't want

this done.  Not, I don't want this to happen, but "I want to
think about it a little bit."  That's not a complete and
voluntary abandonment.  And in any event, this defense had
nothing to do with Mr. Nodwell and Mr. Porterfield.

He did nothing to persuade Mr. Nodwell not to commit this
crime.  He did nothing to persuade Mr. Porterfield not to
commit this crime, and the Instruction says persuaded that
person.

At best, maybe this applies to Sergeant Stites, but not
really.  He said he wanted to think about it.  No complete
voluntary abandonment.

Let's talk about Mr. Nodwell while we're discussing some
of the witnesses.  What about Mr. Nodwell?

Well, he was introduced to the defendant in the middle of
April 2010 right around the time that the custody situation
went back to supervised visits at the Layne Project.  Remember
that very important piece of Dawn Wake's testimony.

He meets him at Goodcents, talks to him a little bit
about construction, and then they start talking about the
defendant's wife being the root of all of his problems, and he
asks Mr. Nodwell to make Annie Johnson disappear.

He takes him for a ride in his car.  He shows him places.
He shows him where Annie lives, the kind of car she drives,
where she gets her coffee in the morning on the way to work,
talks to him about his child custody issues and where they do

1    exchanges of little Rheuben, of Rheuben the IV.

2         He then goes to the Olathe Police Department on April the

3    18th and tells law enforcement what happened.  And by the way,

4    these things all check out.  The defendant shows Nodwell where

5    Annie lives.  She actually lives there.  He shows him where

6    she goes to get her coffee.  That's where she actually gets

7    her coffee.  He tells her (sic) about the child custody

8    situation and he gets it right.

9         Why does Mr. Nodwell know all of these details?  Why does

10   he need to know all the correct and verifiable details about

11   Annie Johnson if all he needs to do is construction work or

12   beekeeping or whatever it is the defendant thinks or claims he

13   was hiring Mr. Nodwell to do?  Why does he have this accurate

14   information about Ms. Johnson's life?

15        So he goes to the Olathe Police Department.  He is

16   interviewed by Detective Campbell, calls the defendant, leaves

17   a message.  What are Mr. Nodwell's motivations?  What is he

18   getting out of all this?  What does he have to gain?  The

19   answer is, not a lot.

20        You heard his testimony.  He's not getting a single

21   benefit from the State.  He's getting no deal.  We didn't so

22   much as fix a parking ticket for him.  He's getting nothing

23   except the heartburn from coming to court and being asked

24   questions by a couple of lawyers.  That's all he's getting out

25   of this.  Why would he make all of this up?  He's got no beef

against the defendant.  He doesn't know him from Adam.  He
doesn't know Annie either.  Why would he come up with this
story and include in that story verifiable information about
Annie's life?  What's his motivation for doing that?  What
does he have to gain?

Let's talk about Richard Porterfield.  Now, to be frank,
he's got a lot to gain for his testimony.  He's getting a
deal.  We're not hiding from that.  He got a great deal,
although he wants a better one, apparently.  But ask yourself,
can we verify some of the things that Mr. Porterfield said?
The answer is that we can.  The answer is that we can.

We know that he knows that Annie is a nurse, and she
actually is.  He knows the defendant's sister is a lawyer, and
the amount of money that the defendant offers him 10,000 is
the same amount he offered to Sergeant Stites. So some of the
Porterfield information is verifiable, and that you should
focus on when judging his credibility.

Now, what about Nodwell and Porterfield?  They have
criminal records.  We have been up front about that.  We're
not running from it.  But here's the thing, if you wanted to
hire someone to commit a murder, if you wanted to hire someone
to kill your spouse, who are you going to turn to?  Are you
going to ask a friend?  Are you going to ask a neighbor?  Are
you going to ask your minister?  You're going to turn to
someone like these two guys.

If you have got access to someone like that, and you
really want someone killed, aren't those two guys exactly the
sort of person that you talk to?  Who else would you turn to?
You want someone with a record, don't you?  You want someone
willing to commit a crime because you're asking that person to
commit a murder.  That's precisely whom you would go to.
Their criminal records lend credence to the story, not the
other way around.
          Let's talk about the defendant's motive.  Why is he
having Annie Johnson killed?  Well, the reason is pretty
simple:  There's a messy custody battle.  That much is clear
between him and his ex-wife where she has primary custody and
he has either supervised or unsupervised visits, depending on
when we're talking.  Those supervised visits were moved back
to the Layne Project in the middle of April 2012 right around
the time he first meets Mr. Nodwell.  Not a coincidence.
          We know from Dawn Wake that the defendant was agitated,
upset, hopeless.  He felt that there was no end to the
situation and thought the whole thing was unjust, and we know
he was making poor progress.  That's his motive.  His ex-wife
is the root of all of his problems.
          Contrary to what you've been told, his custody case from
the person who knows it best, the family therapist overseeing
it, was not going particularly well for him.  That's why he
did what he did.

