1

2              IN THE DISTRICT COURT OF JOHNSON COUNTY, KANSAS
                           CRIMINAL DEPARTMENT
3

4

5    STATE OF KANSAS,

6              Plaintiff,

7    vs.                              Case No.: 12CR1074
                                      Appellate Case: 11837A
8
     RHEUBEN JOHNSON,
9
               Defendant.
10

11

12                   TRANSCRIPT OF PROCEEDINGS
                        (Sentencing Hearing)
13

14         The above-captioned matter came on for a sentencing

15   conference hearing before the HONORABLE BRENDA M. CAMERON,

16   Judge of the Tenth Judicial District of Kansas, Division 13,

17   at Olathe, Kansas, on the 28th day of October, 2013.

18

19   APPEARANCES:

20   FOR THE STATE:                   Mr. Keith Henderson &
                                      100 North Kansas Avenue
21                                    Olathe, Kansas 66061

22   FOR THE DEFENDANT:               Mr. Scott Toth
                                      105 East Park Street
23                                    Olathe, Kansas 66061

24          REPORTED BY GLORIA J. O'MALLEY, CSR, CCR

25

| | INDEX | |
|---|---|---|
| DEFENDANT'S STATEMENT. | . . . . . . . . . . . | 8 |
| VICTIM'S STATEMENT. | . . . . . . . . . . | 15 |
| SENTENCE PRONOUNCED. | . . . . . . . . . . | 21 |

1

2 **INDEX**

3 DEFENDANT'S STATEMENT. . . . . . . . . . . 8

4 VICTIM'S STATEMENT. . . . . . . . . . 15

SENTENCE PRONOUNCED. . . . . . . . . . .21

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**2**
**OFFICIAL TRANSCRIPT**

**\* \* \* \* \* \* P R O C E E D I N G S \* \* \* \* \* \***

1

2               THE COURT:  The State of Kansas versus

3 Rheuben Clifford Johnson, III, 12CR1074.

4               MR. HENDERSON:  May it please the Court,

5 Your Honor, the State appears by Keith Henderson.

6               MR. TOTH:  Good morning, Your Honor, may it

7 please the Court, Rheuben Johnson appears in person along with

8 his attorney, Scott Toth.

9               THE COURT:  We are set for post-trial

10 motions and sentencing.  I think I see a motion for a new

11 trial, the State's response, the defendant's motion for a

12 durational departure, and an objection to the criminal

13 history.

14     Regarding the objection to the criminal history, that

15 objection was to an entry from a 1981 juvenile conviction for

16 aggravated burglary and theft.  Does the State agree with

17 that?

18               MR. HENDERSON:  Well, we've come to an

19 agreement.  We located documents for it and also contacted the

20 victim from the original case back in 1980.  He indicated that

21 the structure that was burglarized was an unattached garage,

22 which would make it a nonresidential burglary.  Because it's a

23 nonperson, it would have been a Class "D" felony back then.

24 The conviction would have sentenced to "K" and wouldn't count

25 towards his criminal history score.

1          THE COURT:  Do you agree with that, Mr.
2    Toth?
3          MR. TOTH:  I do, Your Honor.  And in
4    speaking with Mr. Henderson, and to make it easier to both
5    sides, we are willing to stipulate that my client will be a
6    criminal history "H."
7          THE COURT:  Is that correct, Mr. Henderson?
8          MR. HENDERSON:  That's correct, Judge.
9    That's where I think it falls.
10         THE COURT:  The PSI will need to be
11   amended, the face sheet, to show that this is a criminal
12   history "H" upon agreement of the parties.
13       Regarding the motion for new trial.
14         MR. TOTH:  Your Honor, I'm not going to
15   belabor the issues in my motion.  This Court sat and listened
16   to the evidence in this case.  You know the evidence as well
17   as probably anybody in this courtroom, so I'm asking that you
18   just consider my arguments.  I do think that this is a -- it's
19   got some interesting legal issues to it, especially with
20   regard to the jurisdictional issue, the withdrawal issue.
21   Certainly we are still of the position that there was
22   insufficient evidence to convict my client to these charges.
23       Since you have my motion in front of you, I will not find
24   it necessary to belabor this.
25         THE COURT:  Thank you, Mr. Toth.  State?

