IN THE DISTRICT COURT OF JOHNSON COUNTY, KANSAS
CRIMINAL DEPARTMENT


STATE OF KANSAS,

       Plaintiff,

vs.                    Case No.: 12CR1074
                              Appellate Case No.: 11837A

RHEUBEN JOHNSON,

       Defendant.


TRANSCRIPT OF PROCEEDINGS
(Motion Hearing)


      The above-captioned matter came on for a motions hearing before the HONORABLE BRENDA M. CAMERON, Judge of the Tenth Judicial District of Kansas, Division 13, at Olathe, Kansas, on the 18th day of December, 2012.


**APPEARANCES**:

FOR THE STATE:           Ms. Heather Jones &
                             Mr. Keith Henderson
                             100 North Kansas Avenue
                             Olathe, Kansas 66061

FOR THE DEFENDANT:      Mr. Joseph L. Dioszeghy
                             130 North Cherry Street
                             Olathe, Kansas 66061


       REPORTED BY GLORIA J. O'MALLEY, CSR, CCR

```
* * * * * * * P R O C E E D I N G S * * * * * * * *
```

1

2              THE COURT:  The State of Kansas versus

3  Rheuben Clifford Johnson, III, 12CR1074.

4              MS. JONES:  May it please the Court, the

5  State appears by Heather Jones.

6              MR. DIOSZEGHY:  May it please the Court,

7  Your Honor, Mr. Johnson appears in person in custody and by

8  and through Joseph L. Dioszeghy and Debra S. Johnson,

9  attorneys.

10             THE COURT:  Thank you.  We are here on the

11  defendant's motion to dismiss.

12    I did review that motion.  I reviewed the State's

13  response as well.  Anything to add to your motion today, Mr.

14  Dioszeghy?

15             MR. DIOSZEGHY:  Your Honor, just briefly.

16  I do ask that you take judicial notice of the transcript of

17  the preliminary hearing.  I'm sure Your Honor has had a chance

18  to review that, but I am asking that you do that.

19    And, Judge, I think the significant issue really with

20  respect to Count I, the legal issue is whether or not there's

21  jurisdiction in this court to hear that count.

22    Your Honor, the evidence produced at the preliminary

23  hearing indicates that there was discussion between Mr.

24  Johnson and Detective Stites acting in an undercover capacity.

25  The preliminary discussions were here in Olathe, Kansas,

1  Judge, it's very important to note that at no time during any

2  of the discussions that happened here in Johnson County,

3  Kansas, did Mr. Johnson ever affirmatively solicit Mr. Stites

4  in his undercover capacity to commit any crime whatsoever.

5      Mr. Stites admitted that fact at the preliminary hearing.

6  He said the entire, the entire conversations that he had with

7  Mr. Johnson and the idea that they were intended as

8  solicitation for him to commit murder were a matter for

9  innuendo, insinuation, speculation.  Detective Stites was of

10  the opinion that Mr. Johnson was speaking in code when he

11  talked about either doing investigative work or cleaning up

12  junk in some old vans and things that he had at his place.

13  But at no time, at no time, did Mr. Johnson speak to Mr.

14  Stites directly that this is going to be a code.

15      And, Judge, Mr. Stites got that idea that this was a code

16  from Mr. Ron Nodwell, who is the alleged person who Mr.

17  Johnson first talked to cited in Count II.

18      Your Honor, the statute itself 21-5303 subsection (c),

19  provides that it is an affirmative defense if the actor, in

20  this case it's alleged Mr. Johnson, after he does solicit and

21  does pursue, and we'll just assume for sake of argument that

22  in some fashion he was soliciting a crime here in Kansas.  But

23  that there are circumstances where there is a renunciation of

24  the criminal purpose, then it's a defense.

25      Judge, the next to last phone call, and I pointed this

**3**
**OFFICIAL TRANSCRIPT**

out in our motion, between Mr. Stites and Mr. Johnson ends with Mr. Stites refusing to meet Mr. Johnson in the State of Missouri.

Mr. Johnson very clearly states, "Well, I think that I've got to just think about this whole thing." He indicates that he is wanting to rethink whatever the agreement was to be or was supposed to be. In fact, his exact words -- let me back up.

