**No. 2013-110837-A**

————

**IN THE
COURT OF APPEALS OF THE
STATE OF KANSAS**

————

**STATE OF KANSAS**
Plaintiff-Appellee

vs.

**RHEUBEN JOHNSON**
Defendant-Appellant

————

**BRIEF OF APPELLEE**

————

Appeal from the District Court of Johnson County, Kansas
Honorable Brenda Cameron, District Judge
District Court Case No. 12CR1074

Shawn E. Minihan #19861
Assistant District Attorney
Tenth Judicial District
P.O. Box 728
Olathe, KS 66051-0728
(913) 715-3124
(913) 715-3050 (fax)
Shawn.Minihan@jocogov.org

Attorney for Appellee

# TABLE OF CONTENTS

ISSUES ON APPEAL ............................................................................................ 1

    I. THE COMMONLY USED AND UNDERSTOOD WORD "ENCOURAGING,"
    FOUND WITHIN K.S.A. 2011 SUPP. 21-5303, DOES NOT RENDER THE
    SOLICITATION STATUTE VAGUE OR OVERBROAD. ............................................. 1

    II. JOHNSON'S CONVICTIONS FOR THE SOLICITATION OF NODWELL AND
    STITES TO KILL HIS EX-WIFE WERE NOT MULTIPLICITOUS, AS THE
    SOLICITATIONS WERE OF TWO DIFFERENT INDIVIDUALS, AT TWO DIFFERENT
    TIMES, AT TWO DIFFERENT LOCATIONS, AND WITH TWO DIFFERENT OFFERS. 1

    III. THE STATE PRESENTED SUFFICIENT EVIDENCE THAT JOHNSON
    SOLICITED NODWELL AND STITES TO COMMIT THE PREMEDITATED FIRST-
    DEGREE MURDER OF HIS EX-WIFE. ................................................................. 1

    IV. THE LANGUAGE WITHIN JURY INSTRUCTIONS 16 AND 17, WHICH
    DEFINE THE AFFIRMATIVE DEFENSE OF RENUNCIATION, WAS PROPER, AS IT
    ALIGNED WITH THE REQUIREMENTS OF K.S.A. 2011 SUPP. 21-5303(C). IN THE
    ALTERNATIVE, THERE WAS NO CLEAR ERROR IN GIVING THE INSTRUCTIONS. 1

    V. BECAUSE IT WAS JOHNSON'S BURDEN TO ESTABLISH THE AFFIRMATIVE
    DEFENSE OF RENUNCIATION, HE WAS PROPERLY CONVICTED. IN THE
    ALTERNATIVE, THERE WAS SUFFICIENT EVIDENCE TO ESTABLISH THAT
    JOHNSON DID NOT RENUNCIATE HIS SOLICITATION OF STITES TO MURDER HIS
    EX-WIFE. ....................................................................................................... 2

    VI. JUDGE CAMERON PROPERLY INSTRUCTED THE JURY THAT, IF THERE
    WAS A SUBSTANTIAL AND INTEGRAL CONNECTION BETWEEN JOHNSON'S
    CRIME OF SOLICITATION OF STITES AND THE STATE OF KANSAS, THE JURY
    COULD CONVICT, EVEN THOUGH PART OF THE CRIME OCCURRED IN ANOTHER
    STATE. ........................................................................................................... 2

    VII. THE TERMS "ENCOURAGING" AND "REQUESTING" DO NOT CREATE
    ALTERNATIVE MEANS IN THE SOLICITATION STATUTE. IN THE ALTERNATIVE,
    THERE WAS SUFFICIENT EVIDENCE OF EACH MEAN. ....................................... 2

**VIII. THE COMPLAINT FILED AGAINST JOHNSON WAS NOT DEFECTIVE SIMPLY BECAUSE IT USED THE WORDS "ENCOURAGED" AND "REQUESTED," RATHER THAN "ENCOURAGING" AND "REQUESTING."** ................................... 2

**STATEMENT OF FACTS** .................................................................. 2

*ANNIE AND JOHNSON'S DISCORDANT DIVORCE* ...................................... 2
*NODWELL INTRODUCED TO JOHNSON - MET AT MR. GOODCENTS* ................ 4
*JOHNSON DROVE NODWELL TO PLACES ANNIE FREQUENTED* ................... 5
*NODWELL CONTACTED THE OLATHE POLICE DEPARTMENT* ..................... 6
*NODWELL, STITES, AND JOHNSON MET AT THE WATERWORKS PARK* .......... 6
*TUESDAY: JOHNSON DID NOT SHOW FOR WATERWORKS PARK MEETING* ....... 7
*STITES AGREES TO MEET JOHNSON IN MISSOURI* ............................... 8
*JOHNSON SOLICITED PORTERFIELD TO KILL HIS WIFE* .......................... 11
*ARREST, CONVICTIONS, AND SENTENCE* ....................................... 12

**ARGUMENTS AND AUTHORITIES** .............................................. 12

**I. THE COMMONLY USED AND UNDERSTOOD WORD "ENCOURAGING," FOUND WITHIN K.S.A. 2011 SUPP. 21-5303, DOES NOT RENDER THE SOLICITATION STATUTE VAGUE OR OVERBROAD.** ............................ 12
    K.S.A. 2011 Supp. 21-5303 ...................................................... 12
    *No objection* ...................................................................... 13
    K.S.A. 2011 Supp. 21-5303 ...................................................... 13
    *State v. Atteberry*, 44 Kan. App. 2d 478, 239 P.3d 857 (2010) ............ 13
    *State v. Papen*, 274 Kan. 149, 162, 50 P.3d 37 (2002) ..................... 13
    *Test for vagueness* ................................................................ 14
    *State v. Bollinger*, 302 Kan. 309, 318, 352 P.3d 1003 (2015) ............. 14
    *Standard of review* ................................................................ 14
    *Bollinger*, 302 Kan. at 318 ..................................................... 14
    *Caselaw on vagueness* ............................................................ 15
    *State v. Adams*, 254 Kan. 436, 441, 866 P.2d 1017 (1994) ................ 15
    *State v. Kirby*, 222 Kan. 1, 6, 563 P.2d 408 (1977) ........................ 15
    *State v. Bryan*, 259 Kan. 143, Syl. ¶ 4, 910 P.2d 212 (1996) ............ 15
    *State v. Rose*, 234 Kan. 1044, 1050, 677 P.2d 1011 (1984) ............... 15
    *Hearn v. City of Overland Park*, 244 Kan. 638, 642, 772 P.2d 758 (1989) 15
    *State v. Richardson*, 289 Kan. 118, 209 P.3d 696 (2009) .................. 15
    *Cardarella v. City of Overland Park*, 228 Kan. 698, 703-05, 620 P.2d 1122 (1980) ............................................................................... 15
    *State v. Rucker*, 267 Kan. 816, 834, 987 P.2d 1080 (1999) ............... 15
    *State v. Srack*, 49 Kan. App. 2d 761, Syl. ¶ 3, 314 P.3d 890 (2013) ..... 15

*Term "encouraging" is not vague* ............................................................. 16
   K.S.A. 2011 Supp. 21-5303 .................................................................. 16
   Black's Law Dictionary, 644 (10th Ed. 2014). ................................... 16
*Term "encourage" in other states* .......................................................... 16
   *Edmondson v. Pearce*, 91 P.3d 605, 631-32 (Okla. 2004) ........................ 16
   *State v. Todd*, 468 N.W.2d 462, 465–466 (Iowa 1991) ............................ 16
   *State v. Young*, 695 S.W.2d 882, 883 (Mo. 1985) ..................................... 16
*No requirement of corroboration* .......................................................... 17
   *State v. Potts*, 304 Kan. 687, 694, 374 P.3d 639 (2016). ........................... 17
*Solicitation statute not overbroad* ........................................................ 17
   *Dissmeyer v. State*, 292 Kan. 37, 40, 249 P.3d 444 (2011) ....................... 18
   *State v. McAffry*, 263 Kan. 521, 949 P.2d 1137 (1997) .............................. 18
   *City of Junction City v. Mevis*, 226 Kan. 526, 601 P.2d 1145 (1979) ......... 18
*Johnson's overbroadness argument: Free Speech* ......................................... 18
*Vague and overbroadness harmless, as term "encourage" was explained to jury* ............................................................................................... 19
   *State v. Carter*, 305 Kan. ___, 380 P.3d 189 (2016). .................................. 19
   *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011) ........................... 19
*Conclusion* ............................................................................................ 20


**II.** **JOHNSON'S CONVICTIONS FOR THE SOLICITATION OF NODWELL AND STITES TO KILL HIS EX-WIFE WERE NOT MULTIPLICITOUS, AS THE SOLICITATIONS WERE OF TWO DIFFERENT INDIVIDUALS, AT TWO DIFFERENT TIMES, AT TWO DIFFERENT LOCATIONS, AND WITH TWO DIFFERENT OFFERS.** 21
*No timely objection* .......................................................................... 21
   *State v. Nguyen*, 285 Kan. 418, 433, 172 P.3d 1165 (2007). ...................... 21
*Multiplicity* ....................................................................................... 21
   *State v. King*, 297 Kan. 955, 970, 305 P.3d 641 (2013) ............................. 21
   *State v. Thompson*, 287 Kan. 238, 244, 200 P.3d 22 (2008). ..................... 21
*Standard of review* ............................................................................ 21
   *King*, 297 Kan. at 970 ........................................................................... 21
*Not the same conduct* ........................................................................ 22
   *State v. Sprung*, 294 Kan. 300, 306-07, 277 P.3d 1100 (2012). ................. 22
   *Schoonover*, 281 Kan. 453, 467, 133 P.3d 48 (2006). ............................... 22
*Conclusion* ........................................................................................ 22

**III.** **T**HE **S**TATE PRESENTED SUFFICIENT EVIDENCE THAT **J**OHNSON
SOLICITED **N**ODWOOD AND **S**TITES TO COMMIT THE PREMEDITATED FIRST-
DEGREE MURDER OF HIS EX-WIFE...................................................................23
  *Objection*...........................................................................................................23
    *State v. Rivera*, 42 Kan. App. 2d 914, 918, 218 P.3d 457 (2009)................23
  *Standard of review* ...........................................................................................23
    *State v. Mason*, 268 Kan. 37, 39, 986 P.2d 387 (1999)................................23
  *Sufficient evidence of each element* .................................................................23
    *Conclusion* ....................................................................................................24

**IV.** **T**HE LANGUAGE WITHIN **J**URY INSTRUCTIONS 16 AND 17, WHICH
DEFINE THE AFFIRMATIVE DEFENSE OF RENUNCIATION, WAS PROPER, AS IT
ALIGNED WITH THE REQUIREMENTS OF **K.S.A.** 2011 **S**UPP. 21-5303(C). **I**N THE
ALTERNATIVE, THERE WAS NO CLEAR ERROR IN GIVING THE INSTRUCTIONS.
  24
  *Standard of review and progression of analysis* ............................................24
    *State v. Dominguez*, 299 Kan. 567, 573, 328 P.3d 1094 (2014) ..................24
    *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011)..............................25
    *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).................25
  *Jurisdiction to consider claim: Invited error* .................................................25
    *State v. Thomas*, 305 Kan. ___, ___ P.3d ___, 2016 WL 5844494, 2 (2016).
    ...........................................................................................................................25
    *State v. Hargrove*, 48 Kan. App. 2d 522, 531, 293 P.3d 787 (2013)...........25
  *K.S.A. 2011 Supp. 21-5303(c), and Jury Instructions 16 & 17*......................26
  *Affirmative defense was legally questionable*..................................................27
    *State v. LaMae*, 303 Kan. 993, Syl. ¶ 4, 368 P.3d 1110 (2016)...................27
  *Instructions were legally appropriate* ............................................................28
    *State v. Allen*, 52 Kan. App. 2d 729, 733-34, 372 P.3d 432 (2016)............28
    *State v. Acevedo*, 49 Kan. App. 2d 655, 663, 315 P.3d 261 (2013).............28
  *Demonstrating" given instead of "manifesting"*............................................28
    http://www.thesaurus.com/browse/demonstrate?s=ts.................................29
    http://www.dictionary.com/browse/demonstrating?s=t ..............................29
    http://www.dictionary.com/browse/manifesting?s=t...................................29
    http://www.thesaurus.com/browse/manifesting?s=t. ..................................29
  *Abandonment" given instead of "renunciation"*............................................29
    Black's Law Dictionary 2 (Tenth ed. 2014) ("abandonment")...................29
    http://www.dictionary.com/browse/abandonment?s=t. ..............................29
    Black's Law Dictionary 1489 (Tenth Ed. 2014) ("renunciation")...............30
    http://www.dictionary.com/browse/renunciation?s=t ..................................30
  *Plan" given instead of "purpose"*...................................................................30

http://www.dictionary.com/browse/plan?s=t. ...............................................30

http://www.thesaurus.com/browse/plan?s=t. ............................................30

Black's Law Dictionary 1431 (10th Ed. 2014) ("purpose") ........................30

Black's Law Dictionary 1431 (10th Ed. 2014) ("purposely") .....................30

http://www.dictionary.com/browse/purpose?s=t. ......................................30

http://www.thesaurus.com/browse/purposes?s=t. .....................................30

*No clear error* ...........................................................................................31

*State v. Brammer*, 301 Kan. 333, 341, 343 P.3d 75 (2015) ......................31

*Ellmaker*, 289 Kan. 1132, at Syl. ¶ 2. ..................................................31

*Conclusion* ..............................................................................................32

**V.  BECAUSE IT WAS JOHNSON'S BURDEN TO ESTABLISH THE AFFIRMATIVE DEFENSE OF RENUNCIATION, HE WAS PROPERLY CONVICTED. IN THE ALTERNATIVE, THERE WAS SUFFICIENT EVIDENCE TO ESTABLISH THAT JOHNSON DID NOT RENUNCIATE HIS SOLICITATION OF STITES TO MURDER HIS EX-WIFE.** ......................................................................................................32

*Objection not necessary* ...........................................................................32

*Standard of review* ..................................................................................33

*State v. Jefferson*, 287 Kan. 28, 33, 194 P.3d 557 (2008). .........................33

*State v. Plummer*, 295 Kan. 156, 162, 283 P.3d 202 (2012). ....................33

*Johnson had burden to prove affirmative defense* .........................................33

*Martin v. Ohio*, 480 U.S. 228, 235, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987)

................................................................................................................33

*May v. Cline*, 304 Kan. 671, 675-76, 372 P.3d 1242 (2016) ......................33

*United States v. Corrigan*, 548 F.2d 879, 883 (10th Cir. 1977)...................33

*State v. Kershner*, 15 Kan. App. 2d 17, 19, 801 P.2d 68 (1990).................34

*Sufficient evidence to negate affirmative defense* ..........................................34

*Conclusion* ..............................................................................................34

