No. 110,837

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

RHEUBEN JOHNSON,
*Appellant.*

MEMORANDUM OPINION

Appeal from Johnson District Court; BRENDA M. CAMERON, judge. Opinion filed October 13, 2017. Affirmed.

*Rheuben Johnson*, appellant pro se.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MCANANY, P.J., STANDRIDGE, J., and WALKER, S.J.

PER CURIAM: This is Rheuben Johnson's direct appeal from his conviction of two counts of solicitation to commit the first-degree murder of his former wife, Annie Johnson. The couple was married in 2005, and their son was born the following year. They separated in October 2009 and were divorced in January 2012. The district court apparently ordered primary placement of their child with Annie, and Johnson had unsupervised parenting time which then changed to supervised parenting time. This created ongoing conflicts between the parents.

During this period, Ronald Nodwell, who had recently been released from prison, was looking for employment. A mutual friend recommended that Nodwell speak to Johnson about working for Johnson's extermination company.

On April 15, 2012, Nodwell met Johnson at a Mr. Goodcents restaurant to talk about the possibility of employment. At first, the conversation focused on employment, but Johnson soon shifted the conversation to his ex-wife. Johnson told Nodwell that Annie was "the root of all his problems, [explaining] how she was taking his son, his money, his business, she was into weird things like Goth and vampires and addicted to pain pills." Johnson said Annie was an unfit mother.

Johnson told Nodwell "it would be worth money if she would disappear. . . if she was gone." Nodwell understood Johnson to mean "he wanted to kill her." Initially, Nodwell thought Johnson was kidding, but the conversation continued to focus on Annie. Johnson told Nodwell that he would pay him $20,000 "to make her go away."

After leaving the restaurant, Johnson drove Nodwell past Annie's apartment complex to show Nodwell where she lived. Johnson told Nodwell that he could not get into the gated apartment complex without a code. Johnson showed Nodwell that Annie drove a black SUV. He drove Nodwell to the McDonald's restaurant where Annie routinely stopped to get coffee before work, and he identified for Nodwell the hospital where Annie worked. Johnson also told Nodwell the days his son was at daycare.

While they were in the truck together, Johnson gave Nodwell three suggestions about how he could make Annie disappear. First, Johnson suggested that Annie was addicted to pain pills, so Nodwell "could overdose her on her pain pills and [make it look] like an accident." Second, Nodwell could burn down her apartment. Third, Nodwell

could catch Annie after getting coffee "and drive up beside her and shoot [her] in the head on the way to work."

After this meeting, Johnson and Nodwell spoke several times on the phone. In these conversations Nodwell wanted to talk to Johnson about employment, but Johnson turned the discussion to Annie, leading Nodwell to conclude that Johnson was serious about having his ex-wife killed. Nodwell told Johnson it would be stupid to make Annie disappear because Johnson would be the prime suspect. From that point on, Johnson became more cautious and "[e]very time he talked to me after that, he made it sound like he was talking about a construction job or cleaning up glass. He made it sound like it was something other than what it was."

On May 18, 2012, Nodwell contacted the Olathe Police Department and told Detective Matt Campbell about his meeting with Johnson. The police decided to use an undercover officer to make contact with Johnson. They asked Nodwell to call Johnson and record the conversation. When Johnson did not answer, Nodwell left a message which Johnson returned two days later.

Nodwell told Johnson that he did not have time to handle the situation, but he had a friend that was willing, and asked Johnson if he'd be interested in meeting him. Johnson agreed, and they made arrangements to meet the next day, May 22, 2012.

The meeting took place at Waterworks Park in Olathe. Johnson, Nodwell, and Sergeant Lonnie Stites, an undercover police officer, were present. Stites was wearing a transmitter and recording device. A recording of the conversation was later introduced into evidence. Nodwell introduced Stites to Johnson and then left the meeting. Stites and Johnson agreed that Stites would carry out Johnson's request for $10,000. Johnson

agreed to pay $3,000 as a down payment and the remaining $7,000 after the task was completed.

During the course of the meeting, Johnson did not directly ask Stites to kill Annie, but he verified that Nodwell had informed Stites on the details of what Johnson wanted done. During the conversation, Johnson often referred to the job in terms of work. He told Stites that he wanted some junk hauled off. An example of this is as follows:

> "[Nodwell] kind of filled you in on what needs to be done. We can call it, you know, a whole bunch of different projects. We can call it hauling off a bunch of old vans and trucks that I've got in the back, or that'd be one . . . one project or remodeling, fixing up the home could be another project."

Johnson told Stites that his life was going well except for the child custody issues, so it was time to get these projects done. Johnson played for Stites a recording Johnson had made of his son crying when he returned his son to Annie's home. Johnson told Stites it would be nice to get "stuff cleaned up here" as soon as possible.