1    Let's talk a little bit about when the defendant meets
2 with Dawn Wake from 1:30 to 3 o'clock on May 22nd, the day of
3 the final meeting.  The first hour is a family therapy
4 session, and then there's a half hour one-on-one between the
5 two of them, and Ms. Wake shares her concerns that things
6 aren't going very well.  An hour later at four o'clock, the
7 defendant is on the phone with Sergeant Stites asking to move
8 the location of their meeting to the Missouri side.  Why is he
9 doing that?
10                    THE COURT:  Five minutes.
11                    MR. HENDERSON:  What could possibly
12 motivate him to do that?
13    Now, Kathy Klostermann, what does she tell you that
14 actually helps the State's case?
15    Well, we know that it's unusual for the defendant to
16 leave large amounts of money like $7,000 n the truck that he
17 drives for people to pick up.  That is unusual, but that's
18 precisely what he told Sergeant Stites that he would do.
19    We also know from Ms. Klostermann that the defendant has
20 no reason to suspect through his businesses that his phone
21 calls might be recorded, but he clearly expresses that concern
22 on the tapes that you got to listen to.
23    We know that the photos of the van and junk, Defendant's
24 Exhibits E through GG or whatever, they are not hard to get a
25 hold of.  No reason to be overly concerned about that.  Why

didn't he just give them to Stites?

     And it would be helpful to know the address.  It would be helpful to know where those vans in the photographs are, and specifically what needs to be hauled away.

     Now, Sergeant Stites, what do we know about him?  He met with the defendant at the Waterworks Park on May 21st.  He talked about hauling away some vans.  He talked getting $10,000 in cash, photos of the problems and maps of this location.  That's what Stites asked for.

     We've got phone calls on May 22nd the next day.  During those phone calls the defendant needed an excuse to provide photographs of Annie.  Because up to this point he talked about hauling away vans.  So he comes up with this idea about doing some detective work, investigative work.  And he's worried about being recorded.  He says that on one of the calls.  And then we've got the meeting at Wal-Mart when the defendant showed up with a picture of Annie with a map and $3,000 in cash.

     Is Stites really supposed to just haul away some vans?  Is he really supposed to?  He doesn't have photos of the vans.  He doesn't know where they are, and he's getting ten grand to haul away some vans in a week's work?  That's a pretty good week, folks.  How many of you would sign up for that?  Haul away some vans for ten grand?  That's pretty good work.

     What about detective work?  The defendant never gives

Annie's last name.  He never gives him any information about
Annie's friends or relatives.  Now, how is Stites supposed to
get any of his work done?  How is he supposed to be a
detective?  How is he supposed to haul away junk?  He has the
information he needs to kill Annie Johnson.  He's got a
picture, he's got a map, he's got money.  He doesn't have what
he needs to do anything else.  That's how you know what the
defendant was really asking him to do.  He gave him the tools
to do one job, and one job only, and that job is murder for
hire.

                    THE COURT:  Mr. Toth?

                    MR. TOTH:  Under the law, you cannot
convict a criminal defendant, you cannot convict Rheuben
Johnson under the law if you have a hunch that he did
something criminal.  You can't convict him if you strongly
suspect that he did something criminal.  You can't convict him
if you think it's reasonable to believe that he did something
criminal.

     Folks, you have to know unequivocally in your heart and
in your head, you have to know beyond any reasonable doubt
that Rheuben Johnson was hiring these people to kill his wife.
Not that he thinks that it makes sense or that you have a
hunch that that's the way, but you got to know to the
exclusion of any other possibility.  The exclusion of any
other possibility.  And you can't base your decision because

you think the fact that Rheuben Johnson is charged in three
counts with soliciting somebody to murder his ex-wife.
You don't base your verdicts on fear.  You don't base your
verdicts on:  Well, my gosh, what if he did do it, even though
I don't think that the State has proven all the elements.
Don't do that.  The law doesn't allow you to do that.  The law
says you have to be convinced beyond a reasonable doubt, and I
sincerely appreciate Sergeant Lonnie Stites' honesty when I
asked him, "Why didn't you just ask Rheuben if he wanted you
to kill Annie?"  And he said, "Well, I wanted him to make his
intentions clear.  I wanted to give him the benefit of the
doubt."