MR. HENDERSON:  Judge, I'll pretty much
stand on my motion.  I think the jury considered the
jurisdictional issue for all defense and looked at the
evidence, and concluded the matter contrary to the defendant's
position.
          THE COURT:  Thank you.  And, of course, I'm
very familiar with the facts.  This case was one that was well
tried by both lawyers.
     I do not believe that the verdict is contrary to the
evidence and the law.  There was sufficient evidence, and the
jury found the evidence sufficient.
     Furthermore, jurisdiction was proper here.  The jury
found so.  I find so.  I don't believe there was any error
there, and there was no error in submitting the proposed
instructions over the defendant's objection.
     I also do not believe that it was an error to submit the
transcript of the recorded conversations.  So I appreciate the
motions, and Mr. Toth has done a nice job preserving all the
issues, and while I appreciate the argument, the motion will
be overruled.  Are you ready then for sentencing?
          MR. TOTH:  Yes, Your Honor.
          THE COURT:  Mr. Toth.
          MR. TOTH:  Thank you, Your Honor.  I
suppose that I've got two issues I'd like to raise with the
Court.

**5**
**OFFICIAL TRANSCRIPT**

The first one relates to my motion for durational departure.  Although there really is kind of less steam in the potential sentence that my client is facing now that the criminal history check is done.

         Even as a criminal history H as opposed to a criminal history "I," potentially he's looking at 16 additional months of prison, unless he's treated as a criminal history "I" as opposed to an "H," and we're stipulating that his criminal history is H.  But as I indicated in my motion for durational departure, there is a Kansas case that I've cited, the *Richardson* case, that talks about the amount of time that's elapsed between the last felony conviction and the current felony conviction.

         In this particular case, my client was a teenager.  He was a delinquent, and I know he was delinquent because if you go back and look at the journal entries it says he was a delinquent, which kind of harkens back to how juvenile cases were treated back in those days.

         I briefly practiced as a prosecutor, prosecuting juvenile cases a little bit after that, but basically the theory was the same, quite frankly, because rehabilitation and delinquency were at the heart of the matter.  Kids used to get rolled through the system, and it was a common practice for defense practitioners to just plead them and place them on probation, and I don't think that anybody had contemplated

that sentencing guidelines would come into effect back then, and that there could be some real issues going forward in the future for somebody that did have some criminal history.

So I am asking the Court to take that into account and really sentence my client as if he was a criminal history "I."

My second point I would like to make has to do with whether this Court, which I have the utmost respect for, grants concurrent or consecutive sentences.

If you accept the State's theory in this case, what you really have is one event with multiple actors. Certainly the jury found that there were multiple actors involved based on the State's theory, but really the event is the same accepting the evidence that the State presented.

As such, I do think that it would be fair for the Court to consider that the sentences then run concurrent with one another because we're really talking about one event with multiple individuals.

Of course, under Kansas law, it's discretionary with Your Honor on how you want to deal with this, but it makes a substantial difference as far as the amount of time that my client is going to spend in prison.

So I would ask that you consider that argument because I do think that it makes some sense, and that's pretty much it what I have to state for Your Honor.

My client does have a statement that he would like to

1    read to the Court at the time of allocution.

2                    THE COURT:  Why doesn't he go ahead.  Mr.

3    Johnson, do you have anything you want to say?

4                    THE DEFENDANT:  Yes.  For every trial in

5    life there is a blessing.  During the year that I've been in

6    jail, I spent a lot of time reflecting back on my life and how

7    I got to where it is today.  But it is important to think

8    about what I can do to improve the next half of my life.