Detective Stites asks him, "Are you wanting me to do the original project or not?" And Mr. Johnson says, and this is on page 16 of my motion, "I probably need to think about this whole thing a little bit more." Whereupon, Mr. Stites refuses to meet Mr. Johnson in Missouri. Mr. Johnson says a second time, "I'm probably going to have to go back to thinking about this whole thing." Detective Stites tells Mr. Johnson that he, Stites, is leaving town, and he will not be around if Johnson decides to call him next week, and the phone call is terminated either by Detective Stites or by Mr. Johnson. That is the end of whatever deal they had here in Kansas.

Keep in mind, Judge, that Mr. Johnson was in Lee's Summit, Missouri, according to the evidence, when this phone call was taking place.

Mr. Johnson never calls Detective Stites back. It is Detective Stites who later calls Mr. Johnson and says, "Well, I really need the money, and I'll agree to meet you. I need

the money to go out of town, so I'll agree to meet you in Missouri."

And everything that happened thereafter, and as I said pointing to clarification, this is now a new transaction because that first one was clearly terminated. Everything that happened thereafter occurred in Missouri.

The evidence that Mr. Johnson gave detective Stites a photograph, that he gave him some cash, that he gave him a map, every bit of that happened in Missouri not here in Johnson County, Kansas.

This intervening termination would, in our view, make this a brand new -- giving the State the light most favorable, a brand new solicitation of some kind, but no jurisdiction here in Kansas.

Judge, very interestingly, the State's response to our motion to dismiss does not even address our jurisdictional argument. We feel that it's a very strong argument for a dismissal of Count I.

With respect to Count II, the preliminary hearing transcript, and as we tried to point out in our factual statement, will clearly show that Mr. Nodwell's credibility is so bad that even Judge Ruddick commented on it. It is so bad that it obviates, or it actually mitigates against his, Nodwell's, competency to testify as a witness.

I think that's one small exception to the general rule

that a Court will not consider the credibility of witnesses at a preliminary hearing.

However, I think the cases are replete with a caveat that when it is so obvious that a witness is not competent that the Judge, as a gatekeeper of the evidence, will not bind over on that kind of testimony.

So with our argument that since the State chose to file an amended complaint alleging a second crime with respect to Mr. Nodwell, the two incidents are separate and apart. One cannot be used to corroborate the other, otherwise it's just part and parcel. If it's argued that these are part and parcel of the same offense, then the two counts would be multiplicious, and it should be subject to dismissal on that basis.

So just to recap and summarize briefly, the two counts are to be considered separately. Count I -- in Count I there is a major issue of termination of whatever the agreement or attempt at what an agreement was between Detective Stites and Mr. Johnson, be it legal or illegal, and that after that termination everything else occurred in Missouri and that became a new and separate attempt at a contract. Therefore, occurring in Missouri, there is no jurisdiction here in Johnson County, Kansas.

With respect to Mr. Nodwell in Count II, his testimony was just so incredible and so contradictory to his prior

1  statement and his overall lack of credibility, 22 prior

2  convictions for dishonesty, 25 years in the penitentiary.  Mr.

3  Nodwell, as Judge Ruddick pointed out, was singularly

4  unimpressive.

5      And the Court can, in fact, dismiss when the witness's

6  credibility does not obviate the appearance that the defendant

7  probably committed the felony, and there's case law to that

8  effect, *State vs. Chapman.*

9      Those are major legal arguments, Your Honor, and we've

10  attempted to set out the factual basis.  You did indicate that

11  you had read our motion, and we know that's true.

12      I do ask that you consider the transcript of the

13  preliminary hearing and take judicial notice of that.  Thank

14  you very much.

15                    THE COURT:  Thank you, Mr. Dioszeghy.  Ms.

16  Jones, your position?

17                    MS. JONES:  Judge, the State's position is

18  that the Court should deny the defendant's motion on all

19  grounds.