**VI.    JUDGE CAMERON PROPERLY INSTRUCTED THE JURY THAT, IF THERE WAS A SUBSTANTIAL AND INTEGRAL CONNECTION BETWEEN JOHNSON'S CRIME OF SOLICITATION OF STITES AND THE STATE OF KANSAS, THE JURY COULD CONVICT, EVEN THOUGH PART OF THE CRIME OCCURRED IN ANOTHER STATE.** ......................................................................................................35

*Progression of analysis* ............................................................................35

*State v. Dominguez*, 299 Kan. 567, 573, 328 P.3d 1094 (2014) .................35

*State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011)...........................35

*State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).................36

*Jurisdiction and preservation* ...................................................................36

*State v. Ellmaker*, 289 Kan. 1132, Syl. ¶ 1, 221 P.3d 1105 (2009)..............36
*Instruction was proper*.........................................................................37
   K.S.A. 2011 Supp. 21-5106............................................................37
*Instruction mentioned "state," not "Johnson County"* ........................37
   K.S.A. 2011 Supp. 21-5106............................................................37
*Cases dealing with interstate crimes* ..................................................38
   *State v. Grissom*, 251 Kan. 851, 886-87, 840 P.2d 1142 (1992) ...............38
   *State v. Watts*, No. 104,669, 2012 WL 2148163 (Kan. App. 2012) ...........38
*No clear error* ....................................................................................39
   *Ellmaker*, 289 Kan. 1132, at Syl. & 2. .........................................39
*Conclusion* ........................................................................................40

**VII.  THE TERMS "ENCOURAGING" AND "REQUESTING" DO NOT CREATE
ALTERNATIVE MEANS IN THE SOLICITATION STATUTE. IN THE ALTERNATIVE,
THERE WAS SUFFICIENT EVIDENCE OF EACH MEAN.**......................................40
*Invited error* ......................................................................................40
   *State v. Verser*, 299 Kan. 776, 326 P.3d 1046 (2014)..................................40
   *State v. Schreiner*, 46 Kan. App. 2d 778, 791, 264 P.3d 1033 (2011).........41
   *State v. Wright*, 290 Kan. 194, 201, 205–06, 224 P.3d 1159 (2010) ...........41
   *State v. Holt*, 119 Wash. App. 712, 82 P.3d 688, 718 (2004).....................41
*Standard of review* .............................................................................41
   *State v. Cato–Perry*, 48 Kan. App. 2d 92, 94–95, 284 P.3d 363 (2012)......42
   *State v. McCaslin*, 291 Kan. 697, 710, 245 P.3d 1030 [2011]....................42
*Alternative means analysis* .................................................................42
   *State v. Timley*, 255 Kan. 286, 289-90, 875 P.2d 242 (1994) .....................42
   *State v. Brown*, 295 Kan. 181, 199-200, 284 P.3d 977 (2012). ..................42
*Encouraging" and "requesting" are not alternative means*..........................42
   K.S.A. 2011 Supp. 21-5303 ..........................................................42
   Black's Law Dictionary 644 (10th Ed. 2014) ("encourage"). .....................43
   http://www.dictionary.com/browse/encourage?s=t. ...................................43
   http://www.dictionary.com/browse/requesting?s=t. ...................................43
*Super sufficiency not proper harmless error standard*..................................43
   *State v. Wright*, 290 Kan. 194, 207, 224 P.3d 1159 (2010) ........................43
   *State v. Beck*, 32 Kan. App. 2d 784, Syl. ¶ 4, 88 P.3d 1233 (2004)............43
   *Alternative Means Jurisprudence in Kansas: Why Wright is Wrong*, 62 U.
   Kan. L. Rev. 53, 70-73, 86-88 (2013) ...............................................43
   *State v. Grissom*, 251 Kan. 851, 891-92, 840 P.2d 1142 (1992) ................44
   *State v. Brown*, 295 Kan. 181, 216, 284 P.3d 977 (2012)...........................44
   K.S.A. 22-3421.............................................................................44
   *State v. Briseno*, 299 Kan. 877, 883, 326 P.3d 1074 (2014)......................44

*State v. Dixon*, 279 Kan. 563, 605, 112 P.3d 883 (2005)............................45

*State v. Dern*, 303 Kan. 384, 412-17, 362 P.3d 566 (2015).........................45

*Sufficient evidence of each mean*.................................................................45

*Remedy is a new trial*..................................................................................46

*Conclusion*..................................................................................................46


**VIII. THE COMPLAINT FILED AGAINST JOHNSON WAS NOT DEFECTIVE
SIMPLY BECAUSE IT USED THE WORDS "ENCOURAGED" AND "REQUESTED,"
RATHER THAN "ENCOURAGING" AND "REQUESTING."**...................................46

*No objection*...............................................................................................47

*State v. Dunn*, 304 Kan. 773, 819, 375 P.3d 332 (2016)............................47

*Standard of review*......................................................................................47

*State v. Moody*, 282 Kan. 181, 188, 144 P.3d 612 (2006).........................47

*Present participles does make a complaint defective*....................................48

*Cannon*, 274 Kan. 166, 173, 50 P.3d 48 (2002).........................................48

*Conclusion*..................................................................................................49


**CONCLUSION**...........................................................................................49


**APPENDIX**...............................................................................................51-61

**2013-110837-A**

_____

IN THE
**COURT OF APPEALS OF THE
STATE OF KANSAS**

_____

**STATE OF KANSAS**
Plaintiff-Appellee

vs.

**RHEUBEN JOHNSON**
Defendant-Appellant

_____

**BRIEF OF APPELLEE**
_____

<u>**ISSUES ON APPEAL**</u>

I.      **The commonly used and understood word "encouraging," found
within K.S.A. 2011 Supp. 21-5303, does not render the solicitation
statute vague or overbroad.**

II.     **Johnson's convictions for the solicitation of Nodwell and Stites to kill
his ex-wife were not multiplicitous, as the solicitations were of two
different individuals, at two different times, at two different locations,
and with two different offers.**

III.    **The State presented sufficient evidence that Johnson solicited Nodwell
and Stites to commit the premeditated first-degree murder of his ex-
wife.**

IV.     **The language within Jury instructions 16 and 17, which define the
affirmative defense of renunciation, was proper, as it aligned with the
requirements of K.S.A. 2011 Supp. 21-5303(c). In the alternative, there
was no clear error in giving the instructions.**

**V.**     Because it was Johnson's burden to establish the affirmative defense of renunciation, he was properly convicted. In the alternative, there was sufficient evidence to establish that Johnson did not renunciate his solicitation of Stites to murder his ex-wife.

**VI.**     Judge Cameron properly instructed the jury that, if there was a substantial and integral connection between Johnson's crime of solicitation of Stites and the State of Kansas, the jury could convict, even though part of the crime occurred in another state.

**VII.**     The terms "encouraging" and "requesting" do not create alternative means in the solicitation statute. In the alternative, there was sufficient evidence of each mean.

**VIII.**     The complaint filed against Johnson was not defective simply because it used the words "encouraged" and "requested," rather than "encouraging" and "requesting."

## STATEMENT OF FACTS

Rheuben Johnson's ex-wife, Annie Johnson, testified that they married in October of 2005, and had a son in 2006. (R.15, 10). During their marriage, Johnson operated an extermination business, and also participated in other business projects that provided him with significant income. (R.15, 11). Annie believed that Johnson earned between $300,000 and $500,000 a year. (R.15, 11). Johnson, thus, had access to large amounts of cash. (R.15, 11).

*Annie and Johnson's discordant divorce*

Annie and Johnson separated in October of 2009, and finalized their divorce, which involved child-custody disagreements, in January of 2012. (R.15, 10-12). They were not allowed to have contact with one another. (R.15, 14).

Dawn Wake, a clinical social worker who worked with the family on their child-custody problems, conducted five or six sessions with Johnson and his son. (R.15, 27, 29-30). She explained that Johnson was generally agitated, hopeless, and felt like the process was an injustice. (R.15, 33-35). His frustration was mainly directed at Annie but also at Wake's supervisor, Trina Nudson. (R.15, 34-35).

In early 2012, Johnson's visits with his son changed from unsupervised to supervised. (R.15, 30-32). This upset Johnson, who informed Wake that he felt that the process was too slow, and the focus of the child custody dispute was on trivial matters. (R.15, 31-32, 33-34). Wake, however, was in support of the modification. (R.15, 30-32).

Between March and May of 2012, Johnson's visits with his son were mostly supervised, with the visits occurring at Layne Project, a business that provides supervised visitation services. (R.15, 13). In mid-April, Wake implemented the "Step Up" plan, to help Johnson move toward unsupervised visitation, but it just upset him. (R.15, 32-33). Wake did not believe that Johnson made significant progress on the plan. (R.15, 34).

Wake had her final session with Johnson and his son on May 22, 2012, from 1:30-3:00 p.m., the same day that Johnson met with Detective Stites in Missouri to solicit him to murder Annie. (R.9, 138; R.15, 33-34).

*Nodwell introduced to Johnson - met at Mr. Goodcents*

At trial, Ronald Nodwell testified that he had recently been released from prison and was looking for employment. (R.9, 91).[1] A mutual friend recommended that he speak to Johnson about working for his extermination company. (R.9, 91, 102-03). Nodwell had never met Johnson or Annie. (R.9, 106; R.15, 8). On April 15, 2012, Nodwell met Johnson at a Mr. Goodcents. (R.9, 91-92; R.15, 69).

At first, the conversation focused on employment. (R.9, 93). Johnson, however, shifted the conversation to Annie, stating that she was the root of all his problems. (R.9, 93; R.15, 69). Nodwell told Detective Campbell that Johnson "was looking to see (sic) for somebody to kill her." (R.15, 69).

Johnson believed that Annie was taking his son, money, and business away from him. (R.9, 93-94). He believed that Annie was addicted to pain pills, and into vampires and Goth. (R.9, 93-94; R.21, State's Exhibit 5, 02:30-02:45). Johnson told Nodwell that it would be worth money to him, "If she was gone." (R.9, 93-94). Nodwell believed Johnson was asking him to murder Annie. (R.9, 94).

Initially, Nodwell thought Johnson was joking, but he continued to focus on Annie, telling Nodwell that he would pay him $20,000.00 "to make her go away." (R.9, 94-95). He even offered to make payments. (R.9, 95).

Nodwell told Johnson it would be stupid for him to make Annie disappear, because he would be the prime suspect. (R.9, 101-02). After that, Johnson "made

---

[1] To reduce the length of the statement of facts, the State has focused on Nodwell's testimony, but has also included cites to Detective Campbell's testimony, where he corroborates Nodwell.

it sound like he was talking about a construction job or cleaning up glass. He made it sound like it was something other than what it was." (R.9, 102).

*Johnson drove Nodwell to places Annie frequented*

After leaving Mr. Goodcents, Johnson drove Nodwell to Annie's apartment complex, which was in a gated community. (R.9, 95-96; R.15, 14, 69-70). Johnson told Nodwell that he would need a code to get into the complex. (R.9, 96). Johnson also told Nodwell what Annie drove. (R.9, 96; R.15, 70).

Johnson drove Nodwell to a McDonalds where, prior to work, Annie would stop for coffee: a fact confirmed by Annie at trial. (R.9, 96; R.15, 15, 70). He drove Nodwell to Annie's work. (R.9, 98; R.15, 14-15, 70). He also told Nodwell what days his son was at daycare. (R.9, 98).

Johnson suggested to Nodwell ways he could make Annie disappear. (R.9, 98-99; R.15, 70). Nodwell told Campbell that Johnson had "a couple of ideas." (R.15, 70). Johnson told Nodwell "that, you know, she's addicted to pain pills, and that I could overdose her on her pain pills and it looked like an accident." (R.9, 99). Annie was, in fact, taking several prescribed medications at the time. (R.15, 15). Johnson also suggested that Nodwell could burn Annie's apartment down, or "catch her after getting coffee and drive up beside her and shoot her in the head on the way to work." (R.9, 99).

After the meeting, Nodwell and Johnson, on several occasions, spoke on the phone. (R.9, 100). Nodwell would call Johnson to ask about employment, but Johnson would focus on Annie. (R.9, 100). Johnson called Nodwell from

"[s]everal different numbers." (R.9, 100-01). Campbell testified that Nodwell denied having contacted Johnson. (R.15, 70-71).

*Nodwell contacted the Olathe Police Department*

Nodwell eventually contacted the Olathe Police Department (OPD), and, that same night, Friday, May 18, 2012, met with Campbell. (R.9, 102-03; R.15, 68-69). After the interview, officers decided to use an undercover officer so that they could record the conversation(s) and determine the criminality of Johnson's actions. (R.9, 122; R.15, 71-72).

Campbell asked Nodwell to call Johnson and record the conversation. (R.15, 71). Nodwell attempted to call him several times, but Johnson never answered. (R.9, 103). Nodwell left a message. (R.9, 103).

The following Sunday, May 20th, 2012, Johnson returned Nodwell's phone call. (R.9, 103). Nodwell told Johnson that he did not have time to handle the "situation," but "had a friend that was willing to, and asked him if he'd be interested in meeting him." (R.9, 103-04). They made arrangements to meet the next day. (R.9, 103).

*Nodwell, Stites, and Johnson met at the Waterworks Park*

Nodwell returned to the OPD on Monday, May 21st, 2012. (R.9, 104; R.15, 72). Nodwell and his "friend," undercover police officer Lonnie Stites, met Johnson at Waterworks Park. (R.9, 104). Stites was wearing a transmitter and a recording device. (R.9, 135). State's Exhibit 2, is a two-part audio recording of the meeting, and is the best evidence of the interaction. (R.21, State's Exhibit 2).

6

Nodwell followed instructions given to him by the police, as he introduced Stites to Johnson, but then quickly left the area and had no further contact with Johnson. (R.9, 104, 134).

Johnson and Stites agreed to a $10,000 fee to kill Annie. (R.9, 150; R.21, State's Exhibit 2, Part 2, 00:30-2:15). He agreed to pay $3,000.00 as a down payment, and the remaining $7,000 after the task was completed. (R.9, 124).

During the conversation, Johnson would refer to the murder of Annie in terms of work. (R.9, 150). "Um, well I mean he kind of filled you in on what needs to be done. We can call it you know a whole bunch of different projects, we can call it hauling off a bunch of old vans and trucks that I've got in the back, or that'd be one…one project or remodeling, fixing up the home, could be another project." (R.21, State's Exhibit 2, Part 1, 06:15-07:00).

Stites asked for a second meeting so that Johnson could provide additional information, including maps and pictures. (R.9, 124). Stites agreed to call Johnson the next day to establish the time and place of the meeting. (R.9, 124).

*Tuesday: Johnson did not show for Waterworks Park meeting*

Around 12:30 p.m. the next day, May 22, 2012, Johnson set up a meeting with Stites, which was to occur around 4:00 p.m. at Waterworks Park. (R.9, 125, 140-41; R.15, 73; R.21, State's Exhibit 3). State's Exhibit 3 is an audio recording of the meeting, and is the best evidence of the interaction. (R.21, State's Exhibit 3).