Johnson said he would be out of town from Wednesday until Monday and suggested that would be a good time. Johnson said that nobody knows about the project other than Nodwell, and it "would be nice to have everything cleaned up when I got back." Stites understood that Johnson was talking in code about having his ex-wife murdered.

Stites told Johnson, "when you talk about hauling trucks off or whatever I got a general idea of what you're needing." Johnson responded that it would not be smart for either one of them to go into more detail. Stites said that Nodwell had told him that Johnson had a problem with his ex-wife. Johnson responded:  "Yeah. Um, that is a

4

problem, um, be nice if I didn't have that problem. But nice if, uh, never had to deal with her again." When Stites asked if Johnson wanted the project terminated, Johnson responded: "'Of course, that's not why we're here today. I just want the van hauled off.'"

Stites agreed to $10,000 for the job, noting he would need pictures and addresses where Annie could be found. Stites originally wanted to be paid $5,000 upfront because this was "a unique problem to take care of," and if Stites did not get paid, "it's not like I can take you to small claims court." Johnson expressed concern that if something happened to Annie, he would be a suspect. Stites said: "That's the whole point of this happening while you're out of town." Stites finally agreed to an initial payment of $3,000.

Stites wanted a second meeting so that Johnson could provide additional information, including photographs of Annie and a map. When Stites called Johnson the next day to set up the meeting, Johnson shifted his request to a request that Stites do private detective work investigating Annie. Johnson gave Stites information such as the vehicle Annie drove and her daily schedule but expressed concerns about being caught:

> "I thought about it a whole lot and, you know, what I've really got to do is what's best for my son, and if I don't do something stupid it's not really good for him and . . . if I don't and . . . I go give somebody money and maps and pictures all at once, it really could be easily misconstrued as . . . pretty bad intentions."

Johnson said he could give Stites pictures and maps, though he noted,

> "giving somebody money and map and pictures could be . . . can you see how that can look really really bad, I haven't quite figured out how to . . . how to . . . deal with that yet. . . . I'm not sure if it's worth that much risk. . . . [T]o do that, no matter how much I want to, I'd like to track and see where my wife is and no matter how much I'd like to get stuff

hauled off or whatever I want to call it, . . . I just think I'd be putting myself in a world of trouble."

Johnson said he wanted to make sure he did not say or do something that ended up getting himself into a mess. Stites told Johnson that there were things he needed to know and that he could not just "guess." Stites said that if Johnson was worried about the picture, he could bring one to the meeting to show what Annie looked like, but Stites would need the addresses and the money. Stites told Johnson he would rather talk further in person rather than over the phone. Johnson told Stites that Annie would be bringing their son to therapy later in the day, giving Stites the location, the time, and a description of her vehicle. Stites again requested a meeting and asked Johnson to bring a picture that he could at least see what she looked like. Johnson agreed to bring some family pictures on his phone for Stites to see. Johnson identified for Stites the hospital where Annie worked and gave Stites the address where Annie dropped off their son for supervised visitation.

Johnson called Stites and cancelled their second meeting at the last minute. He told Stites that he could not "say or do or insinuate anything that would be wrong doing" because any conversation can be recorded. Johnson told Stites he needed "to get you on as, like, an investigator that can kind of help out" and asked if Stites needed more detail than that. Stites replied that Johnson could use whatever words that he wanted to use, but that they both understood what Johnson was asking. Johnson replied: "Right."

Stites told Johnson that he was giving mixed signals, and he wanted to know if Johnson wanted him to do the "original project." Johnson responded "probably," but he needed to think about it some more. But he then concluded, "Yea. The goal is to solve the problem."

Johnson agreed to pay the $3,000 down payment but suggested that he give Stites the money in Missouri rather than in Kansas. But Stites told Johnson that he had a problem going into Missouri because "they kind of want to talk to me over there, so I don't go over there." Johnson insisted that he needed to give Stites the money in Missouri. Stites agreed to meet Johnson at a Walmart store in Missouri.

When their second face-to-face meeting took place at the Walmart store, Johnson gave Stites $3,000 in cash and a hand-drawn map that showed where Annie lived and where Johnson had his supervised parenting time with his son. When Johnson showed Stites a picture of Annie, Stites asked, "This is the vehicle you want to disappear?" Johnson confirmed:  "Yeah."

When Johnson gave Stites the map, he again discussed the vehicle that Annie drove and Annie's schedule the next day. Johnson told Stites to be careful because Annie could be armed, explaining that she was into drugs and associated with "drug people, Goth people, vampire people." Johnson confirmed that once the job was done, he would arrange to pay Stites the additional $7,000. Johnson told Stites that he did not want anything to happen in front of his son.