        Ladies and gentlemen, as jurors your sworn duty is to
give the benefit of the doubt to the defendant.  It's what the
law says.  If Sergeant Stites wasn't completely sold on the
idea that that's what Rheuben Johnson wanted, then how can
you?  There's so many unknowns in this case.  And what it
really has to come down to is that you have to believe to the
extent of any other possibility that something else wasn't
going on.  And I would suggest to you the evidence is totally
lacking and it is a stretch.  Of course we'll talk about some
of the individual witnesses in this case, and I suppose the
logical place to start would be with Ronald Nodwell.  And you
know, Mr. Henderson has indicated what is he getting out of it
and why did he do this?  Those are all questions you don't

have to answer to find that his testimony has little or no
credibility.  You don't have to figure that out.  Just look at
the root of what he says.  What makes logical sense to you.
Here's what we do know:

     We know that he met with Rheuben Johnson on April 15th of
2012.  We know that under cross-examination he told me that he
really didn't take Rheuben Johnson too seriously.  He said he
thought:  What is this, a joke or whatever?  He said that he
had to make assumptions to believe that Rheuben Johnson
actually wanted him to kill his wife.  I mean he is trying to
put some pieces to a puzzle, and maybe he didn't have all the
pieces.  What we do know was that Mr. Johnson said that he
admitted that he has an ex-wife, and she can be a problem.
Okay.  And that his life would be better if the problem would
disappear.

     Now, for you to convict Rheuben Johnson of hiring
somebody to kill his wife, you have to believe that the
statement "I wish my problem disappears" means I wish you will
kill my wife.  It doesn't mean that, you know, when we talk
about the problem disappearing that she moved away.  It
doesn't mean that, you know, she relinquishes her parental
rights to Rheuben and he gets full custody.  It doesn't have
to mean that he means to kill her.

     We all know that they were going through a divorce.  Not
all divorces are, you know, happy and friendly and things like

that.  It doesn't sound to me, and I would ask that you would find this, like this divorce was anything super extraordinary. People have disputes, people have disputes about their kids. That is the way that the world works when it comes to those types of things.

If he would have -- Mr. Johnson would have told Ron Nodwell:  I want you to kill my wife, don't you think when Mr. Nodwell went into the Olathe Police Department 33 days later, that they would have gone out and arrested him?  Of course they would have.  Of course they would.  But the reason that they didn't was because he never said the words, and everything is subject to interpretation.

What we do know about Mr. Nodwell is that he's very inconsistent.  He's all over the board.  He tells you yesterday that at Mr. Goodcents my client told him there are three ways that you can kill Annie.  She could overdose on some pills, I guess with the inference being that somehow Mr. Nodwell could force-feed pills down her and she could die, you could do a drive-by shooting at her apartment, or you could burn her apartment down.

Well, what did he tell Detective Campbell 33 days after the fact, which is much more recent in time than July 29th of 2013.  He said, "What he told me was that maybe she could OD on some pills."  He never told him anything about burning down her apartment or shooting at her or anything like that.  And

you know what else he didn't say?  When asked by Detective Campbell, Detective Campbell says "Did you guys discuss the price?"  What Nodwell says is that "No, we really didn't.  There really wasn't any price that was discussed."  But yesterday on the witness stand he wants to tell you that Mr. Johnson said, "It's going to cost him 20 grand to do it."

Now, if that's what actually was said, why wouldn't he tell that to Detective Campbell?  He is not a believable witness, and, therefore, that raises reasonable doubt regardless of his motives.

So Mr. Nodwell goes to the police, he decides that, you know, they took him up with Detective Stites, and we know this.  Detective Stites and Ron Nodwell have very little contact with each other, very little.  And when Detective Stites is introduced to Rheuben Johnson at Waterworks Park on May 22nd, Mr. Johnson says to him, "I assume Ron told you what I need done."  And there's really no indication in that transcript that Stites says anything that would contradict that.  Okay.

So he's under the assumption, Mr. Johnson, that Nodwell knows or that Stites has been told by Nodwell that he needs his project done and he needs this stuff all done.

At one point during the Waterworks conversation, when Detective Stites is doing everything he can, everything he can to try to get Mr. Johnson to admit or to tell him that he

wants Annie Johnson killed, Detective Stites says to him, "So you want the problem terminated?"  And what does Mr. Johnson say?  He says "That's not why we're here chatting today.  I just want the junk hauled off."

Now, the spoken words are the truth.  And because Mr. Johnson never has told anybody that he wanted anybody to kill his wife, that creates reasonable doubt.

So what does he want?  Does he want the trash hauled off?  Well, there certainly is evidence to suggest that.  We showed you the trash.  It's there.  He's got junk and vans.  The State never went out and showed you this property.  Is it private detective work?

Well, we know that's been done in the past.  In 2010 Rheuben Johnson hired Orion Investigations to investigate into Annie Johnson because he was concerned about the lifestyle choices that she was making and whether or not it affected her ability to parent little Rheuben.

He paid $3,000, just like he paid Detective Stites, and the work was not accomplished to his satisfaction.  So it's been done before.  It's not unheard of.