9         I'm actually thankful for the first six months of being

10   in jail, maybe even the entire year with blessings.  It

11   brought my family back together, stronger and closer.

12        I've also read several relationship books and realized

13   how miserably I failed others.  I regained interest in

14   activities that I long ago set aside:  Reading, drawing,

15   painting, creativity.  All of this giving me new ideas of

16   something better to do with the rest of my life, ideas to

17   appreciate and value.

18        Most important, I've learned what unconditional love is

19   and how to make a marriage or a relationship work.

20        All my life, starting when I was 10 years old selling

21   plastic bags and tool kits door to door, I was taught and

22   pushed to work, work, work, nothing later about relationships,

23   not by example or teaching.

24        So far what I've recently learned surprised me:  What to

25   do to make it work, make it good.  It takes more than just

listening and sticking it out.  One must really care about
what the other one says.  You have to really listen.  You must
really love the other and not just do time hoping it will
magically improve one day, touching both physically,
emotionally and spiritually, encouraging and praising, sharing
your thoughts and feelings and activities and more are all
needed.

    The two books I found the most valuable were *Love Life* by
Ed Wheat and *Love Is A Decision* by Gary Smalley.

    But my most valuable lesson came from my significant
other, Kat, who has given me unconditional love throughout
this trial, caring and faithful, carrying our load, and all on
her own and enduring.

    Had I not ended up in jail, I never would have learned
someone could love like this.  That then motivated me to learn
how to cherish such a treasure.  I made my personal checklist
of things to work on weekly:  New ideas, reminders, some
actions completely opposite of what I used to claim was just
what guys do.

    Most important, I learned not to push or demand change
from the other, but for me to work on this myself knowing that
my actions will effect others' reactions.

    Reflecting on my past is why I plan on providing family
counseling to others to help prevent families from being
destroyed, to change the system which I believe encourages

rushed divorces rather than promoting family unity and
marriage skills.  All of this, another blessing from this
trial in life.

It's so sad to watch guys in jail I've grown to care for
have relationship issues.  I've attempted to help several
while considering what the book said:  Don't push advice,
share ideas.

A few guys really benefited.  Helping others was good for
me too.  It helped me remember.  It helped me see the results
of what happens when you do everything wrong.  This is what
filled a year of my days and nights.  It filled my head,
filled my heart.

One important lesson was common in all the self-help
classes I went to in jail, AA, NA.  Even though I rarely drank
and never do drugs, anger management probably is good for
everyone, parenting and the Bible study group.  That lesson
was to avoid temptation, drive evil away, resist stupid
mistakes, one must say fill their head with the heart of God.
And for nonbelievers what's most important is to fill your
head and heart with what God asks for:  Goodness, helping
others and being kind, all while keeping a list of more
appropriate projects to do during the day rather than doing
wrong.  This really works.

Bad ideas will tempt us all at some point, and it's
normal.  I've learned that one must have patience and

knowledge to stop.  Consider better options and fill their head and heart with goodness leaving the heart with nothing more.

One must say no to things that have no interest in rather than replying with a weak no or a yes.  I probably need to think about it.  The same kind of no I can tell a pushy car salesman if I didn't want to buy his car.

I always try to avoid conflict having to tell people no. I seldom fired anyone.  I don't think I've ever been the one to break up.  I have never taken anyone to court and have never been in a fight my entire life. I tend to want to please others, which is what also contributed to my house arrest being messed up, though I was solely responsible.

Even now in jail I find myself getting talked into handing over a phone card, and more, all bad deals for various reasons.  I've learned I must do a better job about saying no. That responsibility is mine, and mine alone.

This is what I've learned and thought about during the past year and a half.  Way back when I was just a kid, like many kids, I had some problems but learned from that also. Avoiding for the rest of my life, crimes, drugs, violence, just as all my family has.

My early years were difficult with my parents divorcing, and they are good friends now, good examples of how a divorce should end up.