20      With respect to Count I, there is no doubt that Count I

21  began in Johnson County.  The crime was committed in Johnson

22  County.  The defendant in this case met with Sergeant Stites

23  at a park and Mr. Nodwell at a park in Olathe, obviously, in

24  Johnson County, Kansas.  That's where the conversations

25  started.  That is where the defendant asked Mr. Nodwell if he

**7**
**OFFICIAL TRANSCRIPT**

1   had filled in Sergeant Stites as to what was being worked on.
2   That is when the defendant started talking in code to Sergeant
3   Stites and suggested that they talk in code.
4       That is where the defendant referred back to Mr. Nodwell
5   and stated to Sergeant Stites what he filled you in on is what
6   needs to be done.  That is where the defendant told Sergeant
7   Stites that he had shared some ideas with Mr. Nodwell of how
8   to get his problem to go away.
9       The defendant also then went into great detail, explained
10  to Sergeant Stites about his schedule with respect to child
11  exchange and also told Sergeant Stites when his ex-wife would
12  be at the exchange and how to locate her.
13      Also, the price was discussed at this location in Johnson
14  County, Your Honor.  Sergeant Stites told him that it would be
15  $10,000, and it was deduced how that money would be divided up
16  with $3,000 being given up front, and the remaining be given
17  when the problem was taken care of.
18      Sergeant Stites at this location in Olathe told the
19  defendant that he needed to bring the $3,000 in cash and the
20  photos and the map.
21      The defendant told Sergeant Stites, referring back to his
22  ex-wife, that she just broke up with her boyfriend, and that
23  if something happened to her, the defendant expressed concern,
24  that if someone found out that if he gave Sergeant Stites a
25  picture of his ex-wife that the first person to be blamed

1   would be Sergeant Stites.

2       Sergeant Stites made some clarification with the

3   defendant of what the defendant wanted done because the

4   defendant continued talking in code, although it was clear to

5   Sergeant Stites what the defendant wanted that the defendant

6   advises the project is still the same.  This was on the phone

7   conversation the next day.

8       The defendant did seem concerned about getting himself in

9   a world of trouble no matter how bad he wanted to take care of

10  the problem.

11      The defendant gave Sergeant Stites a description of his

12  ex-wife's car.  He told Sergeant Stites that she would be

13  driving a black Dodge Nitro.

14      Then with respect to having second thoughts, or this

15  abandonment or termination or renunciation, the defendant at

16  no time called this off, not one time.  Simply having second

17  thoughts saying, "I probably need to think about this whole

18  thing" when being asked, "Do you still want me to do the job?"

19  He never said:  No, I don't want you to do the job.  Forget

20  it.  This was a bad idea.  No, the deal is up.  Never once did

21  the defendant say that.  There has to be a complete and

22  voluntary renunciation, and this was nowhere close.

23      Also the State believes that that would also be a

24  question of fact for the jury.  But having second thoughts,

25  merely second thoughts in making the statement, "Oh, maybe I

1   need to think about this," is completely different from
2   abandonment or termination or renunciation.
3        With respect to Count II, you know, Your Honor, when you
4   make the decision that you want to have your wife, your
5   ex-wife killed, you're not going to typically find a choir boy
6   or a nun to do that.  You're going to find someone that you
7   know or that you hope is willing to carry out the job.
8        The defendant found Mr. Nodwell, and Mr. Nodwell is no
9   choir boy.  He does have a lengthy criminal history, and he
10  looks the part.  He didn't clean up well.  He talks the part.
11       But the fact of the matter is that unfortunately to the
12  defendant he didn't play the part anymore.  And when it became
13  clear to Mr. Nodwell that the defendant was persistent and was
14  not going to stop and really had the worst of intentions in
15  mind and wanted nothing more than to have his wife killed or
16  ex-wife killed, Mr. Nodwell did the right thing and went to
17  the police about that.
18       He does have a lot of criminal history, and he has a lot
19  of crimes involving truth and veracity, and he has made his
20  mistakes, and he's making his amends, and he's done time, a
21  lot of time in prison.
22       And Mr. Dioszeghy is going to have ample opportunity to
23  cross-examine Mr. Nodwell on that.  At trial he's going to
24  have ample opportunity to argue to the jury that Mr.
25  Nodwell has these crimes involving truth and veracity and what

motive he may or may not have had, and whether or not he should be believed, and those are all questions for the jury to decide.

Your Honor, I would ask that you take these arguments into consideration in conjunction with the motion and deny the defendant's motion to dismiss.

MR. DIOSZEGHY:  Judge, Your Honor, just final rebuttal, if I may?

THE COURT:  Sure.

MR. DIOSZEGHY:  I'll take it in reverse order.

With respect to Mr. Nodwell, it is critical to note that his conversation with the police and Detective Campbell specifically was tape recorded.  Never once does Mr. Nodwell say that Mr. Johnson asked him or solicited him to kill his wife.

What he says is that Mr. Johnson says in general conversation talking about how they are having, he's having a difficult time because there was an ongoing custody dispute, that kind of thing.  He says, "Yeah, sure, it would be nice if she just disappeared," and that's all.