The phone call in State's Exhibit 3 occurred prior to Johnson's appointment with Wake and his son (1:30-3:00 p.m.), and the meeting would have occurred after the appointment. (R.9, 138; R.15, 33-34).

Johnson did not show up to the meeting but, shortly thereafter, called and stated that he was doing work in, and wanted to move the meeting to, Missouri. (R.9, 140-41; R.15, 74; R.21, State's Exhibit 9). Stites told Johnson that he was busy, would have to look at his schedule, and would call him back. (R.9, 141). State's Exhibit 9 is an audio recording of the meeting, and is the best evidence of the interaction. (R.21, State's Exhibit 3).

The officers returned to the OPD, regrouped, and Stites called Johnson back. (R.9, 125; R.21, State's Exhibit 4). Johnson continued to insist that the meeting occur in Missouri. (R.21, State's Exhibit 4). State's Exhibit 4 is an audio recording of this meeting, and is the best evidence of the interaction. (R.21, State's Exhibit 4).

*Stites agrees to meet Johnson in Missouri*

After ending the phone conversation, Stites and other officers discussed if it would be proper to hold the meeting in Missouri. (R.9, 126). They decided that a life was at stake, and it was worth the risk. (R.9, 126). Around 5:00-5:30 p.m., Stites called Johnson and agreed to meet him at a WalMart in Missouri. (R.9, 126; R.15, 75-76; R.21, State's Exhibit 10). State's Exhibit 10 is an audio recording of this meeting. (R.21, State's Exhibit 10).

When Stites arrived, Johnson approached his vehicle and handed him $3,000 in cash, which was admitted into evidence as State's Exhibit 8. (R.9, 125, 140-41, 144-45; R.15, 73; R.21, State's Exhibit 5). State's Exhibit 5 is an audio recording of this meeting, and is the best evidence of the interaction. (R.21, State's Exhibit 5).

Johnson gave Stites a hand-drawn map, admitted as State's Exhibit 7. (R.9, 145). At trial, Annie was shown the map, and explained that, in Johnson's handwriting, it was of her "apartment complex. There's a school that's near my place, Grant Street is present. There's a question mark. That's marked 79th Street, and it says '1:30 court Wednesday, 2:45, 3 p.m., drop off Layne, 7 o'clock pick up." (R.15, 18: R.21, State's Exhibit 7).

Annie explained that, on the other side of State's Exhibit 7, "This is Rheuben Johnson's handwriting. This is the Layne Project. This is Santa Fe, and this says 'courthouse.'" (R.15, 17-18; R.21, State's Exhibit 7).

Johnson also gave Stites a picture of Annie, admitted as State's Exhibit 6. (R.9, 146). During their conversation, Stites asked Johnson, "Is this the van you want to disappear." (R.9, 146-47). Stites was pointing to Annie. (R.9, 147).



State's Exhibit 6 [larger than portrayed, and in color]: the photo Johnson gave to Stites, of the "van" that he wanted hauled off.

Stites had Annie's first name. (State's Exhibit 5, 06:10). He asked for Annie's last name, but did not think that Johnson provided that information. (R.9, 147). "The only thing I had was a description." (R.9, 147).

Johnson never gave Stites his address, which would have made it impossible for him to haul vans from Johnson's property (as was suggested by the code language). (R.9, 148). Johnson never gave Stites his name. (R.9, 148). Johnson did not have Stites's name. (R.9, 148).

*Johnson solicited Porterfield to kill his wife*

Richard Porterfield testified that he met Johnson while they were both incarcerated in the Johnson County Adult Detention Center. (R.15, 43, 77-78).[2] Around the first week of March, 2013, Johnson told Porterfield that he worked in pest and animal control. (R.15, 45, 47). Porterfield told Johnson that he did not think he would be good at pest control. (R.15, 78). Johnson responded, by stating "you'd probably be better at getting rid of humans." (R.15, 45, 78). Porterfield responded, "Yeah, that's probably more up my alley." (R.15, 45, 78).

Porterfield was not serious in his response, but was simply playing along. (R.15, 45). However, Johnson asked Porterfield if he would be interested in doing something like that. (R.15, 45 46). Porterfield asked "What?" (R.15, 46). Johnson responded, "Killing my wife." (R.15, 46).

Porterfield asked Johnson, "How much does something like that pay?" (R.15, 45). Johnson said "8 to $10,000." (R.15, 45, 78). Porterfield did not think that was a good deal, but continued to play along. (R.15, 46). He never actually intended to kill Johnson's ex-wife. (R.15, 47-48). Johnson provided Porterfield details regarding his family. (R.15, 79).

Later, Johnson asked Porterfield how long he was going to be in jail. (R.15, 47-48, 78). Johnson told Porterfield, "I don't know for sure." (R.15, 48). Johnson responded "I hope it's soon." Porterfield replied "I do too." (R.15, 48).

---

[2] To reduce the length of the statement of facts, the State has focused on Porterfield's testimony, but has also included cites to Detective Campbell's testimony, where he corroborates Porterfield.

At trial, Porterfield admitted that his reason for bringing this information to law enforcement was that it may help his own case, but that he was also afraid that Johnson was trying to trap him in some way. (R.15, 79-80).

*Arrest, convictions, and sentence*

After the meeting in Missouri with Sites, Johnson drove back to Kansas, and was arrested shortly thereafter. (R.9, 126). He was subsequently convicted of soliciting Nodwell and Stites to commit the first-degree premeditated murder of Annie, but was acquitted of the solicitation of Porterfield to murder Annie. The two counts were run consecutive for a controlling 132-month prison sentence. (R.1, 209).

Johnson now appeals his convictions. (R.1, 203).

## ARGUMENTS AND AUTHORITIES

I.  **The commonly used and understood word "encouraging," found within K.S.A. 2011 Supp. 21-5303, does not render the solicitation statute vague or overbroad.**

Johnson argues that, on its face, K.S.A. 2011 Supp. 21-5303 is unconstitutionally vague and overbroad, because it does not define the term "encouraging."[3] The term "encouraging," however, is a commonly used and understood word, and is thus not vague. In addition, the use of the word "encouraging" in K.S.A. 2011 Supp. 21-5303 does not result in a violation of Johnson's First Amendment rights, and is thus not overbroad.

---

[3] K.S.A. 2011 Supp. 21-5303 applies to Johnson's crimes, which occurred in April and May of 2012. K.S.A. 21-5303 was amended in 2013, but the "offending" language remains the same.

*No objection*

Johnson concedes that he did not timely object to the vagueness or overbroadness of K.S.A. 2011 Supp. 21-5303. Appellant's Brief, **8-9. He, however, argues that this Court should consider the issue because it involves a question of law on proven or admitted facts which is finally dispositive of the case. Appellant's Brief, **8-9. In the alternative, he argues that consideration of the issue serves the ends and justice or prevents the denial of his constitutional rights. Appellant's Brief, **8-9.

This Court, in *State v. Atteberry*, 44 Kan. App. 2d 478, 239 P.3d 857 (2010), considered a vagueness/overbroadness claim, even when there was no objection. Not all courts, however, have done so. For example, in *State v. Papen*, 274 Kan. 149, 162, 50 P.3d 37 (2002), the Kansas Supreme Court refused to consider a vagueness/overbroadness claim made for the first time on appeal, finding that, "A defendant to whom a statute may constitutionally be applied cannot challenge the statute on the ground that it may conceivably be applied unconstitutionally in circumstances not before the court."

Not unlike in *Papen*, even if Johnson can establish that the term "encouraging" is vague or overbroad, he still does not contest the fact that K.S.A. 2011 Supp. 21-5303 "may constitutionally be applied" in his case. The jury could have simply convicted Johnson of "requesting" that Nodwell and Stites murder Annie. K.S.A. 2011 Supp. 21-5303 may, thus, be "constitutionally be applied" to Johnson's case, and this Court should not consider Johnson's claim.

*Test for vagueness*

A statute is unconstitutionally vague if it fails to "provide a person of ordinary intelligence fair notice of what is prohibited." *State v. Bollinger*, 302 Kan. 309, 318, 352 P.3d 1003 (2015). It is also unconstitutionally vague if it fails to protect against arbitrary enforcement. *Bollinger*, 302 Kan. at 318.

The test for determining whether a criminal statute is so vague as to be unconstitutional entails two related inquiries: (1) whether the statute gives fair warning to those potentially subject to it; and (2) whether it adequately guards against arbitrary and unreasonable enforcement. *Bollinger*, 302 Kan. at 318.

*Standard of review*

Whether a statute is constitutional is a question of law subject to unlimited review. *Bollinger*, 302 Kan. at 318. Appellate courts presume that statutes are constitutional, resolving all doubts in favor of passing constitutional muster. *Bollinger*, 302 Kan. at 318. "It is difficult for a challenger to succeed in persuading a court that a statute is facially unconstitutional. Such challenges are disfavored, because they may rest on speculation, may be contrary to the fundamental principle of judicial restraint, and may threaten to undermine the democratic process." *Bollinger*, 302 Kan. at 318-19. "If there is any reasonable way to construe a statute as constitutionally valid, this court has both the authority and duty to engage in such a construction." *Bollinger*, 302 Kan. at 318.

*Caselaw on vagueness*

Kansas courts have, on occasion, found statutes to be unconstitutionally vague. See, e.g., *State v. Adams*, 254 Kan. 436, 441, 866 P.2d 1017 (1994) (term "misconduct" was "so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application."); S*tate v. Kirby*, 222 Kan. 1, 6, 563 P.2d 408 (1977) (vague as it is unclear whether term "wanton" requires an intentional or unintentional act).

Most vagueness arguments, however, fail. See, e.g., *State v. Bryan*, 259 Kan. 143, Syl. ¶4, 910 P.2d 212 (1996) (term "following" "was not sufficiently vague so as to render its meaning incomprehensible."); *State v. Rose*, 234 Kan. 1044, 1050, 677 P.2d 1011 (1984) (term "substantially" not vague, as it "defines a standard between the extremes of total and complete impairment and slight impairment, similar to the use of the phrase 'material deviation.'"); *Hearn v. City of Overland Park*, 244 Kan. 638, 642, 772 P.2d 758 (1989) (Term "breed," when referring to canines, not vague.); *State v. Richardson*, 289 Kan. 118, 209 P.3d 696 (2009) (terms "life threatening" and "exposing" not vague); *Cardarella v. City of Overland Park*, 228 Kan. 698, 703-05, 620 P.2d 1122 (1980) (terms "device" and "designed for use" not vague): *State v. Rucker*, 267 Kan. 816, 834, 987 P.2d 1080 (1999) (terms "repeated" or "repeatedly" not vague);  *State v. Srack*, 49 Kan. App. 2d 761, Syl. ¶ 3, 314 P.3d 890 (2013) (term "substantially similar" not vague).

*Term "encouraging" is not vague*

K.S.A. 2011 Supp. 21-5303 defines criminal solicitation as the "commanding, encouraging or requesting" of another to commit a felony…." It does not define the term "encouraging." Black's Law Dictionary defines the term "encourage" as, "To instigate; to incite to action; to embolden; to help." Black's Law Dictionary, 644 (10[th] Ed. 2014).

There is no ambiguity with the term "encouraging." To be guilty of solicitation, the defendant must have instigated, incited to action, or emboldened Stites and Nodwell to murder Annie. It is a commonly used, and understood, term in the English vocabulary.

*Term "encourage" in other states*

Other States have found the term "encourage" to not be vauge. For example, the Oklahoma Supreme Court, in *Edmondson v. Pearce*, 91 P.3d 605, 631-32 (Okla. 2004), found that the phrase "willfully instigates or encourages any cockfight…," to not be vague. See also *State v. Todd*, 468 N.W.2d 462, 465–466 (Iowa 1991) (Iowa Supreme Court construed a similarly worded statute as not unconstitutionally vague or overbroad).

The *Pearce* Court distinguished the Missouri Supreme Court decision in *State v. Young*, 695 S.W.2d 882, 883 (Mo. 1985), which found, in its cockfighting statute, the phrase, "and any person who shall encourage, aid or assist or be present thereat, or shall permit or suffer any place belonging to him or under his control to be so kept or used," to be vague. The *Pearce* Court, however, pointed

out that, "Critical to the decision was the Missouri statute's failure to contain the necessary 'requirement of unlawful intent to give meaning to the presence provision.'" *Pearce*, 91 P.3d at 632.

*No requirement of corroboration*

Johnson also argues that the solicitation statute is vague because it does not require corroborating evidence. Kansas does not require corroborating evidence to convict a defendant of solicitation. "A conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom. If an inference is a reasonable one, the jury has the right to make the inference." *State v. Potts*, 304 Kan. 687, 694, 374 P.3d 639 (2016).

But even if required, there was much corroborating evidence in this case. Not only did Nodwell testify to the solicitation, he provided information on Johnson's business, where Annie lived, where she bought her coffee, and where she worked. Stites's testimony was corroborated by the phone calls and meetings with Johnson (which were audio recorded and presented at trial), Johnson's continuing referral of the murder of Annie in job-related terms (which tied with Nodwell's testimony), the map, the $3,000 in cash, and the picture of Annie.

*Solicitation statute not overbroad*

Johnson argues that the solicitation statute is overbroad. "While a vague statute leaves persons of common intelligence to guess at its meaning, an overbroad statute makes conduct punishable which under some circumstances is

constitutionally protected." *Dissmeyer v. State*, 292 Kan. 37, 40, 249 P.3d 444 (2011).

To succeed on an overbreadth argument, a defendant must establish that "1) the protected activity is a significant part of the law's target, and 2) there exists no satisfactory method of severing that law's constitutional from its unconstitutional applications…. The Supreme Court has recognized that "the overbreadth doctrine 'should be employed sparingly and only as a last resort.'" *Dissmeyer*, 292 Kan. at 44.

In *Dissmeyer*, the Court ruled that statutes that defined, and made illegal, "gray machines," was overbroad because it made "it unlawful to own or operate a broad spectrum of property that does not relate to a legitimate government interest in controlling gambling." *Dissmeyer*, 292 Kan. at 4. See also *State v. McAffry*, 263 Kan. 521, 949 P.2d 1137 (1997) (statute overbroad where it "prohibited shining an artificial light on animals while in possession of any implement that could kill animals, because it could be read as a prohibition on protecting one's cattle from coyotes."); *City of Junction City v. Mevis*, 226 Kan. 526, 601 P.2d 1145 (1979) (city ordinance on carrying firearms "overbroad because it made no exception for transportation of firearm from place of purchase or repair or between a place of business and home.").

*Johnson's overbroadness argument: Free Speech*

Johnson argues that the solicitation statute is overbroad because it violates his free speech rights. The solicitation statute, however, requires more than just

announcing a desire. A defendant must command, encourage, or request another person to commit, attempt to commit, or aid and abet in a felony.

Johnson went beyond free speech when he encouraged and/or requested that Stites and Nodwell murder Annie. He went beyond free speech when he drove Nodwell around to where Annie lived, worked, and bought coffee, and when he offered Nodwell cash to murder Annie.