Following this second meeting Johnson was arrested shortly after he crossed the state line into Kansas. He was charged with solicitation to commit murder based on his solicitation of Stites. The State later amended the complaint to include a second charge of solicitation to commit murder based on his solicitation of Nodwell.

While awaiting trial, Johnson met Richard Porterfield in the Johnson County Adult Detention Center where they both were being held. In March 2013, Johnson told Porterfield that he worked in pest and animal control. Porterfield told Johnson that he did not think he would be any good at pest control work. Johnson resplied, "You'd probably

be better at getting rid of humans." Porterfield, playing along, said: "Yeah, that's probably more up my alley."

According to Porterfield, Johnson asked him if he would be interested in doing something like that, more specifically "killing my wife." When Porterfield asked how much Johnson would pay, Johnson responded: "$8 to $10,000." Johnson provided Porterfield with details about his family. Johnson asked Porterfield how long he was going to be in jail and expressed his hope that Porterfield would be released soon.

 Porterfield testified that he received a plea deal from the State in exchange for his testimony against Johnson. Porterfield admitted that his reason for bringing this information to law enforcement was to get help in his own case.

After Porterfield disclosed his conversation with Johnson, the State amended the complaint for a second time to include a count of solicitation to commit murder based on Johnson's solicitation of Porterfield.

At trial, Johnson's girlfriend, Kathy Klostermann, testified for the defense. She described Johnson's property, and the defense proffered pictures of junk and vehicles around Johnson's property that needed to be removed.  She testified that Johnson had hired a private investigator to look into his wife's affairs but that the child custody and divorce issues were improving at the time of Johnson's arrest.

The jury convicted Johnson solicitation to commit murder in the first degree with respect to the Nodwell and Stites transactions. He was acquitted on the third charge involving Porterfield.

Following the denial of Johnson's motion for a new trial, Johnson was sentenced to a controlling term of 132 months in prison. Johnson's appeal of his convictions brings the matter to us for review.

*Constitutionality of Criminal Solicitation Statute*

Johnson challenges the constitutionality of our criminal solicitation statute on the grounds of vagueness. K.S.A. 2016 Supp. 21-5303(a) states: "Criminal solicitation is commanding, encouraging or requesting another person to commit a felony, attempt to commit a felony or aid and abet in the commission or attempted commission of a felony for the purpose of promoting or facilitating the felony."

Johnson did not raise this issue before the district court. Generally, an appellant may not raise a constitutional issue for the first time on appeal. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). But because Johnson's argument is that the statute is unconstitutional on its face, rather than as applied to him, the issue before us is a legal issue that does not require any findings of fact. Accordingly, we can consider this claim for the first time on appeal. See *State v. Atteberry*, 44 Kan. App. 2d 478, 492, 239 P.3d 857 (2010).

Our review of this issue is unlimited. *State v. Bollinger*, 302 Kan. 309, 318, 352 P.3d 1003 (2015), *cert. denied* 136 S. Ct. 858 (2016). In reviewing the criminal solicitation statute, we presume the statute is constitutional and resolve all doubts in favor of its validity. We must interpret the statute in a way that makes it constitutional if there is any reasonable construction that will maintain the legislature's apparent intent. See *State v. Petersen-Beard*, 304 Kan. 192, 194, 377 P.3d 1127 (2016).

In resolving this constitutional challenge, we first determine whether the statute gives adequate warning of the proscribed conduct. The statute is unconstitutionally vague if it does not provide a person of ordinary intelligence with fair notice of what is prohibited. Next, we determine whether the statute adequately guards against arbitrary and unreasonable enforcement. *Bollinger*, 302 Kan. at 318.

*Vagueness: Lack of Objective Standards*

Unconstitutional vagueness arises when persons of common intelligence must guess at a statute's meaning and may differ as to its application. See *City of Lincoln Center v. Farmway Co-Op, Inc.*, 298 Kan. 540, 545, 316 P.3d 707 (2013). But a statute is not unconstitutionally vague if its words are commonly used, are judicially defined, or have a settled meaning in law. *City of Wichita v. Hackett*, 275 Kan. 848, 853-54, 69 P.3d 621 (2003).

Johnson's argument focuses on the absence of any definition for the term "encouraging" as used in the statute. He does not raise this vagueness argument with respect to the terms "commanding" and "requesting" found in the statute. See K.S.A. 2016 Supp. 21-3303(a).

Johnson claims the word "encouraging" lacks an objective standard in that it requires "an inquiry into the mental state of the person solicited." He posits that based on the subjective interpretation of the reader, Jonathan Swift would be liable for prosecution for hundreds of counts of solicitation of murder under K.S.A. 2016 Supp. 21-5303 for the language used in his satirical essay, *A Modest Proposal* (1729), in which he advocated for cannibalism of babies as a means of population control.