Well, he tells his girlfriend in May 2012, "I want to hire a private investigator to follow Annie."  Is it related to the fact that there will be some changes in the visitation schedule?  Probably.  I don't know.  Who knows?  There's been no evidence to suggest one way or the other, but the reality

1   is that there was some investigating that he wanted done, and
2   we've been able to prove that to you.
3        So on May 21st they meet at Waterworks Park.  There's a
4   vague conversation about hauling off some vans and trash and
5   things of that sort.  The very next day in the first phone
6   call, they discuss whether or not they are going to meet at
7   Waterworks Park.  Again, a pretty vague conversation.
8        Then we have this second phone call where Detective
9   Stites calls Rheuben because he was expecting him to be at
10  Waterworks Park and Rheuben says "I'm not going to meet you at
11  Waterworks Park.  I'm over at Lee's Summit.  I'm over in the
12  State of Missouri."  And Detective Stites basically doesn't
13  know what to do at that point.  So the phone call ends, and
14  then later, as we now know, Detective Stites then again calls
15  Rheuben Johnson.  He initiated the phone call, and it's very
16  clear when you look at this transcript and look at this
17  conversation that as Detective Stites is trying to bait,
18  convince, encourage, procure, help Mr. Johnson into setting up
19  this transaction, that Mr. Johnson is hedging.
20       Regardless of what you think, this whole business
21  transaction is about whether it's about private detective
22  work, whether it's about hauling off stuff, whether it's about
23  murder for hire, Mr. Johnson clearly indicates that he didn't
24  want to go through with anything.
25       So he says after Stites says "I don't want to go to

Missouri," he says, "Well, if anything is going to take place, it's going to have to take place in Missouri." Stites says "No," and so Mr. Johnson says, "I'm probably going to have to go back to thinking about this whole thing." And Stites says, "Hey, I'm leaving town."

Now, what is the inference there? If Stites says "I'm leaving town" after he says, "I'm going to have to go back and be thinking about it," and Mr. Johnson says "Maybe I'll call you next week," and this thing is over, and Detective Stites is the one that hangs the phone call up. And if you don't believe that this thing wasn't over, ask yourself: Who makes the next phone call? It's not Rheuben Johnson. It's Lonnie Stites. Lonnie Stites knows Rheuben Johnson is in the State of Missouri. He calls him back and says, "Hey, I'll go ahead and meet you over there." He reinitiates the whole thing.

Ladies and gentlemen, that thing was over with. Whatever you think that it was, and we are certainly not conceding that it was murder for hire, because the evidence simply is too abundant that it was something else. And the reason that that's important is because of the defense of abandonment.

And remember, I told you yesterday in opening statement, I said "This isn't going to mean much to you now, but you're going to hear something before a phone call that is going to mean something to you later on in this case."

This is the time where it means something. Because it is

a defense to any solicitation if you abandon the solicitation. You abandon the purpose of the solicitation. And very clearly here Rheuben Johnson didn't call back. It was Detective Stites. There was abandonment, and that Instruction 17 says:

The defense raises abandonment as a defense. Evidence in support of this defense should be considered by you in determining whether the State has the burden to prove the defendant is guilty. The State's burden does not shift to the defendant.

What that means is that he doesn't have to prove that he abandoned this. It means the State has to prove that he didn't, and they can't because the phone calls speak for themselves.

Now, this causes a problem for the State on two levels.

Number one, I would suggest to you this: Anything that takes place with Detective Stites is kind of a continuation of what was started by Mr. Nodwell. And if you believe that this is a murder for hire, it ends at that point.

Now, what takes place after that we know is that there's some money that exchanges hands over on State Line. Okay. If you want to argue that that's a completion of a murder for hire, I respectfully disagree with you.

But remember this, the elements instruction of solicitation with respect to both Mr. Nodwell and Mr. Stites say that the defendant intentionally encouraged or requested

1    Lonnie Stites or Ron Nodwell to commit murder in the first

2    degree, and this act occurred between May 1st, 2012, and May

3    22nd, 2012 in Johnson County, Kansas.

4         This all took place in the State of Missouri.  If you

5    believe this is murder for hire, this man should be sitting in

6    the courthouse 20 miles away in downtown Kansas City because

7    he didn't do anything in the State of Kansas.  If you believe

8    the State's theory, and, again, we will never concede that

9    because we don't believe that the evidence shows that.

10   Please look at the instructions.

11        So then, we have this thing going on at State Line.  And

12   before this exchange takes place, Mr. Johnson says "You know

13   what, things are going really well as far as what's going on

14   with my wife and the child support."  And you know what,

15   ladies and gentlemen, it's true, and we demonstrated that.  We

16   have absolutely demonstrated that.

17        Look at Defendant's Exhibit 1 and Defendant's Exhibit 2.

18   The testimony that you heard, sure, there are bumps in the

19   road here, but reality is he's started to get to see his son

20   before more than he ever had.  Just a week before this, he was

21   granted broader visitation rights.