1      I was bullied by neighborhood kids and didn't have many
2 friends, but my early years were good to me also, including
3 Cub Scouts, Boy Scouts, bands, country club, Christian church,
4 youth groups and choirs and family trips, all of this, the
5 good and the bad blessed me with many good qualities which are
6 easily seen by my significant other, past relationships and my
7 family.

8      I've read through Annie's statement.  I understand she's
9 mad.  In fact, she's stated she's learned to hate.  What's in
10 her statement should be in a divorce court where there would
11 be accusation, rebuttal both ways.  We've been in divorce
12 court where a majority of this was not brought up.  In fact,
13 there is strong evidence against it all.

14      There are also accusations based on smidgens of the truth
15 through therapists over and over and exaggerations.

16      Today is not a day to rehash all this.  So I've chosen
17 two examples.

18      The first is an example of bits of truth that were
19 over-exaggerated.  Annie wrote:  I was not allowed to have my
20 own vehicle.

21      Not mentioned is that together we paid for her leased BMW
22 for about two and a half years of our marriage.  Then we both
23 agreed a new lease was a waste of money.  She then wrote in
24 her will an almost brand new Suburban that I have as her
25 vehicle until the engine blew up one night.  She was, who

1   knows where, and well past three a.m.  It was probably my
2   fault.  A man should do a better job checking the oil, even in
3   wife's car.
4        Then, yes, the last few months of our marriage we
5   basically shared one Suburban, unless she took the work van.
6   At that point, that is true that she didn't have her own
7   vehicle.
8        The most serious allegation is rape.  With Annie's first
9   charge of her physical alleged sexual abuse against her son,
10  which was hotlined by others, not me.  I met with the Olathe
11  Police Department.  I forewarned them Annie would have vague
12  accusations saying how I was abusive and controlling, just as
13  she claimed in her prior two marriages.
14       The detective later had to ask her several times and
15  finally got an answer as to what exactly I did that was so
16  bad.  Her answer was from the transcript which was:  She
17  wasn't allowed to watch TV, use the Internet or drink pop.
18  But the main reason she said she filed for divorce was because
19  I wouldn't let our son go to speech therapy.
20       I would like to address all that also.  My main point is
21  she wanted me to look my worst.  That's all there was.
22  That's it.  We were only married two years before all that.
23  All was good, though not great, up until the crash.  The
24  semi-truck hit us from behind.  She was in severe back pain
25  from then on.

1    Still we had our son together and got along reasonably
2  well, likely better than most.  But with worsening pain and
3  surgeries came more problems.  One wish for me to have would
4  be to have her read her book on the bedside table in her now
5  separate bedroom before she filed for divorce.  *How*
6  *Painkillers Destroy the Family* by Dr. Ruth Henschke.
7    Instead I'd like to say:  In order to be a faithful
8  loving husband, I thought all I had to do was stick it out,
9  not divorce.  Do nice things for her every once in a while and
10 let her do whatever she wants as her therapist recommended to
11 me.  But I had no idea what I needed to do to make things
12 better.  She needed to feel love, not learn to love.
13   However, at the time any advice might not have mattered.
14 I felt I couldn't change anything, and I was too busy taking
15 care of, raising our son, whom I love, doing the best that I
16 could do the best for her also, which wasn't much.  The rest
17 is in depositions and such.
18   I certainly learned life isn't fair sometimes.  But
19 sitting by and looking at mistakes made only makes it worse.
20   But today isn't supposed to be about the divorce history.
21 It's about this mess I got into.  Guilty or not guilty, I'm
22 truly sorry for how it's affected everyone, including Annie.
23 However, this marriage and problem has helped me grow.
24   Looking for a blessing in all that, I recall the day when
25 Kat asked me, "Why did you stay and suffer through all that?"

1   My reply was first quoting Genesis 2:24, look it up.

2       I think continuing on with:  You just don't walk out and
3   leave someone when they are hurt and times are bad.

4       To this day I wonder why Kat chose to stay by my side and
5   certainly doing a better job of giving unconditional love.
6   This is what I've learned, and this is how I've changed.