Never once in that taped conversation between Nodwell and Detective Campbell does Mr. Nodwell say that Mr. Johnson ever instructed him or that he himself, Johnson, was going to talk in code.

1    What Mr. Nodwell wants us to believe is that having met

2 him for the first time ever that Mr. Johnson, who was looking

3 for a handyman to either haul off some trash or do some work

4 of this kind, and Mr. Nodwell was in that kind of business,

5 that having just met him for the first time that Mr. Johnson

6 launched into this very specific and very detailed story about

7 how he wanted his wife, ex-wife at this point, killed.  He was

8 even setting out specifics on three separate methods.

9    However, when Mr. Nodwell talked to the police, he never

10 told them that.  He never told them that Mr. Johnson

11 specifically said, "Here's some ways that you can do that.

12    All that he ever said, and, Judge, in all due respect to

13 the prosecutor, on page two of her response, paragraph five,

14 she says that Nodwell told Campbell that he asked the

15 defendant how he wanted his ex-wife killed, and according to

16 Nodwell, the defendant said he had several ideas, but thought

17 she could overdose on pills due to her use of prescription

18 medication.  That's a misstatement.

19    Basically, what happened is Detective Campbell asked Mr.

20 Nodwell, "Well, how did this Mr. Johns want it done?"  And all

21 that Mr. Nodwell said was "Well, Mr. Johns," at the time.

22 It's really Mr. Johnson.

23    All that he said was "Well, she is addicted and perhaps

24 she may overdose on her own medication."  He never said:  I

25 want you to tie her up and jam these pills down her throat.

**12**
**OFFICIAL TRANSCRIPT**

Although that's how he testified at the preliminary hearing, he never told the police that. That's just a misstatement.

Judge, the other very telling statement that was made here in Kansas by Mr. Johnson was when Detective Stites continually asked out at the water park about "How do you want her gone?" "What is it that you really want done to her, but we're really here to talk about her?"

He says, Mr. Johnson says, "Well, that, of course, is not why we are here." He said, "We're here to talk about getting vans hauled off," and then he said, "Well, yeah, and in a perfect world if I didn't have to deal with her the rest of my life, that would be great."

But it's basically Mr. Stites coming to this conclusion that Johnson wants his wife killed based upon some very nebulous things that Mr. Nodwell said to him.

And, Your Honor, the termination part of the statute does refer to somehow that the actor prevented the commission of the felony under circumstances manifesting a complete and voluntary renunciation of the actor's criminal purpose.

Well, a circumstance which would have prevented this, if there was a felony, from happening here in Kansas was Mr. Johnson's absolute adamant demand that they meet in Missouri.

Detective Stites absolutely refused to do so, and the phone was hung up, and that was the end of the deal. Mr. Johnson not only had second thoughts and said, "Well, I've got

1  to just rethink this whole thing," but the matter was

2  terminated with the parties at a total impasse.  So that's a

3  renunciation.  That's it.  Negotiations were over.

4      And then as I argued before, when Detective Stites, not

5  the defendant reinitiates negotiations, everything occurs in

6  Missouri.  There's simply no jurisdiction, and the State still

7  has not addressed that even in their oral argument.

8      Judge, we think that's a very strong argument.  There's

9  not sufficient evidence to prosecute this case here in Johnson

10  County, Kansas.

11          THE COURT:  Thank you, Mr. Dioszeghy.

12      I appreciate the arguments today, and you both lay out

13  your arguments very thoroughly in your motion and your

14  response.

15      Judge Ruddick previously ruled that there was probable

16  cause to believe that these crimes were committed here in

17  Johnson County, Kansas by this defendant, bound the defendant

18  over for trial.