Johnson went beyond free speech when he had two meetings with Stites to discuss the murder of Annie. He went beyond free speech when he provided cash, a map, and a picture of Annie to Stites. In fact, but for Stites being a police officer, Annie would likely now be dead.

*Vague and overbroadness harmless, as term "encourage" was explained to jury*

Even if the term "encouraging" is vague or overbroad, this Court could still affirm Johnson's convictions if it was harmless. Vagueness and overbroadness claims arise from the Due Process Clause of the Fourteenth Amendment. "[A] a violation of the defendant's right to due process, is subject to appellate court examination for harmlessness under the federal constitutional standard…." *State v. Carter*, 305 Kan. ___, 380 P.3d 189 (2016).

This Court can affirm Johnson's convictions if the State "proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., proves there is no reasonable possibility that the error affected the verdict." *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011).

Even if there was some vagueness or overbroadness in the word "encouraging," the State and Johnson's attorney cured any ambiguity by focusing on the term "requesting." The State told the jury, "We have Mr. Nodwell saying 'he told me to shoot her in the head.' We have Sergeant Stites testifying they are talking about hauling off a clean-up problem. He was presented with a picture of Annie, you have Richard Porterfield as well. Those elements have been satisfied." (R.15, 147). The State also emphasized the absurdity of Johnson's claim that he was asking Stites to haul off junk. (R.15, 168)

Johnson's attorney told the jury that they could not convict Johnson unless they found that he had intended to solicit Nodwell and Stites to murder Annie. "[Y]ou cannot convict Rheuben Johnson under the law if you have a hunch that he did something criminal. You can't convict him if you strongly suspect that he did something criminal. ... Folks, you have to know unequivocally in your heart and in your head, you have to know beyond any reasonable doubt that Rheuben Johnson was hiring these people to kill his wife." (R.15, 154).

*Conclusion*

This Court should find that the term "encouraging" does not render the solicitation statute unconstitutionally vague or overbroad. In the alternative, this Court should find that the term is severable and, thus, harmless.

**II.    Johnson's convictions for the solicitation of Nodwell and Stites to kill his ex-wife were not multiplicitous, as the solicitations were of two different individuals, at two different times, at two different locations, and with two different offers.**

Johnson argues that his two convictions for solicitation to commit the first-degree murder of Annie are multiplicitous. He, however, solicited two different individuals, at two different times, at two different locations, and with two different offers, to kill Annie. These were, therefore, separate crimes of solicitation and, therefore, not multiplicitous.

*No timely objection*

Multiplicity can be raised for the first time on appeal, even without a timely objection. *State v. Nguyen*, 285 Kan. 418, 433, 172 P.3d 1165 (2007).

*Multiplicity*

Multiplicity is the charging of a single offense in several counts of a complaint or information. *State v. King*, 297 Kan. 955, 970, 305 P.3d 641 (2013). "The principal danger of multiplicity is that it creates the potential for multiple punishments for a single offense, which is prohibited by the Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights." *State v. Thompson*, 287 Kan. 238, 244, 200 P.3d 22 (2008).

*Standard of review*

Whether charges are multiplicitous is a question of law subject to unlimited appellate review. *King*, 297 Kan. at 970.

*Not the same conduct*

To be multiplicitous, Johnsons' acts must have "arose from the same act or transaction." *State v. Sprung*, 294 Kan. 300, 306-07, 277 P.3d 1100 (2012). "[T]he 'same conduct' inquiry does not determine whether there is a double jeopardy violation; rather it determines if there could be a violation." *Schoonover*, 281 Kan. 453, 467, 133 P.3d 48 (2006).

In this case, Johnson solicited two different individuals, at two different times, at two different places, and with two different offers, to murder Annie. In April of 2012, Johnson offered Nodwell $20,000 to kill Annie. He drove him to Annie's residence, to where she bought her coffee, and to where she worked. He also continued to pester Nodwell about killing Annie.

On May 21st and 22nd, 2012, Johnson asked Stites to kill Annie. He spoke with him on the phone, met with him on two occasions, gave him $3,000, a map of Annie's residence, and a picture of Annie.

These acts were not part of the same conduct, but were separate solicitations to murder Annie. These were fresh impulses by Johnson to solicit the murder of Annie.

*Conclusion*

Because Johnson solicited two different individuals, at two different times, at two different locations, and with two different officers, to kill Annie, they were separate crimes of solicitation and were, therefore, not multiplicitous.

**III.    The State presented sufficient evidence that Johnson solicited Nodwood and Stites to commit the premeditated first-degree murder of his ex-wife.**

Johnson argues that the State failed to present sufficient evidence that he solicited Nodwell and Stites to murder his ex-wife. The record establishes that there was sufficient evidence of each conviction. This Court should affirm Johnson's convictions.

*Objection*

A criminal defendant need not challenge the sufficiency of the evidence before the district court to preserve the issue for appeal. *State v. Rivera*, 42 Kan. App. 2d 914, 918, 218 P.3d 457 (2009).

*Standard of review*

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found Johnson guilty beyond a reasonable doubt. *State v. Mason*, 268 Kan. 37, 39, 986 P.2d 387 (1999).

*Sufficient evidence of each element*

To convict, the State was required to establish, beyond a reasonable doubt, that Johnson intentionally encouraged or requested [Ronald Nodwell and Lonnie Stites] to commit the premeditated first-degree murder of Annie. (R.1, 178-79).

There was sufficient evidence that Johnson solicited Nodwell to murder Annie. In April of 2012, Johnson offered Nodwell $20,000 to kill Annie. He drove

him to Annie's residence, to where she bought her coffee, and to where she worked. He also continued to pester Nodwell about killing Annie.

On May 21st and 22nd, 2012, Johnson asked Stites to kill Annie. He spoke with him on the phone, met with him on two occasions, gave him $3,000, a map of Annie's residence, and a picture of Annie.

*Conclusion*

There was sufficient evidence to convict Johnson of both counts of solicitation to commit the first-degree murder of Annie. This Court should affirm Johnsons' convictions.

**IV.     The language within Jury instructions 16 and 17, which define the affirmative defense of renunciation, was proper, as it aligned with the requirements of K.S.A. 2011 Supp. 21-5303(c). In the alternative, there was no clear error in giving the instructions.**

Johnson argues that Judge Cameron incorrectly advised the jury, in Jury Instructions 16 and 17, on the law of renunciation, by replacing the terms "manifesting," "renunciation," and "purpose," with the terms "demonstrating," "abandonment," and "plan." This Court should not consider this claim, as Johnson invited the error. In the alternative, the instructions were appropriate, as they correctly stated the law on renunciation. This Court should affirm Johnson's convictions.

*Standard of review and progression of analysis*

The Kansas Supreme Court, in *State v. Dominguez*, 299 Kan. 567, 573, 328 P.3d 1094 (2014), set out a progression of analysis and the corresponding

standards of review for jury instruction issues: first, the reviewing court must consider both jurisdiction and preservation, while exercising an unlimited scope of review; second, the reviewing court must determine whether there was error in giving the instruction; finally, if there was error, the reviewing court must determine if it was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011). The evidence that would support the instruction must be viewed in the light most favorable to the requesting party. *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

*Jurisdiction to consider claim: Invited error*

Johnson requested the exact language given by Judge Cameron in Jury Instructions 16 and 17. (R.1, 160-61, 185-86). "The doctrine of invited error precludes a party from affirmatively requesting a district court rule on a particular issue in a given way and then challenging that ruling on appeal." *State v. Thomas*, 305 Kan. ___, ___ P.3d ___, 2016 WL 5844494, 2 (2016).

The invited error doctrine "effectively binds trial counsel to strategic decisions inducing judicial rulings with the purpose of obtaining favorable judgments for their clients—not guilty verdicts or, in some cases, convictions on lesser charges for criminal defendants." *State v. Hargrove*, 48 Kan. App. 2d 522, 531, 293 P.3d 787 (2013). "The rule also defeats a disreputable strategy aimed at requesting that a judge act in a particular way to salt the record with error as an end in itself, thereby providing potential grounds for reversal of an adverse

judgment." *Hargrove*, 48 Kan. App. 2d at 532. As Johnson requested the instructions, he invited the error, and this Court should not consider this issue.

*K.S.A. 2011 Supp. 21-5303(c), and Jury Instructions 16 & 17*

The criminal solicitation statute, K.S.A. 2011 Supp. 21-5303(c), states that, "It is an affirmative defense that the actor, after soliciting another person to commit a felony, persuaded that person not to do so or otherwise prevented the commission of the felony, under circumstances *manifesting* a complete and voluntary *renunciation* of the actor's criminal *purposes*." (emphasis added to complained-of language).

Johnson objects to Jury Instruction 16, which states that, "It is a defense to a charge of criminal solicitation that the defendant, after soliciting another person to commit a felony, persuaded that person not to do so or otherwise prevented the commission of the felony, under circumstances *demonstrating* a complete and voluntary *abandonment* of the defendant's criminal *plan*. (R.1, 185) (emphasis added to complained-of language).

Jury instruction 17 states that, "The defendant raises *abandonment* as a defense. Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant." (R.1, 186) (emphasis added to complained-of language).

*Affirmative defense was legally questionable*

It is questionable whether the affirmative defense of renunciation should have even been given in this case, as the evidence of renunciation was weak, at best. Johnson cites to volume nine, pages 98, 122, and 156-58, for his renunciation claims. Appellant's Brief, *38. Any other "renunciation" claims have been waived by Johnson, as they were not included in his brief. See *State v. LaMae*, 303 Kan. 993, Syl. ¶ 4, 368 P.3d 1110 (2016) ("An issue not briefed by an appellant is deemed waived and abandoned.").

Page 98 of Volume Nine of the record on appeal, is Nodwell testifying to his drive with Johnson. (R.9, 98). Page 122 of Volume Nine of the record on appeal, is Campbell testifying to the plan to meet with Johnson, and for Nodwell to leave the area. (R.9, 122). Neither of these pages address Johnson's "renunciation" claim.

Pages 156-58 of Volume Nine of the record on appeal, do, however, deal with "renunciation." This was testimony regarding a phone call between Johnson and Stites, after Johnson missed the Waterworks Park meeting on Tuesday. (R.9, 155-56). During the conversation, Johnson stated, "Uh…probably…I probably need to think about this whole thing a little bit more, uh…it kind of came up fast on me and there…I can't jeopardize doing anything that…" (R.21, State's Exhibit 3, 2:45). Later, Johnson states, ""I got that, I got that. I heard you say that. Uh…I'm probably gonna have to go back to thinking about this whole thing then. Uh…" (R.21, State's Exhibit 3, 6:20).

There is no indication that Johnson was suggesting that he was backing out of the solicitation to murder Annie. It was, in fact, more likely that he was waffling on whether to stick to his guns, and require that the meeting occur in Missouri, or concede to Stites, and have the meeting in Kansas.

The comments certainly do not establish that Johnson renunciated his solicitation of Stites. He never attempted to persuade, or otherwise prevent, Stites from killing Annie. He never attempted to make a "complete and voluntary renunciation" of the plan. Had Stites not been a police officer, Annie would likely now be dead.

*Instructions were legally appropriate*

Instructions 16 and 17 are identical to PIK Crim. 4th 53.100 and 51.050. "Although the use of PIK instructions is not required, it is strongly recommended, as those instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions." *State v. Allen*, 52 Kan. App. 2d 729, 733-34, 372 P.3d 432 (2016).

Absent a particular reason to do so, PIK instructions should be followed. *State v. Acevedo*, 49 Kan. App. 2d 655, 663, 315 P.3d 261 (2013). There was nothing unique about this case, which required straying from the PIK instructions.

*"Demonstrating" given instead of "manifesting"*

Johnson argues that the court erred in using the term "demonstrating," instead of "manifesting." Dictionary.com defines the term "demonstrate" as, "to make evident or establish by arguments or reasoning; prove," "to describe,

explain, or illustrate by examples, specimens, experiments, or the like," "to *manifest* or exhibit; show," and "to display openly or publicly, as feelings." One of its synonyms is "manifest." http://www.thesaurus.com/browse/demonstrate?s=ts. http://www.dictionary.com/browse/demonstrating?s=t (emphasis added).

Dictionary.com defines the term "manifest," in verb form, as, "to make clear or evident to the eye or the understanding; show plainly," "to prove; but beyond doubt or question," and "to record in a ship's manifest." http://www.dictionary.com/browse/manifesting?s=t. One of its synonyms is "demonstrate." http://www.thesaurus.com/browse/manifesting?s=t.

There is very little, if any difference between the terms "demonstrating" and "manifesting." They are so similar, in fact, that the term "manifest" is used to define the term "demonstrate," and the term "demonstrate" is a synonym of "manifest."

*"Abandonment" given instead of "renunciation"*

Johnson argues that the court erred in using the term "abandonment," instead of "renunciation." The term "abandonment" is defined as, "The act of withdrawing or discontinuing one's help or support, esp. when a duty or responsibility exists." Black's Law Dictionary 2 (Tenth ed. 2014) ("abandonment"). Dictionary.com defines it as, "to give up; discontinue; withdraw from." http://www.dictionary.com/browse/abandonment?s=t.

The term "renunciation" is defined as, "The express or tacit *abandonment* of a right without transferring it to another." Black's Law Dictionary 1489 (Tenth

Ed. 2014) ("renunciation") (emphasis added). Dictionary.com defines it as, "an act or instance of relinquishing, *abandoning*, repudiating, or sacrificing something, as a right, title, person, or ambition."

http://www.dictionary.com/browse/renunciation?s=t (emphasis added).

There is very little, if any difference between the terms "abandonment" and "renunciation." They are so similar, in fact, that the term "abandonment" is used to define the term "renunciation."

*"Plan" given instead of "purpose"*

Johnson argues that the court erred in using the term "plan," instead of "purpose." Dictionary.com defines the term "plan" as, "a scheme or method of acting, doing, proceeding, making, etc.," and "a design or scheme of arrangement." http://www.dictionary.com/browse/plan?s=t. The term "purpose" is a synonym of the term "purpose." http://www.thesaurus.com/browse/plan?s=t.

The term "purpose" is defined as, "An objective, goal, or end." Black's Law Dictionary 1431 (10th Ed. 2014) ("purpose"). The term "purposely" is defined as, where an actor engages "in prohibited conduct with the intention of causing the social harm that the law was designed to prevent." Black's Law Dictionary 1431 (10th Ed. 2014) ("purposely"). Dictionary.com defines "purpose" as "an intended or desired result; end; aim; goal," and the "practical result, effect, or advantage." http://www.dictionary.com/browse/purpose?s=t. The term "plan" is a synonym of the term "purpose" http://www.thesaurus.com/browse/purposes?s=t.

Again, there is very little, if any, difference between the terms "purpose" and "plan." They are so similar, in fact, that the terms "purpose" and "plan" are synonyms.

*No clear error*

Even if this Court finds error, this is not a due process claim. The jury was instructed on renunciation as a statutorily created affirmative defense. The jury was allowed to consider the theory. The error in this case was simply one of degree of accuracy.