But Black's Law Dictionary defines "encourage" as: "To instigate; to incite to action; to embolden; to help." Black's Law Dictionary 644 (10th ed. 2014). This definition is not predicated on the mental state of the person solicited. Jonathan Swift would have nothing to fear from publishing his essay in Kansas.

Johnson cites our Supreme Court's decisions in *State v. Bryan*, 259 Kan. 143, 910 P.2d 212 (1996), and *State v. Kirby*, 222 Kan. 1, 9-10, 563 P.2d 408 (1977), for support. In *Bryan* the court examined the words "alarms," "annoys," and "harasses" and found them to be unconstitutionally vague because the statute did not contain a definition or objective standard to measure the prohibited conduct. 259 Kan. at 149. The court found that those terms were subject to a wide variety of interpretations and were thus dependent upon the subjective feelings of the victims. 259 Kan. at 149-50. In *Kirby* the court found the term "endangering of life" was vague within the meaning of the statute. The court noted there was no universally accepted definition of "endangering of life," and the definition of the phrase was a matter of speculation. 222 Kan. at 10.

*Bryan* does not control. As noted earlier, the definition of "encourage" does not include any element related to any mental state of the person solicited. In fact, under K.S.A. 2016 Supp. 21-5303(b), "[i]t is immaterial under subsection (a) that the actor fails to communicate with the person solicited to commit a felony if the person's conduct was designed to effect a communication." The word "encouraging" is a common term, plainly stated and easily understood, and is not dependent to the subjective feelings of the victims, as was the case in *Bryan*. In our case, the defendant's conduct—rather than the subjective understanding of the person solicited— is the standard for determining whether the crime has been committed.

Unlike *Kirby*, in which there was no universally accepted definition of the phrase "endangering of life," we have a clear, easily understood, and universally accepted

11

definition of the verb "encourage." A person of common intelligence is adequately notified of the prohibited conduct under our criminal solicitation statute. The language in the statute is clear and unambiguous.

In *Edmondson v. Pearce*, 91 P.3d 605, 631-32 (Okla. 2004), the Oklahoma Supreme Court found that the word "encourages" in the phrase "willfully instigates or encourages any cockfight" was not unconstitutionally vague because a person of ordinary intelligence could understand it and has fair notice of what conduct is prohibited. See also *State v. Todd*, 468 N.W.2d 462, 465-66 (Iowa 1991).

Johnson argues that there is no distinction between encouraging under the statute and protected free speech. But the court in *Edmondson* rejected a similar argument that the language of the cockfighting statute infringed upon First Amendment rights because "communication which incites the imminent lawless action of cockfighting does not constitute protected speech." 91 P.3d at 633.

A common person can understand the terms "commanding, encouraging, or requesting" without any definitions in the statute. K.S.A. 2016 Supp. 21-5303 does not contain terms that are confusing or susceptible to ambiguous or differing meanings. Thus, Johnson fails to demonstrate that the language in K.S.A. 2016 Supp. 21-5303 provides inadequate notification of the proscribed conduct.

*Vagueness: Subject to Arbitrary and Discriminatory Enforcement*

Johnson argues that the statute's language fails the precision necessary to protect against arbitrary and discriminatory enforcement. A statute is unconstitutionally vague if it fails to protect against arbitrary and discriminatory action by those responsible for enforcing it. *Bollinger*, 302 Kan. at 318.

Johnson relies on *Thelen v. State*, 272 Ga. 81, 82 526 S.E.2d 60 (2000), in which the court examined a noise ordinance and found that prohibiting unnecessary or unusual sound or noise which annoys others fails to clearly identify the prohibited conduct because whether a noise is unnecessary, unusual, or annoying to others depends on the listener. But in our present case, as we explained earlier in this opinion, there are no subjective elements included in K.S.A. 2016 Supp. 21-5303.

Johnson claims the statute allows a prosecution even though "real innocent explanations exist." He cites *State v. Adams*, 254 Kan. 436, 866 P.2d 1017 (1994); *Smith v. Fairmont*, 196 Kan. 73, 410 P.2d 73 (1966); and *People v. McCaughan*, 49 Cal. 2d 409 317 P.2d 974 (1957). But he provides no argument as to how these cases support his position.

Johnson also argues that K.S.A. 2016 Supp. 21-5303 is vague because it does not require corroborating evidence. He claims a requirement of corroborating evidence, such as required in Colorado (Colo. Rev. Stat. § 18-2-301[1] [1998]) and Texas (Tex. Penal Code Ann. § 15.03[b] [1994]), would remedy the problem that allows convictions based on the subjective interpretation of the person allegedly solicited. But, as demonstrated above, a conviction under our criminal solicitation statute is not dependent upon the mental state of the person solicited.