22        Now to suggest that just because his therapist says:

23   "Well, he became agitated over the delay in getting all this

24   stuff done" means that he is angered to the point where he

25   wants to kill his ex-wife, I would respectfully suggest is

1   ludicrous.

2       He can be agitated over what's going on in court without

3   being angered to the point where he is going to kill his wife.

4   Did he ever demonstrate anything about being so angry that he

5   wanted to kill her?  Did he ever tell anybody?  No.

6       Dawn Wake has seen people that are angry.  Would she

7   characterize Rheuben that way?  No.  He is agitated, which

8   means he is a little more than annoyed, and that's what

9   happens sometimes, folks.  So the evidence is there to show

10  that the State lacks the demonstration of motive why he would

11  want to do this.

12      So then we've asked further, and then we got to deal with

13  Richard Porterfield.  And I say, "We've got to deal with

14  Richard Porterfield" because as a defense in this case I've

15  got a witness coming on and saying, "He told me he wanted me

16  to kill his wife."  Well, you've got to look why would he be

17  saying that?

18      Make no mistake, Rheuben Johnson was not liked as an

19  inmate in jail.  Whether he's in Olathe or whether he's

20  Gardner, he's not liked.  He's made fun of.  Mr. Porterfield

21  called him himself, quote, a dumb ass.  He's known to snitch

22  people off to get people in trouble.  He is not a well-liked

23  person, which means he is an easy target.

24      When Porterfield comes forward without any detail other

25  than to say, "you know, he wants me to kill his wife and she's

a nurse."  Well, how secretive information is that?  He says
to Detective Campbell when asked, "why are you doing this,
Man?  Why are you coming forward?"

Now, he tells you on the witness stand, "Oh, I'm just so
worried about the boy," and "It's just a wrong thing to do."
When, in fact, he tells him quote:  "Fuck it, I want to try to
help myself."  End quote.  And help himself he did.

He got a tremendous deal from the State of Kansas.  His
testimony would certainly have been more credible if they
would have waited until next week to assess whether or not he
testified truthfully and fairly.

But what they did was, they gave him his deal before
testimony.  And when that happens, there's no way to ensure
validity or accuracy.  So he comes in here, and he knows he's
got to say certain things to get his deal, and the deal is
already in place.  And his deal is:  I can scoot on 10 years
of prison and go out to this rehab facility that I probably
would really like to go to because there are no security
guards, there are no other inmates to worry about, there's no
restrictions on my liberty like I find -- if I do 10 years in
prison.  That's a no-brainer, folks, for a guy like him who is
a lifelong criminal.  It is a no-brainer to cut a deal like
that.

So how truthful is the information he's given to you?
How do you know?  That's a problem.  That's a problem.  Now,

do you know there's certainly not enough to know beyond a
reasonable doubt?  He is not believable.

There is an instruction that was given to you about acts
committed in two states that says:  If you find the defendant
committed criminal acts in this state, which is the State of
Kansas, which were a substantial and integral part of an
overall continuing plan which were clearly in partial
execution of that plan, the prosecution may be in this state.

Please remember this, the only thing that took place
after Lonnie Stites hung up on Mr. Johnson ending whatever
transaction it is they were going to do on May 22nd is that
Mr. Stites called Rheuben Johnson who we all know is in the
State of Missouri.  He at one point was in Lee's Summit, went
over and eventually ended up at the Wal-Mart over on the
Missouri side.

Mr. Johnson didn't do any acts in the State of Kansas
which were clearly in partial execution of any sort of plan
after that.  It didn't happen.

Now, you know, it's not very often that something like
this happens.  And we as lawyers argue things like, you know,
I guess you might say it's a legal technicality or whatever.
But the reality is, it's what the law says.

                    THE COURT:  Ten minutes.

                    MR. TOTH:  Thank you, Your Honor.

If the law says that he can abandon the solicitation, if

you believe that that's what he was doing, and they can't
prove that he didn't, then you have proof beyond a reasonable
doubt that he should be not guilty.

If the law says that if he committed some sort of
transaction in the State of Missouri, and, therefore, the
State of Kansas doesn't have jurisdiction to prosecute him,
this becomes a Missouri problem and not a Kansas problem, and
you as jurors have to uphold that law.

Remember, folks, and I'm not going to get a chance to get
up here again.  You know, I don't have much more to say, but
just remember this:  You have to give him the benefit of the
doubt.  You have been sworn to uphold that duty.  And if you
give him the benefit of the doubt because of all of these
problems, inherent problems in the State's case, I'm confident
that you're going to find him not guilty of these charges.

Thank you.

MR. HENDERSON:  Let's talk about that first
meeting at the Waterworks Park, what happens?  Stites meets
with Johnson.  He asks -- "We don't have to leave it up to
what Mr. Nodwell filled you in on."  He asks point blank to
the defendant:  "What are you wanting done and how much?  What
are you wanting done and how much?"  Okay.  That's what he
says.