7                   THE COURT:  Thank you for your comments.
8   Mr. Henderson?

9                   MR. HENDERSON:  Judge, Annie Johnson would
10  like to address the Court.  I'd like to begin with that.

11                  THE COURT:  Sure.  Come on up to the
12  podium, please.

13                  MS. JOHNSON:  I, Annie Johnson, am the
14  intended victim of a heinous murder for hire crime over the
15  custody of my son.  Rheuben Johnson intended to kill me.  He
16  intended to deprive my son from his mommy.  His attempts
17  however were unsuccessful thanks to Mr. Nodwell, Detective
18  Stites and all of the law enforcement and the DA prosecutors
19  included in this investigation.

20      These attempts have had a huge impact on my son, my
21  family, and me in a number of ways.  It will impact us for the
22  rest of our lives.

23      The impact of Rheuben Johnson's crimes is great.  It has
24  taken an incredible amount of my time, my energy, my sleep, my
25  money, my family's money, and most importantly my concerted

1    effort to protect my son from the negativity that surrounds
 2    everything that he caused.
 3        As a mother, I have to only imagine what life my child
 4    had when he was around him.  If he is capable of trying to
 5    kill me, his mommy, what kind of parent was he to him?  I know
 6    some details from the reports of the supervised visits which
 7    were sickening and disturbing.  The child custody and
 8    psychological report from Dr. Spiridigliozzi was just
 9    incredibly horrifying.
10        Rheuben doesn't speak about his father now.  Since last
11    May he has not said he has missed him even one time.  His
12    crimes, however, have certainly impacted him.
13        Shortly after the incident, my son started showing
14    extreme separation anxiety where he would not physically leave
15    my side.  He would follow me to my room, and when I did
16    separate from him to bathe or use the restroom and lock the
17    door, he would bang on the door and cry for me to come back
18    out.
19        I finally asked him what he was afraid of.  He told me,
20    "Mommy, I'm afraid that daddy is going to hurt you, and I want
21    to protect you."  This is something a child should never have
22    to say to his mother.  Every night he refused to sleep in his
23    room because he was so scared and wanted to be right next to
24    me.  My son has been receiving continual therapy with Dawn
25    Wake.

1     Although during the trial previous details of abuse that
2  I received from him when we were married were not brought up
3  in the trial, I can now say that this is the ultimate domestic
4  violence case.  He beat me.  He raped me, forcing me to get
5  ovulation kits prior to the rapes, which stuck in my mind for
6  years.  He would pull Rheuben as a baby out of my arms
7  violently, and I let him have him because I would not fight
8  and pull my child back for fear of him getting hurt.

9     The control of every daily action of my life by him was
10 horrifying.  He would not allow me to watch the television,
11 use the Internet, and if I was caught drinking a soda,  he
12 would put salt or sugar in it to ruin it.  He would lock me
13 out of the house for hours and have our child watch through
14 the glass window door as I begged him to let me back in.  He
15 prevented me from going anywhere without permission except to
16 the grocery store or errands for his business.  I was not
17 allowed to have my own vehicle.  I was not allowed to take my
18 child anywhere, the library, or any normal children's
19 activity.  He monitored every phone call I made by his
20 recording phone system.

21     When Rheuben fell so far behind in speech and
22 development, I knew I had to leave him to protect my son.  I
23 knew that once I left him, he would make my life hell, and he
24 did.

25     One week after leaving him, he made false allegations

against me, putting a fraudulent protection from abuse order against me to prevent me from being with my son.  I was not allowed to see my son for five weeks.  He then trained him to become a tool to hurt me.  He should have been a parent to him and showed him love.  He put horrible lies in his mind, and forced him to lie to police officers and health care providers.  Because of his choices, he caused little Rheuben to enter SRS and stay with a foster parent for two nights. Rheuben had bruises on both legs and a black eye that he did to him.  This is a mother's worst nightmare.  The truth was revealed over and over again that he was coaching him and I still had trouble protecting him.  I took a lie detector test over his false sexual allegations; and, of course, I passed. He avoided the detective's calls for his lie detector test. He paid another private party for one.  They are not equal.