19      I've reviewed the history here.  I've reviewed the

20  motions and all the pleadings, and I'm not going to grant the

21  motion.  I think it should be denied today.  I think these

22  arguments are best left to a jury.  It's now time for a jury

23  to decide these facts.  You have both presented good arguments

24  that you both made, but it's for a jury to decide at this

25  point.  So the defendant's motion to dismiss will be denied.

```
 1        Are you ready to have this set for trial?

 2                    MR. DIOSZEGHY:  Yes, Your Honor.

 3                    THE COURT:  How long will be necessary?

 4                    MS. JONES:  Judge, the State's case will

 5   probably take, not including jury selection, probably a day

 6   and a half.

 7                    MR. DIOSZEGHY:  Judge, I think that we

 8   probably should set aside a full week.

 9                    THE COURT:  January 28th.

10                    MR. DIOSZEGHY:  I am already in jury trial

11   in Court 19 that week, Judge.

12                    MS. JONES:  That works for the State.

13                    THE COURT:  February 25th?

14                    MR. DIOSZEGHY:  Yes, I'm available that

15   week.

16                    THE COURT:  Does that work for the State?

17                    MS. JONES:  Yes.

18                    THE COURT:  February 25th will be set for

19   jury trial.  I will set aside the week.  We will begin at nine

20   a.m., Monday, February 25th.  Pretrial conference will be

21   February 22nd at nine a.m.

22        All instructions need to be on file before the pretrial

23   conference.  Is there anything further today?

24                    MS. JONES:  Judge, with respect to speedy

25   trial, will the time still be charged to the defendant?
```

```
  1                    THE COURT:  These were defendant's motions
  2       today, and he had continued it for that purpose.  Time will be
  3       assessed against the defendant.
  4                    MR. DIOSZEGHY:  Your Honor, I do have a
  5       motion on bond.
  6                    THE COURT:  I've heard this a couple of
  7       times, and I will allow you some time to do so now, but please
  8       note that I've heard your arguments a couple of times.  Go
  9       ahead.
 10                    MR. DIOSZEGHY:  Your Honor, Mr. Johnson has
 11       now been in jail for quite some time because of basically a
 12       case of poor judgment where he elected to help his girlfriend
 13       with a furnace and whatnot and was out of the area or out of
 14       where he should have been for a period of time.  That was the
 15       only violation.  Because he was in violation of the strict
 16       terms of his house arrest and the route that he was to take
 17       with the GPS.
 18           The defendant, while out on bond, certainly never
 19       committed any offenses.  He never threatened the alleged
 20       victim or anyone else.  He totally was law abiding, and,
 21       Judge, I think that he's paid a heavy, heavy price for that
 22       bad judgment that he had when he was out on bond.
 23           Certainly, he'd be very beneficial if he were allowed to
 24       be out.  It would help us in preparing his case.  It would
 25       help him and his family financially if he could work.
```

1   You know, house arrest, as we all know, is a pain, but he

2   certainly would comply with house arrest, GPS, whatever Your

3   Honor felt, and Judge Ruddick saw fit to substantially lower

4   his bond twice after hearing -- especially after hearing the

5   evidence and seeing that this was a case that was not what we

6   term a "slam dunk" by any means.

7          So now that he's been punished for that error in his

8   judgment, we feel that he will not be any kind of a flight

9   risk.  He will not be any kind of a danger to the community,

10  especially not to his ex-wife, and certainly we feel he

11  deserves further consideration, and I ask that you basically

12  reinstate the bond that he was on prior to the time that you

13  revoked him.  Thank you.

14                  THE COURT:  Thank you, Mr. Dioszeghy.  The

15  State's position?

16                  MS. JONES:  Your Honor, the State would be

17  opposed to for the reasons previously given by the State in

18  prior hearings, I don't believe the concerns have changed

19  warranting any reduction or modification.

20                  THE COURT:  I think bond is appropriately

21  set in this matter.  The charges are quite serious.  I had

22  concerns previously and noted that with taking this up a

23  couple of times.  Given the charges and the allegations here,

24  I think bond is appropriately set, and the motion will be

25  denied.  We'll see you back here February 22nd at nine for

**17**
**OFFICIAL TRANSCRIPT**

1    pretrial conference.  February 25th for jury trial.

2        Is there anything further?

3                        MS. JONES:  Not from the State.

4                        MR. DIOSZEGHY:  No, Your Honor.

5                        THE COURT:  Thank you very much.

6                        * * * * * * * * * * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

STATE OF KANSAS    )

JOHNSON COUNTY     )

          I, Gloria J. O'Malley, a certified
shorthand reporter, and the regularly appointed,
qualified, and Acting Official Reporter of Division
No. 13 of the Tenth Judicial District of the State of
Kansas, do hereby certify that as such Official
Reporter, I was present at and reported in machine
shorthand the above and foregoing proceedings.

          I further certify that a transcript of
my shorthand notes was typed, and that the foregoing
transcript is a true and correct transcript of my
notes in said case to the best of my knowledge and
ability,

          SIGNED, OFFICIALLY SEALED, AND FILED
WITH THE CLERK OF THE DISTRICT COURT OF JOHNSON COUNTY
KANSAS.

Gloria J. O'Malley, CSR No. 1383