As this is a jury instruction issue and there was no objection, it should be reviewed under the clear error standard. "To reverse for clear error, the court must be firmly convinced the jury would have reached a different verdict had the instruction error not occurred." *State v. Brammer*, 301 Kan. 333, 341, 343 P.3d 75 (2015). To reach this conclusion, an appellate court must examine the instructions as a whole, rather than isolating any one instruction, and determine if the instructions properly and fairly state the law as applied to the facts of the case. *Ellmaker*, 289 Kan. 1132, at Syl. ¶ 2.

There was overwhelming evidence that Johnson approached both Nodwell and Stites, and encouraged/requested that they kill Annie. In April of 2012, Johnson offered Nodwell $20,000 to kill Annie. He drove him to Annie's residence, to where she bought her coffee, and to where she worked. He also continued to pester Nodwell about killing Annie. On May 21st and 22nd, 2012, Johnson asked Stites to kill Annie. He spoke with him on the phone, met with him

on two occasions, gave him $3,000, a map of Annie's residence, and a picture of Annie.

*Conclusion*

This Court should not consider Johnson's claim, as he invited any error in giving Jury instructions 16 and 17. In the alternative, Judge Cameron instructed the jury on the affirmative defense of "renunciation." But even if it was an incorrect instruction, the court did not commit clear error.

**V.     Because it was Johnson's burden to establish the affirmative defense of renunciation, he was properly convicted. In the alternative, there was sufficient evidence to establish that Johnson did not renunciate his solicitation of Stites to murder his ex-wife.**

Johnson argues that the State failed to present sufficient evidence to disprove his affirmative defense of renunciation (only applicable to charge of solicitation of Stites). It was, however, Johnson's burden to prove renunciation. In the alternative, there was sufficient evidence that Johnson did not renunciate his solicitation of Stites to kill Annie.

*Objection not necessary*

A criminal defendant need not challenge the sufficiency of the evidence before the district court to preserve the issue for appeal. *State v. Rivera*, 42 Kan. App. 2d 914, 918, 218 P.3d 457 (2009).

*Standard of review*

Whether the defendant or the State has the burden of proof to establish an affirmative defense is a question of law, and this Court's review is de novo. *State v. Jefferson*, 287 Kan. 28, 33, 194 P.3d 557 (2008).

When considering sufficiency of the evidence, "the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Plummer*, 295 Kan. 156, 162, 283 P.3d 202 (2012).

*Johnson had burden to prove affirmative defense*

Johnson had the burden to prove his affirmative defense of renunciation. "'[T]he common-law rule was that affirmative defenses, including self-defense, were matters for the defendant to prove.' *Martin v. Ohio*, 480 U.S. 228, 235, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987)." *May v. Cline*, 304 Kan. 671, 675-76, 372 P.3d 1242 (2016). This rule "arises directly out of the nature of affirmative defenses—i.e., affirmative defenses (or the lack thereof) are neither elements of the alleged offense nor do they negate any element of the offense. Rather, affirmative defenses provide a legally recognized justification for the action such that the actor cannot be held criminally or civilly liable. See, e.g., *United States v. Corrigan*, 548 F.2d 879, 883 (10th Cir. 1977) ('An affirmative defense admits the defendant committed the acts charged, but seeks to establish a justification or excuse.')." *May*, 304 Kan. at 675-76. "[D]ue process is not violated by requiring a

defendant to carry the full burden of proving that defense by a preponderance of the evidence." *State v. Kershner*, 15 Kan. App. 2d 17, 19, 801 P.2d 68 (1990).

In this case, the State was required to prove the following elements: Johnson (1) intentionally encouraged or requested Lonnie Stites, (2) to commit murder in the first degree, the elements of premeditated first-degree murder being the (3) killing of Annie with (4) premeditation.

The State was not required to prove, beyond a reasonable doubt, that Johnson never renunciated his solicitation of Stites. Therefore, the burden of proof was on Johnson to establish the affirmative defense of renunciation.

*Sufficient evidence to negate affirmative defense*

Even if this Court considers Johnson's claim, there was sufficient evidence to negate his affirmative defense of renunciation. Johnson's "renunciation" comments were likely not related to second-guessing whether he wanted to solicit Stites to kill Annie, but whether he was willing to have the meeting with Stites in Kansas. In addition, Johnson later met with Stites, gave him a map of Annie's residence, $3,000.00, and a picture of Annie, in order to cause Annie's murder. But for Stites being a police officer, Annie would likely now be dead.

*Conclusion*

Johnson had the burden of proof to establish the affirmative defense of renunciation. But even if it was the State's burden, there was sufficient evidence to disprove renunciation.

**VI.** **Judge Cameron properly instructed the jury that, if there was a substantial and integral connection between Johnson's crime of solicitation of Stites and the State of Kansas, the jury could convict, even though part of the crime occurred in another state.**

Johnson argues that Judge Cameron made a mistake in giving Jury Instruction 18, which allowed the jury to convict Johnson of solicitation even when part of the crime occurred in Missouri. Although Johnson's issue is confusing, it appears that he is arguing that the venue instruction should have advised the jury that they must find the crime occurred in Johnson County (not just in the "state"). Jury Instruction 18 properly informed the jury that, as long as there was a substantial and integral connection between the crime and Kansas, Johnson could be convicted. In addition, the elements instructions advised the jury that it must find that Johnsons' crimes occurred in Johnson County, Kansas. This Court should affirm Johnson's conviction of solicitation of Stites.

*Progression of analysis*

The Kansas Supreme Court, in *State v. Dominguez*, 299 Kan. 567, 573, 328 P.3d 1094 (2014), set out a progression of analysis and the corresponding standards of review for jury instruction issues: first, the reviewing court must consider both jurisdiction and preservation, while exercising an unlimited scope of review; second, the reviewing court must determine whether there was error in giving the instruction; finally, if there was error, the reviewing court must determine if it was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011).

In considering whether an instruction is factually appropriate, the evidence that would support the instruction must be viewed in the light most favorable to the requesting party. *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

*Jurisdiction and preservation*

The issue raised on appeal - "The Court erred as a matter of law in instructing the jury on the law re venue jurisdiction as it failed to instruct the jury as to the necessary findings re venue jurisdiction within JoCo, KS" - is not the same argument that was made in the district court. Appellant's Brief, *43. (R.15, 129-30).

At trial, Johnson objected to Jury Instruction 18 because it was not a PIK instruction, and because there was no evidence that the solicitation continued from Kansas to Missouri. (R.15, 130). "I don't think there's any evidence that Mr. Johnson did anything in Kansas, if you accept our argument on abandonment, which was clearly in partial execution of any plan because he clearly abandoned any sort of agreement that he had with Mr. Stites, Detective Stites." (R.15, 130).

The Kansas Supreme Court, in *State v. Ellmaker*, 289 Kan. 1132, Syl. ¶ 1, 221 P.3d 1105 (2009), has ruled that, "Where a trial objection to a jury instruction is different from the argument presented on appeal, a clearly erroneous standard of review applies." This Court should apply the clearly erroneous standard of harmlessness.

*Instruction was proper*

K.S.A. 2011 Supp. 21-5106 controls the jurisdiction of courts in Kansas. It states that, "A person is subject to prosecution and punishment under the law of this state if: The person commits a crime wholly or partly within this state." It also states that, "A crime is committed partly within this state if: (1) An act which is a constituent and material element of the offense; (2) an act which is a substantial and integral part of an overall continuing criminal plan; or (3) the proximate result of such act, occurs within the state." K.S.A. 21-5106(a)-(b).

Johnson's jury was instructed that, "If you find that the defendant committed criminal acts in this state which were a substantial and integral part of an overall continuing crime plan, and which were clearly in partial execution of that plan, the prosecution may be in this state or any other state in which such acts occur." (R.1, 187).

*Instruction mentioned "state," not "Johnson County"*

It appears that Johnson is arguing that the instruction should have said "Johnson County," not "state." Jury Instruction 18 was not meant to inform the jury that the crime must have occurred in Johnson County, Kansas. It was meant to explain that Johnson could still be convicted of solicitation of Stites, even if the crime had partially occurred in Missouri.

Jury Instruction 18 properly advised the jury on the law in Kansas, as it legally aligned with K.S.A. 2011 Supp. 21-5106. It properly instructed the jury on

the legal requirements to convict Johnson of solicitation when a portion of the crime occurred in Missouri.

*Cases dealing with interstate crimes*

A few cases have analyzed jurisdiction to prosecute and sentence a defendant for a crime committed in two states. In *State v. Grissom*, 251 Kan. 851, 886-87, 840 P.2d 1142 (1992), the Kansas Supreme Court was asked to determine whether Kansas had jurisdiction to convict the defendant of murder "because no evidence was presented at trial concerning the location of the alleged killings and because the three women were last seen alive in Missouri." The Court found, "There is evidence from which a jury could find that Grissom committed criminal acts in Kansas which were a substantial and integral part of an overall continuing crime plan and which were in partial execution of the plan." *Grissom*, 251 Kan. at 889-90. See also *State v. Watts*, No. 104,669, 2012 WL 2148163 (Kan. App. 2012) (unpublished) (Appendix) (this Court found that a similarly worded instruction to Jury Instruction 18, sans the word "clearly," was not clearly erroneous).

More so in this case than in *Grissom*, there is much evidence that the criminal acts by Johnson in Kansas were a substantial and integral part of an overall continuing crime plan to murder Annie. The phones calls and the initial meeting occurred in Johnson County, Kansas. This was where the agreement was made. The second meeting was to occur in Johnson County, but Johnson asked that it be moved to Missouri.

The last meeting, which occurred in Missouri, was held so that Johnson could give Stites the $3,000.00, a map of where Annie lived, and a picture of Annie.

*No clear error*

Even if there was error, there was no clear error. An instruction is clearly erroneous only if the reviewing court is firmly convinced there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. *Ellmaker*, 289 Kan. 1132, at Syl. & 2.

If anything, Johnson benefited from the giving of Jury Instruction 18. It provided him with another avenue of acquittal. It forced the jury to question how much of the solicitation of Stites actually occurred in Johnson County, Kansas. But for that instruction, the fact that some of the crime occurred in Missouri would have been of no consequence.

In addition, there was no evidence that the interactions between Stites and Johnson occurred in another county in Kansas. The initial meeting occurred at Waterworks Park, in Johnson County. The telephone calls were made from the OPD police station.

The jury was also informed that they were to consider the instructions as a whole. "[I]t is your duty to consider and follow all of the instructions." (R.1, 170). The jury was also required to "consider and weigh everything admitted into evidence." (R.1, 171). The elements instructions required that the jury find, beyond a reasonable doubt, that the acts occurred "in Johnson County, Kansas."

(R.1, 178-80). The instructions, in fact, twice informed the jury that they were required to find that the acts occurred in Johnson County, Kansas. (R.1, 178-80).

*Conclusion*

Judge Cameron did not make a mistake in giving Jury Instruction 18. In the alternative, the giving of the instruction was not clear error. This Court should affirm Johnson's conviction of the solicitation of Stites to kill Annie.

**VII.  The terms "encouraging" and "requesting" do not create alternative means in the solicitation statute. In the alternative, there was sufficient evidence of each mean.**

Johnson argues that the terms "encouraging" and "requesting" are alternative means of committing the crime of solicitation. This Court should not consider this claim, as Johnson invited the error. In the alternative, the terms "encouraging" and "requesting" are so intertwined that they seek the same intent: to incite Stites and Nodwell, in this case, to murder Annie, and were thus not alternative means. In the alternative, there was sufficient evidence of each mean. This Court should affirm Johnson's convictions.

*Invited error*

Johnson invited any error that occurred here. Johnson proposed an instruction that informed the jury that it could convict him if "the defendant intentionally *encouraged or requested* [Lonnie Stites and Ronald Nodwell] to commit the crime of murder in the first degree, a felony." (R.1, 157-58) (emphasis added). See *State v. Verser*, 299 Kan. 776, 326 P.3d 1046 (2014) ("In general,

when a defendant has invited error, he or she cannot complain of the error on appeal.").

In *State v. Schreiner*, 46 Kan. App. 2d 778, 791, 264 P.3d 1033 (2011), this Court found that the invited error doctrine applies to alternative means claims. Citing *State v. Wright*, 290 Kan. 194, 201, 205–06, 224 P.3d 1159 (2010) (rev'd on other grounds), this Court found, "[J]ury unanimity in criminal cases is a statutory right rather than a fundamental constitutional right…. Nothing in the United States Constitution requires unanimous verdicts in noncapital criminal cases tried in state courts." (citation omitted). *Schreiner*, 46 Kan. App. 2d at 791. Because alternative means issue is not a constitutional issue, the invited error doctrine should apply.

*Schreiner* is supported by the Washington Court of Appeals's decision in *State v. Holt*, 119 Wash. App. 712, 82 P.3d 688, 718 (2004) (overruled on other grounds), where, in a more egregious case (the jury instruction was broader than the charging document) the court found that the invited error doctrine applies to alternative means.

*Standard of review*

If this Court considers this issue, it must determine whether, "after considering all of the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt on each of the alternative

means presented." *State v. Cato–Perry*, 48 Kan. App. 2d 92, 94–95, 284 P.3d 363 (2012) (citing *State v. McCaslin*, 291 Kan. 697, 710, 245 P.3d 1030 [2011]).

*Alternative means analysis*

In *State v. Timley*, 255 Kan. 286, 289-90, 875 P.2d 242 (1994), this Court found, "Unanimity is not required … as to the means by which the crime was committed so long as substantial evidence supports each alternative means." Whether language in a statute creates alternative means, or simply options within means, involves the analysis of legislative intent. *State v. Brown*, 295 Kan. 181, 199-200, 284 P.3d 977 (2012).

Oftentimes, intent can be discerned from the structure of the statute. *Brown*, 295 Kan. at 199-200. "On the other hand, the legislature generally does not intend to create alternative means when it merely describes a material element or a factual circumstance that would prove the crime. Such descriptions are secondary matters—options within a means—that do not, even if included in a jury instruction raise a sufficiency issue that requires a court to examine whether the option is supported by evidence." *Brown*, 295 Kan. at 199-200.

*"Encouraging" and "requesting" are not alternative means*

This terms "encouraging" and "requesting" are options within means. They are both found in subsection (a) of K.S.A. 2011 Supp. 21-5303; a clear indication that these are different options within the same mean.

"Encouraging" and "requesting" have very similar meanings. The term "encourage" is defined as, "To instigate; to incite to action; to embolden; to help."

Black's Law Dictionary 644 (10th Ed. 2014) ("encourage"). Dictionary.com

defines "encouraging" as, "to stimulate by assistance, approval, etc.," "to promote,

advance, or foster." http://www.dictionary.com/browse/encourage?s=t.

Dictionary.com defines "requesting," in its verb form, as, "to ask for,

especially politely or formally," and "to ask or beg (someone) to do something."

http://www.dictionary.com/browse/requesting?s=t.