The language of K.S.A. 2016 Supp. 21-5303 gives fair warning of the proscribed conduct and adequately guards against arbitrary and unreasonable enforcement. It is not unconstitutionally vague on its face.

*Vagueness: Unconstitutionally Overbroad*

Johnson also asserts that K.S.A. 2016 Supp. 21-5303 is overbroad because it infringes upon his First Amendment right to free speech; does not contain an element requiring "imminent" conduct; and by prohibiting speech that encourages action, the statute does not use the least restrictive means to accomplish the goals of the statute.

A statute is facially invalid if it prohibits a substantial amount of protected speech. *United States v. Williams*, 553 U.S. 285, 292, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008). "An overbroad statute makes conduct punishable which under some circumstances is constitutionally protected." *Dissmeyer v. State*, 292 Kan. 37, 40, 249 P.3d 444 (2011). For an overbreadth argument to succeed, a defendant must establish that (1) the protected activity is a significant part of the law's target, and (2) there exists no satisfactory method of severing that law's constitutional from its unconstitutional application.

As noted earlier, K.S.A. 2016 Supp. 21-5303(a) prohibits "commanding, encouraging or requesting another person to commit a felony, attempt to commit a felony or aid and abet in the commission to attempted commission of a felony for the purpose of promoting or facilitating the felony."

Johnson argues that the solicitation statute is overbroad because it violates his free speech rights. But "[d]espite our First Amendment rights, we are not free to harm others under the guise of free speech." *State v. Whitesell*, 270 Kan. 259, 271, 13 P.3d 887 (2000).

> "'"[T]he goal of the First Amendment is to protect expression that engages in some fashion in public dialogue, that is "'communication in which the participants seek to persuade, or are persuaded; communication which is about changing or maintaining

14

beliefs, or taking or refusing to take action on the basis of one's beliefs.'" [Citations
omitted.]' . . . A statute that is otherwise valid, and is not aimed at protected expression,
does not conflict with the First Amendment simply because the statute can be violated by
the use of spoken words or other expressive activity.'" [Citations omitted.]" *Whitesell*,
270 Kan. at 271-72.

Our Supreme Court has repeatedly held that "expressive activity may be
prohibited if it 'involves substantial disorder or invasions of the rights of others. . . .
[Thus] violence or other types of potentially expressive activities that produce special
harms distinct from their communicative impact . . . are entitled to no constitutional
protection.'" *Whitesell*, 270 Kan. at 272 (quoting *Champagne v. Gintick*, 871 F. Supp.
1527, 1534 [D. Conn. 1994]). Johnson fails to explain how the State intervening in his
efforts to have his ex-wife murdered interferes with his free speech rights under the First
Amendment. K.S.A. 2016 Supp. 21-5303(a) does not violate Johnson's free speech rights.

With regard to Johnson's "imminence" argument, he fails to explain how a statute
is overbroad if it does not specify that the criminal action being solicited, such as his
murder-for-hire scheme, must be executed within some specified time period.

With regard to the argument that the statute does not use the least restrictive means
to accomplish its goals, Johnson fails to adequately explain how the use of the word
"encouraging" is unreasonably restrictive and that the use of the words "commanding"
and "requesting" would suffice to achieve the statute's goal.

K.S.A. 2016 Supp. 21-5303 is not unconstitutionally overbroad.

*Multiplicity*

Multiplicity is charging a single offense in several counts, creating the potential for multiple punishments for a single offense in violation of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10 of the Kansas Constitution Bill of Rights. *State v. King*, 297 Kan. 955, 970, 305 P.3d 641 (2013). See *State v. Overman*, 301 Kan. 704, Syl. ¶ 4, 348 P.3d 516 (2015); *State v. Schoonover*, 281 Kan. 453, 475, 133 P.3d 48 (2006).

Johnson claims his convictions are multiplicitous because the State's evidence showed a single ongoing attempt to hire first Nodwell and then Stites to murder his ex-wife. Multiplicity is an issue of law subject to unlimited review. *State v. Belt*, 305 Kan. 381, 407, 381 P.3d 473 (2016). We may address the issue of multiplicity for the first time on appeal in order to serve the ends of justice and prevent a denial of fundamental rights. *State v. Weber*, 297 Kan. 805, 809, 304 P.3d 1262 (2013).

The key inquiries in resolving a multiplicity claim are whether the convictions arise from the same conduct and whether, by statutory definition, there are two offenses or just one. *King*, 297 Kan. at 970. In determining whether a conviction arose from the same conduct, we consider four factors:  (1) whether the acts occurred at or near the same time; (2) whether the acts occurred at the same location; (3) whether there is a causal relationship between the acts as opposed to there being an intervening event; and (4) whether a fresh impulse motivated some of the conduct. *State v. Pribble*, 304 Kan. 824, Syl. ¶ 3, 375 P.3d 966 (2016).