(Whereupon, the audio recording was
played.)

```
 1                    MR. HENDERSON:  That's what the defendant
 2    says when asked "What are you wanting done?"  We can call it a
 3    bunch of different projects.  We can call it a bunch of
 4    different projects.  Why do you need to call it anything?  Why
 5    can't you just answer the man's question and say, "Hey, I've
 6    got these vans that need to be hauled off here."  Why do you
 7    have to call it something?  Why do you have to call it
 8    something other than what it is if it's not murder for hire?
 9    What else did he say?
10                    (Whereupon, the audio recording was
11    played.)
12                    MR. HENDERSON:  Why can't the defendant
13    talk about what he wants done?  Why can't he talk about it?
14    Why can't he just come out and say "I've got vans?"  Why does
15    he have to mess around with it?  What's scary about hauling
16    off some old vans?  Why would that be scary to talk about?
17    Why all the secrecy?  Why the cloak and dagger?  Why all the
18    secrecy if all we're really talking about is hauling off some
19    old vans?
20         The answer is, that's not what the defendant was talking
21    about.  What he's talking about is his ex-wife.  He's not
22    talking about vans.  He's not really talking about hauling off
23    some old vans.  He's talking about having Annie Johnson
24    killed.  That's what he's talking about, and that's why you're
25    going to convict him.  What else does the defendant say?
```

He talks about identity a little bit.  He makes it real clear he doesn't want to know who Sergeant Stites is.  He makes it real clear that he doesn't know Stites and Stites doesn't know him, and he likes it that way.  Why?  Why did the defendant say that at the Waterworks Park?

THE COURT:  (Whereupon, the audio recording was played.)

MR. HENDERSON:  Why?  Why is that a good way to have it?  Why does he prefer to keep it that way?  Why does he prefer to have it where you don't know each other's identity?  Why is it a bad idea to know the identity of the person who is hauling away some vans?  What's troubling about that?  Now, it would be a bad idea to know the identity of a person you are hiring to do a murder for hire, that's a bad idea.  But a guy hauling off some vans, there's no trouble there.

And the defendant says that this whole thing is kind of risky.  He acknowledges risks here.  What does he say about that?

(Whereupon, the audio recording was played.)

MR. HENDERSON:  Why would Stites be taking a risk by hauling off some vans?  What's risky about that?  Listen to what the defendant said one more time.  Listen not so much to the words he is saying, but the tone of his voice,

1   how he's saying it.  Listen to his inflection.

2                         (Whereupon, the audio recording was

3   played.)

4                         MR. HENDERSON:  Is that the voice of a man

5   who is really asking Sergeant Stites if he's hauled vans

6   before?  Why the pregnant pauses?  Why does he have to think

7   about it?  There's some emotion in his voice.  He's not asking

8   Stites that.  He's really asking:  Have you ever killed anyone

9   before?  Are you prepared to do so again?  That's what he's

10  really asking.  Listen to his voice.

11      Now, they discuss terms, the defendant and Sergeant

12  Stites.  Stites says, "I need a photo to clean up the problem.

13  I need a map of the problem's location, and I need $10,000 in

14  cash with $3,000 up front.  Let's listen to that part of the

15  conversation.

16                        (Whereupon, the audio recording was

17  played.)

18                        MR. HENDERSON:  Stites wants photos of your

19  problem.  He wants photos of your problem.  It's the defendant

20  who mentions Annie.  Stites didn't mention Annie.  It's the

21  defendant who talks about giving you family photos, photos of

22  her.  Stites is talking about a van.  It's the defendant who

23  shifts the conversation around and starts talking about a

24  person.  Stites is just talking about vans in the clip you

25  just heard.

Now, what else does the defendant say about photographs?

                        (Whereupon, the audio recording was played.)

                        MR. HENDERSON:  Why is something going to happen to Annie?  He was talking about vans here, folks.  He was talking about hauling off junk.  She didn't live with him anywhere.  They had been separated for years.  Why would something happen to Annie Johnson if Stites is going to go to the defendant's property in Gardner, which he doesn't know where it is, and pick up some van and haul it away?  Why would Annie Johnson get hurt in all that?  Because that's not what they are talking about, folks.  It's pretty obvious what they are.

        The location, as I said, Stites doesn't know where these vans are.  What are they talking about in term of location?  What does the defendant say?

                        (Whereupon, the audio recording was played.)

                        MR. HENDERSON:  Where can I find him?  Where can I find him at?  The defendant doesn't give his residential address.  He doesn't even say Gardner.  He says these vans that he's hauling away, where he will find them at is at The Layne Project in downtown Olathe where the child custody exchanges are done.

        Let's talk about the first phone call placed on May 22nd.

What do we learn from that?