He stalked me for years, even with a restraining order. He tried hiring private investigators and blaming them for not finding anything wrong that I was doing.  All I was doing was being a mommy and trying to keep myself and my son safe.

His actions made me more vigilant so that his bad behavior will not have a future impact on my son.  He made me more protective, and this took so much of my effort and purpose in life.

He did this all by himself.  I am not an intimidating person.  I am fair, but he was not.  Now, I must manage the

chaos he created, and I realize how proud I am to know just how strong I have become.

I have experienced hate for the first time, and this has changed me. I was such a trusting person, and now I don't know how to trust and must relearn. I had to look at evil, and it was the father of my child.

He is self-centered. He has no empathy or even an understanding for anyone else's feelings, and his only goal is to get what he wants at any cost. I am asking you, Judge Cameron, to make him be accountable for his actions today.

Not only was I traumatized by the domestic violence and the course of control he exercised, but on top of that the even more traumatic experience of knowing he wanted me dead to get his way has an extreme impact on me emotionally and financially to my family as well.

I've had extensive therapy to deal with these traumas to work on recovery. I had to install an extensive alarm system, which should not be needed in a secure, gated community. And when I came home, I immediately checked the windows and doors and put the alarm back on when I was home of fear caused by him. I've had nightmare of abuse, and ones of him or someone else coming into my place to kill me.

The only way I feel safe is if he is behind bars. He is free, I am not. I know him well enough, there are no boundaries he is not willing to cross to get what he wants.

Judge Cameron, I am asking you to help protect my son and
me from this dangerous man.  Please give him the maximum
consecutive sentence possible so my son and I don't have to
live in fear.  Please give us some relief we really need.
Thank you.

                    THE COURT:  Thank you.  Mr. Henderson.

                    MR. HENDERSON:  Judge, just to address the
defense's arguments.

         First, regarding the departure, I think the Court has to
deny that the substantial and compelling proffer at the age of
the felony convictions because they have decayed, they are not
factored into the criminal history at all.  So essentially the
defendant is already getting the benefit of the departure by
operation of law.  He is an "H" not because of the felony
conviction when a juvenile or adjudications, but because of
the various misdemeanor convictions that he picked up between
1990 and 2005 when he was an adult.  So certainly there are
enough there that the Court should not ignore that, and
sentence him not as an "I" but as an "H".

         There are no other substantially compelling factors
proffered to the Court.  So I ask the Court to deny the motion
for departure.

         Regarding sentencing, the State is asking the Court to
sentence the defendant to the aggravated number on Count I,
which is 71 months and also Count II, the aggravated number,

which is 61 months, and to run them consecutively for a controlling sentence of 132 months.

I feel that the aggravated number and consecutive sentencing is appropriate here for several reasons.

First of all, in most basically the defendant's actions in this case, he approached two strangers and asked them to kill the mother of his son.

The Court obviously heard the facts in this case, and I'm not going to rehash them all, but that's a very serious thing that he did.

And, then, secondly, I think the defendant's attitude speaks to consecutive sentencing there. This is something premeditated. This is something he had to be cold and calculating about and plenty of time to think it over. It's not just a single action, as Mr. Toth contends. There is a break in time where he had a chance to go home and think things over and think about whether this is something he really wanted to do, to hire a stranger to kill his ex-wife.

He met with Mr. Nodwell initially back in April and met with him again in May. He was introduced to Sergeant Stites undercover, and it was only the second meeting where he showed up with money and a map and photos. He had time in that sequence of events to think about what he was doing to be sure that's what he wanted to do. Because of that time to reflect, that should have caused him pause. I think the Court should

1    sentence the two counts consecutively.