"Encouraging" and "requesting" require the same intent: to bring about a

certain event through communication. They are, thus, not alternative means, but

options within means.

*Super sufficiency not proper harmless error standard*

If "encouraging" and "requesting" are alternative means, the State believes

that the super-sufficiency standard in *State v. Wright*, 290 Kan. 194, 207, 224 P.3d

1159 (2010) (rev'd on other grounds), is the incorrect remedy. The State, however,

recognizes that this Court is duty-bound to follow Supreme Court precedent. *State

v. Beck*, 32 Kan. App. 2d 784, Syl. ¶ 4, 88 P.3d 1233 (2004).

As explained by the Honorable Judge William R. Mott's, in his article

*Alternative Means Jurisprudence in Kansas: Why Wright is Wrong*, 62 U. Kan. L.

Rev. 53, 70-73, 86-88 (2013), there are several problems with the *Wright* super-

sufficiency standard, including, among others, that it is not a constitutional error,

there is no Fifth Amendment due process right equivalent under the Kansas

Constitution, Kansas has historically relied on the common law, and the Kansas

Supreme Court "has consistently held that Section 5 [of the Kansas constitution's

bill of rights] preserves the jury trial right as it historically existed at common law when [[the] state's constitution came into existence.'"

The Kansas Supreme Court could return to the common law rule and affirm Johnson's convictions if there is evidence of any one of the alternative means. *Why Wright is Wrong*, 62 U. Kan. L. Rev. at 73-75, 88; See also *State v. Grissom*, 251 Kan. 851, 891-92, 840 P.2d 1142 (1992) ("The State is not required to prove a defendant committed both premeditated and felony murder."); *State v. Brown*, 295 Kan. 181, 216, 284 P.3d 977 (2012) (Justice Moritz, in a concurring opinion, stated, "I would find that *Wright* permits a modified harmless error analysis in this case…. Specifically, I would find that when there is sufficient evidence of one alternative means but no evidence or argument regarding another means and thus no possibility of jury confusion, we need not engage in a complicated analysis to determine whether the legislature intended terms separated by an 'or' to be alternative means."); K.S.A. 22-3421 (statute relied upon in creating a statutory alternative means rule).

The Court could apply the clearly erroneous standard, which requires this Court to "assesses whether it is firmly convinced that the jury would have reached a different verdict had the instructional error not occurred. The party claiming a clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal." *State v. Briseno*, 299 Kan. 877, 883, 326 P.3d 1074 (2014) (citations omitted).

Judge Mott discouraged the clearly erroneous standard, noting that it is a "certainty-of-error," not a "certainty-of-prejudice," concept. *Why Wright is Wrong*, 62 U. Kan. L. Rev. at 86. Where the error was not objected to, however, it seems appropriate to shift the burden to the defendant to establish that the error affirmatively affected the outcome of the case.

In the alternative, Judge Mott's analysis could be adopted, and the harmless error standard could be applied. *Why Wright is Wrong*, 62 U. Kan. L. Rev. at 89-91; K.S.A. 60-261; See also *State v. Dixon*, 279 Kan. 563, 605, 112 P.3d 883 (2005); *State v. Dern*, 303 Kan. 384, 412-17, 362 P.3d 566 (2015) (Justices Johnson and Biles indicated a willingness to depart from *Wright*).

*Sufficient evidence of each mean*

Even if "encouraging" and "requesting" are alternative means, there was sufficient evidence of each mean. Viewing the evidence in the light most favorable to the State, the evidence established that Johnson *encouraged* Nodwell and Stites to kill Annie.

Johnson brought the subject up at Mr. Goodcents, offered Nodwell $20,000.00 to kill Annie, took him around to where Annie lived, bought her coffee, and worked, and called Nodwell a number of times, trying to get him to kill Annie. Johnson also encouraged Stites to kill his wife, by returning phone calls, meeting at a location in Kansas, offering $10,000, having another meeting in Missouri, and giving Stites $3,000, a map of Annie's home, and a picture of Annie.

The evidence also established that Johnson requested Nodwell and Stites to kill Annie. Johnson offered both individuals money to kill his wife. He repeatedly called Nodwell, trying to get him to accept the offer. He met with Stites on two different occasions, asking him to kill Annie.

*Remedy is a new trial*

Even if this issue is reversible, the remedy should be a retrial on those alternative means for which there was sufficient evidence. See *State v. Shaw*, 47 Kan. App. 2d 994, Syl. ¶5, 281 P.3d 576 (2012) ("When there is insufficient evidence at trial to support the defendant's conviction of each alternative means of committing a crime, the proper remedy is to reverse the defendant's conviction and remand for a new trial only on the alternative means supported by sufficient evidence in the first trial.")

*Conclusion*

This Court should find that the terms "encouraging" and "requesting" are not alternative means. In the alternative, there was sufficient evidence of each mean. If there was error, this Court should remand the case for a new trial on the means for which there is sufficient evidence.

**VIII. The complaint filed against Johnson was not defective simply because it used the words "encouraged" and "requested," rather than "encouraging" and "requesting."**

For his final issue, Johnson argues that his complaint was defective because the State used the terms "encouraged" and "requested," rather than "encouraging"

and "requesting." Johnson's due process right to notice was not violated when the State changed the terms from past tense to present participle. This Court should affirm Johnson's convictions.

*No objection*

Johnson did not object to the charging document in the district court. Because charging documents no longer confer jurisdiction on a court, this Court should not consider his claim unless it involves only a question of law arising on proved or admitted facts, finally determinative of case, or consideration of the claim is necessary to serve ends of justice, prevent denial of fundamental rights. *State v. Dunn*, 304 Kan. 773, 819, 375 P.3d 332 (2016).

Johnson does not explain how the change from "encouraged" and "requested," to "encouraging" and "requesting" is a question of law arising on proved or admitted facts. There is nothing in the record that establishes that Jones was confused by the change in the language.

He also does not explain how consideration of this claim serves the ends of justice or prevents the denial of fundamental rights. The change in the language did not affect Jones's ability to understand or contest the charges. This Court should not consider Jones's claim.

*Standard of review*

Whether a complaint is jurisdictionally defective is a question of law and this Court's review is de novo. *State v. Moody*, 282 Kan. 181, 188, 144 P.3d 612 (2006).

*Analysis*

"Kansas charging documents do not bestow or confer subject matter jurisdiction on state courts to adjudicate criminal cases; the Kansas Constitution does." *Dunn*, 304 Kan. 773 at Syl 1. Defective complaints in Kansas are measured under the Due Process Clause of the United States Constitution. *Dunn*, 304 Kan. at 814.

In *Dunn*, 304 Kan. 773 at Syl. 1, the Kansas Supreme Court explained that, "Kansas charging documents need only show that a case has been filed in the correct court, e.g., the district court rather than municipal court; show that the court has territorial jurisdiction over the crime alleged; and allege facts that, if proved beyond a reasonable doubt, would constitute a Kansas crime committed by the defendant." *Dunn*, 304 Kan. 773 at Syl. &2.

*Present participles does make a complaint defective*

The Kansas Supreme Court has found that, in certain circumstances, the difference between a verb and its present participle can be important. See *Cannon*, 274 Kan. 166, 173, 50 P.3d 48 (2002) ("We agree that ambiguity exists both in the use of the words 'having a claim' and in the use of the word 'claim.'"). But the difference between the terms "encouraged" and "requested," and "encouraging" and "requesting," are of no consequence.

The fact that the State changed the terms from present participle to past tense did not change the meaning of the words. The jury was still required to find

that Johnson either encouraged or requested that Nodwell and Stites murder Annie.

*Conclusion*

Johnson's due process rights were not violated when the State changed the terms "encouraging" and "requesting" to "encouraged" and "requested." This Courts should affirm Johnsons' convictions.

## **CONCLUSION**

For the foregoing reasons, this Court should affirm Rheuben Johnson's convictions.

Respectfully Submitted,

DEREK SCHMIDT
Attorney General

STEPHEN M. HOWE
District Attorney

/s/ Shawn E. Minihan

_____

Shawn E. Minihan #19861
Assistant District Attorney
Tenth Judicial District
P.O. Box 66051-0728
(913) 715-3124
(913) 715-3050 (fax)
Shawn.Minihan@jocogov.org
Attorney for Appellee

## CERTIFICATE OF SERVICE

I hereby certify that, on the 15th day of December, 2016, a copy of the Brief of Appellee was mailed to pro-se defendant, Rheuben Johnson, #106724, at the El Dorado Correctional Facility, PO Box 311, El Dorado, KS 67042-0311.

/s/ Shawn E. Minihan

_____

Shawn E. Minihan

# APPENDIX

277 P.3d 1193 (Table)
Unpublished Disposition
(Pursuant to Kansas Supreme Court Rule
7.04(f), unpublished opinions are not
precedential and are not favored for citation.
They may be cited for persuasive authority
on a material issue not addressed by a
published Kansas appellate court opinion.)
Court of Appeals of Kansas.

STATE of Kansas, Appellee,
v.
Timothy WATTS, Appellant.

No. 104,669.
|
June 8, 2012.
|
Review Denied Mar. 26, 2013.

Appeal from Johnson District Court; Sara Welch,
Judge.

**Attorneys and Law Firms**

Richard Ney, of Ney & Adams, of Wichita, and
Michelle A. Davis, of Kansas Appellate Defender
Office, for appellant.

Steven J. Obermeier and Megan Fisher, assistant
district attorneys, Stephen M. Howe, district
attorney, and Derek Schmidt, attorney general, for
appellee.

Before LEBEN, P.J., MALONE and ARNOLD-
BURGER, JJ.

## MEMORANDUM OPINION

PER CURIAM.

**\*1** Timothy Watts appeals his conviction for
aggravated kidnapping and the resulting 554–
month prison sentence. He raises several issues on
appeal including prosecutorial misconduct,
instructional error, improper admission of prior
crimes evidence, misstatement of the law in
closing argument, and sufficiency of the evidence.
Finding no error, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

Prior to January 24, 2009, Watts and Melanee
Radenberg had an on-and-off relationship which
involved domestic violence. On the night of
January 24, 2009, Watts and Radenberg went to a
bar to celebrate the birthday of one of
Radenberg's friends. During the drive home,
someone called Radenberg's phone, but only the
number appeared. Watts accused Radenberg of
giving another man her phone number and Watts
became angry and began yelling at her.
Radenberg was frightened so she put 9–1–1 in her
phone in case Watts started hitting her.

When they arrived at Radenberg's apartment in
Overland Park, Watts went back to the bedroom.
While he was in her bedroom, Radenberg took her
pepper spray out of her purse. Watts came out of
the bathroom, saw that Radenberg had the pepper
spray in her hands, and began yelling at her. He
came towards her as if he was going to hurt her
and she started spraying the pepper spray, but she
ended up getting it all over herself instead.
Somehow, Radenberg ended up on the floor and
Watts was standing over her. She asked Watts if
she could wash her face off and she went to the
kitchen sink to wash. As she was washing her
face, Watts told her that they needed to leave
because the police were on their way. She told
Watts that the police were not coming and told
him that she would not leave. Watts told her that
they needed to leave the apartment at least three
times and each time Radenberg told him that she
would not leave. Watts then grabbed Radenberg
by her hair, pulling her away from the kitchen
sink, at which point, Radenberg agreed to go with
him. Radenberg did not want to leave with Watts,
but she felt that she did not have any other choice
because she was afraid of what Watts would do to
her if she did not leave with him.

Watts and Radenberg walked to her vehicle.
Watts got in the driver's seat and Radenberg was
in the passenger seat. While they were driving, a
man called Radenberg's phone. At this point,
Watts had her phone and asked why a man was
calling her. Radenberg said she did not know why,
and Watts began to punch her in the face.
Radenberg curled up so that Watts could not
punch her anymore, but he grabbed her hair and
started slamming her head into the passenger side

window. Radenberg tried to grab the steering wheel and run her car off the road, but Watts was able to maintain control of the car. They pulled off of the highway onto Wornall Road, in Kansas City, Missouri. Radenberg was able to kick Watts, unlock her door, and get out of the car. Watts ran after her, caught her, and pulled her to the ground. Radenberg was screaming for help and Watts backed off, said he was sorry, and asked her to get back in the car. As Watts was walking back to the car, Radenberg began to run away again. She ran to some police officers and one of them attempted to chase Watts, but was not able to catch him as he fled the scene. Radenberg went to a nearby ambulance and yelled at the paramedic inside the ambulance for help.

**\*2** The day after the incident, Watts started calling Radenberg. He asked her what he was going to be charged with and told her that he was going to kill himself because he did not want to go to jail.

The State charged Watts with aggravated kidnapping. A jury trial was held and the jury found Watts guilty of aggravated kidnapping. On April 14, 2010, the trial court sentenced Watts to a mitigated sentence of 554 months in prison. Watts raises several points of error on appeal.

## PROSECUTORIAL MISCONDUCT

At Watts' preliminary hearing, Officer Kerry Hawes testified that during her interview with Radenberg, Radenberg told Hawes that Watts had dragged her out of the apartment by her hair toward the vehicle. This fact scenario was also included in the officer's report given to the prosecutor. At the jury trial, however, during her testimony, Hawes indicated that she needed to correct her report. She testified that she had listened to the audio recording of the interview and discovered that Radenberg did not say that Watts had dragged her out of the apartment by her hair, but that Radenberg had voluntarily agreed to leave with Watts.

Watts contends that the revelation of this new information deprived him a fair trial because his theory of defense and the execution of that theory may have been different if he had known about the correct information before trial started.

After the jury trial, the trial court denied Watts' motion for new trial due to prosecutorial misconduct. In its ruling, the trial court held: (1) the evidence could have been delivered in a timelier manner, but that it was not withheld by the State, particularly from the jury; (2) the evidence was clearly exculpatory; and (3) the State did not act in bad faith.

We review the trial court's decision on a motion for new trial for an abuse of discretion. *State v. Mathis,* 281 Kan. 99, 103–04, 130 P.3d 14 (2006). An abuse of discretion occurs when the action is arbitrary, fanciful, or unreasonable. This abuse means no reasonable person would have taken the action of the trial court. *State v. Sellers,* 292 Kan. 117, 124, 253 P.3d 20 (2011).

As recognized by the courts, a prosecutor has an affirmative duty, without requiring a court order, to disclose exculpatory evidence to a defendant. *State v. Carmichael,* 240 Kan. 149, 152, 727 P.2d 918 (1986). "Prosecutorial misconduct occurs when the county attorney fails to disclose to both the trial judge and the defense counsel that he intends to introduce into evidence a report which he failed to inform the defense counsel had been corrected." *State v. Lewis,* 238 Kan. 94, 99, 708 P.2d 196 (1985).