Johnson cites several cases that involve the grouping of solicitation charges for the purposes of sentencing, but the cases cited do not hold that the convictions themselves are multiplicitous. See e.g., *United States v. Wilson*, 920 F.2d 1290, 1293 (6th Cir. 1990).

Johnson was charged with soliciting Nodwell, Stites, and Porterfield to murder Annie. He was convicted of soliciting Nodwell and Stites but acquitted on the charge relating to Porterfield. The convictions on the charges relating to Nodwell and Stites were not multiplicitous. They covered conduct in separate periods of time. They involved different individuals. The solicitations occurred at different locations. The solicitation of Stites occurred after the intervening event of Nodwell withdrawing from the plan. The State relied on separate evidence in proving each charge. Each of these charges constitutes a separate and distinct unit of prosecution. They are not multiplicitous.

*Sufficiency of the Evidence*

Johnson contends that the evidence presented at trial was insufficient to support his convictions because (1) the State relied on stacked inferences to support the conviction; (2) the State failed to prove sufficient evidence of imminence; (3) the evidence amounted to nothing more than discussions; (4) there was insufficient evidence that Johnson was the solicitor; (5) the State's case was based entirely on innuendo; (6) Stites' understanding of Johnson's request was based on impressions he received from Nodwell; and (7) the State failed to prove Johnson's specific intent. Johnson fails to provide adequate argument to support many of his contentions, but we will address each in turn.

In considering the sufficiency of the evidence to support a conviction, we view the evidence in a light favoring the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. *State v. Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015). In doing so, we do not reweigh the evidence or assess the credibility of witnesses. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016).

There is no distinction between direct and circumstantial evidence in terms of probative value. *State v. McBroom*, 299 Kan. 731, 754, 325 P.3d 1174 (2014). A verdict may be supported by circumstantial evidence if such evidence provides a basis from which the fact-finder may reasonably infer the existence of the fact in issue. The evidence need not exclude every other reasonable conclusion or inference. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016). Circumstantial evidence used to infer guilt must be proved and cannot be inferred or presumed from other circumstances. *State v. Richardson*, 289 Kan. 118, 127, 209 P.3d 696 (2009).

Johnson cites caselaw regarding stacked inferences, but he provides no argument regarding its application to this case. He fails to show how his convictions relied on stacked inferences.

Next, Johnson claims that there is insufficient evidence of imminence. By this, he apparently claims the State had to prove that he solicited Nodwell and Stites to immediately murder his ex-wife. The statute makes no reference to imminence. Johnson cites *Brandenburg v. Ohio*, 395 U.S. 444, 449, 89 S. Ct. 1827, 23 L. Ed. 2d 430 (1969), in which the court held that the Ohio Criminal Syndicalism Act was unconstitutional because it "purports to punish mere advocacy" and to forbid "assembly with others merely to advocate the described type of action." This has nothing to do with the sufficiency of the evidence. Besides, the crime is the solicitation, which is not predicated on the efficacy of the person solicited to carry out the plan.

Next, Johnson claims the evidence shows that he never went beyond mere discussion, and the State failed to prove that he crossed the threshold from mere discussion to action. He cites *State v. Gains*, 431 So. 2d 736 (Fla. 1983), for the proposition that serious discussions without a decision to proceed is insufficient. But here, there was ample evidence that Johnson went beyond mere discussion. With respect

to Nodwell, Johnson offered him money, provided details that would help Nodwell accomplish the murder, and suggested different scenarios for committing the crime. With respect to Stites, Johnson actually delivered the down payment to Stites for the crime. We reject Johnson's argument on this point.

Next, Johnson claims there is insufficient evidence that he was the solicitor. He relies on *People v. Salazar*, 140 Mich. App. 137, 362 N.W.2d 913 (1985), in which the informant did the soliciting and the defendant only responded to the informant's solicitations. But viewing the evidence as a whole, it is clear that Johnson solicited Nodwell and Stites to kill Annie. Neither Nodwell nor Stites sought out Johnson to see if he was interested in having his ex-wife murdered.

Next, Johnson argues there is insufficient evidence because the entire case is based on innuendo. For support, Johnson points to Stites' preliminary hearing testimony that Johnson never directly asked Stites to kill his ex-wife. But Johnson ignores the testimony the jury heard at trial. There was more than enough testimony, both direct and circumstantial, to support the jury's verdicts without resorting to any innuendo.

Next, Johnson refers to the testimony about him telling Stites that he had a van that needed to be hauled off. Johnson's argument is unclear, but he seems to be claiming that Stites had a preconceived notion of what Johnson was requesting, which led to a misinterpretation of Johnson's request. Again, this is a question for the jury. It was the jury's role to determine what Johnson was requesting and weigh the credibility of the witnesses. The jury had ample evidence with which to see through Johnson's thinly coded statements that made clear his intent to hire someone to murder his ex-wife.