Stites calls the defendant to arrange a final meeting at the Waterworks Park. The defendant however has a problem giving Stites this photograph of Annie and a map of where to find her. He knows that it doesn't make a whole lot of sense that they are only talking about vans, so what happens? What else did the defendant say about that?

(Whereupon, the audio recording was played.)

MR. HENDERSON: The defense introduced Defendant's 20-some exhibits of some photographs from the defendant's house with vans in them with nary a problem. What was the problem with the defendant giving those same pictures to Sergeant Stites on either May 21st or May 22nd. They came in to court here pretty easily. What was so hard about showing up with those pictures to Wal-Mart? Except what he needed to give Sergeant Stites was a picture of Annie because that's who was supposed to die.

Now, it does look bad. It looks bad to show up and hand over a picture of the ex-wife if we're only talking about hauling off vans. So what does the defendant do? He needs an excuse to do that, so he comes up with this idea of doing detective work. Something that was never mentioned the previous day at the Waterworks Park.

The second phone call, what do we learn from that? He

1    shows up at the meeting at the Waterworks Park.  The defendant

2    didn't show.  They re-rally at the office, and the defendant

3    wants to meet over on the Missouri side.

4                 (Whereupon, the audio tape was played.)

5                 MR. HENDERSON:  Right there.  Right there

6    you know why he's talking in code because he knows there is a

7    possibility, however remote, that someone is taping what he's

8    saying, and he's not going to be caught on tape saying the

9    word "kill."  That's why all the cloak and daggers.  It's in

10   the back of his mind there.  That why he's playing cute with

11   everything.  He admits it on the phone call because he knows

12   there's a chance he could be recorded, and he doesn't want to

13   be caught on tape.  Because if he's caught on tape saying

14   "kill," your job is real easy.  Although with what he did say,

15   your job is not that hard either.  It's all there.  Any

16   conversation anywhere that can be recorded, that's what the

17   defendant said.  That is what is going through his mind.

18                (Whereupon, the audio recording was

19   played.)

20                MR. HENDERSON:  He's got to justify it why

21   he's handing over a picture of Annie and the location at the

22   final meeting at Wal-Mart.  That's what is said there.

23                (Whereupon, the audio recording was

24   played.)

25                MR. HENDERSON:  "This is the vehicle you

```
 1   want to disappear?"  What is Sergeant Stites pointing at?
 2   This photograph of Annie Johnson.  "That's the vehicle you
 3   want to disappear right there?"  It all adds up to only one
 4   thing.  We're talking about real estate deals being wrecked,
 5   bystanders being hurt, phone numbers disappearing, phones
 6   disappearing, all of that only adds up to one thing.  If
 7   you're engaged in lawful behavior, you're not worried about
 8   any of that.  Why is the defendant being closely watched if
 9   we're talking about investigative work.  If you're doing
10   nothing wrong, you're not worried about any of that stuff.
11   And the defendant never even knew Lonnie Stites' name.  He
12   never asked.  He never told.  Why is that important?  Why am I
13   choosing to end my closing argument on that particular point?
14   Well, if you're going to have some vans hauled way, if you're
15   going to hire someone else to haul away your vans, you're
16   probably going to want to know his name.  If he does a good
17   job, you maybe will hire him again.  Maybe you will recommend
18   him to a friend.  If you're hiring someone to do private
19   investigative work, you probably want to know his name, you
20   probably want to keep his phone number.  Maybe you got
21   follow-up work to be done in the future.
22        But your hitman, you don't want to know his name.  You
23   don't want to know your hitman's name, and you'd like it a lot
24   better if he doesn't know yours either.  That's the only
25   reason, the only reason he didn't asks Stites' name because he
```

```
 1   didn't want to know.  If you don't want to know your hitman's
 2   name, folks, that's what he thought Stites was, a hitman.  It
 3   was a murder for hire.  Find him guilty.
 4                     THE COURT:  Ms. Nelson, will you raise your
 5   right hand.
 6                     (Whereupon, the Bailiff was sworn.)
 7                     THE COURT:  There are 13 of you.  As I
 8   said, we have to pick one of you out of the hat.  I'm going to
 9   have one of you come down and do that.  I picked a name one
10   time, and the person got mad at me.  So I'm going to pick one
11   of you to come down.  This is just random.  Sometimes people
12   are happy that their names are picked and sometimes people are
13   not.  Ms. Saladin, you are on the end, why don't up come down
14   and pick a name for me.
15                     (Whereupon, Ms. Saladin came to the bench
16   to pick a name.)
17                     THE COURT:  Ms. Walterscheid, you're going
18   to be our alternate in this case.  So you will need to stick
19   around.  Ms. Nelson will give you some instructions.  The jury
20   is now excused to go to the jury room to deliberate.  Please
21   stand for the jury.
22                     (Whereupon, the jury left the jury room to
23   deliberate at 2:46 p.m.)
24                     THE COURT:  We are on the record outside
25   the presence of the jury.  Everyone is here, including Mr.
```

1    Johnson with his counsel.

2        Mr. Toth, regarding the exhibits, does your client wish

3    to be present or wish to waive his presence if the jury wants

4    to look at any of the exhibits.  Have you discussed that?