2         Ms. Johnson has requested I think $5,730 in restitution.

3    Some of that deals with counseling costs.  The others deal

4    with the alarm system that she mentioned in her statement to

5    the Court.  So, obviously, that is up to the Court's

6    discretion.

7                   THE COURT:  The motion for durational

8    departure filed by Mr. Toth will be denied.  I don't find

9    substantial and compelling reasons to depart from the

10   presumptive sentence here.  And as the parties have agreed, he

11   is now a criminal history "H."

12        So for the crime of solicitation to commit murder in the

13   first degree, Count I, it is a level 3 person felony.  The

14   sentencing range is 61 to 71 months.  The maximum good time is

15   15 percent.  The defendant will be ordered to serve 71 months.

16   It is presumptive for prison.  The offense does require

17   registration pursuant to K.S.A. 22-4901.  You will be ordered

18   to register.  Post release is 36 months.

19        Count II, solicitation to commit murder in the first

20   degree, also a level 3 person felony.  The sentencing range is

21   55 to 61 months.  A 61-month sentence is imposed.  Those

22   sentences will run consecutively to one another for the

23   controlling term of 132 months.

24        And the reason they are consecutive is because these were

25   two separate events.  Unlike many situations where we see

1   there is one event, and we see that a lot where there are a
2   number of crimes committed in one event.  For example, a sale
3   of drugs, maybe you have a tax stamp and paraphernalia and
4   miscellaneous added in with one episode.  This is quite
5   different than that.  This was two separate distinct offenses
6   and two separate dates.  It is quite serious.  The facts are
7   serious.  The underlying crimes here are, therefore, very
8   serious, and the defendant's actions and taking everything
9   into consideration, this is an appropriate sentence.  Again,
10  credit will be given for time served.

11       Restitution will be ordered.  That amount, I have
12  deducted the monitoring costs.  He's been in custody now.  I
13  realize he was out part of that, but I am not going to assess
14  monitoring costs.  Restitution is $5,080.

15       I do believe there was very, very good reason for the
16  victim to be scared.  She should have been scared.  The
17  defendant was trying to have her killed, and I think the other
18  costs are appropriate, and that will be the restitution.

19       The defendant may appeal.  Of course, he will have 14
20  days to do that.  Is there anything further today?

21                 MR. TOTH:  Your Honor, I do have two
22  orders.  First, allowing me to withdraw, which I will file
23  with the clerk once I file Mr. Johnson's notice of appeal.

24       The second one is an order appointing the Kansas
25  Appellate Defender to represent him.

```
 1                    THE COURT:  Can he not afford appellate
 2    counsel?
 3                    MR. TOTH:  He cannot, Your Honor.  To be
 4    honest, it was his mother that retained me.  My client is
 5    completely indigent.  He doesn't have any resources at all.
 6                    THE COURT:  Okay.  I will allow Mr. Toth to
 7    withdraw.  You've done an excellent job, as you always do.  I
 8    have signed the order as well as the order assigning the
 9    appellate defender.
10                    MR. TOTH:  Thank you very much.
11                    THE COURT:  We're adjourned.
12                * * * * * * * * * * * * * * *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**24**
**OFFICIAL TRANSCRIPT**

C E R T I F I C A T E

STATE OF KANSAS   )

JOHNSON COUNTY    )

        I, Gloria J. O'Malley, a certified shorthand reporter, and the regularly appointed, qualified, and Acting Official Reporter of Division No. 13 of the Tenth Judicial District of the State of Kansas, do hereby certify that as such Official Reporter, I was present at and reported in machine shorthand the above and foregoing proceedings.

        I further certify that a transcript of my shorthand notes was typed, and that the foregoing transcript is a true and correct transcript of my notes in said case to the best of my knowledge and ability,

        SIGNED, OFFICIALLY SEALED, AND FILED WITH THE CLERK OF THE DISTRICT COURT OF JOHNSON COUNTY KANSAS.

Gloria J. O'Malley, CSR No. 1383