A defendant's constitutional rights are implicated when the State partakes in the misconduct of withholding exculpatory evidence, regardless of the State's good or bad faith. *Wilkins v. State,* 286 Kan. 971, 989, 190 P.3d 957 (2008) (citing *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 [1963] ). There are three elements the appellate courts address when reviewing a *Brady* prosecutorial misconduct claim: (1) The evidence at issue is favorable to the defendant, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; *and* (3) the defendant was prejudiced by the suppression of the evidence. 286 Kan. at 989.

*The evidence was favorable to Watts.*
**\*3** Under K.S.A. 21–3420(c), kidnapping is accomplished when a person is taken or confined through force, threat, or deception, with the intent to inflict bodily injury or terrorize that person. Aggravated kidnapping is when bodily harm is brought upon the victim during the kidnapping.

K.S.A. 21–3421, Exculpatory evidence does not need to be so strong so as to exonerate the defendant, but need only be strong enough to assist in his or her defense. *State v. Gammill*, 2 Kan.App.2d 627, 633, 585 P.2d 1074 (1978). The fact that Radenberg voluntarily left her apartment with Watts could undermine the possibility that she was taken by force from her apartment and harmed during the kidnapping. Therefore evidence that Radenberg did not claim she was dragged from the apartment by her hair was favorable to Watts.

*The evidence was not suppressed by the State.*

It is clear from the record that Watts was not aware that the officer would be correcting her report during her trial testimony. The officer's correction to her report was not provided until after voir dire, opening statements, and the testimony of three other State's witnesses. However, the audio recording upon which the officer based her report was provided to Watts and his attorney. In fact, his attorney listened to the audio recording before trial with the prosecutor. In the audio recording, there was never any mention from Radenberg that Watts dragged her by the hair out of her apartment and into the vehicle. In addition, there is no evidence in the record that there were any other discussions between Hawes and Radenberg concerning how she left the apartment that could have lead Watts to believe that Radenberg exaggerated her claim to Hawes during a conversation other than the one that was recorded. So Watts was aware prior to trial that the audio recording of the interview between Radenberg and Hawes did not comport with Hawes written report and preliminary hearing testimony. The State did not suppress the evidence. The evidence was available to Watts before trial through the audio recording.

*Suppression of the evidence did not prejudice Watts.*

Even if the State had suppressed the fact that the officer was going to correct her report and testify that Radenberg never stated that Watts dragged her out of her apartment by her hair, it was not prejudicial to Watts' theory of defense or his execution of that theory.

Watts claims his theory of defense had been to discredit Radenberg and show that she had exaggerated her story to the officer, initially telling the officer that Watts dragged her out of the apartment, when he had not. During the hearing on the motion for new trial, counsel claimed its theory was to show that Radenberg was overly dramatic and intoxicated.

In voir dire, defense counsel asked the potential jurors about whether they believed that everyone who talks to the police always tells the truth. In opening statements, defense counsel stated that when the victim jumped out of her car and flagged down the police, she embellished her story and reported that she was dragged out of the apartment by her hair. The defense argues that it was caught off guard by Hawes' correction and could no longer pursue the defense that Radenberg had exaggerated her claims even though it had already started down that path with the jury. But Hawes' correction did not impede Watts' defense strategy. There was undisputed testimony from Officer Jonathan Munyan, the Kansas City, Missouri, officer that she flagged down, that Radenberg told him that she was dragged from her apartment by the hair. In addition, defense counsel questioned Radenberg about exaggerating her claims of a dislocated jaw as the result of a prior incident with Watts. Defense counsel referred to both of these exaggerations in closing argument. The inability to argue that Radenberg also exaggerated her claims to Hawes did not prejudice the defense. In fact, the evidence allowed counsel to impeach Hawes' credibility by pointing out that she had lied under oath at the preliminary hearing. Moreover, the defense attempted to establish through Hawes and three other law enforcement witnesses that Hawes may have rushed to judgment and facilitated the district attorney's office pursuit of an unsupported aggravated kidnapping charge based on Hawes' inaccurate reporting.

**\*4** Watts' sole argument that he may have changed the way in which he cross-examined Radenberg is mere speculation. Watts neglects to make any reference as to how or why his cross-examination of Radenberg would have changed if he had been aware that the officer was going to correct her report during her testimony except to say that he could have been more aggressive in cross-examining Radenberg and establishing reasonable doubt. Moreover, Radenberg was recalled later in the case as the State's last witness. Watts objected to her being recalled and did not

cross-examine her or seek to reopen his prior cross-examination of her based on the new information.

Therefore, the trial court did not abuse its discretion when it denied Watts' motion for new trial based on a *Brady* prosecutorial misconduct violation.


## JURY INSTRUCTIONS

Watts claims the court made two errors with regards to jury instructions in the case. He first contends that the court erred when it failed to give a requested instruction regarding general criminal intent. Second, he objects to the content of the instruction given to the jury regarding jurisdiction. We examine each claim of instructional error.


### *General criminal intent instruction*

Watts contends that it was reversible error when the trial court refused to give the jury the general criminal intent instruction found in PIK Crim.3d 54.01–A. Watts asserts that because the evidence of Radenberg's kidnapping from her apartment was weak, then the omission of the instruction was key because the trial court did not specifically instruct, within the elements instruction, that Watts intended to take and/or confine Radenberg by force or threat.

" 'When the trial court refuses to give a requested instruction, an appellate court must review the evidence in a light most favorable to the party requesting the instruction.' " *State v. Ransom,* 288 Kan. 697, 713, 207 P.3d 208 (2009).

The district court gave an aggravated kidnapping instruction that conformed to PIK Crim.3d 56.25. See *State v. Peck,* 237 Kan. 756, 764, 703 P.2d 781 (1985) (approving the use of PIK Crim.2d 56.25). The additional instruction requested by Watts, PIK Crim.3d 54.01–A, provides:

"In order for the defendant to be guilty of the crime charged, the State must prove that (his)(her) conduct was intentional. Intentional means willful and purposeful and not accidental.

"Intent or lack of intent is to be determined or inferred from all of the evidence in the case."

The Notes on Use for PIK Crim.3d 54.01–A state that the instruction "should be used only where the crime requires only a general criminal intent and the state of mind of the defendant is a substantial issue in the case." There is a long line of cases that establish that the general criminal intent instruction is not recommended for general use, and that the instruction should not be given in a case where specific intent must be proven because the instruction blurs specific and general intent. See *State v. Ellmaker,* 289 Kan. 1132, 1141, 221 P.3d 1105 (2009), *cert. denied* 130 S.Ct. 3410 (2010).

**\*5** Aggravated kidnapping is a specific intent crime. *State v. Pennington,* 281 Kan. 426, 442, 132 P.3d 902 (2006). Accordingly, the general intent instruction is not recommended.

In addition, under *State v. Cheeks,* 253 Kan. 93, 98–99, 853 P.2d 655 (1993), failure to give the general criminal intent instruction at the defendant's request will not be considered an error where the substance of the requested instruction is present in other instructions given by the trial court.

In instruction No. 12, the trial court gave the definition for "intentionally" as "conduct that is purposeful and willful and not accidental. Intentional includes the terms 'knowing,' 'willful,' 'purposeful' and 'on purpose.' "

In addition, the trial court gave the following instruction in instruction No. 11:

"Ordinarily, a person intends all of the usual consequences of his voluntary acts. This inference may be considered by you along with all the other evidence in the case. You may accept or reject it in determining whether the State has met its burden to prove the required criminal intent of the defendant. This burden never shifts to the defendant."

On the whole, with the inclusion of instruction Nos. 11, 12, and 13, the substance of the general criminal intent instruction was present within the jury instructions as a whole, therefore the district court did not err in failing to give PIK Crim.3d 54.01–A.

*Jurisdiction instruction*

The State's case was based upon its theory that Watts' actions were part of a continuing course of conduct making up the crime of aggravated kidnapping that started in Kansas and ended in Missouri. It requested, and the jury was given, the following instruction No. 10:

> "If you find that the defendant committed criminal acts in this state which were a substantial and integral part of an overall continuing crime plan, and which were in partial execution of that plan, the prosecution may be in this state or any other state in which such acts occur."

The instruction is not included in the PIK, but was suggested by the State based on *State v. Grissom, 251 Kan. 851, 889–90, 840 P .2d 1142 (1992)*. Watts objected to giving the jury this instruction. At trial, Watts' objection to the instruction was based on the fact that the evidence showed that the acts in Kansas and the acts in Missouri were two separate acts for which the jury instruction was not supported. In contrast, in his appellate brief, Watts contends that the trial court erred when it neglected to use the word "clearly" in the language of the jury instruction.

Because Watt's claim of instructional error on appeal is different than the claim he made at trial, we review the instruction provided to determine if it was clearly erroneous. See *State v. Nelson, 291 Kan. 475, 483, 243 P.3d 343 (2010)*. "An instruction is clearly erroneous only if the reviewing court is firmly convinced there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred." *State v. Martinez, 288 Kan. 443, 451–52, 204 P.3d 601 (2009)*.

*6 In the *Grissom* case, upon which Watts relies, Grissom was charged with kidnapping three women from their apartments in Johnson County, Kansas, and later murdering each of them. No bodies were ever recovered and the evidence presented was wholly circumstantial. Although taken from Kansas, the women were last seen alive in Missouri. Grissom argued that the State had not established jurisdiction in Kansas for the murder charges. In denying Grissom's claim, the Supreme Court first examined the Kansas territorial jurisdiction statute, K.S.A. 21–3104, which provides that "[a]n offense is committed partly within this state if either an act which is a constituent and material element of the offense, or the proximate result of such act, occurs within the state." 251 Kan. at 886. It then proceeded to interpret the statute broadly and found that jurisdiction was established in Kansas because there was evidence from which a jury could have found that "Grissom committed criminal acts in Kansas which were a substantial and integral part of an overall continuing crime plan and which were in partial execution of the plan." 251 Kan. at 889.

However, within the syllabus of the opinion, our Supreme Court added the word "clearly" to its analysis:

> "The State of Kansas has jurisdiction in a criminal case in which any element or the result of the crime occurs in Kansas or the defendant commits criminal acts in Kansas that are a substantial and integral part of an overall continuing crime plan and that are *clearly* in partial execution of the plan." (Emphasis added.) 251 Kan. at 851, Syl. ¶ 5.

Even though *Grissom* did not involve a jury instruction at all, Watts argues that because the word "clearly" was left out of the instruction by the trial court, then the evidentiary standard was lowered for the jury's review when it applied the facts of the case to the law provided by the trial court. We find no merit to Watt's argument because based on the evidence presented to the jury it cannot be said that the jury would have rendered a different verdict if the word "clearly" had been included in the instruction. There was evidence to support the factual conclusion that Radenberg was either forced or threatened to leave her apartment with Watts. At the time that Radenberg agreed to go with Watts, it can hardly

be said she did so voluntarily. Watts had a hold of Radenberg's hair when he demanded that she go with him, at which point she agreed. Radenberg did not want to leave with Watts, but she felt that she did not have any other choice because she was afraid of what Watts would do to her if she did not leave with him. Thus, even if omission of the word "clearly" was error, it cannot be said that the jury would have rendered a different verdict if the alleged trial error had not occurred.

## MISSTATEMENT OF THE LAW IN CLOSING ARGUMENT

Related to his objection to the jurisdiction instruction, Watts also asserts that the explanation provided by the State to the jury regarding the jurisdiction instruction was a misstatement of the law and misled the jury.

**\*7** A misstatement of controlling law must be reviewed on appeal, regardless of a timely objection at trial, to protect a defendant's right to due process. When a misstatement of controlling law is made deliberately, it is outside the considerable latitude given to prosecutors. *State v. Gunby*, 282 Kan. 39, 63–64, 144 P.3d 647 (2006).

Watts takes issue with the following argument made by the State during its closing argument:

"We have jurisdiction over this case because it started here in Johnson County. This is one continuing course of events. This is one act that happened. It started in the car on the way home from the bar when he started yelling at her and calling her a whore and a liar. It continued in her apartment after the pepper spray when he wouldn't give her time to rinse out her eyes, and he jerked on her hair to get her to come with him. That's force. He used force on her to compel her to come with him.... He didn't have to have his hands on her, because of everything that had happened before, she knew if she resisted, physical violence was imminent. This started here. They get on to the highway, and she testifies that while they're on the road ... her phone rings, and it's another man. It actually was another man that time. He starts punching her. He grabs her hair, and he slams her head against the dashboard. He punches her some more...."

"... You could find that any of those violent acts in the car, if you don't find that she was forcibly kidnapped out of her apartment, you could find any of those acts in the car, in an attempt to confine her, he did it by force in the car, and it happened in Kansas as well. They drove for sometime after that, and they got off on Wornall Road.... [S]he finally got out. He wanted to keep her and confine her in that vehicle, that he pulled all that hair out of her head.... All of it started in Johnson County. It doesn't matter where it ended up."

We find that the State's argument is not a misstatement of the law, but merely an application of the facts to the law. The State was arguing that the aggravated kidnapping occurred either when Watts and Radenberg left her apartment, or in the vehicle before they crossed the state line. In essence, what the State is arguing is that the *full* crime was committed in Kansas before Watts and Radenberg reached Missouri. The fact the crime ended in Missouri made little difference in the State's analysis. What the State asserted was not a misstatement of the law, but was actually correct in that if the jury found that the aggravated kidnapping occurred at Radenberg's apartment or before the vehicle crossed the state line, then Kansas had jurisdiction to prosecute Watts. It does not appear that the State relied on the trial court's jurisdiction instruction because the State believed the crime was fully completed in Kansas and merely continued on into Missouri.

## ADMISSION OF K.S.A. 2010 SUPP. 60–455 EVIDENCE REGARDING WATTS' PAST VIOLENCE TOWARDS RADENBERG

**\*8** The fact that a person committed a crime or prior bad acts on a specified occasion is inadmissible to prove such person's disposition to commit crime. See K.S.A. 60–455(a). In other words, the fact that a defendant may have physically beaten someone 2 years ago cannot be used as the basis to infer that the defendant beat up the victim in the case before the court. The reason for such a rule is clear. If the jury is allowed to consider prior crimes by the defendant, it might conclude that because the defendant has committed a similar crime or bad act before, he or she committed the crime before the jury. Or the jury may conclude that the defendant deserves

punishment because he or she is a general wrongdoer. Or finally, the jury might conclude that because the defendant is a criminal, evidence presented on his or her behalf should not be believed. *Gunby*, 282 Kan. at 48–9. However, "such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." K.S.A. 60–455(b). The list of material facts in the statute is exemplary rather than exclusive. *Gunby*, 282 Kan. at 56. And even when the evidence is relevant to prove some other material fact, the court must also determine whether the probative value of the evidence outweighs the potential for producing undue prejudice. *State v. Hollingsworth*, 289 Kan. 1250, 1259, 221 P.3d 1122 (2009). Finally, to protect against the chance that a jury may instead consider the evidence to prove the defendant's propensity to commit the crime before it, the judge is required to give a limiting instruction outlining the purpose for which the jury can consider the prior bad acts evidence. *Gunby*, 282 Kan. at 48.