Next, Johnson claims the evidence at trial was insufficient to establish that even if he solicited Nodwell or Stites, he did so with the specific intent that one of them murder

Annie. Once again Johnson cites his coded statements to Nodwell and Stites which were not only easily seen through by Nodwell and Stites but also by the jury in determining Johnson's intent to have his ex-wife murdered. There was ample evidence that Johnson intended Nodwell, and then Stites, to murder Annie.

Finally, Johnson points to the definition of "murder in in the first degree" in the jury instructions and asserts that there was no evidence that he killed Annie, as she was not murdered. But solicitation to commit murder does not require that the solicited crime be completed. Our Supreme Court has stated that the crime of solicitation "is complete when the person communicates the solicitation to another with the requisite mens rea. No act in furtherance of the target crime needs to be performed by either person." *State v. DePriest*, 258 Kan. 596, 604, 907 P.2d 868 (1995).

There was more than ample evidence to support Johnson's convictions.

*Jury Instruction: Affirmative Defense of Renunciation*

Johnson claims the district court erred in advising the jury about the law of renunciation in Jury Instruction Nos. 16 and 17 by replacing the terms "manifesting," "renunciation," and "purpose," with the terms "demonstrating," "abandonment," and "plan."

The protocol for reviewing jury instructions on appeal is well known to the parties and can be found in *State v. Fisher*, 304 Kan. 242, 256-57, 373 P.3d 78 (2016).

Jury Instruction Nos. 16 and 17 were appropriate, as they correctly stated the law on renunciation and were consistent with K.S.A. 2016 Supp. 21-5303(c) and PIK Crim. 4th 53.100 (2013 Supp.) and 51.050 (2013 Supp.). Besides, if there had been any error in

these instructions, the rule against invited error would apply. Jury Instruction Nos. 16 and 17 were given exactly as requested by Johnson. The invited error doctrine "effectively binds trial counsel to strategic decisions inducing judicial rulings with the purpose of obtaining favorable judgments for their clients." *State v. Hargove*, 48 Kan. App. 2d 522, 532, 293 P.3d 787 (2013). A litigant may not invite error and then complain of the error on appeal. *State v. Verser*, 299 Kan. 776, 784, 326 P.3d 1046 (2014).

This claim of error fails.

*Sufficiency of Evidence to Disprove Defense of Renunciation*

Jury Instruction No. 16 stated: "It is a defense to a charge of criminal solicitation that the defendant, after soliciting another person to commit a felony, persuaded that person not to do so or otherwise prevented the commission of the felony, under circumstances demonstrating a complete and voluntary abandonment of the defendant's criminal plan."

Jury Instruction No. 17 stated: "The defendant raises abandonment as a defense. Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant."

Johnson claims that the State failed to disprove that Johnson persuaded or prevented Nodwell and Stites from murdering his ex-wife.

As noted in Instruction No. 17, Johnson did not bear the burden of proving his defense of abandonment; it was the State's burden to disprove this defense. See K.S.A.

2016 Supp. 21-5108(c); *State v. Staten*, 304 Kan. 957, 965, 377 P.3d 427 (2016); *State v. Bethel*, 275 Kan. 456, 474, 66 P.3d 840 (2003).

Johnson's brief second thoughts about going forward with this murder-for-hire plot were based on his fear of getting caught. But there is no evidence that he decided to abandon the plan and tried to prevent Nodwell or Stites from going forward. Rather, he simply shifted his communications to the use of code words to thinly disguise his true intent. There is no evidence that he manifested "a complete and voluntary renunciation of [his] criminal purposes." K.S.A. 2016 Supp. 21-5303(c). Thus, if there was any error at all, it was the district court giving an instruction on Johnson's claimed abandonment of the plan when there is no evidence that he did, in fact, abandon the plan. The State presented substantial evidence from which a rational fact-finder could conclude that Johnson never abandoned the plan of soliciting Annie's murder.

*Jury Instruction: Jurisdiction and Venue*

The court instructed the jury in Jury Instruction No. 18 as follows:

> "If you find that the defendant committed criminal acts in this state which were a substantial and integral part of an overall continuing crime plan, and which were clearly in partial execution of that plan, the prosecution may be in this state or any other state in which such acts occur."

Johnson objected to this jury instruction on the basis that it was not a PIK instruction and because he claimed there was no evidence that the solicitation continued from Kansas to Missouri. Now, on appeal, he appears to be arguing that the instruction failed to inform the jury that it must find that the crime occurred in Johnson County.