5                    MR. TOTH:  We haven't discussed that.

6                    (Whereupon, Mr. Toth spoke with the

7    defendant.)

8                    MR. TOTH:  He'll waive his appearance.

9                    THE COURT:  Is that correct, Mr. Johnson?

10                   THE DEFENDANT:  Yes.

11                   THE COURT:  If the jury wishes to look at

12   the evidence, you could be part of that.  We could bring them

13   back in and listen here or they can look at them back there,

14   and you have a right to be there, and you wish to waive that

15   right and have the ability to look at that with the jury, have

16   the ability to look at them back in the jury room; is that

17   correct?

18                   THE DEFENDANT:  Correct.

19                   THE COURT:  Okay.  Thank you very much.

20   Counsel, stay close.

21                   MR. TOTH:  Can I give you, since I'm across

22   the street, can I give you my cell number?

23                   THE COURT:  Sure.

24                   MR. TOTH:  It takes less than a minute.

25                   THE COURT:  Counsel, you did a nice job.

1    Make sure we have all exhibits before Ms. O'Malley takes them

         2    back.  Everyone stay in contact.

         3                      (Whereupon, Court recessed at 3:35 p.m.,

         4    while the jury deliberated.)

         5                      THE COURT:  We are on record in the State

         6    of Kansas versus Rheuben Clifford Johnson, III, 12CR1074.  The

         7    jury has been deliberating.  Everyone is in place, including

         8    Mr. Johnson and his counsel.

         9        The jury has sent out a question, and the question reads

        10    for the record:  Transcript, copies of phone calls, photos and

        11    Wal-Mart photo/map.  Signed by the foreperson.  Is this Mr.

        12    Breckenridge?  I thought I could see a "D."  Have I read the

        13    questions correctly?

        14                      THE JURY FOREPERSON:  Yes.

        15                      THE COURT:  And I've talked to the lawyers,

        16    and we're going to send all the exhibits back for you.  The

        17    phone calls are on the disks that have been admitted, and,

        18    counsel, Mr. Henderson and Mr. Toth will bring the equipment

        19    back for you so that you can look at the transcripts there.

        20    There haven't been written transcripts, just what has been

        21    admitted into evidence.  And you can take that back into the

        22    jury room with you, but I need to put that on the record, and

        23    you can go back and look at everything.  Does that answer your

        24    question?

        25                      THE JURY FOREPERSON:  Yes.

```
 1                    THE COURT:  Very good.  Please stand for
 2    the jury.
 3                    (Whereupon, the jury went back in to
 4    deliberate at five o'clock.)
 5                    (Whereupon, the jury entered the courtroom
 6    at 5:05 p.m.)
 7                    THE COURT:  We are back on the record in
 8    State of Kansas versus Rheuben Clifford Johnson, III,
 9    12CR1074.  Parties appear as before, including Mr. Johnson.
10    The jury is in place.  They have been deliberating this
11    afternoon, and it is five o'clock, or a little after five.  We
12    are going to break for the evening and come back at nine.
13    It's been a long day, and we've worked hard, and the jury is
14    going to take a break for the evening, and I would like to
15    bring you back and call the case officially at nine o'clock,
16    and call the case and send you back.
17        Again, we'll have coffee and treats for you and we'll
18    call the case formally at nine o'clock.
19        I wish you all well.  Please remember the Court's
20    admonition and do not discuss the case.  Have a good evening.
21                    (Whereupon, the jury left the courtroom at
22    5:07 p.m.)
23                    THE COURT:  Is there anything we need to
24    put on the record before we break?
25                    MR. HENDERSON:  No.
```

1                    MR. TOTH:  No.

2                    THE COURT:  I will see you at nine.

3                    (Whereupon, court adjourned for the evening

4     at 5:07 p.m.)

5                    * * * * * * * * * * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    C E R T I F I C A T E

STATE OF KANSAS    )

JOHNSON COUNTY     )


          I, Gloria J. O'Malley, a certified
shorthand reporter, and the regularly appointed,
qualified, and Acting Official Reporter of Division
No. 13 of the Tenth Judicial District of the State of
Kansas, do hereby certify that as such Official
Reporter, I was present at and reported in machine
shorthand the above and foregoing proceedings.
          I further certify that a transcript of
my shorthand notes was typed, and that the foregoing
transcript is a true and correct transcript of my
notes in said case to the best of my knowledge and
ability,
          SIGNED, OFFICIALLY SEALED, AND FILED
WITH THE CLERK OF THE DISTRICT COURT OF JOHNSON COUNTY
KANSAS.




                         Gloria J. O'Malley, CSR No. 1383