In this case, the State filed a motion under K.S.A.2010 Supp. 60–455 to admit evidence regarding Watts' and Radenberg's discordant relationship. In the motion, the State set forth four instances in which Watts was physically violent towards Radenberg, three of which the court ultimately allowed. The first instance was when Radenberg did not want to go with Watts to Blue Springs, Missouri. Watts shoved Radenberg against a wall, picked her up by the neck, and strangled her. The second incident occurred in Las Vegas, Nevada. While on a trip there, Watts became upset because he thought Radenberg was looking at another man. Upon returning to their hotel room, Watts punched Radenberg in the jaw, grabbed her by the hair, and dragged her onto the floor. After their friends returned to the room as well, Radenberg rejected Watts attempt to "snuggle" and Watts strangled her again. In the final instance, Watts was convicted of aggravated battery where Radenberg was the victim. In this incident, Watts arrived at Radenberg's apartment while another man was there. Watts began to fight with the other man and then turned around and punched Radenberg in the face. She fell to the ground and lost consciousness. The trial court held that these three incidents were relevant to show the prior discordant relationship between Watts and Radenberg; to show the existence of a continuing course of conduct between them so as

to corroborate Radenberg's testimony (to show why she put 9–1–1 in her phone and got out her pepper spray, actions that may seem unusual absent knowledge of Watts' prior aggression toward her); and to show Watts' intent in the present case. The trial court also determined that the probative value of the evidence outweighed the prejudicial effect. The court gave the following limiting instruction:

> **\*9** "Evidence has been admitted tending to prove that the defendant committed crimes other than the present crime charged. The evidence may be considered solely for the purposes of proving the defendant's intent, establishing the discordant relationship between the defendant and Melanee Radenberg and to corroborate the testimony of Melanee Radenberg. You may not consider the evidence of prior crimes as evidence that the defendant has any propensity for criminal behavior."

Watts contends that trial court erred when it allowed the admission of evidence regarding Watts' past physical violence towards Radenberg for three reasons. First, he alleges that the evidence was only probative to show Watts' propensity, a prohibited purpose. Second, even if it was relevant, the prejudicial effect of allowing evidence of Watts' prior bad acts toward Radenberg outweighed its probative value. And finally, the stated reason in the limiting instruction, "to corroborate" Radenberg's testimony, was both impermissible and unnecessary. We examine each claim of error.

*The prior bad acts evidence was admissible under K.S.A.2010 Supp. 60–455.*

The first step in our K.S.A.2010 Supp. 60–455 analysis is whether the evidence was relevant to prove a material fact. *State v. Riojas*, 288 Kan. 379, 383, 204 P.3d 578 (2009). Next, we determine whether the material act is in dispute and whether the evidence is relevant to prove the

disputed material fact. We use an abuse of discretion standard in this portion of our review. An abuse of discretion occurs when the action is arbitrary, fanciful, or unreasonable. This abuse means no reasonable person would have taken the action of the trial court. *State v. Sellers*, 292 Kan. 117, 124, 253 P.3d 20 (2011).

In this case, the trial court determined that the evidence was admissible to prove the discordant relationship between Watts and Radenberg, to corroborate Radenberg's testimony regarding her actions that night, and to prove Watts' intent.

Although not a listed factor under K.S.A.2010 Supp. 60-455(b), our Supreme Court has recognized that prior bad acts evidence can be used to prove a continuing course of conduct between a defendant and a victim. See *Gunby*, 282 Kan. at 56 (citing *State v. McHenry*, 276 Kan. 513, 520, 78 P.3d 403 [2003] ). The material fact of Watts' and Radenberg's discordant relationship was in dispute because Watts attempted to show that Radenberg loved him, they had a good relationship, she became intoxicated and exaggerated the severity of the events of the evening, and she went with him voluntarily. The evidence was relevant to prove Watts' and Radenberg's discordant relationship. The facts surrounding all three violent incidents show that Watts and Radenberg were in a relationship before the incident in this case and the relationship involved several arguments that resulted in Watts' physical aggression towards Radenberg. It also goes to show whether Radenberg felt threatened and whether she was forced to go with Watts or whether she went voluntarily.

*10 Again, although not a listed factor under K.S.A.2010 Supp. 60-455(b), our Supreme Court has also recognized that prior bad acts evidence can be used to corroborate a witness' testimony. See *Gunby*, 282 Kan. at 56 (citing *State v. Lee*, 263 Kan. 97, 104, 948 P.2d 641 [1997] ). This factor was also in dispute because Watts based his defense on the fact that Radenberg was not fearful of him, she loved him, and she went with him voluntarily. The evidence was also relevant to corroborate Radenberg's actions on the night of the incident which led to this case. Radenberg testified that she dialed 9–1–1 into her phone during the drive from the bar to her apartment in case Watts started to hit her. In addition, Radenberg testified that when Watts was in her

bedroom she remained near the kitchen and took pepper spray out of her purse in case Watts came at her. Without the admission of the three prior incidents of Watts' physical aggression towards Radenberg, the jury would be at a loss as to why Radenberg would go so far as to put 9–1–1 into her phone and take our her pepper spray in preparation while Watts was in another room.

"Intent" is a listed material fact under K.S.A.2010 Supp. 60-455(b). The trial court also found that the prior bad acts evidence goes to show Watts' intent. Because kidnapping, under K.S.A. 21-3420(c), requires the intent to hold a person in order to inflict bodily injury or to terrorize the victim, the three prior incidents are relevant to show Watts' intent to hold Radenberg in order to inflict bodily injury or to terrorize her. This factor was in dispute because Watts based his defense on the position that Radenberg went with him voluntarily and he did not have the intent to kidnap her or to injure or terrorize her.

We find that the prior crime evidence was relevant to prove each material fact alleged and the court did not abuse its discretion in finding that the evidence supported each disputed material fact.

*The district court did not abuse its discretion in finding that the probative value of the evidence did not outweigh its prejudicial effect.*

Next, the court must determine whether the probative value of the evidence outweighs the potential for creating undue prejudice. Appellate review of this determination is also for abuse of discretion. Based on our review of the evidence, as outlined above, we find that the district court did not abuse its discretion in finding that the probative value of the evidence did not outweigh its prejudicial effect.

*Even if the limiting instruction was improper, it was harmless error.*

Finally, if the court decides to admit the evidence, the court must give a limiting instruction notifying the jury of the specific purpose for the admission of the K.S.A.2010 Supp. 60-455 evidence. *Riojas*, 288 Kan. at 383.

Watts contends that the stated reason in the limiting instruction, to corroborate Radenberg's

testimony, was both impermissible and unnecessary. It was impermissible because it did not clearly and specifically address the reason for its admission, to *explain* Radenberg's conduct—not to *corroborate* her testimony. And it was unnecessary because the court already indicated that the evidence was being offered to show a discordant relationship between the parties, which clearly would have put Radenberg's conduct in context.

**\*11** "When a party has objected to an instruction at trial, the instruction will be examined on appeal to determine if it properly and fairly states the law as applied to the facts of the case and could not have reasonably misled the jury. In making this determination an appellate court is required to consider the instructions as a whole and not isolate any one instruction." *State v. Appleby*, 289 Kan. 1017, 1059, 221 P.3d 525 (2009).

The trial court did not err in its limiting instruction to the jury. It has already been determined that it was proper for the trial court to allow the prior bad acts evidence to prove the discordant relationship, to corroborate Radenberg's testimony, and to show Watts' intent. The trial court indicated that the jury could only use the evidence for these three specific reasons and that it could not consider the evidence as an indication that Watts had any propensity for criminal behavior. The limiting instruction properly stated the law as applied to facts of the case.

But even if the instruction failed to clearly state that Watts' prior actions were offered to explain Radenberg's actions of dialing 9-1-1 and using pepper spray, the evidence remained admissible to show intent and discordant relationship. We find that the jury's verdict would not have been different had the district court more specifically advised the jury concerning this one material fact, when two other reasons remained for which it could consider the evidence.

## SUFFICIENCY OF THE EVIDENCE

Watts contends that there was insufficient evidence to prove Watts committed aggravated kidnapping.

"The standard of review for a challenge to the sufficiency of the evidence in a criminal case is whether, after review of all the evidence, examined in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. It is the function of the jury, not an appellate court, to weigh the evidence and to determine the credibility of witnesses." *State v. Portillo*, 294 Kan. ——, Syl. ¶ 1, 274 P.3d 640 (2012).

Watts relies on Radenberg's testimony during her cross-examination that she agreed to leave her apartment with Watts and she did not believe he was going to hurt or terrorize her. She also testified that she did not believe Watts had kidnapped her. However, Watts completely ignores the testimony Radenberg gave while on direct examination.

According to Radenberg's testimony on direct examination, when they arrived at her apartment, Watts went back to the bedroom. While he was in her bedroom, Radenberg took her pepper spray out of her purse. Watts came out of the bathroom, saw that Radenberg had the pepper spray in her hands, and began yelling at her. He came towards her as if he was going to hurt her and she started spraying the pepper spray, but she ended up getting it all over herself instead. Somehow, Radenberg ended up on the floor and Watts was standing over her. She asked Watts if she could wash her face off and she went to the kitchen sink to wash. As she was washing her face, Watts told her that they needed to leave because the police were on their way. She told Watts that the police were not on their way and told him that she would not leave. Watts told her that they needed to leave the apartment at least three times and each time Radenberg told him that she would not leave. Watts then grabbed Radenberg by her hair, pulling her away from the kitchen sink, at which point, Radenberg agreed to go with him. Radenberg did not want to leave with Watts, but she felt that she did not have any other choice because she was afraid of what Watts would do to her if she did not leave with him. Watts and Radenberg walked to her vehicle. Watts got in the driver's seat and Radenberg was in the passenger seat. She reiterated during cross-examination that although she was not scared for her life, she was scared of what might happen.

**\*12** On redirect examination Radenberg

described that she can recognize a physical change in Watts' face and eyes when he gets angry. When he came toward her in the apartment, she noticed the same physical change in his face and eyes that she associated with his outbursts of anger in the past. She became afraid that he was going to beat her up again. She repeated that she did not want to go with him that night, but did not feel she had a choice. Although Watts left with Radenberg in her car, his car was at Radenberg's apartment and there was no reason he could not have taken his own car and left without Radenberg. Instead, he chose to take her with him. She testified that Watts tried to confine her to the car even though he was attempting to get out, he hurt her, and she was afraid.

Based on Radenberg's testimony on direct examination as well as the evidence of Watts' prior physical violence towards Radenberg, there was sufficient evidence that a rational factfinder could have found Watts guilty of aggravated kidnapping beyond a reasonable doubt. When he pulled her head up by her hair from the kitchen sink and demanded that they leave, Radenberg was afraid that if she did not do as he demanded then she would be physically hurt. Her choices were either (1) go with Watts or (2) suffer the consequences of defying him. In addition, based on their prior physical altercations, it would not be irrational or unreasonable for a jury to conclude that Watts intended to harm or terrorize her.

## FAILURE TO INQUIRE WHETHER WATTS KNOWINGLY AND INTELLIGENTLY WAIVED HIS RIGHT TO TESTIFY

Watts asserts that the trial court erred when it failed to ask him whether he knowingly and intelligently waived his right to testify. Watts concedes that this issue has been raised for the first time on appeal, but this court should review the issue because it only involved a question of law, is finally determinative of the case, and review of the issue is necessary to prevent the denial of a fundamental right. See *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 (2010). Because a defendant's right to testify on his own behalf is a fundamental right, we agree to review Watts' claim of error.

The decision whether a defendant will testify is to be made by the defendant after full consultation with counsel. See *Flynn v. State*, 281 Kan. 1154, 1163, 136 P.3d 909 (2006). Therefore, when a defendant asserts a challenge regarding his or her constitutional right to testify on appeal, the appellate courts review the matter de novo. See *State v. Carter*, 284 Kan. 312, 318–19, 160 P.3d 457 (2007).

Watts concedes that our Supreme Court in *Taylor v. State*, 252 Kan. 98, Syl. ¶ 5, 843 P.2d 682 (1992), has already determined that a trial court has no duty to *sua sponte* ask a defendant whether he or she knowingly and intelligently waived his or her right to testify, but Watts suggests that it would be better practice to do so.

In *Taylor*, our Supreme Court stated:

> **\*13** "A trial court has no duty sua sponte to address a silent defendant and inquire whether he or she knowingly and intelligently waives the right to testify. An express waiver, on the record, is not necessary because a defendant's conduct provides a sufficient basis from which to infer that the right to testify is waived. There is a danger that by asking a defendant if he or she is aware of his right to testify, a trial court may inadvertently influence a defendant to waive the equally fundamental right against self-incrimination." 252 Kan. 98, Syl. ¶ 5.

The Court of Appeals is duty bound to follow Kansas Supreme Court precedent, absent some indication the court is departing from its previous position. *State v. Jones*, 44 Kan.App.2d 139, 142, 234 P.3d 31 (2010), *rev. denied* 292 Kan. 967 (2011). Therefore, because our Supreme Court has already determined that a trial court does not have to *sua sponte* inquire whether a defendant and knowingly and intelligently waived his or her right to testify, then this court is duty bound to follow that position. Thus, the trial court did not err when it failed to make such an inquiry in Watts' case.

In addition, we cannot ignore the fact that although Watts complains that the district court failed to inquire whether he was freely and voluntarily waiving his right to testify, his attorney specifically declined the district court's invitation to so inquire. A defendant may not invite error and then complain of the error on appeal. See *State v. Divine*, 291 Kan. 738, 742,

246 P.3d 692 (2011).

## CUMULATIVE ERROR

Watts argues that all of the above errors, while perhaps not reversible on their own, cumulatively call for the reversal of his case.

Even if an individual error is insufficient to support reversal, the cumulative effect of multiple errors may be so great as to require reversal. The test is ' "whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant.' [Citation omitted.]" *State v. Edwards,* 291 Kan. 532, 553, 243 P.3d 683 (2010).

Because there is no merit to any of Watts' claims of trial error, his contention that cumulative errors require the reversal of his conviction is also without merit.

## SENTENCING

Watts contends the trial court erred by considering his two prior convictions without requiring those convictions to be proven beyond a reasonable doubt to a jury. Watts claims this practice violates the principles of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

Watts concedes that our Supreme Court has rejected his argument in *State v. Ivory,* 273 Kan. 44, 41 P.3d 781 (2002), but he includes it to preserve the issue for federal review. Absent some indication that our Supreme Court is departing from its position in *Ivory,* and there is no such indication, this court is bound thereby. *Jones,* 44 Kan.App.2d at 142. Similarly, the United States Supreme Court recently reaffirmed that prior convictions need not be proven to a jury beyond a reasonable doubt. See *James v. United States,* 550 U.S. 192, 214 n. 8, 127 S.Ct. 1586, 167 L.Ed.2d 532 (2007). Therefore, we reject Watts' claim that his sentence violated *Apprendi.*

**\*14** Affirmed.

**All Citations**

277 P.3d 1193 (Table), 2012 WL 214816