As noted, we follow the protocol set forth in *State v. Fisher*, 304 Kan. at 256-57 in reviewing the district court's jury instructions. Further, when an objection to a jury instruction at trial is different from the argument presented on appeal, any error should be reversed only if giving the instruction was clearly erroneous. *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 (2012); *State v. Ellmaker*, 289 Kan. 1132, Syl. ¶ 1, 221 P.3d 1105 (2009).

K.S.A. 2016 Supp. 21-5106 provides:  "A person is subject to prosecution and punishment under the law of this state if:  (1) The person commits a crime wholly or partly within this state." K.S.A. 2016 Supp. 21-5106(b) provides that a crime is partly committed within this state if:  "(1) An act which is a constituent and material element of the offense; (2) an act which is a substantial and integral part of an overall continuing criminal plan; or (3) the proximate result of such act, occurs within the state."

Jury Instruction No. 18 was a proper statement of Kansas law. See *State v. Grissom*, 251 Kan. 851, 886-87, 840 P.2d 1142 (1992). Johnson argues that the instruction should have informed the jury that the crime occurred in Johnson County, not in the state. But Jury Instruction No. 18 related to the authority of the State to prosecute Johnson for the crime in Kansas. The instruction containing the elements of the crime included the requirement that the State prove that the crime occurred in Johnson County. The elements instructions accomplished the task of advising the jury that it must find that the crime occurred in Johnson County. We find no error in the court giving Jury Instruction No. 18.

*Kansas Jurisdiction when Evidence Obtained in Missouri*

With respect to the solicitation of Stites, Johnson claims that the Olathe Police Department illegally exercised its powers outside of its jurisdiction under K.S.A. 2016

Supp. 22-2401a by conducting an investigation and obtaining evidence in Kansas City, Missouri. Johnson relies on *State v. Vrable*, 49 Kan. App. 2d 61, 305 P.3d 35 (2013), in which the district court suppressed evidence obtained outside of the jurisdiction of the police who conducted a controlled drug buy. Our Supreme Court held there was no proper request for assistance that would have extended the territorial limits of the police under K.S.A. 2014 Supp. 22-2401a(2)(b).

Here, Johnson claims Stites had no authority to exercise his police powers in Missouri. But Johnson did not move to suppress the evidence obtained. The evidence was admitted at trial without this objection being asserted. K.S.A. 60-404 generally precludes an appellate court from reviewing an evidentiary challenge absent a timely and specific objection. *State v. Dupree*, 304 Kan. 43, 62, 371 P.3d 862 (2016). Johnson cites no applicable exception to this rule.

As a second argument, Johnson contends that his conduct was not a crime in Missouri. Whether his conduct was a crime in Missouri is irrelevant. K.S.A. 2016 Supp. 21-5106 controls, and it allows for the prosecution in Kansas when "the person commits a crime wholly or partly within this state." See K.S.A. 2016 Supp. 21-5106(a)(1). Here, part of the crime occurred in Kansas. Johnson's jurisdictional arguments are without merit.

*Alternative Means*

Johnson claims he was charged with alternative means of committing the crime of solicitation because the jury was instructed it could convict him of the crime if it found that he "encouraged or requested" another to commit the crime of first-degree murder.

Once again, the invited error doctrine applies to bar this claim because Johnson's proposed jury instruction informed the jury that it could convict Johnson if it found that he "intentionally encouraged or requested" another person to commit first-degree murder. See *State v. Schreiner*, 46 Kan. App. 2d 778, 791, 264 P.3d 1033 (2011) (applying the invited error doctrine to an alternative means claim).

*Language in Complaint*

Finally, Johnson claims the complaint was defective because it used the words "encouraged" and "requested" rather than "encouraging" and requesting."

*State v. Dunn*, 304 Kan. 773, 811, 814, 375 P.3d 332 (2015), recognizes the following three types of charging document defects. First, when it does not show that the charges are being filed in the correct court and territory. Second, when it does not allege facts which, if proved beyond a reasonable doubt, show the commission of a Kansas crime. Third, when it does not provide adequate notice of the charges.

Here, Johnson alleges that the complaint did not set out the essential elements of the crime. But *Dunn* only requires the complaint to contain all essential facts of the crime charged drawn in the language of the statute. Johnson does not contend the complaint left out essential facts.

K.S.A. 2016 Supp. 21-5303 states: "Criminal solicitation is commanding, encouraging or requesting another person to commit a felony, attempt to commit a felony or aid and abet in the commission or attempted commission of a felony for the purpose of promoting or facilitating the felony." Johnson seems to contend that the complaint must charge the defendant using the gerunds used in the statute as opposed to using the past tense of the verb form to indicate criminal conduct which occurred in the past but within

the applicable statute of limitations. We reject such a frivolous notion. The complaint adequately contains the facts which, if proved beyond a reasonable doubt, show that Johnson committed criminal solicitation, and he was provided adequate notice of the charges.

Affirmed.